IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

No. 13-17123

_____

TURTLE ISLAND RESTORATION NETWORK and CENTER FOR
BIOLOGICAL DIVERSITY,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL MARINE
FISHERIES SERVICE; PENNY PRITZKER, in her official capacity as Secretary
of the Department of Commerce, UNITED STATES DEPARTMENT OF THE
INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; and S.M.R.
JEWELL, in her official capacity as Secretary of the Interior,

Defendants-Appellees,

_____

On Appeal From The United States District Court For The District of Hawaiʻi
(Civil Action No. 12-00594 SOM RLP)

_____

**PLAINTIFFS–APPELLANTS' OPENING BRIEF**

_____

Paul H. Achitoff
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: achitoff@earthjustice.org
Attorneys for Plaintiffs–Appellants

January 29, 2014

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants Turtle Island Restoration Network, a non-profit corporation, and Center for Biological Diversity, a non-profit corporation, have no parent corporations, and do not issue stock.

Dated: January 29, 2014

/s/ Paul H. Achitoff
Paul H. Achitoff
EARTHJUSTICE
850 Richards St., Suite 400
Honolulu, HI 96813
Telephone:  (808) 599-2436
Facsimile:  (808) 521-6841

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................i

STATEMENT OF JURISDICTION.........................................1

STATEMENT OF THE ISSUES.........................................1

STATEMENT OF THE CASE .........................................3

STATEMENT OF FACTS .........................................6

    A.    The Sea Turtles.........................................6

    B.    Migratory Seabirds .........................................9

    C.    The Fishery .........................................10

SUMMARY OF ARGUMENT .........................................12

STANDARDS OF REVIEW .........................................16

ARGUMENT .........................................18

I.  THE FISH AND WILDLIFE SERVICE'S ISSUANCE OF A PERMIT ALLOWING THE FISHERY TO INCIDENTALLY KILL MIGRATORY ALBATROSS WAS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW AND THE DISTRICT COURT ERRED BY UPHOLDING IT .........................................18

    A.    Background .........................................18

    B.    The Permit Has No Legal Basis .........................................22

        1.    The Migratory Bird Treaty Act.........................................22

        2.    FWS's Regulation .........................................23

C.      Although Practicable Methods to Reduce or Eliminate Seabird Bycatch Exist, The Permit Fails to Require Any Modification to Fishery Operations or Other Conservation Benefit..............................27

D.      The District Court's Approval of FWS's Issuance of the Permit was Clearly Erroneous ...............................................................................30

II.    FWS'S REFUSAL TO EVALUATE ANY ALTERNATIVE TO A STATUS QUO EXEMPTION FROM THE MBTA VIOLATED THE NATIIONAL ENVIRONMENTAL POLICY ACT .....................................35

III.   NMFS VIOLATED THE ENDANGERED SPECIES ACT BY FAILING TO PEROPERLY ASSESS THE FISHERY'S IMPACTS ON ENDANGERED SEA TURTLES ..................................................................40

A.      Legal Framework ...........................................................................40

B.      NMFS Recently Reclassified Loggerheads as Endangered................43

C.      NMFS's Population Models ..............................................................45

D.      NMFS's Loggerhead "No Jeopardy" Opinion Relies on an Unlawful Analytical Approach .........................................................46

E.      The 2012 BiOp's Jeopardy Analysis for Leatherback Ignores the Best Available Science .................................................................50

IV.   NMFS FAILED TO MEANINGFULLY CONSIDER GOLBAL WARMING'S ADMITTED ADVERSE IMPACTS ON SEA TURTLES .............................................................................................55

CONCLUSION ...............................................................................................59

STATEMENT OF RELATED CASES ...........................................................61

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................62

# TABLE OF AUTHORITIES

**Page**

## PUBLISHED CASES

Alaska v. Fed. Subsistence Bd.,
    544 F.3d 1089 (9th Cir. 2008) ...........................................................................31

Alphonsus v. Holder,
    705 F.3d 1031 (9th Cir. 2013) .........................................................................31

Andrus v. Allard,
    444 U.S. 51 (1979)......................................................................................13, 22

Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife,
    273 F.3d 1229 (9th Cir. 2001) .........................................................................26

Blue Mountains Biodiversity Project v. Blackwood,
    161 F.3d 1208 (9th Cir. 1998)..........................................................................35

Blue Water Fishermen's Association v. National Marine Fisheries Service,
    226 F. Supp. 2d 330 (D. Mass. 2002)...............................................................42

Bob Marshall Alliance v. Hodel,
    852 F.2d 1223 (9th Cir.1988) ...........................................................................36

Brower v. Evans,
    257 F.3d 1058 (9th Cir. 2001) .........................................................................17

Center for Biological Diversity v. Pirie,
    201 F. Supp. 2d 113 (D.D.C. 2002), vacated as moot, Center for
    Biological Diversity v. England, No. 02-5163, 2003 WL 179848 (D.C.
    Cir. Jan. 23, 2003)............................................................................................25

Center for Biological Diversity v. Rumsfeld,
    198 F. Supp. 2d 1139 (D. Ariz. 2002) ...................................................52, 57, 58

Center for Biological Diversity v. Salazar,
    804 F. Supp. 2d 987 (D. Ariz. 2011) ................................................................55

Center for Food Safety v. Vilsack,
    718 F.3d 829 (9th Cir. 2013) ......................................................................39, 40

## PUBLISHED CASES (cont.)

Christopher v. SmithKline Beecham Corp.,
    __U.S. __, 132 S.Ct. 2156 (2012)........................................................................30

Citicorp Indus. Credit, Inc. v. Brock,
    483 U.S. 27 (1987)........................................................................................26

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971)......................................................................................34

Conner v. Burford,
    848 F.2d 1441 (9th Cir.1988) ........................................................49, 51, 54, 58

Corley v. United States,
    556 U.S. 303 (2009)......................................................................................24

Defenders of Wildlife v. Norton,
    258 F.3d 1136 (9th Cir. 2001) ......................................................................30

Dickinson v. Zurko,
    527 U.S. 150 (1999)......................................................................................17

Environmental Def. Ctr. v. Environmental Protection Agency,
    344 F.3d 832 (9th Cir. 2003) ........................................................................18

Forest Conservation Council v. Rosboro Lumber Co.,
    50 F.3d 781 (9th Cir. 1995) ..........................................................................17

Idaho Sporting Congress v. Rittenhouse,
    305 F.3d 957 (9th Cir. 2002) ........................................................................34

'Ilio'ulaokalani Coalition v. Rumsfeld,
    464 F.3d 1083 (9th Cir. 2006) ......................................................................34

Kern County Farm Bureau v. Allen,
    450 F.3d 1072 (9th Cir. 2006) ......................................................................54

Marsh v. Oregon Natural Resources Council,
    490 U.S. 360 (1989)......................................................................................18

**PUBLISHED CASES (cont.)**

Mass. v. Env. Prot. Agency,
  549 U.S. 497 (2007)............................................................26

Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.,
  463 U.S. 29 (1983).................................................18, 31, 38

Muckleshoot Indian Tribe v. United States Forest Serv.,
  177 F.3d 800 (9th Cir. 1999) ..............................................39

National Parks & Conserv. Ass'n v. Bureau of Land Management,
  606 F.3d 1058 (9th Cir. 2010) .......................................37, 38

National Wildlife Federation v. National Marine Fisheries Service,
  524 F.3d 917 (9th Cir. 2008) ...............................42, 43, 47

National Wildlife Federation v. United States Army Corps of Engineers,
  384 F.3d 1163 (9th Cir. 2004) .......................................33, 34

Natural Res. Def. Council v. Kempthorne,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) .......................52, 53, 55

New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
  514 U.S. 645 (1995)............................................................24

Ocean Mammal Institute v. Gates,
  546 F. Supp. 2d 960 (D. Haw. 2008).....................................36

Okanogan Highlands Alliance v. Williams,
  236 F.3d 468 (9th Cir. 2000) ..............................................16

Oregon Natural Resources Council v. Daley,
  6 F. Supp. 2d 1139 (D.Or. 1998) .........................................44

Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.,
  265 F.3d 1028 (9th Cir. 2001) ............................................53

**PUBLISHED CASES (cont.)**

Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,
606 F. Supp. 2d 1122 (E.D. Cal. 2008) ...............................................55

Pacific Rivers Council v. U.S. Forest Serv.,
668 F.3d 609 (9th Cir. 2012) .............................................................16

Price v. Stevedoring Services of America, Inc.,
697 F.3d 820 (9th Cir. 2012) .............................................................17

San Luis & Delta–Mendota Water Auth. v. Salazar,
760 F. Supp. 2d 855 (E.D. Cal. 2010) ...............................................58

Securities and Exchange Comm'n v. Chenery Corp.,
318 U.S. 80 (1943)..............................................................................30

Sierra Club v. Marsh,
816 F.2d 1376 (9th Cir. 1987) .........................................12, 41, 49, 58

Sierra Club v. United States Dept. of Agriculture,
116 F.3d 1482 (7th Cir. 1997) ...........................................................22

Sklar v. Comm'r,
282 F.3d 610 (9th Cir. 2002) .............................................................16

South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,
723 F. Supp. 2d 1247 (E.D. Cal. 2010) .............................................55

Southeast Alaska Conserv. Council v. Fed. Highway Admin.,
649 F.3d 1050 (9th Cir. 2011) ...........................................................35

Taproot Admin. Serv., Inc. v. Comm'r of Int. Rev.,
679 F.3d 1109 (9th Cir. 2012) ...........................................................26

Tenn. Valley Auth. v. Hill,
437 U.S. 153 (1978)......................................................................13, 49

Thomas v. Peterson,
753 F.2d 754 (9th Cir.1985) ..............................................................48

**PUBLISHED CASES (cont.)**

United States v. Apollo Energies, Inc.,
611 F.3d 679 (10th Cir. 2010) ....................................................22, 23

United States v. Corbin Farm Service.,
444 F. Supp. 510 (E.D. Cal.), aff'd on other grounds, 578 F.2d 259 (9th
Cir. 1978) .............................................................................................23

United States v. FMC Corp.,
572 F.2d 902 (2d Cir. 1978) ...............................................................22

United States v. Larionoff,
431 U.S. 864 (1977)..............................................................................26

United States v. Moon Lake Electric Ass'n,
45 F. Supp. 2d 1070 (D. Colo. 1999)...................................................22

Washington Toxics Coalition v. Environmental Protection Agency,
413 F.3d 1024 (9th Cir. 2005) .............................................................48

Western Watersheds Project v. Kraayenbrink,
632 F.3d 472 (9th Cir. 2011) ..............................................................34

Wild Fish Conservancy v. Salazar,
628 F.3d 513 (9th Cir. 2010) ..............................................................52

**UNPUBLISHED CASES**

Leatherback Sea Turtle v. National Marine Fisheries Service,
Civ. No. 99-00152 DAE, 1999 WL 33594329 (D. Haw. October 18,
1999) ....................................................................................................11

**UNITED STATES CODE**

5 U.S.C. § 706(2)(A)................................................................................17

5 U.S.C. § 706(2)(D)................................................................................17

16 U.S.C. § 703(a) ............................................................................19, 22

UNITED STATES CODE (cont.)                                    Page

16 U.S.C. § 1536(a)(2) ....................................................40

16 U.S.C. § 1536(b)(4) ....................................................24

16 U.S.C. § 1538(a)(1) ....................................................40

28 U.S.C. § 1291 ..............................................................1

28 U.S.C. § 1331 ..............................................................1

42 U.S.C. § 4332(2)(C) ...................................................35

42 U.S.C. § 4332(2)(E) ...................................................35

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 1500.1(a) ....................................................35

40 C.F.R. § 1502.13 .......................................................37

40 C.F.R. § 1502.14 ..................................................14, 35

40 C.F.R. § 1502.14(c) ..............................................15, 38

40 C.F.R. § 1508.9 .........................................................35

50 C.F.R. § 21.15 ...........................................................25

50 C.F.R. § 21.27 ....................................................passim

50 C.F.R. § 402.02 ...................................................40, 49

50 C.F.R. § 402.14(a) ....................................................41

50 C.F.R. § 402.14(g)(2) ...............................................42

50 C.F.R. § 402.14(g)(3) ...............................................42

50 C.F.R. § 402.14(g)(4) ...............................................41

50 C.F.R. § 402.14(g)(8) ...............................................41

Page

**CODE OF FEDERAL REGULATIONS (cont.)**

50 C.F.R. § 402.14(h)(3)............................................................41

50 C.F.R. § 402.14(i) ................................................................41

50 C.F.R. § 665.813(b)(1)..........................................................48

50 C.F.R. § 665.813(b)(2)..........................................................48

50 C.F.R. § 665.815 ..............................................................29, 32

**FEDERAL REGISTER**

76 Fed. Reg. 58,868 (September 22, 2011) ...............................9

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid. 201 ....................................................................32

**LEGISLATIVE HISTORY**

119 Cong. Rec. 42,913 (1973) .................................................13

2003 National Defense Authorization Act, Pub. L. No. 107-314, § 315(a),
116 Stat. 2,458, 2,509 (Dec. 2, 2002).................................25

International Convention for the Protection of Migratory Birds , 39 Stat.
1,702 (1916) .......................................................................22

**OTHER AUTHORITIES**

724 FW 2 (Aug. 6, 2003)..........................................................34

NMFS & FWS, Final ESA Section 7 Consultation Handbook
(March 1998) ..........................................................42, 49, 58

## STATEMENT OF JURISDICTION

This appeal arises from a judgment and order entered by the United States District Court for the District of Hawai'i, which had jurisdiction under 28 U.S.C. § 1331.

Final judgment was entered on August 23, 2013. Excerpts of Record ("ER") ER 70-71.[1] Plaintiffs-Appellants timely noticed their appeal on October 21, 2013. ER 66-69. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Did the district court err by concluding that the U.S. Fish and Wildlife Service (FWS) was authorized to issue a Special Purpose Permit to the National Marine Fisheries Service (NMFS) under the Migratory Bird Treaty Act (MBTA) and 50 C.F.R. § 21.27,[2] where the fishery is neither engaged in a "special purpose activity" nor in an activity that "relates to migratory birds"; where the use of the regulation's catch-all provision to authorize killing of migratory birds to avoid inconvenience to a commercial enterprise is antithetical to the specific examples in

---

[1] "ER" refers to the documents in the Excerpts of Record. The number corresponds to the Excerpts of Record's consecutive, Bates-stamped page. numbers.

[2] Pertinent statutes and regulations are set forth in the addendum bound with this brief.

the regulation and to the purpose of the MBTA; where FWS reversed its longstanding interpretation of its authority and supplied no standard for evaluating permit applications; and where Congress amended the MBTA specifically because it understood that the regulation does not authorize the incidental take at issue in this case?

2.      Did the district court err by concluding that FWS, in its Environmental Assessment (EA) prepared pursuant to the National Environmental Policy Act (NEPA) on the impacts of issuing the Special Purpose Permit, was not required to evaluate any alternatives that would require the commercial fishery to take any action to reduce its impacts or alter operations in any way, where the law requires evaluation of such alternatives and the record establishes practicable measures exist that would virtually eliminate harm?

3.      Did the district court err by concluding that the Biological Opinion (BiOp) NMFS prepared under Endangered Species Act (ESA) Section 7(a)(2) to analyze the impacts of allowing the fishery to catch endangered loggerhead sea turtles was adequate, where the court misallocated to Plaintiffs the burden of proving the impacts would jeopardize the species and disregarded NMFS's own analysis that the impacts would appreciably reduce the species' likelihood of survival and recovery, and NMFS applied an impermissible legal standard?

4.      Did the district court err by concluding that the BiOp NMFS prepared under ESA Section 7(a)(2) analyzing the impacts of allowing the fishery to catch

endangered leatherback sea turtles was adequate, where NMFS failed to use the best available data, and disregarded the advice of its own expert to use better, available data showing the fishery's impacts will substantially accelerate the species' extinction in the near future?

5.      Did the district court err by concluding that the BiOp NMFS prepared under ESA Section 7(a)(2) analyzing the impacts of allowing the fishery to catch endangered sea turtles was adequate, where NMFS disregarded substantial evidence that global warming is already undermining the species' survival and will continue to do so, by wrongly assuming the fishery's operation will end in 25 years, while the fishery in fact will continue indefinitely?

## STATEMENT OF THE CASE

This action challenges the U.S. Fish and Wildlife Service's unprecedented decision to exempt the Hawai'i-based longline swordfish fishery (Fishery) from the MBTA's strict prohibition against killing migratory birds, without requiring that it take any action to reduce its own impacts.  The Fishery incidentally catches and kills albatross and other protected seabirds during its operations because it does not use the best available bycatch avoidance methods.  The action also incidentally catches and kills endangered sea turtles, and this action challenges NMFS's decision to push two of these endangered species closer to extinction by allowing the Fishery to catch more of them with impunity.

3

On December 10, 2009, NMFS published a final rule, effective January 11, 2010, implementing Amendment 18 to the Fishery Management Plan governing the Fishery's operations under the Magnuson-Stevens Fishery Conservation and Management Act.  NMFS had imposed restrictions in 2004 on the amount of fishing in which the Fishery is allowed to engage to limit the Fishery's impacts on endangered sea turtles, and Amendment 18 removed them.  According to NMFS's analysis prior to Amendment 18, even without the Fishery's impacts, the likelihood that North Pacific loggerhead sea turtles will become quasi-extinct within the next three loggerhead generations was already over 83 percent.  ER 165.  Amendment 18 nevertheless also increased the number of loggerhead sea turtles NMFS authorized the Fishery to catch.

Plaintiffs Turtle Island Restoration Network and Center for Biological Diversity challenged Amendment 18 in Turtle Island Restoration Network, et al. v. Department of Commerce, et al., Civ. No. 09-00598 DAE (D. Haw. Dec. 16, 2009), alleging violations of ESA, NEPA, and MBTA regarding the Fishery's impacts on sea turtles and migratory seabirds.  The parties entered into a Stipulated Injunction vacating portions of a BiOp NMFS had prepared under the ESA for Amendment 18 increasing the Fishery's turtle bycatch, and NMFS's regulations authorization the increase.

Shortly thereafter, in September 2011, NMFS reclassified the loggerhead population, formerly designated as threatened, to endangered status under the ESA

because NMFS recognized the population faces extinction "now," not merely "in the foreseeable future," ER 128, based on "population sizes and trends, current and anticipated threats, and conservation efforts." ER 130. But only a few months later, on January 30, 2012, NMFS issued a new BiOp for Amendment 18, doubling the number of now-endangered loggerheads the Fishery is allowed to catch, from 17 to 34. For the first time in many years, NMFS also increased the allowed incidental catch of critically endangered leatherback sea turtles, from 16 to 26. ER 94-95.

Seeking to insulate itself from the MBTA claim Plaintiffs previously had alleged, NMFS applied to FWS for a permit allowing the Fishery to incidentally kill seabirds despite the MBTA's strict prohibition. FWS on August 24, 2012 issued the requested permit, allowing the Fishery to continue to kill hundreds of protected albatross without making any operational changes to reduce the Fishery's impacts, effectively exempting the commercial activity from the statute. Such a permit had never before been issued, nor been deemed lawful. On October 4, 2012, NMFS issued a final rule implementing the increased take levels for the leatherback and loggerhead sea turtles in the Fishery. ER 94-95.

Plaintiffs challenged these actions on November 5, 2012. By order entered August 23, 2013, the district court granted summary judgment for the defendants on all claims. ER 1. This appeal was timely taken from the court's judgment by notice filed October 21, 2013. ER 66.

**STATEMENT OF FACTS**

A.     <u>The Sea Turtles</u>

Sea turtles are among the most ancient creatures living on earth.  They were common 130 million years, during the age of dinosaurs in the Cretaceous period.  Six of the world's seven species of sea turtles are now in danger of extinction, with incidental bycatch in commercial fisheries being among the most significant causes.

Leatherback sea turtles (*Dermochelys coriacea*) are caught in the Hawai'i longline fishery and are unique among sea turtles in lacking a hard shell.  They are the largest of all sea turtles, and the most massive of all living reptiles; they may grow to a length of 7 feet and weigh up to 2,000 pounds.  Living in the open ocean and feeding primarily on jellyfish, leatherbacks can swim at speeds over 20 miles per hour and dive deeper than 3,000 feet.

Leatherback populations in the Pacific include Eastern Pacific populations nesting in Mexico and Costa Rica, and Western Pacific populations nesting primarily in Papua New Guinea, Papua, Indonesia, and the Solomon Islands.  According to NMFS, "past and present fisheries interactions have been, and continue to be, the greatest human impact on leatherback turtles" within the Western Central Pacific area affected by the Fishery.  ER 164.

"Catastrophic declines" have been observed in Pacific leatherback populations.  ER 174.  The "major nesting rookery at Rantau Bang in Terengganu,

Malaysia has collapsed from over 10,000 nests in 1956 to 20 or fewer nests in recent years." ER 173. "At Playa Grande, Costa Rica, considered the most important nesting beach in the Eastern Pacific, the number of nesting females dropped steadily from 1,367 in 1988-1989 (July-June) to 506 in 1994-1995 to 117 in 1998-1999." ER 171. In Pacific Mexico, "[t]ens of thousands of nests were likely laid on the beaches in the 1980s, but during the 2003-2004 season a total of 120 nests was recorded on the four primary index beaches combined." ER 172.

The largest known nesting site for the Western Pacific population, accounting for about 38 percent of the population, is at Jamursba-Medi, in Papua, Indonesia. Nesting numbers at Jamursba-Medi have dropped from over 13,000 nests recorded in 1984 to 1,865-3,601 recorded between 2001 and 2004, which equates to four nesting seasons. ER 172. More recently, the number of nests for the population has continued to drop, from 6,373 nests in 1996 to a low of 1,537 nests in 2010. ER 151. The Western Pacific Regional Fishery Management Council's (WESPAC's) Supplemental Environmental Impact Statement (EIS) for Amendment 18 describes the status of the second largest Western Pacific leatherback population, in Papua New Guinea, as "critical." ER 163.

The leatherback sea turtle has been listed since 1970 under the ESA as "endangered" throughout its entire range. The International Union for Conservation of Nature and Natural Resources' ("IUCN's") Red List is one conservation tool upon which NMFS (and FWS) relies, see ER 130, ER 145, ER

7

188, and is the world's most comprehensive inventory of the global conservation status of plant and animal species. The IUCN's Red List 2013 classifies the Western Pacific population of the leatherback at issue here as "Critically Endangered," facing an extremely high risk of extinction in the wild with an 83% decline over the last three generations. The IUCN concluded: "[T]his subpopulation will have declined by 96% by the year 2040, or one generation from now. This would correspond to a total subpopulation abundance of … 260 adult females total, and would represent an extremely diminished population."[3]

The Fishery also catches and kills loggerhead sea turtles (*Caretta caretta*). According to NMFS, "[t]he most significant manmade factor affecting the survival and recovery of the loggerhead is incidental capture in commercial and artisinal fisheries." ER 176. Also according to NMFS, all of the loggerheads the Fishery catches come from the North Pacific population that nests in Japan, and that population has declined by up to 90 percent in only the past 50 years. ER 130. In 1978, the loggerhead sea turtle was listed under the ESA as "threatened" throughout its range. On September 22, 2011—just before NMFS authorized increased loggerhead bycatch in the Fishery—NMFS reclassified the North Pacific loggerhead population as "endangered" under the ESA in recognition of its

---

[3] http://www.iucnredlist.org/details/summary/46967817/0 (last viewed January 16, 2014).

increased risk of extinction "now," rather than "in the foreseeable future." 76 Fed. Reg. 58,868 (September 22, 2011); ER 128.

B.     Migratory Seabirds

Mortality in longline fisheries has become the most critical global threat to albatross species. Most of the world's 21 albatross species are now globally threatened with extinction, due principally to incidental catch in longline fisheries. ER 187. Most of the birds caught in the Fishery are Black-footed albatross (*Phoebastria nigripes*) and Laysan albatross (*Phoebastria immutabilis*). The Black-footed albatross nests almost entirely in the Northwestern Hawaiian Islands, and "the primary threat to the Black-footed Albatross at sea is death by drowning on a longline hook." ER 188. The short-tailed albatross (*Phoebastria albatrus*), numbering only about 2,300 breeding pairs globally and listed as endangered under the ESA, also has been spotted in areas where the Fishery operates.

The death of even one Black-footed albatross has an exponential impact on the breeding success of the entire species. The birds mate for life, ER 189, and return to the same nest site each year to reunite with their mate. ER 190. If one mate fails to return to the nest, the remaining mate may miss several breeding cycles before it finds a new life-partner and mates. ER 189.

The IUCN classifies the Black-footed albatross as Near-Threatened, precautionarily predicting a "moderately rapid population decline over the next

three generations."[4]  The IUCN proposes that "best-practice mitigation measures in longline fisheries within the species' range" be adopted to conserve the species.[5]

C.    <u>The Fishery</u>

In longline fishing, a monofilament mainline is reeled out, or "set," and is suspended in the water column by floats.  Mainlines from a single vessel may be up to 60 miles long.  Branchlines are attached to the mainline at intervals, and each branchline carries a baited hook.  After the longline is set, the gear "soaks" for hours before being retrieved, or "hauled."  Longline fishing for swordfish is known as "shallow-set" fishing; the bait is set at depths of 30–90 meters (as compared to the deeper sets used in tuna longlining).  A typical swordfish set uses 700–1,000 hooks.  Shallow-set longline gear is set after sunset, with luminescent light sticks attached to the branchlines to attract fish, and hauled in the morning.  ER 147.

While the longline is being set but before the hooks sink, or when the hooks reemerge during haulback in the morning, seabirds see the bait, dive for it, are hooked and drown.  ER 155.  While the miles of baited hooks dangle in the water overnight, sea turtles may either ingest the baited hook or simply swim through the curtain of hooks and become hooked or entangled.  They drown, or if they survive long enough to be hauled to the fishing vessel and cut loose, despite the crew's

---

[4] http://www.iucnredlist.org/details/22698350/0 (last viewed January 16, 2014).

[5] Id.

efforts they may swim away with a large hook in their gut, or entangled in yards of line, and die later.  ER 152.

The court in <u>Leatherback Sea Turtle v. National Marine Fisheries Service</u>, Civ. No. 99-00152 DAE, 1999 WL 33594329 (D. Haw. October 18, 1999), determined that NMFS had violated NEPA by failing to prepare an EIS assessing the impacts of the Fishery's activities.  The Court enjoined most swordfish longlining pending NEPA compliance.

In 2001, NMFS issued an EIS and a BiOp pursuant to ESA Section 7(a)(2), in which NMFS concluded that the Fishery was jeopardizing the continued survival of several species of sea turtles.  To reduce this impact, NMFS prohibited all Hawaiʻi-based swordfish longlining beginning in 2002.

On April 2, 2004, NMFS reopened the Fishery subject to restrictions designed to limit sea turtle mortality.  In particular, NMFS limited the Fishery to 2,120 sets per year, and required that it use modified fishing gear (<u>e.g.</u>, a "circle hook" rather than a "J hook," and mackerel instead of squid for bait).  NMFS also imposed a "hard cap" on turtle bycatch, requiring that if the Fishery caught 16 leatherbacks or 17 loggerheads in a given fishing season (a calendar year), the Fishery would have to close for the remainder of the calendar year.

These operational changes to the Fishery have reduced the number of sea turtle deaths, but the Fishery continues to catch them.  Since reopening, the Fishery has been closed twice because it reached the hard cap limits, once for loggerheads

and once for leatherbacks.  To keep the Fishery running nonstop all year without concern about reaching the caps, the Western Pacific Regional Fishery Management Council (WESPAC) (chaired almost continuously by presidents of the Hawaii Longline Association, Defendant-Intervenor below) has repeatedly pushed to increase the number of endangered turtles the Fishery is allowed to catch.  However, as discussed below, NMFS's own analyses reveal the population trends for these endangered species are not promising.  As noted, NMFS recently reclassified the loggerhead as endangered in recognition of its increasingly precarious status, and it acknowledges global warming presents a serious threat.

## SUMMARY OF ARGUMENT

Recognizing that both regulators and regulated industries very often find conservation inconvenient, Congress demanded in the National Environmental Policy Act that agencies closely examine their environmental impacts and alternatives to them before making a decision, and included in both the Migratory Bird Treaty Act and the Endangered Species Act strict conservation mandates, emphatically expressed.  ESA Section 7(a)(2) requires that federal agencies "insure" their actions are not likely to jeopardize the continued existence of any endangered species.  This duty  is "rigorous," <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1385 (9th Cir. 1987), and agencies are required to give the benefit of any doubt to the species.  <u>Id</u>. at 1386.  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."  <u>Tenn.</u>

Valley Auth. v. Hill, 437 U.S. 153, 184 (1978).  Congress underscored this intent:

"[T]he agencies of Government can no longer plead that they can do nothing about it.  They can, and they must.  The law is clear." 119 Cong. Rec. 42,913 (1973).

Similarly, the MBTA, implementing treaties with four nations, is a strict liability statute with "comprehensive" and "expansive" prohibitions against harming or killing migratory birds.  Andrus v. Allard, 444 U.S. 51, 59, 60 (1979).  Killing even small numbers accidentally has for decades resulted in criminal prosecution.

Yet, although the ESA expresses the "conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies," Tenn. Valley Auth., 437 U.S. at 185, and although in the MBTA's nearly hundred-year history no business had ever been granted permission to incidentally kill migratory birds, in this case the agencies' extraordinary solicitude for a commercial fishery resulted in unprecedented actions antithetical to Congressional intent.

Neither the MBTA nor FWS's implementing regulations contains an exception to the statute's broad prohibition against harming migratory birds that would allow the Fishery to incidentally kill them.  Consequently, prior to this case, FWS consistently refused requests for permits like the one challenged here.  In fact, after FWS had repeatedly rejected the Navy's applications for such a permit, Congress in 2002 amended the MBTA to allow the military to incidentally kill

13

birds during training exercises under strictly limited circumstances, and FWS issued a narrow regulatory exemption for that purpose alone, because the MBTA and existing regulations otherwise prohibited it.

Reversing decades of agency interpretation and practice, and the sharp and widespread criticisms of its expert staff, FWS nonetheless issued a permit granting the commercial Fishery an exemption from the MBTA to continue incidentally killing migratory birds, without any requirement to use the best available avoidance methods, reduce the Fishery's impacts, or alter operations at all. FWS offered no standard or guidance for determining when such permits are appropriate, nor acknowledged its about-face, simultaneously acknowledging the permit was unprecedented but denying it created a precedent. The court below upheld the permit by deferring to FWS, but according to settled legal principles no deference is due FWS's new, and erroneous, interpretation.

Despite NEPA's requirement that FWS examine all reasonable alternatives to the permit—the "heart" of the NEPA process, 40 C.F.R. § 1502.14—FWS in its EA refused to examine any alternative requiring the Fishery to do anything to reduce its impacts, while the record is replete with evidence of practicable measures that would do so. FWS relied on a clearly erroneous legal principle: that it was not required to look at any alternative if implementation was not entirely under its own control. The law is exactly the opposite. 40 C.F.R. § 1502.14(c) (FWS must evaluate "reasonable alternatives not within the jurisdiction of the lead

14

agency.")  The district court in upholding this clearly erred, wrongly concluding this Court recently had changed this fundamental legal command.

In allowing the Fishery to catch more endangered sea turtles than it has in a decade while the turtle populations continue to decline, NMFS ignored not only the ESA's clear mandate but its own studies, population analyses, findings, and experts in placing the Fishery's convenience ahead of Congress' intent.  NMFS acknowledged that the loggerhead turtles it had just designated endangered are further declining and offered no prediction that this trend will reverse, and also admitted that allowing the Fishery to catch them will exacerbate the problem substantially.  Its cavalier rationales for nonetheless authorizing the Fishery to not only catch them, but catch more of them—that the population may well go extinct regardless due to the many threats it faces—violates ESA Section 7(a)(2), the implementing regulations, and this Court's controlling precedent.  While acknowledging the serious existing and ongoing threat to the species' survival presented by global warming, NMFS excluded any of those impacts from its analysis of the species' future prospects, also in violation of Section 7(a)(2).  This time, NMFS relied on the unfounded assertion that the Fishery will end in twenty-five years, and global warming's impacts will not be experienced within that time, while the record establishes that the Fishery has no time limit, and the effects are being felt by the species already.

In upholding these actions the district court relied on clearly erroneous legal standards and factual assumptions. The court repeatedly misallocated to Plaintiffs the burden of proving the Fishery was jeopardizing endangered species; gave the benefit of any doubts or ambiguities to NMFS, rather than to the endangered species as Congress and this Court directed; deferred to agency arguments and factual assertions contrary to the record; chastised Plaintiffs for citing criticism in the record from the agencies' own experts, rather than the agencies for ignoring it; and misconstrued this Court's precedent. The court's ruling is riddled with error, strips imperiled species of the protections Congress gave them, and must be reversed.

## STANDARDS OF REVIEW

1.     This Court reviews de novo a district court's summary judgment decision. Pacific Rivers Council v. U.S. Forest Serv., 668 F.3d 609, 617 (9th Cir. 2012). No deference is owed the district court. Sklar v. Comm'r, 282 F.3d 610, 612 (9th Cir. 2002).

2.     Whether an Environmental Assessment satisfies the requirements of the National Environmental Policy Act is a question of law reviewed de novo. Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 471 (9th Cir. 2000).

3. The district court's interpretation of the Endangered Species Act is reviewed de novo. Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 783 (9th Cir. 1995).

4. An agency's interpretation or application of a statute is a question of law reviewed de novo. Brower v. Evans, 257 F.3d 1058, 1065 (9th Cir. 2001).

5. Deference to an agency's interpretation of its regulations is unwarranted where "there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. Indicia of inadequate consideration include conflicts between the agency's current and previous interpretations; signs that the agency's interpretation amounts to no more than a convenient litigating position; or an appearance that the agency's interpretation is no more than a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." Price v. Stevedoring Services of America, Inc., 697 F.3d 820, 830 n.4 (9th Cir. 2012) (internal quotations and citations omitted).

6. Agency action must be set aside if it is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. Dickinson v. Zurko, 527 U.S. 150, 152 (1999); 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary and capricious if the agency relied on factors Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The court " 'may not supply a reasoned basis for the agency's action that the agency itself has not given.' " Id. (quoting Security Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947)). The inquiry, though narrow, must be searching and careful, Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989), and the agency must articulate a rational connection between the facts found and the conclusion reached. Environmental Def. Ctr. v. Environmental Protection Agency, 344 F.3d 832, 858 n.36 (9th Cir. 2003).

## ARGUMENT

I.  THE FISH AND WILDLIFE SERVICE'S ISSUANCE OF A PERMIT ALLOWING THE FISHERY TO INCIDENTALLY KILL MIGRATORY ALBATROSS WAS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW AND THE DISTRICT COURT ERRED BY UPHOLDING IT

A.  Background

During the 19th century, the passenger pigeon may have been the most abundant bird on earth, with numbers that defy comprehension. Thunderous flocks hundreds of miles long, blotting out the sun, took days to pass overhead; a single flock was estimated to contain over *three billion* birds—ten times the current world

population of the familiar rock pigeon. This year marks the one hundredth anniversary of the death of the last passenger pigeon, in the Cincinnati Zoo.

Twenty-six species affected by longline fisheries, including 18 species of albatross, are now threatened with extinction. ER 152. The Hawaiʻi-based longline swordfish fishery (Fishery) hooks and drowns albatross during commercial fishing operations. Vessels reel out lines up to sixty miles long carrying hundreds of baited hooks, and when seabirds see the bait, they dive for it, are hooked, and drown. NMFS requires bycatch avoidance measures that have reduced mortality, but NMFS fails to require the most effective practicable methods, so seabird deaths continue unnecessarily, as well as unlawfully.

In previous litigation, plaintiffs alleged NMFS, by authorizing the Fishery, is violating the Migratory Bird Treaty Act, which makes it "unlawful at any time, by any means or in any manner," to "take, capture, [or] kill" any listed migratory bird. 16 U.S.C. § 703(a). Settlement left the merits of that claim unadjudicated, but "to gain legal coverage" in response to the lawsuit, ER 161, NMFS applied to the United States Fish and Wildlife Service for a regulatory exemption—a permit allowing the Fishery to incidentally kill however many birds it happens to kill, without any changes to the status quo, which NMFS refused to consider. ER 123; ER 83.

A study defendants sponsored acknowledges: "Mortality in longline fisheries is the most critical global threat to most albatross and large petrel

species." ER 178.  The Fishery most often catches Black-footed and Laysan albatross.  According to FWS's Final Environmental Assessment for the permit (Final EA), FWS classifies both species as Birds of Conservation Concern, the State of Hawaiʻi lists the Black-footed albatross as threatened, and the IUCN "listed the Black-footed Albatross as Endangered and the Laysan Albatross as Vulnerable in 2003 in response to the threat posed by longline fisheries in the North Pacific."  ER 145.

FWS on August 24, 2012 issued a Special Purpose Permit (Permit) allowing the Fishery to operate without alteration and kill up to 191 Black-footed albatross, 430 Laysan albatross, 30 northern fulmars, 30 sooty shearwaters, and one short-tailed albatross over three years, which are the numbers the Fishery is expected to catch on average, rather than limits FWS imposed based on conservation analyses. FWS staff acknowledged that permitting the Fishery, as a commercial operation with "no benefit to migratory birds," to incidentally kill birds with impunity was "precedent-setting."  ER 81; ER 124 ("highly precedent-setting").  FWS had previously issued such a permit only for "conservation activities that are intended to benefit migratory birds … such as the eradication of non-native predators."  ER 82.  The Permit was a "unique, first-time undertaking," ER 82, the "first time this [was] done for a non-conservation purpose."  ER 88.  As discussed below, this was not because no such applications had previously been made, but because FWS never granted them.

20

The Permit imposes no requirement to minimize or reduce harm, nor even to develop methods to do so.  It allows the Fishery to continue the status quo while exempting it from the MBTA, to avoid any inconvenience or economic effect whatsoever on business operations.

FWS had for decades interpreted its authority as precluding issuance of such permits.  FWS, without explanation, reversed its position to justify issuance of the Permit, and now claims authority to allow any number of mortalities if it deems an application somehow "compelling."  FWS offered no standard or guidance for assessing permit issuance.  ER 140 ("we have no regulatory framework [or] national policy… to inform this issuance of such a permit.").  Granting summary judgment for FWS, the district court deferred to FWS's new interpretation.  ER 21.

Allowing FWS to exempt businesses from the MBTA without conservation benefit or meaningful standards flies in the face of congressional intent, prior agency interpretation and practice, and judicial interpretation.  The court's decision turns decades of MBTA jurisprudence on its head, and opens the door to FWS allowing any number of migratory bird mortalities under circumstances never before deemed lawful, under any circumstance FWS happens to find "compelling," to avoid industry inconvenience.  The district court's erroneous, unprecedented holding must be reversed.

B.   <u>The Permit Has No Legal Basis.</u>

    1.   <u>The Migratory Bird Treaty Act</u>

The MBTA was enacted to implement the International Convention for the Protection of Migratory Birds between the U.S. and Britain (for Canada), 39 Stat. 1,702 (1916).  By later amendments it implemented treaties between the U.S. and Mexico, Japan, and Russia.  "The fundamental prohibition in the Migratory Bird Treaty Act is couched in … expansive" language, <u>Andrus</u>, 444 U.S. at 59, and imposes strict liability for harming migratory birds.[6]

    The government has for decades criminally prosecuted companies harming even small numbers of birds incidentally in the course of otherwise lawful commercial activities, and continues to do so.  <u>See</u>, <u>e.g.</u>, <u>United States v. Apollo Energies, Inc</u>., 611 F.3d 679 (10th Cir. 2010) (failure to bird-proof oil drilling equipment resulting in bird deaths); <u>United States v. FMC Corp</u>., 572 F.2d 902 (2d Cir. 1978) (bird deaths related to pesticide use); <u>Sierra Club v. United States Dept. of Agriculture</u>, 116 F.3d 1482 (Table) (7th Cir. 1997) (logging during nesting periods that could kill birds); <u>United States v. Moon Lake Electric Ass'n</u>, 45 F. Supp. 2d 1070 (D. Colo. 1999) (failure to install protective equipment on power poles).

---

[6] <u>See</u> 16 U.S.C § 703(a) (unlawful to "pursue, hunt, take, capture, kill, attempt to take, capture or kill, [or] possess … any migratory bird … or any part, nest, or egg of any such bird….")

In <u>United States v. Corbin Farm Service</u>., 444 F. Supp. 510 (E.D. Cal. 1978), <u>aff'd on other grounds</u>, 578 F.2d 259 (9th Cir. 1978), a company was held liable for accidentally poisoning ducks by applying pesticide to a crop, noting the statute made it illegal to kill migratory birds "by any means or in any manner." <u>Id</u>. at 532. In <u>Apollo Energies</u>, the court held oil drilling companies strictly liable after a half-dozen birds were discovered lodged in equipment, finding this result compelled by the statute's plain language and supported by decisions of Courts of Appeal in at least seven other circuits. 611 F.3d at 684-86.

The Fishery's actions are indistinguishable—except that the Fishery kills more birds than these other operations, year after year, and now has a permit. An FWS administrator therefore noted: "[T]hese [other] entities could make a much stronger case for their situations being a compelling justification compared to the fishing activities at issue in this case," and feared "this will lead to problems for law enforcement." ER 153.

2.     FWS's Regulation

FWS issued the Permit under 50 C.F.R. § 21.27, for "special purpose activities related to migratory birds," where the applicant "makes a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification." The district court "inferred" that FWS found NMFS's application "compelling,"

23

ER 21, and concluded this allowed FWS to exempt the Fishery.  Id.  The court

erred; the regulation does not authorize the Permit.

First, the regulation's plain language limits permits to activities specifically

directed at migratory birds, not activities incidentally killing them.  An ongoing

fishing business is not a "special purpose activity"; it has no "special purpose"

beyond catching fish.  Nor does fishing "relate to migratory birds," unless every

activity that happens to somehow harm birds thereby "relates" to them (and does

not "relate" to them if it happens not to harm any).  The court erroneously read the

regulation as requiring that the Permit relate to migratory birds, which of course it

does.  ER 26.  The regulation instead requires that the permitted activity relate to

migratory birds, which it does not.  If not absurd, these strained interpretations

necessary to apply the regulation to the Fishery make the language superfluous or

inoperative and are disfavored.  Corley v. United States, 556 U.S. 303, 314 (2009)

(interpretation should give effect to all provisions, with no part inoperative or

superfluous, void or insignificant).  See also New York State Conf. of Blue Cross

& Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655-56 (1995) (scope of

"related to" in a statute must consider statute's purpose).  An FWS administrator

rightfully asked: "Since when can we pick phrases that don't suit our perceived

immediate needs and redefine them for the purposes of a particular action?" ER 80.

Second, Congress knows how to allow incidental take of protected species

when it wants to.  E.g., 16 U.S.C. § 1536(b)(4) (allowing incidental take of

endangered species under specified conditions).  The MBTA nowhere authorizes

incidental take.  In Center for Biological Diversity v. Pirie, 201 F. Supp. 2d 113

(D.D.C. 2002), vacated as moot, Center for Biological Diversity v. England, No.

02-5163, 2003 WL 179848 (D.C. Cir. Jan. 23, 2003), the court held that,

notwithstanding national security concerns following 9/11, when the Navy was

training for missions in the Middle East, the MBTA compelled enjoining military

readiness activities incidentally killing migratory birds.  FWS had repeatedly

denied the Navy's application for precisely the type of incidental take permit at

issue in this case, under the same regulation.  The Navy consequently sought a

statutory amendment, and Congress amended the statute to provide that, until FWS

promulgated a regulatory exemption, the statute "shall not apply to the incidental

taking of a migratory bird by a member of the Armed Forces during a military

readiness activity…."  2003 National Defense Authorization Act, Pub. L. No. 107-

314, § 315(a), 116 Stat. 2,458, 2,509 (Dec. 2, 2002).  The amendment strictly

limits the exemption to actual readiness activities and excludes routine operations,

and requires that the military identify measures to "minimize and mitigate, to the

extent practicable," any impacts on migratory birds.  Id. § 315(b),(f),116 Stat. at

2,510.  FWS issued the military's regulatory exemption in 50 C.F.R. § 21.15.

This amendment and regulatory action show neither Congress nor FWS

interpreted 50 C.F.R. § 21.27 as allowing FWS to authorize incidental take in

military training; *a fortiori* it does not sanction it incidental to commercial activity

25

like the Fishery.  See Citicorp Indus. Credit, Inc. v. Brock, 483 U.S. 27, 35 n.7

(1987) ("Had Congress intended the 1938 Act to exempt innocent parties

generally, amendment would have been unnecessary."); Taproot Admin. Serv., Inc.

v. Comm'r of Int. Rev., 679 F.3d 1109, 1118 (9th Cir. 2012).

Third, even if, despite the absence of any authorizing provision, Congress

intended to allow incidental take, and even if longlining were a "special purpose

activity" that "relates" to migratory birds, the proper scope of permits cannot, as

the district court concluded, be limited only by whatever "justification" FWS may

find "compelling."  MBTA § 701 allows the agency to regulate only "as may be

necessary to carry out the purposes of" the statute, and that purpose is "to aid in the

restoration of [migratory] birds," not to maximize profitability in commercial

enterprises by allowing them to kill however many birds as may be convenient.

United States v. Larionoff, 431 U.S. 864, 873 (1977) (regulations "must be

consistent with the statute under which they are promulgated."); Mass.  v. Env.

Prot. Agency, 549 U.S. 497, 532-35 (2007) (agency's "reasons for action or

inaction must conform to the authorizing statute."); Arizona Cattle Growers' Ass'n

v. United States Fish and Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001) (court

must not "rubber-stamp … administrative decisions that [it] deem[s] inconsistent

with a statutory mandate or that frustrate the congressional policy underlying a

statute.") (citations omitted).

C.     <u>Although Practicable Methods to Reduce or Eliminate Seabird Bycatch Exist, The Permit Fails to Require Any Modification to Fishery Operations or Other Conservation Benefit.</u>

NMFS offered as the Permit's sole "compelling justification" that the Fishery (like almost any business) contributes to the economy. ER 17. Its application baldly asserted: "The continued operation of the shallow-set fishery provides a net benefit to the Nation." ER 191. The record contains no analysis of any potential economic impacts of requiring reduction or even elimination of migratory bird take. In the few sentences FWS devoted to economic impacts in its Final EA, FWS acknowledged they likely would be very modest. ER 146. <u>See also</u> ER 80 ("[T]here are other sectors that we refuse to give incidental take permits to that have a far greater economic impact than the small long-line fishery (the EA admits that the economic impact is small))."

Although the court concluded insulating the Fishery from any expense was a sufficiently "compelling justification," FWS's expert staff disagreed. <u>See</u> ER 91 ("we can only permit the fishery as it stands now IF they show a <u>net benefit</u> in some manner to seabirds (per the permit conditions). That would require some sort of additional measure(s)....") (emphasis added). FWS staff noted that agency practice dictated that concerns about costs of statutory compliance "do not constitute a compelling justification for permit issuance," ER 126, and that NMFS's proffered justification was "not remotely adequate." ER 87. <u>See also</u> ER 80 ("The definition of "compelling interest" has **never** been interpreted...to be

27

exclusively the economic viability of a privately-owned commercial activity.")

Nor was NMFS entitled to "a permit that yields no change for the better and simply

authorizes the status quo because 'take is much lower than it was 15 years ago.'"

ER 83.  Consistent with Congress' and FWS' terms for allowing the military a

limited exemption, drafts of FWS's EA (but the not the final) provided that Section

21.27 required that take be "minimized to the maximum extent possible, and the

remaining take cannot practicably be avoided."  ER 156-157.

The Permit does not require eliminating take to the maximum extent

practicable—nor any attempt to reduce it at all.  The record contains extensive

evidence of practicable methods, superior to those the Fishery now requires, that

virtually eliminate seabird bycatch.  In "side-setting," for example, the longline is

reeled out over the vessel's side instead of the stern; the baited hooks travel along

the side of the moving vessel and sink before seabirds can reach them.  ER 139.  A

defendant-sponsored study reports that "side-setting had the lowest mean seabird

contact and capture rates of all treatments tested.  Side setting reduces the

incidence of seabird captures to close to zero…."  ER 178; see also ER 182

("shown to virtually eliminate bird capture (efficacy range 99.6-100%)").  NMFS

prepared an EIS in 2005 comparing bycatch mitigation regimes, showing that only

side-setting could eliminate bycatch.  See ER 183-185 (alternatives SB8A, SB8B).

Because side-setting is not only effective but provides substantial operational

benefits to longline vessels, "broad industry uptake and voluntary compliance is

28

realistic."  ER 179.  See also ER 168-169 (same).  Thus, "[t]he potential exists for this to be the first seabird bycatch problem in a longline fleet to be reliably and permanently solved, entailing minimal expenditure for compliance."  ER 179.

But NMFS does not require side-setting, so few of the Fishery vessels use it. NMFS instead requires use of blue-dyed bait.  50 C.F.R. § 665.815.  The record establishes that dying squid bait blue can significantly reduce seabird bycatch, but blue-dyed fish bait (as the Fishery now uses) does not.  ER 166 ("Our results suggest that blue-dyed fish are unlikely to be effective as a long-term seabird bycatch mitigation technique.")  Blue-dyed bait also is "impractical" and therefore unlikely to be utilized consistently on the high seas.  ER 169; ER 181.

FWS's expert staff repeatedly noted the Fishery fails to employ the most effective bycatch avoidance methods.  E.g., ER 79 ("[W]e disagree that current regulations have reduced take in this fishery to the maximum extent practicable."); ER 78 ("[T]he most effective method identified in this study for avoiding take of seabirds [] is one that has fallen out of use: side-setting with 60g weighted branchlines."); ER 92 ("Recent research on seabird by-catch avoidance must be considered and incorporated ('best available'), and I suspect NMFS will not go along with this willingly.  We must do this in permitting incidental take under MBTA ….") (emphasis added); ER 89 ("[T]he Hawaii-based fishery is among the only longline fisheries in the world that doesn't use streamer lines…."); ER 84 (Fishery "probably can reduce take further simply/inexpensively"); ER 80

("Conservation measures that avoid and minimize lethal take have not been employed to the maximum extent possible (one example: side-setting of lines)").

    D.    <u>The District Court's Approval of FWS's Issuance of the Permit was Clearly Erroneous</u>

The court below deferred to the interpretation of "other compelling justification" FWS created to insulate the Fishery from any expense and litigation risk, casting aside decades of prior interpretation and practice. ER 27. This violates established principles. Deference is unwarranted "when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a 'convenient litigating position.' " <u>Christopher v. SmithKline Beecham Corp.</u>, __U.S. __, 132 S.Ct. 2156, 2166-67 (2012) (citations omitted). <u>See</u> <u>also</u>, <u>Defenders of Wildlife v. Norton</u>, 258 F.3d 1136, 1145 n.11 (9th Cir. 2001) (deference not due to interpretation "newly minted, it seems, for this lawsuit, and inconsistent with prior agency actions….") (internal citation and quotation marks omitted).

"[T]he grounds upon which the administrative agency acted [must be] clearly disclosed and adequately sustained." <u>Securities and Exchange Comm'n v. Chenery Corp.</u>, 318 U.S. 80, 94 (1943). Yet, while FWS's new interpretation may be implicit in its decision, <u>see</u> ER 21 ("inferring" that FWS found NMFS's application "compelling"), FWS failed even to describe just what that interpretation is, or how FWS would apply it in any other circumstance. Courts

"do not afford <u>Chevron</u> or <u>Skidmore</u> deference to litigation positions unmoored from any official agency interpretation…." <u>Alaska v. Fed. Subsistence Bd.</u>, 544 F.3d 1089, 1095 (9th Cir. 2008). Indeed, to avoid accountability, FWS expressly rejected any need for consistency. <u>See</u> ER 143 (claiming authority to allow take on a "case-by-case basis, regardless of precedent."); ER 144 ("unprecedented" permit "will not establish national standards for conditions under which we might authorize incidental take of migratory birds").

FWS failed even to acknowledge its position had changed, let alone explain its dramatic shift, further undermining any entitlement to deference. <u>Alphonsus v. Holder</u>, 705 F.3d 1031, 1046 (9th Cir. 2013) ("an agency must acknowledge that it is indeed changing course, and it must provide a reasoned explanation"); <u>see</u> <u>also</u> <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.")

The district court summarily rejected that 50 C.F.R. § 21.27 by its terms does not apply to an incidental take permit for a business having no connection to birds other than happening to kill them incidentally, ER 22, although as noted, the court materially misread the regulation by assuming the Permit, rather than the permitted activity, must relate to birds. ER 26. In concluding that some unquantified, unassessed economic impact to the Fishery may constitute a "compelling justification" for exempting a business from a statute, the court

31

emphasized its view that the doctrine of *ejusdem generis* does not necessarily compel interpreting the catch-all phrase to require any conservation purpose. ER 24-26. Yet FWS's own official policy ties "compelling justification" to the regulation's preceding, conservation-based examples:

> [A]pplicants [must] demonstrate a legitimate purpose for engaging in migratory bird-related activities that are not otherwise provided for by any standard permit. The applicant must make a sufficient showing of compelling justification <u>such as benefit to the migratory bird resource, concern for individual birds, or important research reasons</u>.

724 FW 2 (Aug. 6, 2003)(emphasis added).[7] <u>See also</u> ER 154 ("In looking at the other reasons we would issue a special purpose permit, they are all related to benefits to the birds or our knowledge of them. In no way does this imply that an economic benefit to humans is justification for issuing such a permit.")

The court found that, if 50 C.F.R. § 21.27 does require a conservation benefit, the Permit "impos[es] restrictions to protect birds." ER 26. This is erroneous. The Permit imposes no new restrictions, nor requires any conservation actions, beyond NMFS's preexisting regulatory requirements, 50 C.F.R. § 665.815, ER 146 (no new regulations), which as shown above are inferior to other practicable bycatch prevention methods. FWS's Final EA admits:

---

[7] http://www.fws.gov/policy/724fw2.html (last viewed January 16, 2014). Plaintiffs request that the Court take judicial notice of the defendant's official policy document, publicly available on defendant's website and not subject to dispute. Fed. R. Evid. 201.

> The permit reflects the current operation of the fishery, including the seabird-deterrent measures currently required by NMFS …, with <u>no changes</u>, regulatory or otherwise, to the operation of the fishery during the permit period. … NMFS would <u>not be required to collect new data or otherwise expend additional resources</u>, and <u>no new regulations</u> governing the operation of the fishery would be proposed.

ER 75 (emphasis added). <u>See also</u> ER 83 (Permit authorizes Fishery "exactly as it operates and exactly as NMFS wishes…"); ER 84 (FWS received "no commitment from NMFS to further conserve migratory birds in this fishery (or through offset/compensation), much less conduct new research to that end"); ER 86 (the "benefit to the birds would be zero" of this "regrettable regulatory precedent.")

The district court also noted NMFS's assertion that, if the Fishery were closed, Fishery vessels might be replaced by other vessels with less effective seabird bycatch mitigation, resulting in increased take. ER 17-18. If the court or FWS relied on this legally-irrelevant speculation, they erred; the record contains no evidence of other fisheries' seabird bycatch deterrence practices.

The court dismissed all evidence of FWS's expert staff's intense opposition, for policy, legal, and technical reasons, on the ground the experts were not authorized to speak for FWS, and their statements were not final agency positions. ER 14-15. For support the court cited <u>National Wildlife Federation v. United States Army Corps of Engineers</u>, 384 F.3d 1163 (9th Cir. 2004), in which this Court declined to find an agency acted arbitrarily in failing to adopt a particular approach based on a single email self-described as "brainstorming," where it found

ample other record evidence to support the agency's decision.  Id. at 1174-75 & 1175 n.15.

The court below went far beyond this or any precedent, dismissing all expert views not reflecting official final agency positions, without pointing to contrary record evidence.  The record contains no back-and-forth on such matters; FWS's final decision descended from above like a *deus ex machina*.  Record review would be pointless if staff criticism were irrelevant and only the final decision and its purported rationale were to be considered, and this is not how the Administrative Procedure Act operates.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 419-20 (1971) (review must be based on the full administrative record).  This Court has consistently held that disregarding views of an agency's own experts indicates arbitrary decisionmaking.   As in Western Watersheds Project v. Kraayenbrink, 632 F.3d 472 (9th Cir. 2011), "Here, the [FWS] gave short shrift to a deluge of concerns from its own experts…." Id. at 493;  see also ʻIlioʻulaokalani Coalition v. Rumsfeld, 464 F.3d 1083, 1089-90, 1096, 1098, 1101 (9th Cir. 2006) (emphasizing contrary comments of agency's experts as basis for finding its EIS inadequate); Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002) (Forest Service's analysis arbitrary and capricious because it ignored the views of its own scientists).

The court's denial of summary judgment for Plaintiffs is contrary to law and must be reversed.

II.    FWS'S REFUSAL TO EVALUATE ANY ALTERNATIVE TO A
       STATUS QUO EXEMPTION FROM THE MBTA VIOLATED THE
       NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is "our basic national charter for protection of the environment." 40

C.F.R. § 1500.1(a). "NEPA emphasizes the importance of coherent and

comprehensive up-front environmental analysis to ensure informed decision making,

to the end that the agency will not act on incomplete information, only to regret its

decision after it is too late to correct." Blue Mountains Biodiversity Project v.

Blackwood, 161 F.3d 1208, 1216 (9th Cir. 1998) (citation omitted).

NEPA requires that agencies prepare a detailed EIS before undertaking

"major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an EA to decide

whether EIS preparation is warranted. 40 C.F.R. § 1508.9.

The alternatives analysis is the "heart" of any NEPA process. 40 C.F.R. §

1502.14. Agencies must "study, develop, and describe appropriate alternatives to

recommended courses of action in any proposal." 42 U.S.C. § 4332(2)(E). A

federal agency must "'[r]igorously explore and objectively evaluate all reasonable

alternatives [to a proposed action] ….' We have repeatedly recognized that if the

agency fails to consider a viable or reasonable alternative, the EIS is inadequate."

Southeast Alaska Conserv. Council v. Fed. Highway Admin., 649 F.3d 1050, 1056

(9th Cir. 2011) (emphasis added) (citation omitted). This requirement extends to

EAs.  Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228–29 (9th Cir.1988);

Ocean Mammal Institute v. Gates, 546 F. Supp. 2d 960, 975-76 (D. Haw. 2008).

FWS's Final EA for the Special Purpose Permit violated this requirement,

limiting evaluation of alternatives to:

> (1) denying NMFS's application for the Permit;

> (2) issuing the Permit authorizing the status quo, with its ongoing take of
> migratory birds, without alteration; and

> (3) issuing a permit requiring NMFS to develop and evaluate (but not
> implement) seabird bycatch avoidance methods.

ER 75-76.

FWS selected the second alternative.  Plaintiffs do not challenge under

NEPA FWS's discretion to select the alternative it prefers (although its selection

here substantively violates the MBTA as discussed above), but rather its failure to

evaluate any alternative that would "implement any new or modified practices or

technologies (e.g., side-setting, streamerlines) known through research and trials to

be likely to further reduce seabird take," since the record shows such reasonable

alternatives exist.  ER 77.

FWS "excluded from analysis" any such alternatives, solely because it

speculated that their implementation might "requir[e] NMFS to issue regulations

that affect the operation of the fishery," which would "necessitate that the [Western

Pacific Regional] Fishery [Management] Council initiate a regulatory amendment

to the fishery management plan," which FWS summarily declared "not practicable."  ER 77.

The range of alternatives FWS is required to consider is a function of the Permit's purpose and need.  40 C.F.R. § 1502.13.   The purpose and need in turn must reflect Congress' intent behind the authorizing statute, and not merely defer to the applicant's interests.  National Parks & Conserv. Ass'n v. Bureau of Land Management, 606 F.3d 1058, 1070 (9th Cir. 2010).  The purpose and need also must not be so narrow as to effectively lead to one outcome.  Id.

FWS categorically refused to analyze any alternative that would "require NMFS to change operations of the fishery to improve the conservation benefit to seabirds" as "not meet[ing] the purpose and need of our permitting action."  ER 141.  FWS failed to show—or even attempt to show—how any change to the Fishery, especially one that would benefit the seabirds rather than merely the Fishery, could not meet its purported purpose and need, ER 142, but if so, its purpose and need was unlawfully narrow.  National Parks, 606 F.3d at 1072.  The only explanation emerging from the record for FWS's position is that NMFS, the Permit applicant, objected.  See ER 123 (NMFS: "If that is now [FWS's] stated expectation—further reduction of take—then we are done here and I will notify NMFS leadership.");  ER 90 (FWS: "NMFS-PIRO has indicated that permit conditions requiring operational changes to the fishery are unacceptable; moreover, NMFS is not currently comfortable with NEPA review that considers alternatives

37

beyond the fishery exactly as it operates now."). FWS may consider an applicant's interests, but it may not allow them to override its own mission, guided by the MBTA. National Parks, 606 F.3d at 1072. Nor do NMFS's preferences have any relevance to FWS' NEPA obligation to evaluate all reasonable alternatives.

The court acknowledged FWS was required to "give full and meaningful consideration to all reasonable alternatives," but erroneously allowed FWS to declare all alternatives that alter operations "unreasonable" and refuse to evaluate any. ER 34-35. The court offered no explanation or record support for its assumption that FWS could not, if it chose, issue a permit imposing take reduction requirements. Neither FWS nor the court supplied any support for concluding Fishery Management Council-initiated action is a legal prerequisite for the Fishery's compliance with such requirements, nor for deeming such a process not "practicable," ER 77, effectively giving the industry-dominated Council veto power over application of the MBTA. Indeed, what FWS may have meant by "not practicable" in this context is nowhere explained; the court simply assumed it as a fact. This was error. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'")

Even if take-reducing modifications to Fishery operations do require Council action, FWS may not refuse to evaluate an otherwise-reasonable alternative merely because it is not within FWS's power to implement it unilaterally. 40 C.F.R. §

1502.14(c) expressly requires that FWS evaluate "reasonable alternatives not within the jurisdiction of the lead agency." See also Muckleshoot Indian Tribe v. United States Forest Serv., 177 F.3d 800, 814 (9th Cir. 1999). The court erred in concluding FWS could exclude from evaluation any take reduction option because (supposedly) it is not under FWS's direct control, particularly where, as here, take reduction was "more consistent with its basic policy objectives than the alternatives that were the subject of final consideration." Muckleshoot, 177 F.3d at 813 (reversing for failure to include alternative requiring third party action).

The court's ruling violated these bedrock legal principles, erroneously concluding: "[M]atters outside the agency's jurisdiction are not 'reasonable alternatives' that an agency must take a hard look at under section 1502.14(a)." ER 35. It cited, but misconstrued, Center for Food Safety v. Vilsack, 718 F.3d 829 (9th Cir. 2013). In Vilsack, the agency was asked to deregulate a genetically engineered crop. It prepared a full EIS, including an extensive evaluation of an alternative deregulating the crop subject to restrictions. The agency later determined (and this Court agreed) it lacked discretion to do anything except grant full, unrestricted deregulation. The Vilsack Court was not called upon to decide whether the agency erroneously failed to evaluate an alternative missing from its EIS. No evaluation was missing. Rather, the Court determined the agency's hands were tied jurisdictionally; there were "no reasonable alternatives to deregulation because the agency lacks jurisdiction to regulate" the crop. 718 F.3d at 342.

FWS did not lack discretion to require take reduction as a permit condition, and the record contains no argument that it did.  Unlike the agency in <u>Vilsack</u>, FWS was not compelled to issue the Permit in any particular form, if at all.  FWS's failure to evaluate in its EA any reasonable alternatives requiring take reduction, or any change of operations whatsoever, as its expert staff urged and where the record showed the existence of such options, was contrary to law.

III.   NMFS VIOLATED THE ENDANGERED SPECIES ACT BY FAILING TO PROPERLY ASSESS THE FISHERY'S IMPACTS ON ENDANGERED SEA TURTLES

A.   <u>Legal Framework</u>

The ESA prohibits harming, or "taking," endangered species.  16 U.S.C. § 1538(a)(1).  A federal agency may authorize actions causing take only if this will not "jeopardize" any species, defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution."  50 C.F.R. § 402.02.   Every agency must consult NMFS[8] if its action "may affect" marine species to "insure" the action is "not likely to jeopardize the continued existence" of such species. 16 U.S.C. §

---

[8] Here, the "action agency" is NMFS's Office of Sustainable Fisheries (NMFS-Fisheries), and it internally consults NMFS's Office of Protected Resources (NMFS-PR).

1536(a)(2); 50 C.F.R. § 402.14(a).  The duty to "insure" against jeopardy is "rigorous."  <u>Sierra Club</u>, 816 F.2d at 1385.

Following consultation, NMFS-PR must prepare a BiOp using the "best scientific and commercial data available."  50 C.F.R. § 402.14(g)(8).  The BiOp provides NMFS-PR's opinion on whether the projected take incidental to otherwise lawful activity may jeopardize any listed species.  If not, NMFS-PR authorizes the specified number of incidental takes.  <u>Id</u>. § 402.14(h)(3),(i).  If the action likely will jeopardize a species, the BiOp must determine that proceeding risks violating Section 7(a)(2)'s substantive prohibition against jeopardy.

To analyze a proposed action's jeopardy risk, NMFS-PR starts with the "environmental baseline," or status quo, including "past and present impacts of all Federal, State, or private actions and other human activities in the action area."  <u>Id</u>. § 402.02.  It adds the "direct and indirect effects of an action on the species."  <u>Id</u>. It then considers "cumulative effects" of all reasonably certain future State or private activities.  <u>Id</u>.  Finally, NMFS-PR concludes "whether the action, taken together with cumulative effects, is likely to jeopardize" any species.  <u>Id.</u> § 402.14(g)(4).

Thus, ESA Section 7(a)(2) requires that NMFS-PR add:

1.  the proposed action's impacts; plus
2.  the environmental baseline (including all factors already affecting species recovery and survival); plus
3.  the impacts of all reasonably certain future non-federal activities anywhere within the action area;

41

and determine whether the <u>total</u> impact jeopardizes the species.  <u>Id</u>. §

402.14(g)(2), (3).  <u>See</u> NMFS & FWS, <u>Final ESA Section 7 Consultation</u>

<u>Handbook</u> (March 1998) (<u>Consultation Handbook</u>) at 4-35[9] ("The final analysis

then looks at whether, given the aggregate effects, the species can be expected to

both survive and recover….").

　　　Jeopardy determinations cannot be avoided simply by arguing that one's

own actions add only a relatively small impact to the status quo.  In <u>Blue Water</u>

<u>Fishermen's Association v. National Marine Fisheries Service</u>, 226 F. Supp. 2d

330 (D. Mass. 2002), longliners argued their turtle bycatch was a relatively small

contributor to the endangered species' problem, and therefore was not

jeopardizing.  The court rejected this comparative approach:

> To be passable under ESA regulations, then, the NMFS's jeopardy
> finding did not have to single out the pelagic longline fishery as <u>the</u>
> predominant activity jeopardizing the listed turtle populations.  The
> NMFS need only have found that the pelagic longlining threat
> together with other cumulative effects add up to jeopardy.

<u>Id</u>. at 341-342 (citation omitted).

　　　This Court forcefully rejected NMFS-PR's use of this comparative approach

in <u>National Wildlife Federation v. National Marine Fisheries Service</u>, 524 F.3d 917

(9th Cir. 2008) ("<u>NWF v. NMFS</u>"), explaining that NMFS-PR cannot premise a

---

[9] http://www.fws.gov/endangered/esa-
library/pdf/esa_section7_handbook.pdf (last viewed January 16, 2014).

"no jeopardy" conclusion on the subject action's impact being small in comparison to others:

> NMFS argues that, under this definition [of "jeopardy"], it may satisfy the ESA by comparing the effects of [the proposed agency action] on listed species to the risk posed by baseline conditions. Only if those effects are "appreciably" worse than baseline conditions must a full jeopardy analysis be made. Under this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent.
> …
> [A]n agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction. Likewise, even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm."

Id. at 930 (emphasis added; citation omitted).

As NWF v. NMFS confirms, even a relatively small impact causes jeopardy if it "appreciably" worsens the status of a species demonstrably slipping into oblivion. NMFS-PR's own analysis shows that is what the Fishery does. NMFS-PR's conclusion in its 2012 BiOp that the Fishery's impacts do not jeopardize loggerheads, having no other rational basis, ultimately rests on the unlawful comparative approach: that the species may well become extinct regardless, and therefore the Fishery's impacts have no appreciable effect.

B.    NMFS Recently Reclassified Loggerheads as Endangered.

It is undisputed the North Pacific loggerhead sea turtle population is declining towards extinction. In September 2011, NMFS-PR reclassified it from

"threatened" to "endangered" status under the ESA. ER 127 *et seq*. NMFS-PR found the population in danger of extinction "now," not merely "in the foreseeable future," ER 128, based on "population sizes and trends, current and anticipated threats, and conservation efforts." ER 130. NMFS-PR found reclassification compelled by ineffective regulatory measures to reduce fisheries bycatch, extensive destruction of nesting habitat, and global warming accompanied by sea level rise. ER 131-134. Despite recent reductions in turtle bycatch in the Fishery and encouraging nesting data, NMFS-PR noted the population "has declined up to 90 percent from its recorded historical population size," and "continues to be vulnerable to fisheries bycatch." ER 130; ER 129. Ongoing conservation efforts "remain inadequate to ensure the long-term viability of the population." ER 135.

"The whole purpose of listing species as 'threatened' or 'endangered' is not simply to memorialize species that are on the path to extinction, but also to compel those changes needed to save these species from extinction." Oregon Natural Resources Council v. Daley, 6 F. Supp. 2d 1139, 1152 (D.Or. 1998). But only four months later, NMFS authorized the Fishery to annually catch more endangered loggerheads (34) than it had in over a decade. ER 94-95. NMFS-PR's "no jeopardy" conclusion in its 2012 BiOp, contradicted the record evidence and violated the ESA.

C. **NMFS's Population Models.**

NMFS-PR analyzed whether authorizing the Fishery jeopardizes endangered turtles by using as the "main determinant of extinction risk" a measure known as the Quasi-Extinction Threshold (QET). ER 103. Using two different models its expert developed, it projected the turtles' future status, added the Fishery's impacts, and compared the results to QET. The "classical" model (or "Population Viability Assessment (PVA)"), extrapolates future population solely from recent turtle nesting data. ER 103. A second, "climate-based" model incorporates certain cyclical climate patterns that cause ocean conditions that may correlate with turtle nesting behavior. ER 104.

NMFS-PR based the 2012 BiOp's jeopardy analysis on the work of a NMFS scientist who developed and applied these models, Dr. Van Houtan. ER 102 (risk analysis based on Van Houtan (2011)); ER 107 (same). Van Houtan acknowledged his models yield inconsistent results. ER136. In fact, the models disagree radically: the classical model predicts the loggerheads will thrive, while the climate-based model shows the same population steadily declining, well below the Quasi-Extinction Threshold. ER 105-106. NMFS-PR opted to use its climate-based model, which shows with a "high" degree of confidence that the loggerheads' extinction risk is "high" even without the Fishery's impacts. ER -106, Tbl. 8; ER 114. According to NMFS-PR, the Fishery's added impacts

accelerate the loggerheads' decline and further reduce the population by 4-11 percent.  ER 105.

> D.  NMFS's Loggerhead "No Jeopardy" Opinion Relies on an Unlawful Analytical Approach.

Plaintiffs do not challenge NMFS-PR's decision to rely on one model versus the other for its loggerhead jeopardy analysis.  NMFS-PR was "persuaded that the climate-based model provides the most accurate analysis of population trends," ER 116; it has "high confidence" in its results.  ER 114.  That chosen model predicts the loggerheads' prospects are poor, the risk of extinction is "high," and the population drops below QET and keeps dropping; no record evidence suggests it will ever rise above QET again, and NMFS-PR did not claim otherwise.  See ER 96 ("we predicted an oscillating decline of the population below a 50-percent quasi-extinction within one generation (25 years) …."); ER 160 ("Virtually all the loggerhead climate model runs fall below the QET indicating high extinction risk with high model confidence.").



Fishery Impacts on Loggerheads, Climate-Based Model (ER 105)

Yet NMFS-PR authorized the Fishery to kill more turtles than before, by its own calculation reducing the population by 4 to 11 percent. ER 105; ER 121. NMFS-PR knew this was "potentially problematic," ER 121, but nonetheless concluded these impacts will neither jeopardize the loggerheads nor impair their recovery by resorting to the same approach this Court condemned in NWF v. NMFS. NMFS found the Fishery's impact "extremely small when considered together with all impacts considered in the Status of the Species, Baseline and Cumulative Effects sections…." ER 118 (emphasis added). See also ER 117 (no jeopardy "[b]ecause this contribution to mortality is an insignificant fraction of what total mortality for the species might be….") (emphasis added); ER 105 (Because loggerhead seems heading towards extinction anyway, there is "no significant difference in the risk of extinction" with or without the Fishery).

NMFS-PR dismissed as not "significant" the additional loss of up to 11 percent of the loggerheads' population its own expert predicted, because its preferred model predicts the population will fare poorly anyway. This violates ESA Section 7(a)(2). NWF v. NMFS, 524 F.3d at 930 ("[W]here baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm.") (emphasis added).

In upholding NMFS-PR's "no jeopardy" conclusion, the court disregarded that NMFS-PR's own preferred model shows, with "high" confidence, that the Fishery undisputedly exacerbates the already-endangered population's descending

47

trajectory below the Quasi-Extinction Threshold.  The court erroneously reasoned:

"Plaintiffs fail to demonstrate that the incidental killing of a single adult female loggerhead sea turtle per year would appreciably reduce the likelihood of the loggerhead sea turtle's survival and recovery in the wild."  ER 43.

First, placing the burden on Plaintiffs to demonstrate jeopardy was reversible error.  The burden is on NMFS to prove its action is non-jeopardizing.  "It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when the proper procedures have not been followed."  Thomas v. Peterson, 753 F.2d 754, 765 (9th Cir.1985); see also Washington Toxics Coalition v. Environmental Protection Agency, 413 F.3d 1024, 1035 (9th Cir. 2005).

Second, while the court minimizes the Fishery's impacts by describing them as the loss of a single adult female annually, this characterization does not tell the whole story, and lacks any legal significance.  NMFS-PR authorized the Fishery to catch ("interact" with) up to 34 loggerheads annually, ER 95, ER 150, and will close the fishery if—and only if—this limit is reached.  50 C.F.R. § 665.813(b)(1),(2) ("Maximum annual limits are established on the number of physical interactions that occur….")  While NMFS-PR estimated a single adult female mortality will result from these 34 "interactions," and modeled only this assumed fatality, ER 102, the Fishery may catch and kill up to 34 adult females before any action is taken.  NMFS-PR, and the court, ignored this possibility.

48

The duty to "insure" against jeopardy is "rigorous," Sierra Club, 816 F.2d at 1385, and NMFS was required to give the benefit of any doubt to the species. Id. at 1386, Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir.1988); see also Tenn. Valley Auth., 437 U.S. at 194 ("Congress has spoken in the plainest of words ... in favor of affording endangered species the highest of priorities ... [by] adopting a policy which it described as 'institutionalized caution'."); Consultation Handbook at 4-53 ("Section 7 requires minimization of the level of take").  Pinning the species' hopes on there being only a single adult female mortality fails to reflect Congress' mandate.

Third, even aside from NMFS-PR's duty to limit mortalities and minimize take, and even if it properly assumed only one adult female will be lethally taken annually, by NMFS-PR's own calculation, a single adult female mortality in the Fishery annually will cause an additional loss to the loggerhead population of 11 percent.  ER 121 ("The overall impact of the proposed action on the [loggerhead population] is an additional population decline of 11%.")  This impact is "appreciable" by any reasonable definition, and causes jeopardy as a matter of law. 50 C.F.R. § 402.02 (definition of jeopardy).  The court dismissed this by asserting "it is not clear" the Fishery will actually have the maximum effect NMFS-PR itself acknowledged.  It noted the number of loggerheads that will remain, which is legally irrelevant, and asserted Plaintiffs failed to prove jeopardy.  ER 45.  Again, this burden is misplaced, and the court failed to give the benefit of the doubt to the

endangered loggerheads as the law requires.  It instead gave it to NMFS-PR, hoping that (1) only a single adult female will be killed annually among the 34 loggerheads NMFS-PR authorized the Fishery to hook, and (2) NMFS-PR's calculation of the impact of a single adult female mortality will turn out to have been wrong.  The court's disregard of NMFS-PR's own calculation without pointing to better evidence (rather than merely agency equivocation) fails to give the benefit of the doubt to the endangered species, and applies fundamentally erroneous legal standards.

E.    The 2012 BiOp's Jeopardy Analysis for Leatherbacks Ignores the Best Available Science.

NMFS's two models also produced contradictory conclusions regarding the Fishery's impacts on leatherback turtles, but in the opposite direction:  the classical model shows leatherbacks plunging to extinction in the near future, with the Fishery's impacts of 16 authorized takes dramatically accelerating the decline.  ER 108; see ER 125 (NMFS-PR scientist: "[the leatherback population] heads down to true extinction (with [the Fishery impacts]").  According to NMFS's expert Van Houtan, this model shows the leatherbacks also face "high" extinction risk even without the Fishery; NMFS-PR's confidence in the model also is "high."  ER 137; ER 138.  NMFS-PR's preferred climate-based model shows the leatherbacks remaining above QET, but Fishery impacts cause a very substantial "measurable loss" of 16 to 30 percent.  ER 109-110.

NMFS-PR's preferred climate–based model predicts an optimistic scenario for leatherbacks, but its classical model predicts disaster.  The population plunges to "true extinction," accelerated by the authorized Fishery mortalities.  ER 159 ("The proposed action of six annual mortalities exacerbates this trend even further, reducing the final run value 87% from the default trend – from 16 to 2 nesters…. [T]his population will <u>very likely be completely extirpated</u> by the year 2080.") (emphasis added).



Fishery Impacts on Leatherbacks, Classical Model (ER 125; ER 108)

The 2012 BiOp unlawfully ignored this in its jeopardy analysis.  Plaintiffs do not challenge NMFS-PR's prerogative to select the climate-based model for the first 25 years, but that model has, by design, "<u>no predictive value beyond 25 years</u>."  ER 114 (emphasis added); ER 122.  NMFS-PR knew this was problematic, since <u>the proposed action does not end in 25 years</u>, but continues indefinitely.

Section 7(a)(2) requires NMFS-PR to determine the Final Rule's effects in its entirety, not merely an arbitrary first segment.  "[T]he ESA requires the biological opinion to analyze the effect of the entire agency action."  <u>Conner</u>, 848

F.2d at 1453.  See also Natural Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 364 (E.D. Cal. 2007) ("A biological opinion which is not coextensive in scope with the identified agency action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious."); Center for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002) ("[T]he period covered by a biological opinion is defined by the life of the project or agency action.").

In Wild Fish Conservancy v. Salazar, 628 F.3d 513 (9th Cir. 2010), this Court invalidated FWS's biological opinion that concluded that the next five years of ongoing fish hatchery operations would not jeopardize threatened bull trout, because truncating the examined time period would impermissibly allow the agency to avoid assessing the action's full impact: "There could be some impact, but not an appreciable impact, in each of several subdivided periods of operation that, in cumulation, have an undeniably appreciable impact…. [I]f instead the Service were to consider the entire reduction in the local population over fifty years, it might then find an appreciable impact."  Id. at 523.[10]

This Court rejected FWS's  argument that assessing the impacts beyond the five-year period was too uncertain, holding such claims did not obviate the agency's duty to "issue a comprehensive biological opinion taking a long view" of

[10] FWS's plan to reinitiate consultation in five years did not cure the flaw, id. at 524, although here, NMFS-PR made no similar provision.

the proposed action.  Id. at 524-25.  NMFS-PR "cannot abdicate its responsibility to evaluate the impacts of an action on a species by labeling available information 'uncertain,' because doing so violates Congress' intent that the agencies 'give the benefit of the doubt to the species.'"  Kempthorne, 506 F. Supp. 2d at 360.

In upholding NMFS-PR's "no jeopardy" leatherback assessment, the court declared Plaintiffs failed to identify better data than that upon which NMFS-PR relied.  ER 55.  The court was mistaken.  Plaintiffs showed NMFS-PR's rationalization that "[b]eyond 25 years, we do not have information to predict what the population will do," ER 149, was demonstrably false, and the court erred in relying on it.  It is undisputed that the classical model—in which NMFS-PR's expert, Van Houtan, had "high" confidence," ER 138, and which extends for 68 years, ER 158—offers far better information after 25 years than the climate-based model, which NMFS admitted has no predictive value whatsoever after 25 years.

NMFS's own expert therefore recommended NMFS-PR use the classical model to evaluate the Fishery's effects beyond the first 25 years.  ER 136 ("I recommend considering the climate-based PVA for the first generation forecast, and using the classical PVA to evaluate the proposed actions after.").  See Pacific Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1038 (9th Cir. 2001) (arbitrary and capricious to disregard own scientist's opinion).  NMFS-PR admitted "a proper qualitative analysis should consider aspects of both [the climate-based and classical] models."  ER 119; see also ER 96 ("relatively

short 25-year predictive period" undermines climate-based model's value).  But in the jeopardy analysis, NMFS-PR did not incorporate any aspect of the classical model's disastrous forecast, violating Section 7(a)(2)'s requirement that it be based on "the best scientific and commercial data available," and give the benefit of the doubt to the species.  Although it suggested it had, in some cryptic manner, taken the classical model's dire prediction into account, NMFS-PR admitted it evaluated the proposed action's effects <u>only</u> "over the next 25 years, which corresponds to the forecast limitations of the climate-based model,"  ER 148  (emphasis added), lopping off its assessment at that point.  This was flatly unlawful.

Deference is due NMFS-PR's decision to apply the climate-based model to the Fishery's impacts for the first 25 years, but it violated its duty to use the best available data thereafter.  <u>Conner</u>, 848 F.2d at 1454 (to insure against jeopardy, NMFS-PR "cannot ignore available biological information ....".  The presumption of agency expertise may be rebutted if the agency disregards available scientific evidence better than the evidence on which it relies.  <u>Kern County Farm Bureau v. Allen</u>, 450 F.3d 1072, 1080 (9th Cir. 2006).  Since the agency action was not limited to 25 years, as a matter of law the climate-based model alone was not the best available science for assessing the Fishery's impacts on the leatherback where its own expert provided, and urged the use of, another model for the subsequent years.  NMFS violated Section 7(a)(2) and the court plainly erred in concluding otherwise.

IV.  NMFS FAILED TO INCORPROATE GLOBAL WARMING'S
     ADMITTED ADVERSE IMPACTS ON SEA TURTLES INTO ITS
     JEOPARDY ANALYSIS

The outlook for sea turtles is even more grim than either model predicted,

because neither incorporates any of global warming's acknowledged adverse

impacts.  A biological opinion that fails to "address, adequately explain, and

analyze the effects of global climate change on the species" violates Section

7(a)(2).  South Yuba River Citizens League v. Nat'l Marine Fisheries Serv., 723 F.

Supp. 2d 1247, 1274 (E.D. Cal. 2010); Pacific Coast Fed'n of Fishermen's Ass'ns

v. Gutierrez, 606 F. Supp. 2d 1122, 1184 (E.D. Cal. 2008).  NMFS-PR may not

dodge this duty by simply declaring the data too "uncertain."  Center for Biological

Diversity v. Salazar, 804 F. Supp. 2d 987, 1008 (D. Ariz. 2011).  Nor may it

merely cite the many studies concluding global warming is a threat before

dismissing them, but must incorporate their significance into its projections and

discuss how to deal with the problem.   Kempthorne, 506 F. Supp. 2d at 370

(omission was a "failure to analyze a potentially important aspect of the

problem.").

The record is replete with evidence that global warming threatens the

endangered turtles' survival and recovery, and that "the gradual long-term

warming of the western Pacific Ocean over the past 50 years is a major risk factor

that should be considered in any meaningful and comprehensive diagnosis" of the

loggerheads' decline. ER 93. The 2012 BiOp admits: "[C]limate change is <u>likely beginning to affect</u> sea turtles found in the action area through the impacts of rising sand temperatures, rising sea level, increased typhoon frequency, and changes in ocean temperature and chemistry." ER 99 (emphasis added). Rising sand temperatures produce more female hatchlings, and "[s]everal species <u>already exhibit female bias</u> throughout their major rookeries worldwide, in many cases producing anywhere from 60–99% females." <u>Id</u>. (emphasis added) (citing eight published studies). The best available science predicts habitat loss due to sea level rise. <u>Id</u>. (citing three studies). Global warming-induced changes may be altering ocean food availability that can "affect foraging strategies and therefore reproductive capacity for sea turtles." ER 100 (citing four studies). NMFS-PR cited these very global warming-induced impacts among those that recently persuaded it to reclassify the loggerhead as endangered. ER 133-134.

The 2012 BiOp acknowledges ominous changes already being seen are likely due to global warming, "rather than being explained by natural variability or other factors." ER 100-101. It admits "the <u>probability</u> that recently observed changes in sea turtle phenology, sex ratio, and foraging characteristics in studied populations may be influenced by climate change-related phenomena." ER 101 (emphasis added). <u>See also</u> ER 111, ER 115 (impacts to loggerheads "are <u>likely to occur</u> as a result of worsening climate change….") (emphasis added).

The record thus overwhelmingly supports the 2012 BiOp's conclusion that "global anthropogenic climate change <u>is expected to continue and to therefore continue to impact sea turtles and their habitats</u>." ER 111 (emphasis added). But NMFS-PR failed to integrate any of this into its jeopardy analysis of the Fishery's impact on the turtles' fate.

Upholding this, the court asserted: "Plaintiffs fail to show that the agency ignored specific available data or failed to evaluate specific existing data." ER 57. This is wrong. Plaintiffs cited all of the above-mentioned record material, all of which points to global warming having—now and in the future—admitted adverse consequences for the turtle populations. ER 72-74.

Moreover, NMFS-PR's reasons for ignoring the evidence were legally impermissible. First, NMFS-PR cited the lack of a "comprehensive assessment of the potential impacts of climate change within the action area or specific to sea turtles … that may be within the action area," ER 112, and that the precise effects of global warming are "uncertain." ER 112 (citing studies 14 to 16 years old).

Certainty is not the legal standard for a jeopardy analysis; uncertainty is inherent in prediction—Section 7(a)(2)'s mandate. <u>See</u> <u>Rumsfeld</u>, 198 F. Supp. 2d at 1156 (best available science standard "requires far less than conclusive proof" and "recognizes that better scientific evidence will most likely always be available in the future.") To "insure" against jeopardy, NMFS-PR, if it believes significant data gaps exist, must "develop the biological opinion with the available

information giving the benefit of the doubt to the species."  Consultation

Handbook at 1-6.  <u>Sierra Club</u>, 816 F.2d at 1386 (species must receive benefit of

doubt).  NMFS-PR cannot circumvent its mandate and the extensive record

evidence by noting that more comprehensive studies would be desirable.  <u>See</u>

<u>Conner</u>, 848 F.2d at 1454 (to insure against jeopardy, NMFS-PR "cannot ignore

available biological information …."); <u>San Luis & Delta–Mendota Water Auth. v.</u>

<u>Salazar</u>, 760 F. Supp. 2d 855, 871 (E.D. Cal. 2010) ("A decision about jeopardy

must be made based on the best science available at the time of the decision; the

agency cannot wait for or promise future studies."); <u>Rumsfeld</u>, 198 F. Supp. 2d at

1156 (where agency action extends for ten years, agency may not "sidestep[] its

obligation" but must make ten-year prediction using "best scientific evidence

available today, not 3 years from now.").

Second, NMFS-PR justified dismissing the extensive record evidence by

falsely asserting "the temporal scale of the proposed action" is "25 years," and

global warming's effects will not be felt within that period.  ER 120 (leatherbacks);

ER 116 (loggerheads); ER 113 (both).  Here, NMFS-PR could not claim it lacked a

longer-term model—it did not assess global warming's threats with or without a

model—so it simply declared that the action under consideration—the Fishery's

authorization—would last only 25 years, and disavowed any duty to look beyond

that period.

This is plain error.  As noted above, the Fishery was not authorized for 25 years or for any other limited period; it continues indefinitely.  Moreover, NMFS-PR's assertion conflicts with its own findings that global warming is already affecting turtles.  The court's legal analysis was mistaken, and its acceptance of NMFS-PR's material misstatement of the action's temporal scope was clearly erroneous.

## CONCLUSION

Neither the MBTA nor 50 C.F.R. § 21.27 authorizes incidental take of migratory birds.  FWS interpreted the law this way for decades, and from all indications, from the statute's inception a century ago.  Its radical reinterpretation to spare the Fishery any inconvenience lacks any legal support, and throws open the door to handing out similar exemptions on a massive scale.  If FWS favors this new approach, it must issue a new regulation in accordance with law, just as it did at Congress' direction after it had repeatedly—and properly—declined to exempt military training exercises under Section 21.27.  The district court's deference to FWS's new interpretation, ungrounded in the MBTA, agency practice, internal guidance or standard, or any official position prior to issuing the Permit in response to litigation, was erroneous.  FWS also violated NEPA by refusing to examine alternatives that the record establishes are practicable and reasonable and more consistent with the MBTA's mandate than the status quo options to which

FWS limited itself.  The district court misread the law in upholding this.  The Permit must be vacated.

NMFS ignored its own expert, the best available science in the Administrative Record, the undisputed facts, and this Court's precedent in determining that increasing the number of endangered sea turtles the Fishery is allowed to catch will not jeopardize their survival and recovery.  The district court applied incorrect legal standards, misallocated the burden of proof, and accepted as fact clearly erroneous assertions in upholding NMFS's analysis.  The Biological Opinion, Incidental Take Statement, and the regulation allowing increased take must be vacated and the status quo ante restored until NMFS complies with the law.

Respectfully Submitted,

Dated:  January 29, 2014

<u>/s/ Paul H. Achitoff</u>
Paul H. Achitoff
EARTHJUSTICE
850 Richards St., Suite 400
Honolulu, HI 96813
Telephone:  (808) 599-2436
Facsimile:  (808) 521-6841

*Attorneys for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellants certify that they

are not aware of any related case pending in this Court.


/s/ Paul H. Achitoff

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, this

brief is proportionately spaced, has typeface of 14 points or more and contains

13,891 words, excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).

/s/ Paul H. Achitoff