IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 13-17123

TURTLE ISLAND RESTORATION NETWORK and CENTER FOR
BIOLOGICAL DIVERSITY,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL MARINE
FISHERIES SERVICE; PENNY PRITZKER, in her official capacity as Secretary
of the Department of Commerce, UNITED STATES DEPARTMENT OF THE
INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; and S.M.R.
JEWELL, in her official capacity as Secretary of the Interior,

Defendants-Appellees,

On Appeal From The United States District Court For The District of Hawaiʻi
(Civil Action No. 12-00594 SOM RLP)

**PLAINTIFFS–APPELLANTS' REPLY BRIEF**

Paul H. Achitoff
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: achitoff@earthjustice.org
*Attorneys for Plaintiffs–Appellants*

May 14, 2014

# TABLE OF CONTENTS

I.   FWS'S PERMIT UNLAWFULLY ALLOWS INCIDENTAL TAKE
     OF MIGRATORY BIRDS ............................................................................1

     A.   FWS Reversed Its Longstanding Regulatory Interpretation
          Without Explanation. ............................................................................2

     B.   FWS's New Interpretation Granting It Unbounded Discretion
          Conflicts With The Regulation. ............................................................6

     C.   Issuance of the Permit Was Arbitrary and Capricious. ........................7

     D.   Intervenor's Interpretations of the MBTA Are Contrary to Law
          and Its Rhetoric Is Contrary to the Record. .......................................11

II.  FWS UNLAWFULLY REFUSED TO EVALUATE ANY
     ALTERNATIVE TO THE FISHERY'S STATUS QUO .............................17

     A.   FWS Cannot Evade NEPA By Declaring The Permit's Purpose
          Is To Minimize Inconvenience to the Fishery. ....................................17

     B.   FWS Must Evaluate Practical Alternatives Even If No EIS Is
          Triggered. ............................................................................................19

     C.   References To Other Alternatives In Other NEPA Documents
          Are Irrelevant. .....................................................................................22

III. NMFS'S JEOPARDY ANALYSIS FOR AUTHORIZING TAKE OF
     THE LOGGERHEAD TURTLE POPULATION IS UNLAWFUL ............23

IV.  NMFS FAILED TO USE THE BEST AVAILABLE SCIENCE TO
     ASSESS THE FISHERY'S IMPACT ON LEATHERBACK
     SURVIVAL AND RECOVERY .................................................................28

V.   NMFS UNLAWFULLY DISMISSED THE ACKNOWLEDGED
     IMPACTS OF CLIMATE CHANGE .........................................................30

VI.  CONCLUSION ..........................................................................................36

# TABLE OF AUTHORITIES

Page(s)

## PUBLISHED CASES

*Bob Marshall Alliance v. Hodel*,
852 F.2d 1223 (9th Cir. 1988) .......................................................................19

*Bowen v. Georgetown University Hosp.*,
488 U.S. 204 (1988)........................................................................................2

*Center for Biological Diversity v. Pirie*,
191 F. Supp. 2d 161 (D.D.C. 2002)..........................................................4, 5, 12

*Center for Biological Diversity v. Pirie*,
201 F. Supp. 2d 113 (D.D.C. 2001)..................................................................4

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012).....................................................................................2

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ...........................................................................6

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001).....................................................................................6, 7

*Conner v. Burford*,
848 F.2d 1441 (9th Cir.1988) ..............................................................29, 32, 36

*Defensor v. Meissner*,
201 F.3d 384 (5th Cir. 2000) ............................................................................6

*Earth Island Institute v. United States Forest Service*,
697 F.3d 1010 (9th Cir. 2012) .......................................................................20

*Fed. Communication Comm'n v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................5

*Greenpeace v. National Marine Fisheries Service*,
80 F. Supp. 2d 1137 (W.D. Wash. 2000) ........................................................32

*Humane Society v. Glickman*,
217 F.3d 882 (D.D.C. 2000) ..........................................................................15

**PUBLISHED CASES (cont.)**

*Jewett v. Comm'r of Int. Revenue*,
    455 U.S. 305 (1982)........................................................................6

*Judulang v. Holder*,
    132 S. Ct. 476 (2011)......................................................................8

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) .......................................................19

*Mass. Mutual Life Ins. Co. v. Russell*,
    473 U.S 134 (1985).........................................................................7

*Modesto Irr. Dist. v. Gutierrez*,
    619 F.3d 1024 (9th Cir. 2010) .......................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................8

*Nat'l Parks & Conserv. Ass'n v. Bur. of Land Management*,
    606 F.3d 1058 (9th Cir. 2010) .....................................................18

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    254 F. Supp. 2d 1196 (D. Or. 2003) ........................................34, 36

*National Wildlife Federation v. National Marine Fisheries Service*,
    524 F.3d 917 (9th Cir. 2008) ..............................................25, 26, 28

*Newton County Wildlife Association v. United States Forest Service*,
    113 F.3d 110 (8th Cir.1997) .........................................................15

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) .........................................................8

*Securities and Exchange Comm'n v. Chenery Corp.*,
    332 U.S. 194 (1947).................................................................9, 12

**PUBLISHED CASES (cont.)**

*Sierra Club v. Marsh*,
　816 F.2d 1376 (9th Cir. 1987) ............................................................33

*United States v. Apollo Energies, Inc.*,
　611 F.3d 679 (10th Cir. 2010) ......................................................15, 16

*United States v. Brigham Oil & Gas, L.P.*,
　840 F. Supp. 2d 1202 (D.N.D. 2012)............................................15, 16

*United States v. Corbin Farm Serv.*,
　444 F. Supp. 510 (E.D. Cal. 1978), *aff'd.*, 578 F.2d 259 (9th Cir.
　1978) ...................................................................................................14

*Western Watersheds Project v. Abbey*,
　719 F.3d 1035 (9th Cir. 2013) ......................................................21, 22

*Wild Fish Conservancy v. Salazar*,
　628 F.3d 513 (9th Cir. 2010) ........................................................24, 29

**UNPUBLISHED CASES**

*San Luis & Delta-Mendota Water Authority v. Jewell*,
　Nos. 11-15871, 2014 WL 975130 (9th Cir. Mar. 13, 2014).........22, 34

*Western Watersheds Project v. Bureau of Land Management*,
　No. 2:10–CV–02896–KJM–KJN, 2013 WL 4776543 (E.D. Cal.,
　Sept. 4, 2013) ......................................................................................20

**UNITED STATES CODES**

16 U.S.C. § 703(a) .............................................................1, 2, 12, 15

16 U.S.C. § 1536(a)(2)...............................................................23, 36

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 1502.14(c)................................................................17, 18

40 C.F.R. § 1500.2(f) ..........................................................................19

50 C.F.R. § 10.13 ................................................................................14

**CODE OF FEDERAL REGULATIONS (cont.)**

50 C.F.R. § 21.15 ..................................................................................5

50 C.F.R. § 21.27 ..................................................................2, 3, 5, 6, 12

50 C.F.R. § 402.02 ..................................................................................23, 34

**FEDERAL REGISTER**

62 Fed. Reg. 11913 (March 13, 1997) ......................................................7

63 Fed. Reg. 8859 (Feb. 23, 1998) ...........................................................3

74 Fed. Reg. 46836 (Sept. 11, 2009) ........................................................5

78 Fed. Reg. 65844 (Nov. 1, 2013) ..........................................................14

I.    FWS'S PERMIT UNLAWFULLY ALLOWS INCIDENTAL TAKE OF MIGRATORY BIRDS

The Migratory Bird Treaty Act imposes strict liability for harming or killing "any migratory bird," "by any means or in any manner."  16 U.S.C. § 703(a).  The government has for decades criminally prosecuted incidental takes of even small numbers of common birds, and still does so.  Until Plaintiffs challenged the Permit below, FWS's official position was that no regulation authorized incidental take under the MBTA, and its issuance of the Permit for commercial convenience to a business without conservation benefit was unprecedented.  ER88.  Even when, after 9/11, the Navy sought a Special Use Permit to allow training that incidentally killed birds, FWS repeatedly refused, expressly declaring it lacked regulatory authority.

But in response to litigation threatened against NMFS, ignoring a storm of protests from virtually all FWS staff,[1] and without relying on countervailing record evidence or coherent explanation, FWS flipped its position and gave the Fishery a free ride.  ER146.  It required no measures to minimize or even reduce take, even

_____

[1] FWS inaccurately claims the internal criticism came from one individual. Defs' Brf at 44.  The criticism—unanswered in the record—was widespread.  *See, e.g.*, ER80, ER154 (Jeffrey Haskins, Chief, Migratory Bird Office); ER81 (Michael Green, Acting Chief, Division of Migratory Birds and Habitat Programs); ER91 (Marcia Pradines, Deputy Chief, Division of Migratory Bird Management); ER153 (James Dubovsky, Central Flyway Representative); ER83, ER92 (Holly Freifeld, Division of Migratory Birds and Habitat Programs).

after finding they "would not significantly affect the fishery or its economic output." *Id.* This sweeping accommodation kicks open the door to FWS allowing take of any number of migratory birds without accountability. FWS now grasps at *post hoc* straws to cobble together a justification for an action dictated by expediency rather than any principled application of the law or scientific expertise.

A.    FWS Reversed Its Longstanding Regulatory Interpretation Without Explanation.

FWS repeatedly angles for deference to its new position that 50 C.F.R. § 21.27 authorizes incidental take for any "compelling justification," but "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 213 (1988). FWS invented a new interpretation conflicting with its prior view to address NMFS's demands prompted by litigation, ER161, making deference unwarranted. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).

FWS argues the Permit reflects its "longstanding" view that it could allow anyone to incidentally take any migratory birds. *Id.* at 17. To support this, FWS exhumes a 1996 interim guidance, notably absent from the record, Defs' Brf at 32, which proves the opposite of FWS's argument.

After noting that none of FWS's regulations provide for incidental take,[2] the guidance expressly restricts its applicability to ESA-listed birds.[3]  It relies on a legal analysis acknowledging Section 21.27 has never been interpreted to authorize incidental take,[4] and that an incidental take regulatory permitting program "may be advisable," but opining that in the meantime, "use of § 21.27 to permit take *in conjunction with an ESA § 10 permit*" may pass muster, but *only* for ESA-listed species.[5]  Even in that limited circumstance, FWS was advised to provide back-up assurances it would not refer the takes for prosecution.[6]

FWS's rationale for excepting only ESA-listed birds was that "the permittee already would have agreed to an operating conservation program designed to conserve the species and minimize and mitigate the impacts of take of the listed species of migratory birds to the *maximum extent practicable*."  63 Fed. Reg. 8859, 8863 (Feb. 23, 1998) (emphasis added).  FWS's view concerning permitting incidental take of *ESA-listed* birds is irrelevant here:  the interim guidance by its terms does not apply to all but one of the 682 non-ESA-listed bird mortalities the

---

[2] http://www.fws.gov/endangered/esa-library/pdf/Hcpapp5.pdf (first full page) (last viewed April 7, 2014)

[3] *Id*. (second full page) ("*species must be ESA-listed*").

[4] *Id*., Ass't Solicitor's Op. at 2.

[5] *Id*. at 3 (emphasis added); *id.* at 5.

[6] *Id*. at 4.

Permit authorizes, the Permit fails to require mitigation to the maximum extent practicable, and FWS rejects any need to require it. Defs' Brf at 18, 39, 47.

This guidance did not prevent FWS from expressly and repeatedly declaring it lacked authority to permit the Navy to incidentally take migratory birds. Instead, FWS's high-level administrators officially acknowledged: "There are no provisions for the Service to issue permits authorizing UNINTENDED conduct on the part of a permittee." *Center for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161, 167 (D.D.C. 2002) (quoting Letter from Chief, Migratory Birds and Habitat Programs, FWS, to United States Navy, dated August 5, 1996); *see also id.* at 168 (quoting Letter from Acting Director of FWS to Secretary of the Navy, dated June 12, 2001, denying permit but suggesting FWS could "exercise its discretion not to take enforcement action"); *Center for Biological Diversity v. Pirie*, 201 F. Supp. 2d 113, 121 (D.D.C. 2001) ("The fact that FWS has <u>consistently denied permits</u> to defendants for these activities in the past is <u>very significant</u>.") (emphasis added).[7]

FWS cannot explain how its position on the Navy's application under the same regulation is consistent with its current posture, so it struggles to offer some alternative rationale for Congress amending the statute in response to FWS's

---

[7] FWS argues the *Pirie* court was not convinced a permit would not issue, Defs' Brf at 35, but the court made its doubts abundantly clear. It therefore issued an injunction, staying it to allow the Navy to seek congressional action—which, still lacking a permit, the Navy did. *Pirie*, 201 F. Supp. 2d at 120-22.

refusal, Defs' Brf at 36, but had either FWS or Congress imagined Section 21.27 allowed FWS to issue the Navy an incidental take permit, FWS would have issued one, Congress would not have amended the MBTA to temporarily exempt the Navy, and FWS would not have issued a new, narrow regulatory exemption for military training. 50 C.F.R. § 21.15.

FWS has always understood Section 21.27 does *not* authorize incidental take as the Permit allows. This has consistently been its official position, not only in *Pirie*. *See* 74 Fed. Reg. 46,836, 46,862 (Sept. 11, 2009) ("No permit is currently available to authorize incidental take under the MBTA."). *See also* ER140 ("we have no regulatory framework … to inform this issuance of such a permit.")

For FWS's new interpretation to be entitled to deference, FWS must at least "display awareness that it *is* changing position" and not "depart from a prior policy *sub silentio*." *Fed. Communication Comm'n v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1035 (9th Cir. 2010) ("Courts will not assume [an agency] has engaged in reasoned decision making when it implicitly departs from its prior precedent and provides no explanation for doing so.") (citation and internal quotations omitted). FWS neither acknowledged its turnabout nor explained it. Deference is unwarranted.

## B. FWS's New Interpretation Granting It Unbounded Discretion Conflicts With The Regulation.

FWS's new interpretation is not persuasive. FWS argues that Section 21.27 actually means: "FWS may issue a permit for any takes for which it finds the justification compelling." Defs' Brf at 22-26. This argument faces the "insurmountable textual obstacle" of making almost all of the 94-word regulation superfluous. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114 (2001); *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc*., 710 F.3d 946, 966 (9th Cir. 2013) ("[C]ourts should not interpret statutes in a way that renders a provision superfluous."); *Jewett v. Comm'r of Int. Revenue*, 455 U.S. 305, 315-16 (1982) (applied to regulation).

Section 21.27 applies only to "special purpose activities related to migratory birds." "Special purpose activities" cannot mean "any activities, with no special purpose." *See Defensor v. Meissner*, 201 F.3d 384, 388 (5th Cir. 2000) (interpreting immigration statute's requirement that visa applicants have a "specialty occupation" as allowing them to have *any* occupation was "completely opposite the plain purpose of the statute and regulations….") If "activity related to migratory birds" means only that it somehow results in takes, Defs' Brf at 23, it, too, is superfluous; absent takes, no permit is needed.

Nor would FWS have included in the regulation the examples of permissible showings—"benefit to the migratory bird resource, important research reasons,

reasons of human concern for individual birds"—had it intended that an application need only be somehow "compelling." *Adams*, 532 U.S. at 118 (" the location of the phrase 'any other class of workers engaged in ... commerce' in a residual provision, after specific categories of workers have been enumerated, undermines any attempt to give the provision a sweeping, open-ended construction."); *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S 134, 142 (1985) ("This 'blue pencil' method of statutory interpretation—omitting all words not part of the clauses deemed pertinent to the task at hand—impermissibly ignores the relevant context in which statutory language subsists.")

Read in the context of  the statute's and treaties' conservation intent and the regulation's required showings, the regulation limits permits to activities directed at migratory birds that somehow benefit them, directly or indirectly.  FWS has a form specifically designed "to determine whether there is a *bona fide scientific, educational, rehabilitation or other need or benefit to wildlife* for the issuance of a special purpose permit."  62 Fed. Reg. 11,913, 11,914 (March 13, 1997) (emphasis added).

C.      Issuance of the Permit Was Arbitrary and Capricious.

Even assuming the regulation might authorize the Fishery's incidental take under some circumstances, FWS arbitrarily and capriciously applied it here.  If FWS were entitled to jettison decades of interpretation and rewrite its regulation as

it now wishes, a permit justification would still have to be "compelling." FWS offers no standard against which to measure the lawfulness of negating the MBTA's strict prohibition. To be sure, FWS notes some of the circumstances surrounding the issuance of the Permit that it now argues support its decision, but nowhere suggests, in either its brief or the record, that any of these factors was necessary, or circumscribes its discretion. Instead, it reserves the right to approve or reject any future permit application if, for whatever reason, it finds the justification is, or is not, "compelling." [8] FWS would turn MBTA liability into a "sport of chance"—exactly what the Administrative Procedure Act's arbitrary and capricious standard was designed to prevent. *Judulang v. Holder*, 132 S.Ct. 476, 487 (2011).

Immunizing a commercial operation from liability while allowing it to ignore practicable methods to reduce take cannot be "compelling" given the statutory and regulatory context. *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 720 (9th Cir. 2011) ("The fact that an agency has broad discretion in choosing

---

[8] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983) ("Expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.") (citations and internal quotations omitted).

whether to act does not establish that the agency may justify its choice on specious grounds.")

FWS's implied finding of "compelling justification" must be judged solely by the reasons FWS invoked. *Securities and Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196 (1947) ("the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.") These were:

1. the Fishery "contributes in a 'minor way' to total sea bird interactions compared to other domestic and international fisheries";

2. "Interior had already authorized the incidental take under the ESA of short-tailed albatross—one of the same bird species at issue"; and

3. "continued operation of the fishery provides a net economic benefit to the Nation."

Defs' Brf at 20. Even if these unsubstantiated rationalizations (describing the vast majority of migratory bird takes) had record support, they offer no "compelling justification," individually or collectively. *See* ER126 ("The economic considerations and scenario of increased or unmonitored take in foreign-flag fisheries alone do not constitute a compelling justification for permit issuance.")

Although it speculated that closure of the Fishery might shift effort to other fisheries with less effective mitigation, ER191, FWS offers no evidence that denial of the permit application likely would close the Fishery, nor, even if it did, that other fisheries would have a greater impact on these bird populations. *See*

PSER10[9] (FWS specialist dismissing theory as "far-fetched).  Instead, the record establishes: "no estimates of seabird bycatch or information on the use of mitigation measures to reduce seabird bycatch are available for International fleets." PSER38.  The notion that FWS may insulate anyone from MBTA liability without meaningful conditions simply because (contrary to this record) someone else might possibly turn out to be a worse offender was invented out of whole cloth for this case, and lacks legal or factual support.

That FWS authorized take of one endangered short-tailed albatross along with 681 non-ESA-listed birds is a *non sequitur*.  The short-tailed albatross "numbers about 4,000 birds total, nests in Japan, and has never been taken in the fishery," unlike the Black-footed and Layson albatross, which "nest in Hawaii and in the heart of the area where the fishery operates," and which the Fishery hooks often.  ER83.  Moreover, compliance with the ESA does not imply compliance with the MBTA.  Even FWS's extra-record 1996 interim guidance, deeming *only* ESA-compliant incidental take of ESA-listed birds to satisfy the MBTA, offers no basis—let alone "compelling justification"—for 99.9 percent of the Permit's allowed takes.  Indeed, in the record, FWS itself claimed ESA compliance was relevant only to the single authorized take of the endangered bird.  ER191 ("NMFS

---

[9] Plaintiffs-Appellants' Excerpts of Record.

anticipates that any ESA-listed seabird taken in the course of commercial fishing operations consistent with an incidental take statement would also comply with the MBTA permit.")

Finally, that the Fishery provides a "net economic benefit to the Nation" lacks legal significance, record support, or even clear meaning. However "net economic benefit" may be defined, the record contains no analysis of it. Nor does it contain evidence that take reduction, or even elimination, would jeopardize the Fishery. Instead, FWS found that requiring take reduction measures "would not significantly affect the fishery or its economic output," ER146, yet still failed to require any.

### D. Intervenor's Interpretations of the MBTA Are Contrary to Law and Its Rhetoric Is Contrary to the Record.

Intervenor Hawaii Longline Association tries to distract attention from the Permit's legal merits with praise of the Fishery and attacks on Plaintiffs as conniving to "shut the Fishery down." Plaintiffs' legal position and goals are found in their briefs. Plaintiffs are committed to minimizing the hooking of protected species by enforcing the law, no more and no less.

Yet Intervenor complains Plaintiffs created a "legal conundrum," because Plaintiffs in previous litigation alleged migratory bird take was unlawful absent a permit, and now challenge the Permit FWS issued. Plaintiffs have never suggested FWS was free to issue any permit it pleased, on any basis, nor even that any permit

lawfully could issue based on any existing regulation. Plaintiffs merely pointed out the MBTA by its plain language strictly prohibits taking birds without a permit. 16 U.S.C. § 703(a). Plaintiffs have maintained at least since *Pirie* that 50 C.F.R. § 21.27 does not authorize incidental take, and FWS has long taken the same position. FWS and the Fishery, not Plaintiffs, created this problem, and, as the Navy discovered after *Pirie*, it can be solved: FWS can issue a new regulation following the APA's notice-and-comment requirements, hopefully with reliable protections for migratory birds as Congress and the treaties intended. If amending the MBTA is required, Congress may do so if it chooses, as it did following *Pirie*.

Despite extensive record evidence that the Fishery's existing mitigation is not minimizing take to the extent practicable, Intervenor argues otherwise. Intervenor notes some unknown Fishery participants had safety concerns about side-setting, but the record describes the method's extensive "safety and efficiency advantages," in addition to its greater efficacy. SER487. Most important, FWS did not, then or now, dispute take reduction's feasibility, nor premise Permit issuance on its impossibility, but simply argues the Permit need not reduce take. Defs' Brf at 18, 39. *See Chenery,* 332 U.S. at 196 (court must " judge the propriety of [agency] action solely by the grounds invoked by the agency."). Moreover, FWS's bird conservation experts did not share Intervenor's perspective, Op Brf at 28-29; Intervenor identifies none who did. FWS failed to require take

reduction, or even evaluate it in its EA, not because it was not feasible, nor because the law does not require it, but because NMFS refused to agree to it. *See* ER123 (NMFS: "We HAVE NOT applied for a permit for a fishery that has the goal of further reduction in the take of birds…. If that is now [FWS's] stated expectation—further reduction of take—then we are done here and I will notify NMFS leadership."); ER90 ("NMFS-PIRO has indicated that permit conditions requiring operational changes to the fishery are unacceptable; moreover, NMFS is not currently comfortable with NEPA review that considers alternatives beyond the fishery exactly as it operates now."); ER83 (discussing NMFS's opposition to non-status-quo alternatives).

Intervenor argues that because mitigation implemented a decade ago reduced bird take substantially and the species do not face imminent extinction, allowing continued take of hundreds of albatross annually fully complies with the MBTA and FWS's regulations. Intervenor would argue the MBTA out of existence because in its view, enough has been done, and if not, the ESA presumably will prevent extinction. But the MBTA is not the ESA, and neither the MBTA's plain language, nor its legislative history, nor FWS regulations, nor even guidance suggests the MBTA's strict prohibitions apply only to impacts causing a particular degree of population impact (nor suggest any measure of "acceptable" impact). To the contrary, "[I]t is clear that Congress intended to make the unlawful killing of

even one bird an offense. … The language of the conventions supports the conclusion that Congress was concerned with protecting each bird." *United States v. Corbin Farm Serv*., 444 F. Supp. 510, 529-30 (E.D. Cal. 1978), *aff'd*., 578 F.2d 259 (9th Cir. 1978).  If the statute only protected rare birds, FWS would not have included many common species on its regulatory list of protected birds, 50 C.F.R. § 10.13, which applies to all permits.  *Id*. § 10.4(b).  The listing criteria are not based on scarcity, but implement treaties intended to protect migratory birds.  *See* 78 Fed. Reg. 65,844, 65,844-45 (Nov. 1, 2013).

Therefore, FWS properly never deemed population impacts relevant until it needed to rationalize the Permit.  ER90 ("[H]eretofore the Service has defined incidental take relative to individual birds, and not considered to [sic] populations.")  As FWS staff accurately observed, "neither MBTA or our regs provide a yardstick for measuring the importance of that take—it's all prohibited…. [W]e cannot and should not issue a permit that yields no change for the better and simply authorizes the status quo because 'take is much lower than it was 15 years ago' or 'it's only 80 birds' or whatever."  ER83.  To this day, FWS refers for prosecution incidental takes of even small numbers of common migratory birds.[10]  FWS offered no basis for departing from this approach.  If it

---

[10] *E.g.*, http://www.justice.gov/opa/pr/2013/November/13-enrd-1253.html (last viewed April 7, 2014) (utility in November 2013 penalized $1 million for

now believes the MBTA allows it, FWS must promulgate an authorizing regulation in accordance with law.

Finally, Intervenor exaggerates the extent of courts' adoption of the minority view that the MBTA restricts only hunting and poaching and not incidental take.[11] Intervenor relies extensively on the outlier district court decision in *United States v. Brigham Oil & Gas, L.P.*, 840 F. Supp. 2d 1202 (D.N.D. 2012), following *Newton County Wildlife Association v. United States Forest Service*, 113 F.3d 110 (8th Cir.1997). *Newton* rejected MBTA application to timber harvesting "that *indirectly* results in the death of migratory birds," *id.* at 115, unlike longlining, which directly takes them. As the court explained in *United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010), such cases are few, and the large majority of circuits hold that the statute imposes strict liability. *Id.* at 685. This is supported by, for example, the statute's plain language, prohibiting take "by any means or in any manner," 16 U.S.C. § 703(a), and Congress' 1986 amendment adding the word "knowingly" to create the felony offense of selling migratory

---

incidental deaths in wind projects of 153 birds over four years, including hawks, blackbirds, larks, wrens and sparrows). Plaintiffs ask the Court to take judicial notice of Department of Justice's press release.

[11] Intervenor similarly overstates the extent of the "circuit split" on whether the MBTA applies to federal agencies because one circuit held it did not. Since *Humane Society v. Glickman*, 217 F.3d 882, 885-86 (D.D.C. 2000), it has been official FWS policy that it does. *See* http://www.fws.gov/policy/724fw2.html at 2.2 (last viewed April 24, 2014).

birds while leaving intact the language of the misdemeanor provision without an explicit mens rea requirement, together with the amendment's legislative history approving of the courts' strict liability interpretation. See *Apollo Energy,* 611 F.3d at 686. *See also* cases cited at Op Brf at 22-23.

Intervenors' overheated rhetoric notwithstanding, this case does not seek to "criminalize" the Fishery. Plaintiffs seek to have an unlawfully issued permit vacated; FWS's actions thereafter are not before the Court. Nor does the *Brigham Oil* court's concern—that "ordinary activities such as driving a vehicle, owning a building with windows, or owning a cat, [which] inevitably cause migratory bird deaths," 840 F. Supp. 2d at 1212—apply here. While Intervenor characterizes every entity that has ever been prosecuted as somehow more culpable than the Fishery, even assuming reasonable foreseeability is required, the Fishery's commercial operations are nothing like "owning a building with windows" or "owning a cat." The Fishery has been hooking birds month after month for many years, and the record is replete with evidence that take could be reduced, or even eliminated, but for NMFS's arrogance and FWS's faint-heartedness. The Permit is unlawful and must be vacated.

II.   FWS UNLAWFULLY REFUSED TO EVALUATE ANY ALTERNATIVE
      TO THE FISHERY'S STATUS QUO

      A.   <u>FWS Cannot Evade NEPA By Declaring The Permit's Purpose Is To
           Minimize Inconvenience to the Fishery.</u>

Regardless of FWS's authority to issue the Permit without requiring

available take reduction, NEPA required that it evaluate all practicable alternatives,

and FWS did not.  FWS refused to evaluate in its Environmental Assessment any

alternative requiring the Fishery to deviate from the status quo, such as requiring

more effective mitigation, despite ample record evidence of its availability.  Op Brf

at 28-29.  FWS's only stated basis for this refusal was the bare assertion that it was

"not practicable" because the regional fishery management council would have to

initiate a regulatory amendment to the fishery management plan.  ER77.  FWS

must evaluate "reasonable alternatives not within the jurisdiction of the lead

agency."  40 C.F.R. § 1502.14(c).  Unable to defend the district court's erroneous

failure to apply this regulation, FWS urges the Court to ignore it, Defs' Brf at 54,

and offers a *post hoc* impracticability argument that it tries to retroactively

shoehorn into its stated justification.

FWS now suggests for the first time that the process of amending the fishery

management plan would have taken too long, given the "short duration of the

permit."  Def's Brf at 52.  FWS's attempt to handcuff itself fails.  The record

contains no evidence of how long the amendment process would take, nor any

discussion of it.  FWS was not forced to issue the Permit by any particular date (or at all), nor to require that all mitigation be immediately implemented.  Even if amending the fishery management plan were necessary, FWS does not deny that an alternative requiring mitigation as soon as possible was practicable.

FWS also argues that any alternative altering the status quo would not meet the Permit's purpose and need.  Defs' Brf at 48; ER141.  It points to three purposes and needs that require bird conservation, and one that "minimizes unnecessary costs or burdens on the fishery."  *Id.*  FWS did not merely "think hard" about NMFS's needs,  Def's Brf at 53,[12] it unlawfully allowed them to displace all others.  *Nat'l Parks & Conserv. Ass'n v. Bur. of Land Management*, 606 F.3d 1058, 1072 (9th Cir. 2010) (holding "The BLM may not circumvent this proscription [against defining its objectives in unreasonably narrow terms] by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives…," and noting that Department of Interior regulations require the "purpose and need statement for an externally generated action must describe the BLM purpose and need, *not an applicant's or external proponent's purpose and need*.").

---

[12] The Magnuson-Stevens Act's requirement that *NMFS* minimize costs to fishermen where practicable, *see id.*, is irrelevant to *FWS's* NEPA obligation to examine practicable alternatives.

B.    FWS Must Evaluate Practical Alternatives Even If No EIS Is
      Triggered.

Cowed by NMFS's refusal to consider any change to the status quo and by

NMFS's insistence that FWS not even evaluate any such alternative in the EA,

ER83, ER90, ER123, FWS now rationalizes: "Certainly, a regulatory amendment

that is unnecessary to avoid significant adverse effects to bird populations is [an

unnecessary] burden and therefore does not meet the project purpose."  Defs' Brf

at 49-50.  Certainly this is wrong, as a matter of law.  Even assuming no alternative

triggers an EIS by causing significant impacts, NEPA requires that FWS evaluate

practicable alternatives that minimize impacts.  *Bob Marshall Alliance v. Hodel*,

852 F.2d 1223, 1228-29 (9th Cir. 1988) ("Consideration of alternatives is critical to

the goals of NEPA even where a proposed action does not trigger the EIS

process.").

NEPA's purpose mandates: "Federal agencies shall to the fullest extent

possible … use all practicable means … to … avoid or minimize any possible

adverse effects…."  40 C.F.R. § 1500.2(f).  FWS, in its EA, must therefore "inform

decisionmakers and the public of the reasonable alternatives which would avoid or

minimize adverse impacts."  *Id*. § 1502.1; *Hodel*, 852 F.2d at 1228 (To allow

agency and the public to consider "all possible approaches to a particular project

… which would alter the environmental impact and the cost-benefit balance," EA

was obliged to consider alternatives minimizing impact) (citation omitted); *Lands*

*Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) ("The purpose of NEPA is to … permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm.")

Intervenor similarly dismisses any need to examine any alternative because, it argues, the action's impacts are insignificant, citing *obiter dictum* in *Earth Island Institute v. United States Forest Service*, 697 F.3d 1010 (9th Cir. 2012). In *Earth Island*, the Forest Service sought to decrease the likelihood of fires by removing dead trees. The plaintiff advocated removal of fewer trees to support bird habitat. There was no dispute that the agency's goal of fire suppression was legitimate, or that its preferred alternative would better promote it. The decision hinged on the Court's finding that the agency had "offered a reasonable explanation for how its preferred alternative better accomplished its goal of reducing the risk of severe fires than Plaintiffs' proposed alternative," *id.* at 1022, since agencies need not 'consider alternatives that do not promote the goal' or the 'purpose' the agency is trying to accomplish." *Id.* at 1023. *See Western Watersheds Project v. Bureau of Land Management*, No. 2:10–CV–02896–KJM–KJN, 2013 WL 4776543, *9 (E.D. Cal., Sept. 4, 2013) (construing *Earth Island*). Unlike in *Earth Island*, in the present case, an alternative minimizing take would have better served every legitimate purpose and need for the Permit.

More to the point is *Western Watersheds Project v. Abbey,* 719 F.3d 1035 (9th Cir. 2013), in which BLM prepared an EA assessing impacts of grazing allotments. Although it analyzed four alternatives, three maintaining the status quo and the no-action alternative, and there was no claim that grazing had a significant impact triggering the need for an EIS, the Court was "troubled by BLM's decision not to consider a reduced- or no-grazing alternative…." *Id*. at 1050. BLM argued it rejected such alternatives "because they were beyond the purpose and need of the project. But the record shows that these alternatives could feasibly meet the project's goal. *Feasible alternatives should be considered in detail*." *Id*. at 1052 (emphasis added). The Court went on: "BLM's decision not to consider such an alternative, without adequate explanation, shows that it did not take the hard and careful look at impacts of the permit renewal that is required by NEPA. … [T]he EA process … was deficient in its consideration of alternatives insofar as it did not consider in detail any alternative that would have reduced grazing levels….") *Id*. at 1053.

FWS's alternatives analysis was instead dictated by the goal of satisfying NMFS's insistence that the Fishery's operations not be altered, and offered no rational, substantiated explanation for declining to evaluate any take reduction alternative. FWS cannot select EA alternatives by abandoning its own mission and the intent of the statute to genuflect to an applicant's demand for a burden-free

permit. This is so whether FWS declares—without basis—that the permit period is "too short" to accommodate any action by the permittee to alter that status quo, or by deeming 682 takes "insignificant" in relation to the "burden" on the Fishery.

C.    References To Other Alternatives In Other NEPA Documents Are Irrelevant.

Intervenor argues that *FWS* need not have examined any non-status-quo alternative because such alternatives were mentioned in a NEPA document *NMFS* prepared nine years ago, and in another document the regional fishery management council (chaired by Intervenor's president) prepared for NMFS. Intervenor offers no authority that FWS may ignore its obligation to comply with NEPA, or truncate its analysis, because some other agency, assessing some other action, prepared a NEPA document with overlapping analysis (let alone where those analyses were prepared by the very parties applying to FWS for a permit). In *Abbey*, the Court rejected an agency's reliance on its *own* prior EIS, examining similar activities, to justify failure to include an alternative in its EA, because the agency failed to show the prior analysis remained valid. 719 F.3d at 1052. Here, FWS did not purport to rely on these prior NEPA documents when it declined to evaluate any non-status-quo alternatives, nor could it have done so, but instead offered a completely different explanation. Intervenor cites the dissent in *San Luis & Delta-Mendota Water Authority v. Jewell*, Nos. 11-15871, 2014 WL 975130 (9th Cir. Mar. 13, 2014), but even that dissenting opinion does not support Intervenor's contention,

arguing only that NEPA review was superfluous where the agency was complying

with a biological opinion prepared under the ESA.


III.  NMFS'S JEOPARDY ANALYSIS FOR AUTHORIZING TAKE OF THE
      LOGGERHEAD TURTLE POPULATION IS UNLAWFUL

The Endangered Species Act requires that NMFS "insure" its action will not

jeopardize a population's continued existence by appreciably reducing the

likelihood of its survival and recovery.  16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.02

(definition of jeopardize).  NMFS recently reclassified the loggerhead sea turtle

population as Endangered after describing a host of forces pushing it towards

extinction.  ER131-134.  NMFS's modeling shows the loggerhead population

"headed for a significant decline," PSER25, further and further below the Quasi-

Extinction Threshold—which NMFS chose to use as "the main determinant of

extinction risk," PSER23—throughout the 25-year modeled period.  It reveals

NMFS's incidental take authorization will, by its own calculation, cause an

additional loss from the population of 11 percent. PSER19.  No evidence

suggests—nor does NMFS argue—this downward trend will ever reverse, at least

unless NMFS takes action.

The record thus establishes that NMFS's action appreciably reduces the

likelihood of the population's survival and recovery, which ESA § 7(a)(2) strictly

prohibits.  NMFS denies this but offers no concrete analytical basis, and no

demonstration of the expertise to which it claims deference. Instead, it argues that, with or without the authorized takes, "whether the trend of the model pointed upward or downward"—in this case, decidedly downward—"there was no appreciable difference in the outcomes." Defs' Brf at 63. This reasoning—the population may go extinct anyway, so an extra shove will not make much difference—is unlawful.

NMFS claims the Biological Opinion contains a "well-reasoned discussion" of how its action left "sufficient potential for recovery," Defs' Brf at 63, but such reasoning is nowhere to be found, beyond the bald assertion "we believe that the population will remain large enough to retain the potential for recovery," SER172, without supporting analysis that this "potential" will likely ever be realized. Instead, the BiOp reveals that virtually none of the criteria NMFS identified to achieve the species' recovery are being met, or have any likelihood of being met. SER170-171. In *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), where, as here, long-term negative population trends of an endangered population were likely to continue and no basis for anticipating reversal was presented, this Court rejected FWS's blithe assertions that the population would not be jeopardized and would somehow endure. *Id*. at 526.

NMFS ultimately bases its "no jeopardy" conclusion on its view that, because the population's prospects for survival are dismal either way—"high

loggerhead extinction risk with high model confidence," ER160—and "the

expected level of take from the action, including a small number of mortalities, is

extremely small when considered together with all impacts considered," the

population will not be that much worse off, comparatively speaking.  ER118.  *See*

*also* PSER17 ("The removal of such a small number of loggerheads *in relation to*

*total human caused mortality* is not expected to appreciably affect population

dynamics") (emphasis added).  This comparative approach is precisely what this

Court explained Section 7(a)(2) prohibits:

> NMFS argues that, under this definition [of "jeopardy"], it may satisfy
> the ESA by comparing the effects of [the proposed agency action] on
> listed species to the risk posed by baseline conditions. … Under this
> approach, a listed species could be gradually destroyed, so long as
> each step on the path to destruction is sufficiently modest.  This type
> of slow slide into oblivion is one of the very ills the ESA seeks to
> prevent.
> …
> [E]ven where baseline conditions already jeopardize a species, an
> agency may not take action that deepens the jeopardy by causing
> additional harm.[13]

*National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917,

930 (9th Cir. 2008).

Plaintiffs do not argue that NMFS may not authorize any incidental take

merely because a species is endangered.  But it cannot do so where its own

---

[13] The Court's use of "even" shows NMFS need not have previously
conceded the species is in jeopardy before this principle applies.

projection shows the population plunging towards extinction, below the threshold (QET) NMFS itself established as the "main determinant of extinction risk," ER103, without predicting recovery or identifying any basis to do so, and its action increases the risk by 4-11 percent, simply by noting the impact is comparatively "small" since the population is being hammered anyway.

NMFS describes differences between *NWF* and this case, but none makes *NWF*'s fundamental point inapplicable here. As NMFS admits, the Court held its jeopardy analysis unlawful for "failing to consider the full action in the context of degraded baseline conditions." Defs' Brf at 62. Similarly, NMFS concluded here there could be no jeopardy because the population already faces dismal prospects as a result of baseline conditions—*i.e.,* the "outcome" will be the same either way.

Intervenor emphasizes that NMFS estimated the Fishery will likely cause one adult female loggerhead mortality every year, since this number superficially appears so harmless. But absolute numbers mean nothing without context, and emphasizing them ignores not only *NWF*, 524 F.3d at 930 ("Under this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest"), but that NMFS's modeling expert had good reason to acknowledge "the additional loss to the loggerhead population resulting from the proposed action ranges from 4-11 percent." ER105. NMFS's models ignored males and juveniles, not because they lack any biological value, but

because adult females are the only demographic for which NMFS has data (from counts of adult females on nesting beaches). ER102. NMFS doubled the previous authorized take to 34 loggerheads and estimated the Fishery will kill 7 and injure 27, half of which are statistically likely to be female (and all of which could be). PSER16. The Fishery will have a geometrically greater effect than removing one turtle—including the six others that will never reach sexual maturity, and all of the progeny, and progeny of that progeny *ad infinitum*, of all of those turtles (as well as of any hooked turtles that do not immediately die but cannot breed as a consequence of their injuries). NMFS and Intervenor argue that some of those lost turtles might die from other causes—although pointing to no substantiating record evidence[14]—but the undisputed fact, by NMFS's own reckoning, is that *this* action will ensure they never exist, while the population "slides into oblivion." Speculation that an alternate future may be little better cannot immunize jeopardizing action, and, as a matter of law, "appreciable" reduction in survival and recovery does not mean "larger than whatever NMFS is willing to authorize."

---

[14] Intervenor's repeated references to "1 in 1,000 survival" are without record support.

IV.   NMFS FAILED TO USE THE BEST AVAILABLE SCIENCE TO
      ASSESS THE FISHERY'S IMPACT ON LEATHERBACK SURVIVAL
      AND RECOVERY

NMFS's own classical model, in which it has "high confidence," ER138,

predicts the endangered western Pacific leatherback population will be "completely

extirpated by the year 2080," ER159, with the Fishery's four adult female

mortalities every year having a dramatic additional impact.  *Id*. (Fishery impacts

reduce population by 87%); ER125 (figure (c)).  Its climate model predicts a more

optimistic scenario, but has "no predictive value" beyond 25 years, a single

generation.  ER114.

Intervenor tries to manufacture a dispute triggering deference to agency

expertise by pretending Plaintiffs insist the classical model is the better one, Int Brf

at 55, but Plaintiffs merely agree with NMFS's own acknowledgement that, as its

own expert advised, the *two models together are the best available science*, which

Section 7(a)(2) expressly requires NMFS to use.  Defs' Brf at 67; ER119 ("we are

persuaded that a proper qualitative analysis should consider aspects of both

models").  NMFS and Intervenor alternatively urge that NMFS did "consider" both

models, but can point to nothing in the record substantiating this, beyond bald

assertions and vague rhetoric.  Nowhere did NMFS demonstrate that the classical

model's prediction of impending extinction actually played any role in NMFS's

jeopardy analysis.  Far from reducing the previous leatherback authorized take

level, NMFS increased it for the first time in a decade, and did not, despite its own model's prediction that it will drastically accelerate extinction, increase that take by any less than the 63 percent the regional fishery management council requested.

To the contrary, NMFS admitted in the BiOp it did *not* consider the classical model's results: it evaluated the proposed action's effects *only* "over the next 25 years, which corresponds to the forecast limitations of the climate-based model." ER148. But as Intervenor admits, while the climate model's value ends in 25 years, the Fishery continues indefinitely. Int's Brf at 57. NMFS therefore backpedals and argues its truncated climate model alone, however "imperfect," is the best available science. Defs' Brf at 67. NMFS cannot have it both ways, and its exclusive use of the 25-year climate model is contrary to its own expert's advice and the ESA's best available science requirement. Putting on temporal blinders this way is impermissible, *Wild Fish Conservancy*, 628 F.3d at 523-25, particularly when NMFS ignores the best available science for the period after 25 years: its own model in which it has "high" confidence. ER137-38. Nor did NMFS give the benefit of the doubt to the endangered leatherback, as Congress intended. *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir.1988).[15]

---

[15] NMFS argues its no jeopardy conclusion was justified because it believes the Fishery will have less impact on the majority of the population, which it did not model, than on the Jamursba-Medi component, which it did. Defs' Brf at 66. Yet NMFS determined "the risk to [the Jamursba-Medi component] is the best measure

29

V. NMFS UNLAWFULLY DISMISSED THE ACKNOWLEDGED
   IMPACTS OF CLIMATE CHANGE

NMFS recently reclassified the loggerhead as Endangered due in part to concerns about climate change. ER133. NMFS also described in its BiOp the ways climate change threatens sea turtles, supported by extensive record evidence. *E.g.*, PSER12 ("Primary impacts to [western Pacific leatherbacks] in addition to U.S. commercial longline fisheries include … climate change."); ER99-100. Six years ago, Chaloupka (2008), noting sea surface temperatures near the loggerhead rookeries had been increasing since the 1950s "consistent with a general warming of the oceans due to human-induced global climate change," PSER5, listed eight studies discussing climate change impacts. PSER1-2. He analyzed the effects of 50 years of sea surface temperature changes on loggerhead nesting abundance over the same period, and found higher temperature was followed by lower nesting at every location. PSER5. He concluded: "Lower recruitment due to [reduced food and shorter nesting season] *will result* in reduced Pacific loggerhead abundance and *increase the extinction risk*," PSER6-7 (emphasis added), and that "the gradual long-term warming of the western Pacific Ocean over the past 50 years is a *major*

of the risk of the proposed action to the overall population." SER174. Given NMFS's failure to use the best available science to reach any such conclusions, and that the classical model predicts "complete extirpation," the argument ultimately is a red herring.

*risk factor* that should be considered in any meaningful and comprehensive diagnosis of the long-term declines apparent for some Pacific loggerhead nesting populations." PSER6 (emphasis added).

Van Houtan, who created NMFS's population models, admitted existing science predicts climate change will drastically reduce ocean productivity in loggerhead habitat, with consequent impact on the population: "In the North Pacific, projections under anthropogenic climate scenarios indicate a 34% decrease in both the area and primary production of the temperate oceanic biome [over the next 100 years], which would impact juvenile loggerheads from Japan." PSER35.

Such a "major risk factor" is critically relevant to the amount, if any, of incidental mortality the species can withstand without being jeopardized. NMFS defends its complete disregard of these threats (after acknowledging them) with cultivated ignorance, arguing that precise data quantifying the impact on leatherbacks and loggerheads is not available. Intervenor argues Plaintiffs failed to point to specific evidence NMFS did not consider, and urges deference to NMFS's disregard.

NMFS did not consider the effects of climate change in any meaningful sense. NMFS's stated justification that impacts will not be felt during the next 25 years is contrary to its own statements admitting impacts are "likely beginning to affect sea turtles in the action area," ER99, and premised on the plainly erroneous

31

assumption that "the temporal scale of the proposed action" is 25 years, ER116, ER120, when the Fishery is not temporally restricted. NMFS's excuse that 25 years is the "window within which the best available science can meaningfully forecast other direct impacts to turtles," Defs' Brf at 72, if it means anything, is inaccurate and irrelevant. First, the 25-year climate model to which NMFS evidently refers incorporates only historical nesting data and certain cyclical oceanographic conditions. ER103-104. It incorporates none of the other "direct impacts" NMFS acknowledged but effectively ignored, such as mortalities in other fisheries, marine debris, destruction of nesting beaches, hunting, and global warming. ER111-112.

Second, NMFS's obligation to insure against jeopardy from a Fishery it authorized in perpetuity is not bounded by the climate model's severely limited predictive value. The ESA does not demand perfection, but NMFS may not put its head in the sand and make willful ignorance its defense. *See Conner*, 848 F.2d at 1454-55 (NMFS is not "excused from [fulfilling the ESA's dictates] if, in its judgment, there is insufficient information available to complete a comprehensive opinion and it takes upon itself [a more limited analysis]"); *Greenpeace v. National Marine Fisheries Service*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) ("A biological opinion which is not coextensive in scope with the identified agency

action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious.")

NMFS detailed the ways turtles will be harmed and admitted these harms "are likely to occur as a result of worsening climate change," ER115, and acknowledged "climate change is likely beginning to affect sea turtles found in the action area through the impacts of rising sand temperatures, rising sea level, increased typhoon frequency, and changes in ocean temperature and chemistry." ER99. But it then claimed the turtles will experience no adverse impacts for another 25 years, complained it lacked a "comprehensive assessment" of exactly how many turtles will be affected, ER112, and argued, "[t]here is simply no data available about turtle deaths from climate change in the action area." Defs' Brf at 70. NMFS therefore prepared its jeopardy analysis as though climate change will never have any impacts over the life of the Fishery. This displays contempt for its "rigorous" duty to "insure" against jeopardy. *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987).

At various points NMFS hints (and Intervenor argues fervently), that any flaws in NMFS's jeopardy analysis are rendered irrelevant by "spillover effects."[16]

---

[16] Intervenor funded and vetted the paper speculating that the temporary replacement of Fishery-caught swordfish with foreign-caught swordfish during the complete closure of the Fishery in 2002-2004 harmed turtles. PSER9.

According to this theory, longlining throughout the entire Pacific is a zero-sum game, and removing one vessel from the Fishery will mean another fishery will add one. Since all other fleets supposedly use less effective bycatch mitigation, more turtles consequently will be caught unless the Fishery is given free rein. Endangered turtles will be better served if NMFS ignores the ESA and allows the Fishery to expand without limit; every turtle killed in the Fishery is a net conservation benefit. This unprecedented death-blow to the ESA is constructed on speculation and demonstrably false factual and legal assumptions.

NMFS views "spillover effects" as an "indirect effect" of authorizing the Fishery. PSER13. NMFS may consider an action's indirect effects *only* if the record demonstrates they are "reasonably certain to occur." 50 C.F.R. § 402.02 (definition of "effects of the action"); *San Luis & Delta–Mendota Water Authority*, 760 F. Supp. 2d at 940-43; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 254 F. Supp. 2d 1196, 1213 (D. Or. 2003) (noting "the regulatory standard is not 'reasonable chance' but 'reasonable certainty," and rejecting mitigating factors for uncertainty.)

While NMFS may be willing to claim reasonable certainty rhetorically, its own study exploring "possible" effects, PSER29, is based on one unsubstantiated assumption stacked on another. For example, the entire theory is premised on the Fishery having lower turtle bycatch rates than every other swordfish fishery, but

NMFS does not know most of the world's swordfish fisheries' turtle bycatch rates, so it simply "assumed" they are higher. PSER30-31. NMFS has no evidence that other fisheries respond to fluctuations in the Fishery's methods or effort, so it "assumes" that if the Fishery greatly expanded, it could displace imports from all other swordfish fleets, and U.S. consumers will demand U.S.-caught fish because they are patriotic. PSER32. It also assumes, without evidence, that fisheries adding effort could not sell their swordfish anywhere else in the world.

NMFS therefore acknowledged that any "possible" spillover effect is uncertain, negating its eligibility as an indirect effect and making it irrelevant to the jeopardy analysis. PSER14-15 ("the data on foreign fisheries is likely incomplete or inaccurate, foreign fishery bycatch rate estimation is imprecise … [and predictions of avoided foreign turtle interactions] cannot be confirmed."); PSER17 ("we cannot quantify the reduction in risk to the population.") The Chief of NMFS's Endangered Species Conservation Division was less charitable:

> The paper upon which this information relies is *full of assumptions such that it creates the appearance of validity because of its statistical analysis, but is in many ways little more than unsubstantiated assumptions*. There is no discussion whatsoever about the non-US markets the foreign production may serve. All of the findings of this supposed transfer effect are *contradicted by your own opinion* when you state "So when Hawaii production increases, it won't lower the world price because additional production will be absorbed by the US mainland or foreign markets."

PSER26 (emphasis added); *see also* PSER21 (dismissing purported spillover

effect); PSER10 (theory "far-fetched").  Such "junk science" cannot generate a

"reasonably certain" indirect effect in an analysis that must "insure" against

jeopardy, 16 U.S.C. § 1536(a)(2), and must give the benefit of the doubt to the

species.  *Conner*, 848 F.2d at 1454.  NMFS's inclusion of this Hail Mary

speculation reveals its lack of confidence in its "no jeopardy" conclusion.  *See*

PSER19 ("The overall impact of the proposed action … is an additional population

decline of 11%.  In both cases, default run and proposed action, there is a high risk

of extinction and the model confidence is high. This, by itself is problematic.

Consideration of spillover effects becomes important.")  NMFS may not hedge its

bet by declaring it did not rely on spillover effects to salvage its BiOp, ER118,

while hinting spillover effects are a fact.  NMFS tried that gambit before and lost.

*Nat'l Wildlife Fed'n*, 254 F. Supp. 2d at 1214-15.


VI.    CONCLUSION

FWS abruptly, and without explanation or even acknowledgement,

abandoned many years of contrary interpretation and practice to bestow upon itself

unbridled discretion to ignore the MBTA.  It made a mockery of NEPA by

excluding from analysis any alternative that displeased NMFS.  As FWS

previously maintained, its regulation does not authorize the Permit, and its action

36

threatens to strip the law of meaningful conservation value.  The Permit must be vacated.

NMFS for tis part abdicated its conservation duties under the ESA, paying lip service to its own science while effectively ignoring it to ensure the Fishery is not inconvenienced.  Congress instead mandated that NMFS "insure" that endangered species are not jeopardized.  The district court erred, and Plaintiffs are entitled to summary judgment.

Respectfully Submitted,

Dated:  May 14, 2014

/s/ Paul H. Achitoff
Paul H. Achitoff
EARTHJUSTICE
850 Richards St., Suite 400
Honolulu, HI 96813
Telephone:  (808) 599-2436
Facsimile:  (808) 521-6841

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1 and this Court's authorization of Plaintiffs' Notice of Enlargement of their Reply, this brief is proportionately spaced, has typeface of 14 points or more and contains 8,398 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


/s/ Paul H. Achitoff

| 9th Circuit Case Number(s) | 13-17123 |
| --- | --- |

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | May 14, 2014 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Paul H. Achitoff |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) | |

# ADDENDUM

## TABLE OF CONTENTS

Except for the following, all applicable statutes, etc., are contained in the addenda to Appellants Opening Brief or to Federal Appellees' Answering Brief

Page Number(s)

**REGULATIONS**

**Council on Environmental Quality NEPA Regulations**

40 C.F.R. § 1500.2(f), Policy ................................................................... A-1

**U.S. Fish and Wildlife Service MBTA Regulations**

50 C.F.R. § 10.13, List of Migratory Birds ..................................... A-2-21

**FEDERAL REGISTER**

62 Fed. Reg. 11913 (March 13, 1997) ........................................... A-22-24

63 Fed. Reg. 8859 (Feb. 23, 1998) ................................................ A-25-36

74 Fed. Reg. 46836 (Sept. 11, 2009) ............................................ A-37-80

78 Fed. Reg. 65844 (Nov. 1, 2013) ............................................. A-81-101

# PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.

1500.1  Purpose.
1500.2  Policy.
1500.3  Mandate.
1500.4  Reducing paperwork.
1500.5  Reducing delay.
1500.6  Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

vironmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## § 1500.2  Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

District of Columbia, Commonwealth of Puerto Rico, American Samoa, U.S. Virgin Islands, Guam, Commonwealth of the Northern Mariana Islands, Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Atoll, Navassa Island, Palmyra Atoll, and Wake Atoll, and any other territory or possession under the jurisdiction of the United States.

*Whoever* means the same as person.

*Wildlife* means the same as fish or wildlife.

[38 FR 22015, Aug. 15, 1973, as amended at 42 FR 32377, June 24, 1977; 42 FR 59358, Nov. 16, 1977; 45 FR 56673, Aug. 25, 1980; 50 FR 52889, Dec. 26, 1985; 72 FR 48445, Aug. 23, 2007]

## § 10.13 List of Migratory Birds.

(a) *Legal authority for this list.* The Migratory Bird Treaty Act (MBTA) in 16 U.S.C. 703–711, the Fish and Wildlife Improvement Act of 1978, 16 U.S.C. 712, and 16 U.S.C. 742a–j. The MBTA implements Conventions between the United States and four neighboring countries for the protection of migratory birds, as follows:

(1) *Canada:* Convention for the Protection of Migratory Birds, August 16, 1916, United States-Great Britain (on behalf of Canada), 39 Stat. 1702, T.S. No. 628, as amended;

(2) *Mexico:* Convention for the Protection of Migratory Birds and Game Mammals, February 7, 1936, United States-United Mexican States (=Mexico), 50 Stat. 1311, T.S. No. 912, as amended;

(3) *Japan:* Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, March 4, 1972, United States-Japan, 25 U.S.T. 3329, T.I.A.S. No. 7990; and

(4) *Russia:* Convention for the Conservation of Migratory Birds and Their Environment, United States-Union of Soviet Socialist Republics (=Russia), November 26, 1976, 92 Stat. 3110, T.I.A.S. 9073, 16 U.S.C. 703, 712.

(b) *Purpose of this list.* The purpose is to inform the public of the species protected by regulations designed to enforce the terms of the MBTA. These regulations, found in parts 10, 20, and 21 of this chapter, cover most aspects of the taking, possession, transportation, sale, purchase, barter, exportation, and importation of migratory birds.

(c) *What species are protected as migratory birds?* Species protected as migratory birds are listed in two formats to suit the varying needs of the user: Alphabetically in paragraph (c)(1) of this section and taxonomically in paragraph (c)(2) of this section. Taxonomy and nomenclature generally follow the 7th edition of the American Ornithologists' Union's *Check-list of North American birds* (1998, as amended through 2007). For species not treated by the AOU *Check-list*, we generally follow Monroe and Sibley's *A World Checklist of Birds* (1993).

(1) *Alphabetical listing.* Species are listed alphabetically by common (English) group names, with the scientific name of each species following the common name. It is possible that alphabetical listing by common group names may create confusion in those few instances in which the common (English) name of a species has changed. The species formerly known as the Falcated Teal, for example, is now known as the Falcated Duck. To prevent confusion, the alphabetical list has two entries for Falcated Duck: ''DUCK, Falcated'' and ''[TEAL, Falcated (*see* DUCK, Falcated)].'' Other potential ambiguities are treated in the same way.

ACCENTOR, Siberian, *Prunella montanella*
AKEKEE, *Loxops caeruleirostris*
AKEPA, *Loxops coccineus*
AKIALOA, Greater, *Hemignathus ellisianus*
AKIAPOLAAU, *Hemignathus munroi*
AKIKIKI, *Oreomystis bairdi*
AKOHEKOHE, *Palmeria dolei*
ALAUAHIO, Maui, *Paroreomyza montana*
  Oahu, *Paroreomyza maculata*
ALBATROSS, Black-browed, *Thalassarche melanophris*
  Black-footed, *Phoebastria nigripes*
  Laysan, *Phoebastria immutabilis*
  Light-mantled, *Phoebetria palpebrata*
  Short-tailed, *Phoebastria albatrus*
  Shy, *Thalassarche cauta*
  Wandering, *Diomedea exulans*
  Yellow-nosed, *Thalassarche chlororhynchos*
ANHINGA, *Anhinga anhinga*
ANI, Groove-billed, *Crotophaga sulcirostris*
  Smooth-billed, *Crotophaga ani*
AMAKIHI, Hawaii, *Hemignathus virens*
  Kauai, *Hemignathus kauaiensis*
  Oahu, *Hemignathus flavus*
ANIANIAU, *Magumma parva*
APAPANE, *Himatione sanguinea*
AUKLET, Cassin's, *Ptychoramphus aleuticus*

11

A-2

Crested, *Aethia cristatella*
Least, *Aethia pusilla*
Parakeet, *Aethia psittacula*
Rhinoceros, *Cerorhinca monocerata*
Whiskered, *Aethia pygmaea*
AVOCET, American, *Recurvirostra americana*
[BARN-OWL, Common (*see* OWL, Barn)]
BEAN-GOOSE, Taiga, *Anser fabalis*
Tundra, *Anser serrirostris*
BEARDLESS-TYRANNULET, Northern, *Camptostoma imberbe*
BECARD, Rose-throated, *Pachyramphus aglaiae*
BITTERN, American, *Botaurus lentiginosus*
Black, *Ixobrychus flavicollis*
[Chinese (*see* Yellow)]
Least, *Ixobrychus exilis*
Schrenck's, *Ixobrychus eurhythmus*
Yellow, *Ixobrychus sinensis*
BLACK-HAWK, Common, *Buteogallus anthracinus*
BLACKBIRD, Brewer's, *Euphagus cyanocephalus*
Red-winged, *Agelaius phoeniceus*
Rusty, *Euphagus carolinus*
Tawny-shouldered, *Agelaius humeralis*
Tricolored, *Agelaius tricolor*
Yellow-headed, *Xanthocephalus xanthocephalus*
Yellow-shouldered, *Agelaius xanthomus*
BLUEBIRD, Eastern, *Sialia sialis*
Mountain, *Sialia currucoides*
Western, *Sialia mexicana*
BLUETAIL, Red-flanked, *Tarsiger cyanurus*
BLUETHROAT, *Luscinia svecica*
BOBOLINK, *Dolichonyx oryzivorus*
BOOBY, Blue-footed, *Sula nebouxii*
Brown, *Sula leucogaster*
Masked, *Sula dactylatra*
Red-footed, *Sula sula*
BRAMBLING, *Fringilla montifringilla*
BRANT, *Branta bernicla*
BUFFLEHEAD, *Bucephala albeola*
BULLFINCH, Eurasian, *Pyrrhula pyrrhula*
Puerto Rican, *Loxigilla portoricensis*
BUNTING, Blue, *Cyanocompsa parellina*
Gray, *Emberiza variabilis*
Indigo, *Passerina cyanea*
Little, *Emberiza pusilla*
Lark, *Calamospiza melanocorys*
Lazuli, *Passerina amoena*
McKay's, *Plectrophenax hyperboreus*
Painted, *Passerina ciris*
Pallas's, *Emberiza pallasi*
Pine, *Emberiza leucocephalos*
Reed, *Emberiza schoeniclus*
Rustic, *Emberiza rustica*
Snow, *Plectrophenax nivalis*
Varied, *Passerina versicolor*
Yellow-breasted, *Emberiza aureola*
Yellow-throated, *Emberiza elegans*
BUSHTIT, *Psaltriparus minimus*
CANVASBACK, *Aythya valisineria*
CARACARA, Crested, *Caracara cheriway*
CARDINAL, Northern, *Cardinalis cardinalis*
CARIB, Green-throated, *Eulampis holosericeus*
Purple-throated, *Eulampis jugularis*

CATBIRD, Black, *Melanoptila glabrirostris*
Gray, *Dumetella carolinensis*
CHAFFINCH, Common, *Fringilla coelebs*
CHAT, Yellow-breasted, *Icteria virens*
CHICKADEE, Black-capped, *Poecile atricapillus*
Boreal, *Poecile hudsonica*
Carolina, *Poecile carolinensis*
Chestnut-backed, *Poecile rufescens*
Gray-headed, *Poecile cincta*
Mexican, *Poecile sclateri*
Mountain, *Poecile gambeli*
CHUCK-WILL'S-WIDOW, *Caprimulgus carolinensis*
CONDOR, California, *Gymnogyps californianus*
COOT, American, *Fulica americana*
Caribbean, *Fulica caribaea*
Eurasian, *Fulica atra*
Hawaiian, *Fulica alai*
CORMORANT, Brandt's, *Phalacrocorax penicillatus*
Double-crested, *Phalacrocorax auritus*
Great, *Phalacrocorax carbo*
Little Pied, *Phalacrocorax melanoleucos*
Neotropic, *Phalacrocorax brasilianus*
[Olivaceous (*see* Neotropic)]
Pelagic, *Phalacrocorax pelagicus*
Red-faced, *Phalacrocorax urile*
COWBIRD, Bronzed, *Molothrus aeneus*
Brown-headed, *Molothrus ater*
Shiny, *Molothrus bonariensis*
CRAKE, Corn, *Crex crex*
Paint-billed, *Neocrex erythrops*
Spotless, *Porzana tabuensis*
Yellow-breasted, *Porzana flaviventer*
CRANE, Common, *Grus grus*
Sandhill, *Grus canadensis*
Whooping, *Grus americana*
CREEPER, Brown, *Certhia americana*
Hawaii, *Oreomystis mana*
CROSSBILL, Red, *Loxia curvirostra*
White-winged, *Loxia leucoptera*
CROW, American, *Corvus brachyrhynchos*
Fish, *Corvus ossifragus*
Hawaiian, *Corvus hawaiiensis*
Mariana, *Corvus kubaryi*
[Mexican (*see* Tamaulipas)]
Northwestern, *Corvus caurinus*
Tamaulipas, *Corvus imparatus*
White-necked, *Corvus leucognaphalus*
CUCKOO, Black-billed, *Coccyzus erythropthalmus*
Common, *Cuculus canorus*
Mangrove, *Coccyzus minor*
Oriental, *Cuculus optatus*
Yellow-billed, *Coccyzus americanus*
CURLEW, Bristle-thighed, *Numenius tahitiensis*
Eskimo, *Numenius borealis*
Eurasian, *Numenius arquata*
Far Eastern, *Numenius madagascariensis*
[Least (*see* Little)]
Little, *Numenius minutus*
Long-billed, *Numenius americanus*
DICKCISSEL, *Spiza americana*
DIPPER, American, *Cinclus mexicanus*

DOTTEREL, Eurasian, *Charadrius morinellus*
DOVE, Inca, *Columbina inca*
    Mourning, *Zenaida macroura*
    White-tipped, *Leptotila verreauxi*
    White-winged, *Zenaida asiatica*
    Zenaida, *Zenaida aurita*
DOVEKIE, *Alle alle*
DOWITCHER, Long-billed, *Limnodromus scolopaceus*
    Short-billed, *Limnodromus griseus*
DUCK, American Black, *Anas rubripes*
    Falcated, *Anas falcata*
    Harlequin, *Histrionicus histrionicus*
    Hawaiian, *Anas wyvilliana*
    Laysan, *Anas laysanensis*
    Long-tailed, *Clangula hyemalis*
    Masked, *Nomonyx dominicus*
    Mottled, *Anas fulvigula*
    Muscovy, *Cairina moschata*
    Pacific Black, *Anas superciliosa*
    Ring-necked, *Aythya collaris*
    Ruddy, *Oxyura jamaicensis*
    Spot-billed, *Anas poecilorhyncha*
    Tufted, *Aythya fuligula*
    Wood, *Aix sponsa*
DUNLIN, *Calidris alpina*
EAGLE, Bald, *Haliaeetus leucocephalus*
    Golden, *Aquila chrysaetos*
    White-tailed, *Haliaeetus albicilla*
EGRET, Cattle, *Bubulcus ibis*
    Chinese, *Egretta eulophotes*
    Great, *Ardea alba*
    Intermediate, *Mesophoyx intermedia*
    Little, *Egretta garzetta*
    [Plumed (*see* Intermediate)]
    Reddish, *Egretta rufescens*
    Snowy, *Egretta thula*
EIDER, Common, *Somateria mollissima*
    King, *Somateria spectabilis*
    Spectacled, *Somateria fischeri*
    Steller's, *Polysticta stelleri*
ELAENIA, Caribbean, *Elaenia martinica*
    Greenish, *Myiopagis viridicata*
EMERALD, Puerto Rican, *Chlorostilbon maugaeus*
EUPHONIA, Antillean, *Euphonia musica*
FALCON, Aplomado, *Falco femoralis*
    Peregrine, *Falco peregrinus*
    Prairie, *Falco mexicanus*
    Red-Footed, *Falco vespertinus*
FIELDFARE, *Turdus pilaris*
FINCH, Cassin's, *Carpodacus cassinii*
    House, *Carpodacus mexicanus*
    Laysan, *Telespiza cantans*
    Nihoa, *Telespiza ultima*
    Purple, *Carpodacus purpureus*
    [Rosy (*see* ROSY–FINCH)]
FLAMINGO, Greater, *Phoenicopterus ruber*
FLICKER, Gilded, *Colaptes chrysoides*
    Northern, *Colaptes auratus*
FLYCATCHER, Acadian, *Empidonax virescens*
    Alder, *Empidonax alnorum*
    Ash-throated, *Myiarchus cinerascens*
    Brown-crested, *Myiarchus tyrannulus*
    Buff-breasted, *Empidonax fulvifrons*
    Cordilleran, *Empidonax occidentalis*
    Dusky, *Empidonax oberholseri*

Dusky-capped, *Myiarchus tuberculifer*
Fork-tailed, *Tyrannus savana*
Gray, *Empidonax wrightii*
[Gray-spotted (*see* Gray-streaked)]
Gray-streaked, *Muscicapa griseisticta*
Great Crested, *Myiarchus crinitus*
Hammond's, *Empidonax hammondii*
La Sagra's, *Myiarchus sagrae*
Least, *Empidonax minimus*
Narcissus, *Ficedula narcissina*
Nutting's, *Myiarchus nuttingi*
Olive-sided, *Contopus cooperi*
Pacific-slope, *Empidonax difficilis*
Piratic, *Legatus leucophaius*
Puerto Rican, *Myiarchus antillarum*
Scissor-tailed, *Tyrannus forficatus*
Social, *Myiozetetes similis*
Sulphur-bellied, *Myiodynastes luteiventris*
Tufted, *Mitrephanes phaeocercus*
Variegated, *Empidonomus varius*
Vermilion, *Pyrocephalus rubinus*
[Western (*see* Cordilleran and Pacific-slope)]
Willow, *Empidonax traillii*
Yellow-bellied, *Empidonax flaviventris*
FOREST-FALCON, Collared, *Micrastur semitorquatus*
FRIGATEBIRD, Great, *Fregata minor*
    Lesser, *Fregata ariel*
    Magnificent, *Fregata magnificens*
FROG-HAWK, Gray, *Accipiter soloensis*
FRUIT-DOVE, Crimson-crowned, *Ptilinopus porphyraceus*
    Many-colored, *Ptilinopus perousii*
    Mariana, *Ptilinopus roseicapilla*
FULMAR, Northern, *Fulmarus glacialis*
GADWALL, *Anas strepera*
GALLINULE, Azure, *Porphyrio flavirostris*
    Purple, *Porphyrio martinica*
GANNET, Northern, *Morus bassanus*
GARGANEY, *Anas querquedula*
GNATCATCHER, Black-capped, *Polioptila nigriceps*
    Black-tailed, *Polioptila melanura*
    Blue-gray, *Polioptila caerulea*
    California, *Polioptila californica*
GODWIT, Bar-tailed, *Limosa lapponica*
    Black-tailed, *Limosa limosa*
    Hudsonian, *Limosa haemastica*
    Marbled, *Limosa fedoa*
GOLDEN-PLOVER, American, *Pluvialis dominica*
    European, *Pluvialis apricaria*
    [Lesser (*see* American)]
    Pacific, *Pluvialis fulva*
GOLDENEYE, Barrow's, *Bucephala islandica*
    Common, *Bucephala clangula*
GOLDFINCH, American, *Carduelis tristis*
    Lawrence's, *Carduelis lawrencei*
    Lesser, *Carduelis psaltria*
GOOSE, Barnacle, *Branta leucopsis*
    [Bean, (*see* BEAN-GOOSE, Taiga)]
    Canada, *Branta canadensis* (including Cackling Goose, *Branta hutchinsii*)
    Emperor, *Chen canagica*
    Greater White-fronted, *Anser albifrons*
    Hawaiian, *Branta sandvicensis*

Lesser White-fronted, *Anser erythropus*
Ross's, *Chen rossii*
Snow, *Chen caerulescens*
GOSHAWK, Northern, *Accipiter gentilis*
GRACKLE, Boat-tailed, *Quiscalus major*
Common, *Quiscalus quiscula*
Great-tailed, *Quiscalus mexicanus*
Greater Antillean, *Quiscalus niger*
GRASSHOPPER-WARBLER, Middendorff's, *Locustella ochotensis*
GRASSQUIT, Black-faced, *Tiaris bicolor*
Yellow-faced, *Tiaris olivaceus*
GREBE, Clark's, *Aechmophorus clarkii*
Eared, *Podiceps nigricollis*
Horned, *Podiceps auritus*
Least, *Tachybaptus dominicus*
Pied-billed, *Podilymbus podiceps*
Red-necked, *Podiceps grisegena*
Western, *Aechmophorus occidentalis*
GREENFINCH, Oriental, *Carduelis sinica*
GREENSHANK, Common, *Tringa nebularia*
Nordmann's, *Tringa guttifer*
GROSBEAK, Black-headed, *Pheucticus melanocephalus*
Blue, *Passerina caerulea*
Crimson-collared, *Rhodothraupis celaeno*
Evening, *Coccothraustes vespertinus*
Pine, *Pinicola enucleator*
Rose-breasted, *Pheucticus ludovicianus*
Yellow, *Pheucticus chrysopeplus*
GROUND-DOVE, Common, *Columbina passerina*
Friendly, *Gallicolumba stairi*
Ruddy, *Columbina talpacoti*
White-throated, *Gallicolumba xanthonura*
GUILLEMOT, Black, *Cepphus grylle*
Pigeon, *Cepphus columba*
GULL, Belcher's, *Larus belcheri*
Black-headed, *Larus ridibundus*
Black-tailed, *Larus crassirostris*
Bonaparte's, *Larus philadelphia*
California, *Larus californicus*
[Common Black-headed (*see* Black-headed)]
Franklin's, *Larus pipixcan*
Glaucous, *Larus hyperboreus*
Glaucous-winged, *Larus glaucescens*
Gray-hooded, *Larus cirrocephalus*
Great Black-backed, *Larus marinus*
Heermann's, *Larus heermanni*
Herring, *Larus argentatus*
Iceland, *Larus glaucoides*
Ivory, *Pagophila eburnea*
Kelp, *Larus dominicanus*
Laughing, *Larus atricilla*
Lesser Black-backed, *Larus fuscus*
Little, *Larus minutus*
Mew, *Larus canus*
Ring-billed, *Larus delawarensis*
Ross's, *Rhodostethia rosea*
Sabine's, *Xema sabini*
Slaty-backed, *Larus schistisagus*
Thayer's, *Larus thayeri*
Western, *Larus occidentalis*
Yellow-footed, *Larus livens*
Yellow-legged, *Larus michahellis*
GYRFALCON, *Falco rusticolus*
HARRIER, Northern, *Circus cyaneus*

HAWFINCH, *Coccothraustes coccothraustes*
HAWK, [Asiatic Sparrow (*see* SPARROWHAWK, Japanese)]
Broad-winged, *Buteo platypterus*
Cooper's, *Accipiter cooperii*
Crane, *Geranospiza caerulescens*
Ferruginous, *Buteo regalis*
Gray, *Buteo nitidus*
Harris's, *Parabuteo unicinctus*
Hawaiian, *Buteo solitarius*
Red-shouldered, *Buteo lineatus*
Red-tailed, *Buteo jamaicensis*
Roadside, *Buteo magnirostris*
Rough-legged, *Buteo lagopus*
Sharp-shinned, *Accipiter striatus*
Short-tailed, *Buteo brachyurus*
Swainson's, *Buteo swainsoni*
White-tailed, *Buteo albicaudatus*
Zone-tailed, *Buteo albonotatus*
HAWK-CUCKOO, Hodgson's, *Cuculus fugax*
[HAWK-OWL, Northern (*see* OWL, Northern Hawk)]
HERON, Gray, *Ardea cinerea*
Great Blue, *Ardea herodias*
Green, *Butorides virescens*
[Green-backed (*see* Green)]
Little Blue, *Egretta caerulea*
[Pacific Reef (*see* REEF-EGRET, Pacific)]
Tricolored, *Egretta tricolor*
HOBBY, Eurasian, *Falco subbuteo*
HOOPOE, Eurasian, *Upupa epops*
HOUSE-MARTIN, Common, *Delichon urbicum*
HUMMINGBIRD, Allen's, *Selasphorus sasin*
Anna's, *Calypte anna*
Antillean Crested, *Orthorhyncus cristatus*
Berylline, *Amazilia beryllina*
Black-chinned, *Archilochus alexandri*
Blue-throated, *Lampornis clemenciae*
Broad-billed, *Cynanthus latirostris*
Broad-tailed, *Selasphorus platycercus*
Buff-bellied, *Amazilia yucatanensis*
Bumblebee, *Atthis heloisa*
Calliope, *Stellula calliope*
Cinnamon, *Amazilia rutila*
Costa's, *Calypte costae*
Lucifer, *Calothorax lucifer*
Magnificent, *Eugenes fulgens*
Ruby-throated, *Archilochus colubris*
Rufous, *Selasphorus rufus*
Violet-crowned, *Amazilia violiceps*
White-eared, *Hylocharis leucotis*
Xantus's, *Hylocharis xantusii*
IBIS, Glossy, *Plegadis falcinellus*
Scarlet, *Eudocimus ruber*
White, *Eudocimus albus*
White-faced, *Plegadis chihi*
IIWI, *Vestiaria coccinea*
IMPERIAL-PIGEON, Pacific, *Ducula pacifica*
JABIRU, *Jabiru mycteria*
JACANA, Northern, *Jacana spinosa*
JAEGER, Long-tailed, *Stercorarius longicaudus*
Parasitic, *Stercorarius parasiticus*
Pomarine, *Stercorarius pomarinus*
JAY, Blue, *Cyanocitta cristata*
Brown, *Cyanocorax morio*
Gray, *Perisoreus canadensis*

14

[Gray-breasted (*see* Mexican)]
Green, *Cyanocorax yncas*
Mexican, *Aphelocoma ultramarina*
Pinyon, *Gymnorhinus cyanocephalus*
[Scrub (*see* SCRUB-JAY)]
Steller's, *Cyanocitta stelleri*
JUNCO, Dark-eyed, *Junco hyemalis*
Yellow-eyed, *Junco phaeonotus*
KAKAWAHIE, *Paroreomyza flammea*
KAMAO, *Myadestes myadestinus*
KESTREL, American, *Falco sparverius*
Eurasian, *Falco tinnunculus*
KILLDEER, *Charadrius vociferus*
KINGBIRD, Cassin's, *Tyrannus vociferans*
Couch's, *Tyrannus couchii*
Eastern, *Tyrannus tyrannus*
Gray, *Tyrannus dominicensis*
Loggerhead, *Tyrannus caudifasciatus*
Thick-billed, *Tyrannus crassirostris*
Tropical, *Tyrannus melancholicus*
Western, *Tyrannus verticalis*
KINGFISHER, Belted, *Megaceryle alcyon*
Collared, *Todirhamphus chloris*
Green, *Chloroceryle americana*
Micronesian, *Todirhamphus cinnamominus*
Ringed, *Megaceryle torquata*
KINGLET, Golden-crowned, *Regulus satrapa*
Ruby-crowned, *Regulus calendula*
KISKADEE, Great, *Pitangus sulphuratus*
KITE, [American Swallow-tailed (*see* Swal-
low-tailed)]
Black, *Milvus migrans*
[Black-shouldered (*see* White-tailed)]
Hook-billed, *Chondrohierax uncinatus*
Mississippi, *Ictinia mississippiensis*
Snail, *Rostrhamus sociabilis*
Swallow-tailed, *Elanoides forficatus*
White-tailed, *Elanus leucurus*
KITTIWAKE, Black-legged, *Rissa tridactyla*
Red-legged, *Rissa brevirostris*
KNOT, Great, *Calidris tenuirostris*
Red, *Calidris canutus*
LAPWING, Northern, *Vanellus vanellus*
LARK, Horned, *Eremophila alpestris*
Sky, *Alauda arvensis*
LIMPKIN, *Aramus guarauna*
LIZARD-CUCKOO, Puerto Rican, *Coccyzus
vieilloti*
LONGSPUR, Chestnut-collared, *Calcarius
ornatus*
Lapland, *Calcarius lapponicus*
McCown's, *Calcarius mccownii*
Smith's, *Calcarius pictus*
LOON, Arctic, *Gavia arctica*
Common, *Gavia immer*
Pacific, *Gavia pacifica*
Red-throated, *Gavia stellata*
Yellow-billed, *Gavia adamsii*
MAGPIE, Black-billed, *Pica hudsonia*
Yellow-billed, *Pica nuttalli*
MALLARD, *Anas platyrhynchos*
MANGO, Antillean, *Anthracothorax dominicus*
Green, *Anthracothorax viridis*
Green-breasted, *Anthracothorax prevostii*
MARTIN, Brown-chested, *Progne tapera*
Caribbean, *Progne dominicensis*
Cuban, *Progne cryptoleuca*

Gray-breasted, *Progne chalybea*
Purple, *Progne subis*
Southern, *Progne elegans*
MEADOWLARK, Eastern, *Sturnella magna*
Western, *Sturnella neglecta*
MERGANSER, Common, *Mergus merganser*
Hooded, *Lophodytes cucullatus*
Red-breasted, *Mergus serrator*
MERLIN, *Falco columbarius*
MILLERBIRD, *Acrocephalus familiaris*
MOCKINGBIRD, Bahama, *Mimus gundlachii*
Blue, *Melanotis caerulescens*
Northern, *Mimus polyglottos*
MOORHEN, Common, *Gallinula chloropus*
MURRE, Common, *Uria aalge*
Thick-billed, *Uria lomvia*
MURRELET, Ancient, *Synthliboramphus
antiquus*
Craveri's, *Synthliboramphus craveri*
Kittlitz's, *Brachyramphus brevirostris*
Long-billed, *Brachyramphus perdix*
Marbled, *Brachyramphus marmoratus*
Xantus's, *Synthliboramphus hypoleucus*
NEEDLETAIL, White-throated, *Hirundapus
caudacutus*
NIGHT-HERON, Black-crowned, *Nycticorax
nycticorax*
Japanese, *Gorsachius goisagi*
[Malay (*see* Malayan)]
Malayan, *Gorsachius melanolophus*
Yellow-crowned, *Nyctanassa violacea*
NIGHTHAWK, Antillean, *Chordeiles
gundlachii*
Common, *Chordeiles minor*
Lesser, *Chordeiles acutipennis*
NIGHTINGALE-THRUSH, Black-headed,
*Catharus mexicanus*
Orange-billed, *Catharus aurantiirostris*
NIGHTJAR, Buff-collared, *Caprimulgus
ridgwayi*
Gray, *Caprimulgus indicus*
[Jungle (*see* Gray)]
Puerto Rican, *Caprimulgus noctitherus*
NODDY, Black, *Anous minutus*
Blue-gray, *Procelsterna cerulea*
Brown, *Anous stolidus*
[Lesser (*see* Black)]
NUKUPUU, *Hemignathus lucidus*
NUTCRACKER, Clark's, *Nucifraga
columbiana*
NUTHATCH, Brown-headed, *Sitta pusilla*
Pygmy, *Sitta pygmaea*
Red-breasted, *Sitta canadensis*
White-breasted, *Sitta carolinensis*
[OLDSQUAW (*see* DUCK, Long-tailed)]
OLOMAO, *Myadestes lanaiensis*
OMAO, *Myadestes obscurus*
ORIOLE, Altamira, *Icterus gularis*
Audubon's, *Icterus graduacauda*
Baltimore, *Icterus galbula*
[Black-cowled (*see* Greater Antillean)]
Black-vented, *Icterus wagleri*
Bullock's, *Icterus bullockii*
Greater Antillean, *Icterus dominicensis*
Hooded, *Icterus cucullatus*
[Northern (*see* Baltimore and Bullock's)]
Orchard, *Icterus spurius*

Scott's, *Icterus parisorum*
Streak-backed, *Icterus pustulatus*
OSPREY, *Pandion haliaetus*
OU, *Psittirostra psittacea*
OVENBIRD, *Seiurus aurocapilla*
OWL, Barn, *Tyto alba*
　Barred, *Strix varia*
　Boreal, *Aegolius funereus*
　Burrowing, *Athene cunicularia*
　Elf, *Micrathene whitneyi*
　Flammulated, *Otus flammeolus*
　Great Gray, *Strix nebulosa*
　Great Horned, *Bubo virginianus*
　Long-eared, *Asio otus*
　Mottled, *Ciccaba virgata*
　Northern Hawk, *Surnia ulula*
　Northern Saw-whet, *Aegolius acadicus*
　Short-eared, *Asio flammeus*
　Snowy, *Bubo scandiacus*
　Spotted, *Strix occidentalis*
　Stygian, *Asio stygius*
OYSTERCATCHER, American, *Haematopus palliatus*
　Black, *Haematopus bachmani*
　Eurasian, *Haematopus ostralegus*
PALILA, *Loxioides bailleui*
PALM-SWIFT, Antillean, *Tachornis phoenicobia*
PARROTBILL, Maui, *Pseudonestor xanthophrys*
PARULA, Northern, *Parula americana*
　Tropical, *Parula pitiayumi*
PAURAQUE, Common, *Nyctidromus albicollis*
PELICAN, American White, *Pelecanus erythrorhynchos*
　Brown, *Pelecanus occidentalis*
PETREL, Bermuda, *Pterodroma cahow*
　Black-capped, *Pterodroma hasitata*
　Black-winged, *Pterodroma nigripennis*
　Bonin, *Pterodroma hypoleuca*
　Bulwer's, *Bulweria bulwerii*
　Cook's, *Pterodroma cookii*
　[Dark-rumped (*see* Hawaiian)]
　Gould's, *Pterodroma leucoptera*
　Great-winged, *Pterodroma macroptera*
　Hawaiian, *Pterodroma sandwichensis*
　Herald, *Pterodroma arminjoniana*
　Jouanin's, *Bulweria fallax*
　Juan Fernandez, *Pterodroma externa*
　Kermadec, *Pterodroma neglecta*
　Mottled, *Pterodroma inexpectata*
　Murphy's, *Pterodroma ultima*
　Phoenix, *Pterodroma alba*
　Stejneger's, *Pterodroma longirostris*
　Tahiti, *Pterodroma rostrata*
　White-necked, *Pterodroma cervicalis*
　[White-necked, *Pterodroma externa* (see Petrel, Juan Fernandez)]
PEWEE, Cuban, *Contopus caribaeus*
　Greater, *Contopus pertinax*
　Hispaniolan, *Contopus hispaniolensis*
　Lesser Antillean, *Contopus latirostris*
PHAINOPEPLA, *Phainopepla nitens*
PHALAROPE, Red, *Phalaropus fulicarius*
　Red-necked, *Phalaropus lobatus*
　Wilson's, *Phalaropus tricolor*
PHOEBE, Black, *Sayornis nigricans*

Eastern, *Sayornis phoebe*
Say's, *Sayornis saya*
PIGEON, Band-tailed, *Patagioenas fasciata*
　Plain, *Patagioenas inornata*
　Red-billed, *Patagioenas flavirostris*
　Scaly-naped, *Patagioenas squamosa*
　White-crowned, *Patagioenas leucocephala*
PINTAIL, Northern, *Anas acuta*
　White-cheeked, *Anas bahamensis*
PIPIT, American, *Anthus rubescens*
　Olive-backed, *Anthus hodgsoni*
　Pechora, *Anthus gustavi*
　Red-throated, *Anthus cervinus*
　Sprague's, *Anthus spragueii*
　Tree, *Anthus trivialis*
　[Water (*see* American)]
PLOVER, Black-bellied, *Pluvialis squatarola*
　Collared, *Charadrius collaris*
　Common Ringed, *Charadrius hiaticula*
　[Great Sand (*see* Sand-Plover, Greater)]
　Little Ringed, *Charadrius dubius*
　[Mongolian (*see* Sand-Plover, Lesser)]
　Mountain, *Charadrius montanus*
　Piping, *Charadrius melodus*
　Semipalmated, *Charadrius semipalmatus*
　Snowy, *Charadrius alexandrinus*
　Wilson's, *Charadrius wilsonia*
POCHARD, Baer's, *Aythya baeri*
　Common, *Aythya ferina*
POND-HERON, Chinese, *Ardeola bacchus*
POORWILL, Common, *Phalaenoptilus nuttallii*
POO-ULI, *Melamprosops phaeosoma*
PUAIOHI, *Myadestes palmeri*
PUFFIN, Atlantic, *Fratercula arctica*
　Horned, *Fratercula corniculata*
　Tufted, *Fratercula cirrhata*
PYGMY-OWL, Ferruginous, *Glaucidium brasilianum*
　Northern, *Glaucidium gnoma*
PYRRHULOXIA, *Cardinalis sinuatus*
QUAIL-DOVE, Bridled, *Geotrygon mystacea*
　Key West, *Geotrygon chrysia*
　Ruddy, *Geotrygon montana*
QUETZEL, Eared, *Euptilotis neoxenus*
RAIL, Black, *Laterallus jamaicensis*
　Buff-banded, *Gallirallus philippensis*
　Clapper, *Rallus longirostris*
　Guam, *Gallirallus owstoni*
　King, *Rallus elegans*
　Spotted, *Pardirallus maculatus*
　Virginia, *Rallus limicola*
　Yellow, *Coturnicops noveboracensis*
RAVEN, Chihuahuan, *Corvus cryptoleucus*
　Common, *Corvus corax*
RAZORBILL, *Alca torda*
REDHEAD, *Aythya americana*
REDPOLL, Common, *Carduelis flammea*
　Hoary, *Carduelis hornemanni*
REDSHANK, Spotted, *Tringa erythropus*
REDSTART, American, *Setophaga ruticilla*
　Painted, *Myioborus pictus*
　Slate-throated, *Myioborus miniatus*
[REED-BUNTING, Common (*see* BUNTING, Reed)]
　[Pallas' (*see* BUNTING, Pallas's)]
REED-WARBLER, Nightingale, *Acrocephalus luscinia*

16

A-7

REEF-EGRET, Pacific, *Egretta sacra*
REEF-HERON, Western, *Egretta gularis*
ROADRUNNER, Greater, *Geococcyx californianus*
ROBIN, American, *Turdus migratorius*
  Clay-colored, *Turdus grayi*
  Rufous-backed, *Turdus rufopalliatus*
  Siberian Blue, *Luscinia cyane*
  White-throated, *Turdus assimilis*
ROSEFINCH, Common, *Carpodacus erythrinus*
ROSY-FINCH, Black, *Leucosticte atrata*
  Brown-capped, *Leucosticte australis*
  Gray-crowned, *Leucosticte tephrocotis*
RUBYTHROAT, Siberian, *Luscinia calliope*
RUFF, *Philomachus pugnax*
SANDERLING, *Calidris alba*
SANDPIPER, Baird's, *Calidris bairdii*
  Broad-billed, *Limicola falcinellus*
  Buff-breasted, *Tryngites subruficollis*
  Common, *Actitis hypoleucos*
  Curlew, *Calidris ferruginea*
  Green, *Tringa ochropus*
  Least, *Calidris minutilla*
  Marsh, *Tringa stagnatilis*
  Pectoral, *Calidris melanotos*
  Purple, *Calidris maritima*
  Rock, *Calidris ptilocnemis*
  Semipalmated, *Calidris pusilla*
  Sharp-tailed, *Calidris acuminata*
  Solitary, *Tringa solitaria*
  [Spoonbill (*see* Spoon-billed)]
  Spoon-billed, *Eurynorhynchus pygmeus*
  Spotted, *Actitis macularius*
  Stilt, *Calidris himantopus*
  Terek, *Xenus cinereus*
  Upland, *Bartramia longicauda*
  Western, *Calidris mauri*
  White-rumped, *Calidris fuscicollis*
  Wood, *Tringa glareola*
SAND-PLOVER, Greater, *Charadrius leschenaultii*
  Lesser, *Charadrius mongolus*
SAPSUCKER, Red-breasted, *Sphyrapicus ruber*
  Red-naped, *Sphyrapicus nuchalis*
  Williamson's, *Sphyrapicus thyroideus*
  Yellow-bellied, *Sphyrapicus varius*
SCAUP, Greater, *Aythya marila*
  Lesser, *Aythya affinis*
SCOPS-OWL, Oriental, *Otus sunia*
SCOTER, Black, *Melanitta nigra*
  Surf, *Melanitta perspicillata*
  White-winged, *Melanitta fusca*
SCREECH-OWL, Eastern, *Megascops asio*
  Puerto Rican, *Megascops nudipes*
  Western, *Megascops kennicottii*
  Whiskered, *Megascops trichopsis*
SCRUB-JAY, Florida, *Aphelocoma coerulescens*
  Island, *Aphelocoma insularis*
  Western, *Aphelocoma californica*
SEA-EAGLE, Steller's, *Haliaeetus pelagicus*
SEEDEATER, White-collared, *Sporophila torqueola*
SHEARWATER, Audubon's, *Puffinus lherminieri*

Black-vented, *Puffinus opisthomelas*
Buller's, *Puffinus bulleri*
Cape Verde, *Calonectris edwardsii*
Christmas, *Puffinus nativitatis*
Cory's, *Calonectris diomedea*
Flesh-footed, *Puffinus carneipes*
Greater, *Puffinus gravis*
Little, *Puffinus assimilis*
Manx, *Puffinus puffinus*
Pink-footed, *Puffinus creatopus*
Short-tailed, *Puffinus tenuirostris*
Sooty, *Puffinus griseus*
Streaked, *Calonectris leucomelas*
Townsend's, *Puffinus auricularis*
Wedge-tailed, *Puffinus pacificus*
SHOVELER, Northern, *Anas clypeata*
SHRIKE, Brown, *Lanius cristatus*
  Loggerhead, *Lanius ludovicianus*
  Northern, *Lanius excubitor*
SILKY-FLYCATCHER, Gray, *Ptilogonys cinereus*
SISKIN, Eurasian, *Carduelis spinus*
  Pine, *Carduelis pinus*
SKIMMER, Black, *Rynchops niger*
SKUA, Great, *Stercorarius skua*
  South Polar, *Stercorarius maccormicki*
[SKYLARK, Eurasian (*see* LARK, Sky)]
SMEW, *Mergellus albellus*
SNIPE, Common, *Gallinago gallinago* (rare in western Alaska; also *see* SNIPE, Wilson's)
  Jack, *Lymnocryptes minimus*
  Pin-tailed, *Gallinago stenura*
  Swinhoe's, *Gallinago megala*
  Wilson's, *Gallinago delicata* (the ''common'' snipe hunted in most of the U.S.)
SOLITAIRE, Townsend's, *Myadestes townsendi*
SORA, *Porzana carolina*
SPARROW, American Tree, *Spizella arborea*
  Bachman's, *Aimophila aestivalis*
  Baird's, *Ammodramus bairdii*
  Black-chinned, *Spizella atrogularis*
  Black-throated, *Amphispiza bilineata*
  Botteri's, *Aimophila botterii*
  Brewer's, *Spizella breweri*
  Cassin's, *Aimophila cassinii*
  Chipping, *Spizella passerina*
  Clay-colored, *Spizella pallida*
  Field, *Spizella pusilla*
  Five-striped, *Aimophila quinquestriata*
  Fox, *Passerella iliaca*
  Golden-crowned, *Zonotrichia atricapilla*
  Grasshopper, *Ammodramus savannarum*
  Harris's, *Zonotrichia querula*
  Henslow's, *Ammodramus henslowii*
  Lark, *Chondestes grammacus*
  Le Conte's, *Ammodramus leconteii*
  Lincoln's, *Melospiza lincolnii*
  Nelson's Sharp-tailed, *Ammodramus nelsoni*
  Olive, *Arremonops rufivirgatus*
  Rufous-crowned, *Aimophila ruficeps*
  Rufous-winged, *Aimophila carpalis*
  Sage, *Amphispiza belli*
  Saltmarsh Sharp-tailed, *Ammodramus caudacutus*
  Savannah, *Passerculus sandwichensis*

Seaside, *Ammodramus maritimus*
[Sharp-tailed (*see* Nelson's Sharp-tailed and Saltmarsh Sharp-tailed)]
Song, *Melospiza melodia*
Swamp, *Melospiza georgiana*
Vesper, *Pooecetes gramineus*
White-crowned, *Zonotrichia leucophrys*
White-throated, *Zonotrichia albicollis*
Worthen's, *Spizella wortheni*
SPARROWHAWK, Japanese, *Accipiter gularis*
SPINDALIS, Puerto Rican, *Spindalis portoricensis*
Western, *Spindalis zena*
SPOONBILL, Roseate, *Platalea ajaja*
STARLING, [Ashy (*see* White-cheeked)]
Chestnut-cheeked, *Sturnus philippensis*
[Violet-backed (*see* Chestnut-cheeked)]
White-cheeked, *Sturnus cineraceus*
STARTHROAT, Plain-capped, *Heliomaster constantii*
STILT, Black-necked, *Himantopus mexicanus*
Black-winged, *Himantopus himantopus*
STINT, Little, *Calidris minuta*
Long-toed, *Calidris subminuta*
Red-necked, *Calidris ruficollis*
[Rufous-necked (*see* Red-necked)]
Temminck's, *Calidris temminckii*
STONECHAT, *Saxicola torquatus*
STORK, Wood, *Mycteria americana*
STORM-PETREL, Ashy, *Oceanodroma homochroa*
Band-rumped, *Oceanodroma castro*
Black, *Oceanodroma melania*
Black-bellied, *Fregetta tropica*
Fork-tailed, *Oceanodroma furcata*
Leach's, *Oceanodroma leucorhoa*
Least, *Oceanodroma microsoma*
Matsudaira's, *Oceanodroma matsudairae*
Polynesian, *Nesofregata fuliginosa*
Ringed, *Oceanodroma hornbyi*
[Sooty (*see* Tristram's)]
Tristram's, *Oceanodroma tristrami*
Wedge-rumped, *Oceanodroma tethys*
White-faced, *Pelagodroma marina*
White-bellied, *Fregetta grallaria*
Wilson's, *Oceanites oceanicus*
SURFBIRD, *Aphriza virgata*
SWALLOW, Bahama, *Tachycineta cyaneoviridis*
Bank, *Riparia riparia*
Barn, *Hirundo rustica*
Cave, *Petrochelidon fulva*
Cliff, *Petrochelidon pyrrhonota*
Mangrove, *Tachycineta albilinea*
Northern Rough-winged, *Stelgidopteryx serripennis*
Tree, *Tachycineta bicolor*
Violet-green, *Tachycineta thalassina*
SWAMPHEN, Purple, *Porphyrio porphyrio*
SWAN, Trumpeter, *Cygnus buccinator*
Tundra, *Cygnus columbianus*
Whooper, *Cygnus cygnus*
SWIFT, Alpine, *Apus melba*
[Antillean Palm (*see* PALM-SWIFT, Antillean)]
Black, *Cypseloides niger*
Chimney, *Chaetura pelagica*

Common, *Apus apus*
Fork-tailed, *Apus pacificus*
Short-tailed, *Chaetura brachyura*
Vaux's, *Chaetura vauxi*
White-collared, *Streptoprocne zonaris*
White-throated, *Aeronautes saxatalis*
SWIFTLET, Mariana, *Aerodramus bartschi*
White-rumped, *Aerodramus spodiopygius*
TANAGER, Flame-colored, *Piranga bidentata*
Hepatic, *Piranga flava*
Puerto Rican, *Nesospingus speculiferus*
Scarlet, *Piranga olivacea*
[Stripe-headed (*see* SPINDALIS, Puerto Rican and Western)]
Summer, *Piranga rubra*
Western, *Piranga ludoviciana*
TATTLER, Gray-tailed, *Tringa brevipes*
Wandering, *Tringa incana*
TEAL, Baikal, *Anas formosa*
Blue-winged, *Anas discors*
Cinnamon, *Anas cyanoptera*
[Falcated (*see* DUCK, Falcated)]
Green-winged, *Anas crecca*
TERN, Aleutian, *Onychoprion aleuticus*
Arctic, *Sterna paradisaea*
Black, *Chlidonias niger*
Black-naped, *Sterna sumatrana*
Bridled, *Onychoprion anaethetus*
Caspian, *Hydroprogne caspia*
Common, *Sterna hirundo*
Elegant, *Thalasseus elegans*
Forster's, *Sterna forsteri*
Gray-backed, *Onychoprion lunatus*
Great Crested, *Thalasseus bergii*
Gull-billed, *Gelochelidon nilotica*
Large-billed, *Phaetusa simplex*
Least, *Sternula antillarum*
Little, *Sternula albifrons*
Roseate, *Sterna dougallii*
Royal, *Thalasseus maximus*
Sandwich, *Thalasseus sandvicensis*
Sooty, *Onychoprion fuscatus*
Whiskered, *Chlidonias hybrida*
White, *Gygis alba*
White-winged, *Chlidonias leucopterus*
THRASHER, Bendire's, *Toxostoma bendirei*
Brown, *Toxostoma rufum*
California, *Toxostoma redivivum*
Crissal, *Toxostoma crissale*
Curve-billed, *Toxostoma curvirostre*
Le Conte's, *Toxostoma lecontei*
Long-billed, *Toxostoma longirostre*
Pearly-eyed, *Margarops fuscatus*
Sage, *Oreoscoptes montanus*
THRUSH, Aztec, *Ridgwayia pinicola*
Bicknell's, *Catharus bicknelli*
Blue Rock, *Monticola solitarius*
Dusky, *Turdus naumanni*
Eyebrowed, *Turdus obscurus*
Gray-cheeked, *Catharus minimus*
[Hawaiian (*see* KAMAO, OLOMAO, and OMAO)]
Hermit, *Catharus guttatus*
Red-legged, *Turdus plumbeus*
[Small Kauai (*see* PUAIOHI)]
Swainson's, *Catharus ustulatus*
Varied, *Ixoreus naevius*

Wood, *Hylocichla mustelina*
[TIT, Siberian (*see* CHICKADEE, Gray-headed)]
TITMOUSE, Black-crested, *Baeolophus atricristatus*
Bridled, *Baeolophus wollweberi*
Juniper, *Baeolophus ridgwayi*
Oak, *Baeolophus inornatus*
[Plain (*see* Juniper and Oak)]
Tufted, *Baeolophus bicolor*
TITYRA, Masked, *Tityra semifasciata*
TOWHEE, Abert's, *Pipilo aberti*
[Brown (*see* California and Canyon)]
California, *Pipilo crissalis*
Canyon, *Pipilo fuscus*
Eastern, *Pipilo erythrophthalmus*
Green-tailed, *Pipilo chlorurus*
[Rufous-sided (*see* Eastern and Spotted)]
Spotted, *Pipilo maculatus*
[TREE-PIPIT, Olive (*see* PIPIT, Olive-backed)]
TROGON, [Eared (*see* QUETZEL, Eared)]
Elegant, *Trogon elegans*
TROPICBIRD, Red-billed, *Phaethon aethereus*
Red-tailed, *Phaethon rubricauda*
White-tailed, *Phaethon lepturus*
TURNSTONE, Black, *Arenaria melanocephala*
Ruddy, *Arenaria interpres*
TURTLE-DOVE, Oriental, *Streptopelia orientalis*
VEERY, *Catharus fuscescens*
VERDIN, *Auriparus flaviceps*
VIOLET-EAR, Green, *Colibri thalassinus*
VIREO, Bell's, *Vireo bellii*
Black-capped, *Vireo atricapillus*
Black-whiskered, *Vireo altiloquus*
Blue-headed, *Vireo solitarius*
Cassin's, *Vireo cassinii*
Gray, *Vireo vicinior*
Hutton's, *Vireo huttoni*
Philadelphia, *Vireo philadelphicus*
Plumbeous, *Vireo plumbeus*
Puerto Rican, *Vireo latimeri*
Red-eyed, *Vireo olivaceus*
[Solitary (*see* Blue-headed, Cassin's, and Plumbeous)]
Thick-billed, *Vireo crassirostris*
Warbling, *Vireo gilvus*
White-eyed, *Vireo griseus*
Yellow-green, *Vireo flavoviridis*
Yellow-throated, *Vireo flavifrons*
Yucatan, *Vireo magister*
VULTURE, Black, *Coragyps atratus*
Turkey, *Cathartes aura*
WAGTAIL, [Black-backed (*see* White)]
Citrine, *Motacilla citreola*
Eastern Yellow, *Motacilla tschutschensis*
Gray, *Motacilla cinerea*
White, *Motacilla alba*
[Yellow (*see* Eastern Yellow)]
WARBLER, Adelaide's, *Dendroica adelaidae*
Arctic, *Phylloscopus borealis*
Bachman's, *Vermivora bachmanii*
Bay-breasted, *Dendroica castanea*
Black-and-white, *Mniotilta varia*
Black-throated Blue, *Dendroica caerulescens*
Black-throated Gray, *Dendroica nigrescens*

Black-throated Green, *Dendroica virens*
Blackburnian, *Dendroica fusca*
Blackpoll, *Dendroica striata*
Blue-winged, *Vermivora pinus*
Canada, *Wilsonia canadensis*
Cape May, *Dendroica tigrina*
Cerulean, *Dendroica cerulea*
Chestnut-sided, *Dendroica pensylvanica*
Colima, *Vermivora crissalis*
Connecticut, *Oporornis agilis*
Crescent-chested, *Parula superciliosa*
Dusky, *Phylloscopus fuscatus*
Elfin-woods, *Dendroica angelae*
Fan-tailed, *Euthlypis lachrymosa*
Golden-cheeked, *Dendroica chrysoparia*
Golden-crowned, *Basileuterus culicivorus*
Golden-winged, *Vermivora chrysoptera*
Grace's, *Dendroica graciae*
Hermit, *Dendroica occidentalis*
Hooded, *Wilsonia citrina*
Kentucky, *Oporornis formosus*
Kirtland's, *Dendroica kirtlandii*
Lanceolated, *Locustella lanceolata*
Lucy's, *Vermivora luciae*
MacGillivray's, *Oporornis tolmiei*
Magnolia, *Dendroica magnolia*
Mourning, *Oporornis philadelphia*
Nashville, *Vermivora ruficapilla*
Olive, *Peucedramus taeniatus*
Orange-crowned, *Vermivora celata*
Palm, *Dendroica palmarum*
Pine, *Dendroica pinus*
Prairie, *Dendroica discolor*
Prothonotary, *Protonotaria citrea*
Red-faced, *Cardellina rubrifrons*
Rufous-capped, *Basileuterus rufifrons*
Swainson's, *Limnothlypis swainsonii*
Tennessee, *Vermivora peregrina*
Townsend's, *Dendroica townsendi*
Virginia's, *Vermivora virginiae*
Willow, *Phylloscopus trochilus*
Wilson's, *Wilsonia pusilla*
Wood, *Phylloscopus sibilatrix*
Worm-eating, *Helmitheros vermivorum*
Yellow, *Dendroica petechia*
Yellow-browed, *Phylloscopus inornatus*
Yellow-rumped, *Dendroica coronata*
Yellow-throated, *Dendroica dominica*
WATERTHRUSH, Louisiana, *Seiurus motacilla*
Northern, *Seiurus noveboracensis*
WAXWING, Bohemian, *Bombycilla garrulus*
Cedar, *Bombycilla cedrorum*
WHEATEAR, Northern, *Oenanthe oenanthe*
WHIMBREL, *Numenius phaeopus*
WHIP-POOR-WILL, *Caprimulgus vociferus*
WHISTLING-DUCK, Black-bellied, *Dendrocygna autumnalis*
Fulvous, *Dendrocygna bicolor*
West Indian, *Dendrocygna arborea*
WHITETHROAT, Lesser, *Sylvia curruca*
WIGEON, American, *Anas americana*
Eurasian, *Anas penelope*
WILLET, *Tringa semipalmata*
WOOD-PEWEE, Eastern, *Contopus virens*
Western, *Contopus sordidulus*
WOODCOCK, American, *Scolopax minor*

19

Eurasian, *Scolopax rusticola*
WOODPECKER, Acorn, *Melanerpes formicivorus*
American Three-toed, *Picoides dorsalis*
Arizona, *Picoides arizonae*
Black-backed, *Picoides arcticus*
Downy, *Picoides pubescens*
Gila, *Melanerpes uropygialis*
Golden-fronted, *Melanerpes aurifrons*
Great Spotted, *Dendrocopos major*
Hairy, *Picoides villosus*
Ivory-billed, *Campephilus principalis*
Ladder-backed, *Picoides scalaris*
Lewis's, *Melanerpes lewis*
Nuttall's, *Picoides nuttallii*
Pileated, *Dryocopus pileatus*
Puerto Rican, *Melanerpes portoricensis*
Red-bellied, *Melanerpes carolinus*
Red-cockaded, *Picoides borealis*
Red-headed, *Melanerpes erythrocephalus*
[Strickland's (*see* Arizona)]
[Three-toed (*see* American Three-toed)]
White-headed, *Picoides albolarvatus*
WOODSTAR, Bahama, *Calliphlox evelynae*
WREN, Bewick's, *Thryomanes bewickii*
Cactus, *Campylorhynchus brunneicapillus*
Canyon, *Catherpes mexicanus*
Carolina, *Thryothorus ludovicianus*
House, *Troglodytes aedon*
Marsh, *Cistothorus palustris*
Rock, *Salpinctes obsoletus*
Sedge, *Cistothorus platensis*
Winter, *Troglodytes troglodytes*
WRYNECK, Eurasian, *Jynx torquilla*
YELLOWLEGS, Greater, *Tringa melanoleuca*
Lesser, *Tringa flavipes*
YELLOWTHROAT, Common, *Geothlypis trichas*
Gray-crowned, *Geothlypis poliocephala*

(2) *Taxonomic listing.* Species are listed in phylogenetic sequence by scientific name, with the common (English) name following the scientific name. To help clarify species relationships, we also list the higher-level taxonomic categories of Order, Family, and Subfamily.

Order ANSERIFORMES
Family ANATIDAE
Subfamily DENDROCYGNINAE
*Dendrocygna autumnalis,* Black-bellied Whistling-Duck
*Dendrocygna arborea,* West Indian Whistling-Duck
*Dendrocygna bicolor,* Fulvous Whistling-Duck
Subfamily ANSERINAE
*Anser fabalis,* Taiga Bean-Goose
*Anser serrirostris,* Tundra Bean-Goose
*Anser albifrons,* Greater White-fronted Goose
*Anser erythropus,* Lesser White-fronted Goose
*Chen canagica,* Emperor Goose
*Chen caerulescens,* Snow Goose

*Chen rossii,* Ross's Goose
*Branta bernicla,* Brant
*Branta leucopsis,* Barnacle Goose
*Branta canadensis,* Canada Goose (including *Branta hutchinsii,* Cackling Goose)
*Branta sandvicensis,* Hawaiian Goose
*Cygnus buccinator,* Trumpeter Swan
*Cygnus columbianus,* Tundra Swan
*Cygnus cygnus,* Whooper Swan
Subfamily ANATINAE
*Cairina moschata,* Muscovy Duck
*Air sponsa,* Wood Duck
*Anas strepera,* Gadwall
*Anas falcata,* Falcated Duck
*Anas penelope,* Eurasian Wigeon
*Anas americana,* American Wigeon
*Anas rubripes,* American Black Duck
*Anas platyrhynchos,* Mallard
*Anas fulvigula,* Mottled Duck
*Anas wyvilliana,* Hawaiian Duck
*Anas laysanensis,* Laysan Duck
*Anas poecilorhyncha,* Spot-billed Duck
*Anas superciliosa,* Pacific Black Duck
*Anas discors,* Blue-winged Teal
*Anas cyanoptera,* Cinnamon Teal
*Anas clypeata,* Northern Shoveler
*Anas bahamensis,* White-cheeked Pintail
*Anas acuta,* Northern Pintail
*Anas querquedula,* Garganey
*Anas formosa,* Baikal Teal
*Anas crecca,* Green-winged Teal
*Aythya valisineria,* Canvasback
*Aythya americana,* Redhead
*Aythya ferina,* Common Pochard
*Aythya baeri,* Baer's Pochard
*Aythya collaris,* Ring-necked Duck
*Aythya fuligula,* Tufted Duck
*Aythya marila,* Greater Scaup
*Aythya affinis,* Lesser Scaup
*Polysticta stelleri,* Steller's Eider
*Somateria fischeri,* Spectacled Eider
*Somateria spectabilis,* King Eider
*Somateria mollissima,* Common Eider
*Histrionicus histrionicus,* Harlequin Duck
*Melanitta perspicillata,* Surf Scoter
*Melanitta fusca,* White-winged Scoter
*Melanitta nigra,* Black Scoter
*Clangula hyemalis,* Long-tailed Duck
*Bucephala albeola,* Bufflehead
*Bucephala clangula,* Common Goldeneye
*Bucephala islandica,* Barrow's Goldeneye
*Mergellus albellus,* Smew
*Lophodytes cucullatus,* Hooded Merganser
*Mergus merganser,* Common Merganser
*Mergus serrator,* Red-breasted Merganser
*Nomonyx dominicus,* Masked Duck
*Oxyura jamaicensis,* Ruddy Duck
Order GAVIIFORMES
Family GAVIIDAE
*Gavia stellata,* Red-throated Loon
*Gavia arctica,* Arctic Loon
*Gavia pacifica,* Pacific Loon
*Gavia immer,* Common Loon
*Gavia adamsii,* Yellow-billed Loon
Order PODICIPEDIFORMES
Family PODICIPEDIDAE
*Tachybaptus dominicus,* Least Grebe

20

A-11

*Podilymbus podiceps*, Pied-billed Grebe
*Podiceps auritus*, Horned Grebe
*Podiceps grisegena*, Red-necked Grebe
*Podiceps nigricollis*, Eared Grebe
*Aechmophorus occidentalis*, Western Grebe
*Aechmophorus clarkii*, Clark's Grebe
Order PROCELLARIIFORMES
Family DIOMEDEIDAE
*Thalassarche chlororhynchos*, Yellow-nosed Albatross
*Thalassarche cauta*, Shy Albatross
*Thalassarche melanophris*, Black-browed Albatross
*Phoebetria palpebrata*, Light-mantled Albatross
*Diomedea exulans*, Wandering Albatross
*Phoebastria immutabilis*, Laysan Albatross
*Phoebastria nigripes*, Black-footed Albatross
*Phoebastria albatrus*, Short-tailed Albatross
Family PROCELLARIIDAE
*Fulmarus glacialis*, Northern Fulmar
*Pterodroma macroptera*, Great-winged Petrel
*Pterodroma neglecta*, Kermadec Petrel
*Pterodroma arminjoniana*, Herald Petrel
*Pterodroma ultima*, Murphy's Petrel
*Pterodroma inexpectata*, Mottled Petrel
*Pterodroma cahow*, Bermuda Petrel
*Pterodroma hasitata*, Black-capped Petrel
*Pterodroma externa*, Juan Fernandez Petrel
*Pterodroma sandwichensis*, Hawaiian Petrel
*Pterodroma cervicalis*, White-necked Petrel
*Pterodroma hypoleuca*, Bonin Petrel
*Pterodroma nigripennis*, Black-winged Petrel
*Pterodroma cookii*, Cook's Petrel
*Pterodroma longirostris*, Stejneger's Petrel
*Pterodroma alba*, Phoenix Petrel
*Pterodroma leucoptera*, Gould's Petrel
*Pterodroma rostrata*, Tahiti Petrel
*Bulweria bulwerii*, Bulwer's Petrel
*Bulweria fallax*, Jouanin's Petrel
*Calonectris leucomelas*, Streaked Shearwater
*Calonectris diomedea*, Cory's Shearwater
*Calonectris edwardsii*, Cape Verde Shearwater
*Puffinus creatopus*, Pink-footed Shearwater
*Puffinus carneipes*, Flesh-footed Shearwater
*Puffinus gravis*, Greater Shearwater
*Puffinus pacificus*, Wedge-tailed Shearwater
*Puffinus bulleri*, Buller's Shearwater
*Puffinus griseus*, Sooty Shearwater
*Puffinus tenuirostris*, Short-tailed Shearwater
*Puffinus nativitatis*, Christmas Shearwater
*Puffinus puffinus*, Manx Shearwater
*Puffinus auricularis*, Townsend's Shearwater
*Puffinus opisthomelas*, Black-vented Shearwater
*Puffinus lherminieri*, Audubon's Shearwater
*Puffinus assimilis*, Little Shearwater
Family HYDROBATIDAE
*Oceanites oceanicus*, Wilson's Storm-Petrel
*Pelagodroma marina*, White-faced Storm-Petrel

*Fregetta tropica*, Black-bellied Storm-Petrel
*Fregetta grallaria*, White-bellied Storm-Petrel
*Nesofregetta fuiginosa*, Polynesian Storm-Petrel
*Oceanodroma furcata*, Fork-tailed Storm-Petrel
*Oceanodroma hornbyi*, Ringed Storm-Petrel
*Oceanodroma leucorhoa*, Leach's Storm-Petrel
*Oceanodroma homochroa*, Ashy Storm-Petrel
*Oceanodroma castro*, Band-rumped Storm-Petrel
*Oceanodroma tethys*, Wedge-rumped Storm-Petrel
*Oceanodroma matsudairae*, Matsudaira's Storm-Petrel
*Oceanodroma melania*, Black Storm-Petrel
*Oceanodroma tristrami*, Tristram's Storm-Petrel
*Oceanodroma microsoma*, Least Storm-Petrel
Order PELECANIFORMES
Family PHAETHONTIDAE
*Phaethon lepturus*, White-tailed Tropicbird
*Phaethon aethereus*, Red-billed Tropicbird
*Phaethon rubricauda*, Red-tailed Tropicbird
Family SULIDAE
*Sula dactylatra*, Masked Booby
*Sula nebouxii*, Blue-footed Booby
*Sula leucogaster*, Brown Booby
*Sula sula*, Red-footed Booby
*Morus bassanus*, Northern Gannet
Family PELECANIDAE
*Pelecanus erythrorhynchos*, American White Pelican
*Pelecanus occidentalis*, Brown Pelican
Family PHALACROCORACIDAE
*Phalacrocorax melanoleucos*, Little Pied Cormorant
*Phalacrocorax penicillatus*, Brandt's Cormorant
*Phalacrocorax brasilianus*, Neotropic Cormorant
*Phalacrocorax auritus*, Double-crested Cormorant
*Phalacrocorax carbo*, Great Cormorant
*Phalacrocorax urile*, Red-faced Cormorant
*Phalacrocorax pelagicus*, Pelagic Cormorant
Family ANHINGIDAE
*Anhinga anhinga*, Anhinga
Family FREGATIDAE
*Fregata magnificens*, Magnificent Frigatebird
*Fregata minor*, Great Frigatebird
*Fregata ariel*, Lesser Frigatebird
Order CICONIIFORMES
Family ARDEIDAE
*Botaurus lentiginosus*, American Bittern
*Izobrychus sinensis*, Yellow Bittern
*Izobrychus exilis*, Least Bittern
*Izobrychus eurhythmus*, Schrenck's Bittern
*Izobrychus flavicollis*, Black Bittern
*Ardea herodias*, Great Blue Heron
*Ardea cinerea*, Gray Heron

21

*Ardea alba*, Great Egret
*Mesophoyx intermedia*, Intermediate Egret
*Egretta eulophotes*, Chinese Egret
*Egretta garzetta*, Little Egret
*Egretta sacra*, Pacific Reef-Egret
*Egretta gularis*, Western Reef-Heron
*Egretta thula*, Snowy Egret
*Egretta caerulea*, Little Blue Heron
*Egretta tricolor*, Tricolored Heron
*Egretta rufescens*, Reddish Egret
*Bubulcus ibis*, Cattle Egret
*Ardeola bacchus*, Chinese Pond-Heron
*Butorides virescens*, Green Heron
*Nycticorax nycticorax*, Black-crowned Night-Heron
*Nyctanassa violacea*, Yellow-crowned Night-Heron
*Gorsachius goisagi*, Japanese Night-Heron
*Gorsachius melanolophus*, Malayan Night-Heron
Family THRESKIORNITHIDAE
Subfamily THRESKIORNITHINAE
*Eudocimus albus*, White Ibis
*Eudocimus ruber*, Scarlet Ibis
*Plegadis falcinellus*, Glossy Ibis
*Plegadis chihi*, White-faced Ibis
Subfamily PLATALEINAE
*Platalea ajaja*, Roseate Spoonbill
Family CICONIIDAE
*Jabiru mycteria*, Jabiru
*Mycteria americana*, Wood Stork
Order PHOENICOPTERIFORMES
Family PHOENICOPTERIDAE
*Phoenicopterus ruber*, Greater Flamingo
Order FALCONIFORMES
Family CATHARTIDAE
*Coragyps atratus*, Black Vulture
*Cathartes aura*, Turkey Vulture
*Gymnogyps californianus*, California Condor
Family ACCIPITRIDAE
Subfamily PANDIONINAE
*Pandion haliaetus*, Osprey
Subfamily ACCIPITRINAE
*Chondrohierax uncinatus*, Hook-billed Kite
*Elanoides forficatus*, Swallow-tailed Kite
*Elanus leucurus*, White-tailed Kite
*Rostrhamus sociabilis*, Snail Kite
*Ictinia mississippiensis*, Mississippi Kite
*Milvus migrans*, Black Kite
*Haliaeetus leucocephalus*, Bald Eagle
*Haliaeetus albicilla*, White-tailed Eagle
*Haliaeetus pelagicus*, Steller's Sea-Eagle
*Circus cyaneus*, Northern Harrier
*Accipiter soloensis*, Gray Frog-Hawk
*Accipiter gularis*, Japanese Sparrowhawk
*Accipiter striatus*, Sharp-shinned Hawk
*Accipiter cooperii*, Cooper's Hawk
*Accipiter gentilis*, Northern Goshawk
*Geranospiza caerulescens*, Crane Hawk
*Buteogallus anthracinus*, Common Black-Hawk
*Parabuteo unicinctus*, Harris's Hawk
*Buteo magnirostris*, Roadside Hawk
*Buteo lineatus*, Red-shouldered Hawk
*Buteo platypterus*, Broad-winged Hawk
*Buteo nitidus*, Gray Hawk
*Buteo brachyurus*, Short-tailed Hawk

*Buteo swainsoni*, Swainson's Hawk
*Buteo albicaudatus*, White-tailed Hawk
*Buteo albonotatus*, Zone-tailed Hawk
*Buteo solitarius*, Hawaiian Hawk
*Buteo jamaicensis*, Red-tailed Hawk
*Buteo regalis*, Ferruginous Hawk
*Buteo lagopus*, Rough-legged Hawk
*Aquila chrysaetos*, Golden Eagle
Family FALCONIDAE
Subfamily MICRASTURINAE
*Micrastur semitorquatus*, Collared Forest-Falcon
Subfamily CARACARINAE
*Caracara cheriway*, Crested Caracara
Subfamily FALCONINAE
*Falco tinnunculus*, Eurasian Kestrel
*Falco sparverius*, American Kestrel
*Falco vespertinus*, Red-footed Falcon
*Falco columbarius*, Merlin
*Falco subbuteo*, Eurasian Hobby
*Falco femoralis*, Aplomado Falcon
*Falco rusticolus*, Gyrfalcon
*Falco peregrinus*, Peregrine Falcon
*Falco mexicanus*, Prairie Falcon
Order GRUIFORMES
Family RALLIDAE
*Coturnicops noveboracensis*, Yellow Rail
*Laterallus jamaicensis*, Black Rail
*Gallirallus philippensis*, Buff-banded Rail
*Gallirallus owstoni*, Guam Rail
*Crex crex*, Corn Crake
*Rallus longirostris*, Clapper Rail
*Rallus elegans*, King Rail
*Rallus limicola*, Virginia Rail
*Porzana carolina*, Sora
*Porzana tabuensis*, Spotless Crake
*Porzana flaviventer*, Yellow-breasted Crake
*Neocrex erythrops*, Paint-billed Crake
*Pardirallus maculatus*, Spotted Rail
*Porphyrio martinica*, Purple Gallinule
*Porphyrio porphyrio*, Purple Swamphen
*Porphyrio flavirostris*, Azure Gallinule
*Gallinula chloropus*, Common Moorhen
*Fulica atra*, Eurasian Coot
*Fulica alai*, Hawaiian Coot
*Fulica americana*, American Coot
*Fulica caribaea*, Caribbean Coot
Family ARAMIDAE
*Aramus guarauna*, Limpkin
Family GRUIDAE
*Grus canadensis*, Sandhill Crane
*Grus grus*, Common Crane
*Grus americana*, Whooping Crane
Order CHARADRIIFORMES
Family CHARADRIIDAE
Subfamily VANELLINAE
*Vanellus vanellus*, Northern Lapwing
Subfamily CHARADRIINAE
*Pluvialis squatarola*, Black-bellied Plover
*Pluvialis apricaria*, European Golden-Plover
*Pluvialis dominica*, American Golden-Plover
*Pluvialis fulva*, Pacific Golden-Plover
*Charadrius mongolus*, Lesser Sand-Plover
*Charadrius leschenaultii*, Greater Sand-Plover
*Charadrius collaris*, Collared Plover
*Charadrius alexandrinus*, Snowy Plover

*Charadrius wilsonia,* Wilson's Plover
*Charadrius hiaticula,* Common Ringed Plover
*Charadrius semipalmatus,* Semipalmated Plover
*Charadrius melodus,* Piping Plover
*Charadrius dubius,* Little Ringed Plover
*Charadrius vociferus,* Killdeer
*Charadrius montanus,* Mountain Plover
*Charadrius morinellus,* Eurasian Dotterel
Family HAEMATOPODIDAE
*Haematopus ostralegus,* Eurasian Oystercatcher
*Haematopus palliatus,* American Oystercatcher
*Haematopus bachmani,* Black Oystercatcher
Family RECURVIROSTRIDAE
*Himantopus himantopus,* Black-winged Stilt
*Himantopus mexicanus,* Black-necked Stilt
*Recurvirosta americana,* American Avocet
Family JACANIDAE
*Jacana spinosa,* Northern Jacana
Family SCOLOPACIDAE
Subfamily SCOLOPACINAE
*Xenus cinereus,* Terek Sandpiper
*Actitis hypoleucos,* Common Sandpiper
*Actitis macularius,* Spotted Sandpiper
*Tringa ochropus,* Green Sandpiper
*Tringa solitaria,* Solitary Sandpiper
*Tringa brevipes,* Gray-tailed Tattler
*Tringa incana,* Wandering Tattler
*Tringa erythropus,* Spotted Redshank
*Tringa melanoleuca,* Greater Yellowlegs
*Tringa nebularia,* Common Greenshank
*Tringa guttifer,* Nordmann's Greenshank
*Tringa semipalmata,* Willet
*Tringa flavipes,* Lesser Yellowlegs
*Tringa stagnatilis,* Marsh Sandpiper
*Tringa glareola,* Wood Sandpiper
*Bartramia longicauda,* Upland Sandpiper
*Numenius minutus,* Little Curlew
*Numenius borealis,* Eskimo Curlew
*Numenius phaeopus,* Whimbrel
*Numenius tahitiensis,* Bristle-thighed Curlew
*Numenius madagascariensis,* Far Eastern Curlew
*Numenius arquata,* Eurasian Curlew
*Numenius americanus,* Long-billed Curlew
*Limosa limosa,* Black-tailed Godwit
*Limosa haemastica,* Hudsonian Godwit
*Limosa lapponica,* Bar-tailed Godwit
*Limosa fedoa,* Marbled Godwit
*Arenaria interpres,* Ruddy Turnstone
*Arenaria melanocephala,* Black Turnstone
*Aphriza virgata,* Surfbird
*Calidris tenuirostris,* Great Knot
*Calidris canutus,* Red Knot
*Calidris alba,* Sanderling
*Calidris pusilla,* Semipalmated Sandpiper
*Calidris mauri,* Western Sandpiper
*Calidris ruficollis,* Red-necked Stint
*Calidris minuta,* Little Stint
*Calidris temminckii,* Temminck's Stint
*Calidris subminuta,* Long-toed Stint
*Calidris minutilla,* Least Sandpiper
*Calidris fuscicollis,* White-rumped Sandpiper

*Calidris bairdii,* Baird's Sandpiper
*Calidris melanotos,* Pectoral Sandpiper
*Calidris acuminata,* Sharp-tailed Sandpiper
*Calidris maritima,* Purple Sandpiper
*Calidris ptilocnemis,* Rock Sandpiper
*Calidris alpina,* Dunlin
*Calidris ferruginea,* Curlew Sandpiper
*Calidris himantopus,* Stilt Sandpiper
*Eurynorhynchus pygmeus,* Spoon-billed Sandpiper
*Limicola falcinellus,* Broad-billed Sandpiper
*Tryngites subruficollis,* Buff-breasted Sandpiper
*Philomachus pugnax,* Ruff
*Limnodromus griseus,* Short-billed Dowitcher
*Limnodromus scolopaceus,* Long-billed Dowitcher
*Lymnocryptes minimus,* Jack Snipe
*Gallinago delicata,* Wilson's Snipe (the "common" snipe hunted in most of the U.S.)
*Gallinago gallinago,* Common Snipe (rare in western Alaska; also *see Gallinago delicata*)
*Gallinago stenura,* Pin-tailed Snipe
*Gallinago megala,* Swinhoe's Snipe
*Scolopax rusticola,* Eurasian Woodcock
*Scolopax minor,* American Woodcock
Subfamily PHALAROPODINAE
*Phalaropus tricolor,* Wilson's Phalarope
*Phalaropus lobatus,* Red-necked Phalarope
*Phalaropus fulicarius,* Red Phalarope
Family LARIDAE
Subfamily LARINAE
*Larus atricilla,* Laughing Gull
*Larus pipixcan,* Franklin's Gull
*Larus minutus,* Little Gull
*Larus ridibundus,* Black-headed Gull
*Larus philadelphia,* Bonaparte's Gull
*Larus heermanni,* Heermann's Gull
*Larus cirrocephalus,* Gray-hooded Gull
*Larus belcheri,* Belcher's Gull
*Larus crassirostris,* Black-tailed Gull
*Larus canus,* Mew Gull
*Larus delawarensis,* Ring-billed Gull
*Larus californicus,* California Gull
*Larus argentatus,* Herring Gull
*Larus michahellis,* Yellow-legged Gull
*Larus thayeri,* Thayer's Gull
*Larus glaucoides,* Iceland Gull
*Larus fuscus,* Lesser Black-backed Gull
*Larus schistisagus,* Slaty-backed Gull
*Larus livens,* Yellow-footed Gull
*Larus occidentalis,* Western Gull
*Larus glaucescens,* Glaucous-winged Gull
*Larus hyperboreus,* Glaucous Gull
*Larus marinus,* Great Black-backed Gull
*Larus dominicanus,* Kelp Gull
*Xema sabini,* Sabine's Gull
*Rissa tridactyla,* Black-legged Kittiwake
*Rissa brevirostris,* Red-legged Kittiwake
*Rhodostethia rosea,* Ross's Gull
*Pagophila eburnea,* Ivory Gull
Subfamily STERNINAE
*Anous stolidus,* Brown Noddy
*Anous minutus,* Black Noddy

23

*Procelsterna cerulea*, Blue-gray Noddy
*Gygis alba*, White Tern
*Onychoprion fuscatus*, Sooty Tern
*Onychoprion lunatus*, Gray-backed Tern
*Onychoprion anaethetus*, Bridled Tern
*Onychoprion aleuticus*, Aleutian Tern
*Sternula albifrons*, Little Tern
*Sternula antillarum*, Least Tern
*Phaetusa simplex*, Large-billed Tern
*Gelochelidon nilotica*, Gull-billed Tern
*Hydroprogne caspia*, Caspian Tern
*Chlidonias niger*, Black Tern
*Chlidonias leucopterus*, White-winged Tern
*Chlidonias hybridus*, Whiskered Tern
*Sterna dougallii*, Roseate Tern
*Sterna hirundo*, Common Tern
*Sterna paradisaea*, Arctic Tern
*Sterna forsteri*, Forster's Tern
*Sterna sumatrana*, Black-naped Tern
*Thalasseus maximus*, Royal Tern
*Thalasseus bergii*, Great Crested Tern
*Thalasseus sandvicensis*, Sandwich Tern
*Thalasseus elegans*, Elegant Tern
Subfamily RYNCHOPINAE
*Rynchops niger*, Black Skimmer
Family STERCORARIIDAE
*Stercorarius skua*, Great Skua
*Stercorarius maccormicki*, South Polar Skua
*Stercorarius pomarinus*, Pomarine Jaeger
*Stercorarius parasiticus*, Parasitic Jaeger
*Stercorarius longicaudus*, Long-tailed Jaeger
Family ALCIDAE
*Alle alle*, Dovekie
*Uria aalge*, Common Murre
*Uria lomvia*, Thick-billed Murre
*Alca torda*, Razorbill
*Cepphus grylle*, Black Guillemot
*Cepphus columba*, Pigeon Guillemot
*Brachyramphus perdix*, Long-billed Murrelet
*Brachyramphus marmoratus*, Marbled Murrelet
*Brachyramphus brevirostris*, Kittlitz's Murrelet
*Synthliboramphus hypoleucus*, Xantus's Murrelet
*Synthliboramphus craveri*, Craveri's Murrelet
*Synthliboramphus antiquus*, Ancient Murrelet
*Ptychoramphus aleuticus*, Cassin's Auklet
*Aethia psittacula*, Parakeet Auklet
*Aethia pusilla*, Least Auklet
*Aethia pygmaea*, Whiskered Auklet
*Aethia cristatella*, Crested Auklet
*Cerorhinca monocerata*, Rhinoceros Auklet
*Fratercula arctica*, Atlantic Puffin
*Fratercula corniculata*, Horned Puffin
*Fratercula cirrhata*, Tufted Puffin
Order COLUMBIFORMES
Family COLUMBIDAE
*Patagioenas squamosa*, Scaly-naped Pigeon
*Patagioenas leucocephala*, White-crowned Pigeon
*Patagioenas flavirostris*, Red-billed Pigeon
*Patagioenas inornata*, Plain Pigeon
*Patagioenas fasciata*, Band-tailed Pigeon

*Streptopelia orientalis*, Oriental Turtle-Dove
*Zenaida asiatica*, White-winged Dove
*Zenaida aurita*, Zenaida Dove
*Zenaida macroura*, Mourning Dove
*Columbina inca*, Inca Dove
*Columbina passerina*, Common Ground-Dove
*Columbina talpacoti*, Ruddy Ground-Dove
*Leptotila verreauxi*, White-tipped Dove
*Geotrygon chrysia*, Key West Quail-Dove
*Geotrygon mystacea*, Bridled Quail-Dove
*Geotrygon montana*, Ruddy Quail-Dove
*Gallicolumba xanthonura*, White-throated Ground-Dove
*Gallicolumba stairi*, Friendly Ground-Dove
*Ptilinopus perousii*, Many-colored Fruit-Dove
*Ptilinopus roseicapilla*, Mariana Fruit-Dove
*Ptilinopus porphyraceus*, Crimson-crowned Fruit-Dove
*Ducula pacifica*, Pacific Imperial-Pigeon
Order CUCULIFORMES
Family CUCULIDAE
Subfamily CUCULINAE
*Cuculus canorus*, Common Cuckoo
*Cuculus optatus*, Oriental Cuckoo
*Coccyzus americanus*, Yellow-billed Cuckoo
*Coccyzus minor*, Mangrove Cuckoo
*Coccyzus erythropthalmus*, Black-billed Cuckoo
*Coccyzus vieilloti*, Puerto Rican Lizard-Cuckoo
Subfamily NEOMORPHINAE
*Geococcyx californianus*, Greater Road-runner
Subfamily CROTOPHAGINAE
*Crotophaga ani*, Smooth-billed Ani
*Crotophaga sulcirostris*, Groove-billed Ani
Order STRIGIFORMES
Family TYTONIDAE
*Tyto alba*, Barn Owl
Family STRIGIDAE
*Otus flammeolus*, Flammulated Owl
*Otus sunia*, Oriental Scops-Owl
*Megascops kennicottii*, Western Screech-Owl
*Megascops asio*, Eastern Screech-Owl
*Megascops trichopsis*, Whiskered Screech-Owl
*Megascops nudipes*, Puerto Rican Screech-Owl
*Bubo virginianus*, Great Horned Owl
*Bubo scandiacus*, Snowy Owl
*Surnia ulula*, Northern Hawk Owl
*Glaucidium gnoma*, Northern Pygmy-Owl
*Glaucidium brasilianum*, Ferruginous Pygmy-Owl
*Micrathene whitneyi*, Elf Owl
*Athene cunicularia*, Burrowing Owl
*Ciccaba virgata*, Mottled Owl
*Strix occidentalis*, Spotted Owl
*Strix varia*, Barred Owl
*Strix nebulosa*, Great Gray Owl
*Asio otus*, Long-eared Owl
*Asio stygius*, Stygian Owl
*Asio flammeus*, Short-eared Owl
*Aegolius funereus*, Boreal Owl
*Aegolius acadicus*, Northern Saw-whet Owl

24

A-15

Order CAPRIMULGIFORMES
Family CAPRIMULGIDAE
Subfamily CHORDEILINAE
   *Chordeiles acutipennis*, Lesser Nighthawk
   *Chordeiles minor*, Common Nighthawk
   *Chordeiles gundlachii*, Antillean Nighthawk
Subfamily CAPRIMULGINAE
   *Nyctidromus albicollis*, Common Pauraque
   *Phalaenoptilus nuttallii*, Common Poorwill
   *Caprimulgus carolinensis*, Chuck-will's-widow
   *Caprimulgus ridgwayi*, Buff-collared Nightjar
   *Caprimulgus vociferus*, Whip-poor-will
   *Caprimulgus noctitherus*, Puerto Rican Nightjar
   *Caprimulgus indicus*, Gray Nightjar
Order APODIFORMES
Family APODIDAE
Subfamily CYPSELOIDINAE
   *Cypseloides niger*, Black Swift
   *Streptoprocne zonaris*, White-collared Swift
Subfamily CHAETURINAE
   *Chaetura pelagica*, Chimney Swift
   *Chaetura vauxi*, Vaux's Swift
   *Chaetura brachyura*, Short-tailed Swift
   *Hirundapus caudacutus*, White-throated Needletail
   *Aerodramus spodiopygius*, White-rumped Swiftlet
   *Aerodramus bartschi*, Mariana Swiftlet
Subfamily APODINAE
   *Apus apus*, Common Swift
   *Apus pacificus*, Fork-tailed Swift
   *Apus melba*, Alpine Swift
   *Aeronautes saxatalis*, White-throated Swift
   *Tachornis phoenicobia*, Antillean Palm-Swift
Family TROCHILIDAE
Subfamily TROCHILINAE
   *Colibri thalassinus*, Green Violet-ear
   *Anthracothorax prevostii*, Green-breasted Mango
   *Anthracothorax dominicus*, Antillean Mango
   *Anthracothorax viridis*, Green Mango
   *Eulampis jugularis*, Purple-throated Carib
   *Eulampis holosericeus*, Green-throated Carib
   *Orthorhyncus cristatus*, Antillean Crested Hummingbird
   *Chlorostilbon maugaeus*, Puerto Rican Emerald
   *Cynanthus latirostris*, Broad-billed Hummingbird
   *Hylocharis leucotis*, White-eared Hummingbird
   *Hylocharis xantusii*, Xantus's Hummingbird
   *Amazilia beryllina*, Berylline Hummingbird
   *Amazilia yucatanensis*, Buff-bellied Hummingbird
   *Amazilia rutila*, Cinnamon Hummingbird
   *Amazilia violiceps*, Violet-crowned Hummingbird
   *Lampornis clemenciae*, Blue-throated Hummingbird
   *Eugenes fulgens*, Magnificent Hummingbird
   *Heliomaster constantii*, Plain-capped Starthroat

   *Calliphlox evelynae*, Bahama Woodstar
   *Calothorax lucifer*, Lucifer Hummingbird
   *Archilochus colubris*, Ruby-throated Hummingbird
   *Archilochus alexandri*, Black-chinned Hummingbird
   *Calypte anna*, Anna's Hummingbird
   *Calypte costae*, Costa's Hummingbird
   *Stellula calliope*, Calliope Hummingbird
   *Selasphorus platycercus*, Broad-tailed Hummingbird
   *Selasphorus rufus*, Rufous Hummingbird
   *Selasphorus sasin*, Allen's Hummingbird
Order TROGONIFORMES
Family TROGONIDAE
Subfamily TROGONINAE
   *Trogon elegans*, Elegant Trogon
   *Euptilotis neoxenus*, Eared Quetzel
Order UPUPIFORMES
Family UPUPIDAE
   *Upupa epops*, Eurasian Hoopoe
Order CORACIIFORMES
Family ALCEDINIDAE
Subfamily HALCYONINAE
   *Todirhamphus cinnamominus*, Micronesian Kingfisher
   *Todirhamphus chloris*, Collared Kingfisher
Subfamily CERYLINAE
   *Megaceryle torquata*, Ringed Kingfisher
   *Megaceryle alcyon*, Belted Kingfisher
   *Chloroceryle americana*, Green Kingfisher
Order PICIFORMES
Family PICIDAE
Subfamily JYNGINAE
   *Jynx torquilla*, Eurasian Wryneck
Subfamily PICINAE
   *Melanerpes lewis*, Lewis's Woodpecker
   *Melanerpes portoricensis*, Puerto Rican Woodpecker
   *Melanerpes erythrocephalus*, Red-headed Woodpecker
   *Melanerpes formicivorus*, Acorn Woodpecker
   *Melanerpes uropygialis*, Gila Woodpecker
   *Melanerpes aurifrons*, Golden-fronted Woodpecker
   *Melanerpes carolinus*, Red-bellied Woodpecker
   *Sphyrapicus thyroideus*, Williamson's Sapsucker
   *Sphyrapicus varius*, Yellow-bellied Sapsucker
   *Sphyrapicus nuchalis*, Red-naped Sapsucker
   *Sphyrapicus ruber*, Red-breasted Sapsucker
   *Dendrocopos major*, Great Spotted Woodpecker
   *Picoides scalaris*, Ladder-backed Woodpecker
   *Picoides nuttallii*, Nuttall's Woodpecker
   *Picoides pubescens*, Downy Woodpecker
   *Picoides villosus*, Hairy Woodpecker
   *Picoides arizonae*, Arizona Woodpecker
   *Picoides borealis*, Red-cockaded Woodpecker
   *Picoides albolarvatus*, White-headed Woodpecker
   *Picoides dorsalis*, American Three-toed Woodpecker

*Picoides arcticus,* Black-backed Woodpecker
*Colaptes auratus,* Northern Flicker
*Colaptes chrysoides,* Gilded Flicker
*Dryocopus pileatus,* Pileated Woodpecker
*Campephilus principalis,* Ivory-billed Woodpecker
Order PASSERIFORMES
Family TYRANNIDAE
Subfamily ELAENIINAE
*Camptostoma imberbe,* Northern Beardless-Tyrannulet
*Myiopagis viridicata,* Greenish Elaenia
*Elaenia martinica,* Caribbean Elaenia
Subfamily FLUVICOLINAE
*Mitrephanes phaeocercus,* Tufted Flycatcher
*Contopus cooperi,* Olive-sided Flycatcher
*Contopus pertinax,* Greater Pewee
*Contopus sordidulus,* Western Wood-Pewee
*Contopus virens,* Eastern Wood-Pewee
*Contopus caribaeus,* Cuban Pewee
*Contopus hispaniolensis,* Hispaniolan Pewee
*Contopus latirostris,* Lesser Antillean Pewee
*Empidonax flaviventris,* Yellow-bellied Flycatcher
*Empidonax virescens,* Acadian Flycatcher
*Empidonax alnorum,* Alder Flycatcher
*Empidonax traillii,* Willow Flycatcher
*Empidonax minimus,* Least Flycatcher
*Empidonax hammondii,* Hammond's Flycatcher
*Empidonax wrightii,* Gray Flycatcher
*Empidonax oberholseri,* Dusky Flycatcher
*Empidonax difficilis,* Pacific-slope Flycatcher
*Empidonax occidentalis,* Cordilleran Flycatcher
*Empidonax fulvifrons,* Buff-breasted Flycatcher
*Sayornis nigricans,* Black Phoebe
*Sayornis phoebe,* Eastern Phoebe
*Sayornis saya,* Say's Phoebe
*Pyrocephalus rubinus,* Vermilion Flycatcher
Subfamily TYRANNINAE
*Myiarchus tuberculifer,* Dusky-capped Flycatcher
*Myiarchus cinerascens,* Ash-throated Flycatcher
*Myiarchus nuttingi,* Nutting's Flycatcher
*Myiarchus crinitus,* Great Crested Flycatcher
*Myiarchus tyrannulus,* Brown-crested Flycatcher
*Myiarchus sagrae,* La Sagra's Flycatcher
*Myiarchus antillarum,* Puerto Rican Flycatcher
*Pitangus sulphuratus,* Great Kiskadee
*Myiozetetes similis,* Social Flycatcher
*Myiodynastes luteiventris,* Sulphur-bellied Flycatcher
*Legatus leucophaius,* Piratic Flycatcher
*Empidonomus varius,* Variegated Flycatcher
*Tyrannus melancholicus,* Tropical Kingbird
*Tyrannus couchii,* Couch's Kingbird
*Tyrannus vociferans,* Cassin's Kingbird
*Tyrannus crassirostris,* Thick-billed Kingbird
*Tyrannus verticalis,* Western Kingbird

*Tyrannus tyrannus,* Eastern Kingbird
*Tyrannus dominicensis,* Gray Kingbird
*Tyrannus caudifasciatus,* Loggerhead Kingbird
*Tyrannus forficatus,* Scissor-tailed Flycatcher
*Tyrannus savana,* Fork-tailed Flycatcher
*Pachyramphus aglaiae,* Rose-throated Becard
*Tityra semifasciata,* Masked Tityra
Family LANIIDAE
*Lanius cristatus,* Brown Shrike
*Lanius ludovicianus,* Loggerhead Shrike
*Lanius excubitor,* Northern Shrike
Family VIREONIDAE
*Vireo griseus,* White-eyed Vireo
*Vireo crassirostris,* Thick-billed Vireo
*Vireo latimeri,* Puerto Rican Vireo
*Vireo bellii,* Bell's Vireo
*Vireo atricapillus,* Black-capped Vireo
*Vireo vicinior,* Gray Vireo
*Vireo flavifrons,* Yellow-throated Vireo
*Vireo plumbeus,* Plumbeous Vireo
*Vireo cassinii,* Cassin's Vireo
*Vireo solitarius,* Blue-headed Vireo
*Vireo huttoni,* Hutton's Vireo
*Vireo gilvus,* Warbling Vireo
*Vireo philadelphicus,* Philadelphia Vireo
*Vireo olivaceus,* Red-eyed Vireo
*Vireo flavoviridis,* Yellow-green Vireo
*Vireo altiloquus,* Black-whiskered Vireo
*Vireo magister,* Yucatan Vireo
Family CORVIDAE
*Perisoreus canadensis,* Gray Jay
*Cyanocitta stelleri,* Steller's Jay
*Cyanocitta cristata,* Blue Jay
*Cyanocorax yncas,* Green Jay
*Cyanocorax morio,* Brown Jay
*Aphelocoma coerulescens,* Florida Scrub-Jay
*Aphelocoma insularis,* Island Scrub-Jay
*Aphelocoma californica,* Western Scrub-Jay
*Aphelocoma ultramarina,* Mexican Jay
*Gymnorhinus cyanocephalus,* Pinyon Jay
*Nucifraga columbiana,* Clark's Nutcracker
*Pica hudsonia,* Black-billed Magpie
*Pica nuttalli,* Yellow-billed Magpie
*Corvus kubaryi,* Mariana Crow
*Corvus brachyrhynchos,* American Crow
*Corvus caurinus,* Northwestern Crow
*Corvus leucognaphalus,* White-necked Crow
*Corvus imparatus,* Tamaulipas Crow
*Corvus ossifragus,* Fish Crow
*Corvus hawaiiensis,* Hawaiian Crow
*Corvus cryptoleucus,* Chihuahuan Raven
*Corvus corax,* Common Raven
Family ALAUDIDAE
*Alauda arvensis,* Sky Lark
*Eremophila alpestris,* Horned Lark
Family HIRUNDINIDAE
Subfamily HIRUNDININAE
*Progne subis,* Purple Martin
*Progne cryptoleuca,* Cuban Martin
*Progne dominicensis,* Caribbean Martin
*Progne chalybea,* Gray-breasted Martin
*Progne elegans,* Southern Martin
*Progne tapera,* Brown-chested Martin
*Tachycineta bicolor,* Tree Swallow

26

A-17

*Tachycineta albilinea*, Mangrove Swallow
*Tachycineta thalassina*, Violet-green Swallow
*Tachycineta cyaneoviridis*, Bahama Swallow
*Stelgidopteryx serripennis*, Northern Rough-winged Swallow
*Riparia riparia*, Bank Swallow
*Petrochelidon pyrrhonota*, Cliff Swallow
*Petrochelidon fulva*, Cave Swallow
*Hirundo rustica*, Barn Swallow
*Delichon urbicum*, Common House-Martin

Family PARIDAE
*Poecile carolinensis*, Carolina Chickadee
*Poecile atricapillus*, Black-capped Chickadee
*Poecile gambeli*, Mountain Chickadee
*Poecile sclateri*, Mexican Chickadee
*Poecile rufescens*, Chestnut-backed Chickadee
*Poecile hudsonica*, Boreal Chickadee
*Poecile cincta*, Gray-headed Chickadee
*Baeolophus wollweberi*, Bridled Titmouse
*Baeolophus inornatus*, Oak Titmouse
*Baeolophus ridgwayi*, Juniper Titmouse
*Baeolophus bicolor*, Tufted Titmouse
*Baeolophus atricristatus*, Black-crested Titmouse

Family REMIZIDAE
*Auriparus flaviceps*, Verdin

Family AEGITHALIDAE
*Psaltriparus minimus*, Bushtit

Family SITTIDAE
Subfamily SITTINAE
*Sitta canadensis*, Red-breasted Nuthatch
*Sitta carolinensis*, White-breasted Nuthatch
*Sitta pygmaea*, Pygmy Nuthatch
*Sitta pusilla*, Brown-headed Nuthatch

Family CERTHIIDAE
Subfamily CERTHIINAE
*Certhia americana*, Brown Creeper

Family TROGLODYTIDAE
*Campylorhynchus brunneicapillus*, Cactus Wren
*Salpinctes obsoletus*, Rock Wren
*Catherpes mexicanus*, Canyon Wren
*Thryothorus ludovicianus*, Carolina Wren
*Thryomanes bewickii*, Bewick's Wren
*Troglodytes aedon*, House Wren
*Troglodytes troglodytes*, Winter Wren
*Cistothorus platensis*, Sedge Wren
*Cistothorus palustris*, Marsh Wren

Family CINCLIDAE
*Cinclus mexicanus*, American Dipper

Family REGULIDAE
*Regulus satrapa*, Golden-crowned Kinglet
*Regulus calendula*, Ruby-crowned Kinglet

Family SYLVIIDAE
Subfamily SYLVIINAE
*Locustella ochotensis*, Middendorff's Grasshopper-Warbler
*Locustella lanceolata*, Lanceolated Warbler
*Acrocephalus luscinia*, Nightingale Reed-Warbler
*Acrocephalus familiaris*, Millerbird
*Phylloscopus trochilus*, Willow Warbler
*Phylloscopus sibilatrix*, Wood Warbler
*Phylloscopus fuscatus*, Dusky Warbler

*Phylloscopus inornatus*, Yellow-browed Warbler
*Phylloscopus borealis*, Arctic Warbler
*Sylvia curruca*, Lesser Whitethroat

Subfamily POLIOPTILINAE
*Polioptila caerulea*, Blue-gray Gnatcatcher
*Polioptila californica*, California Gnatcatcher
*Polioptila melanura*, Black-tailed Gnatcatcher
*Polioptila nigriceps*, Black-capped Gnatcatcher

Family MUSCICAPIDAE
*Ficedula narcissina*, Narcissus Flycatcher
*Muscicapa griseisticta*, Gray-streaked Flycatcher

Family TURDIDAE
*Luscinia calliope*, Siberian Rubythroat
*Luscinia svecica*, Bluethroat
*Luscinia cyane*, Siberian Blue Robin
*Monticola solitarius*, Blue Rock Thrush
*Tarsiger cyanurus*, Red-flanked Bluetail
*Oenanthe oenanthe*, Northern Wheatear
*Saxicola torquatus*, Stonechat
*Sialia sialis*, Eastern Bluebird
*Sialia mexicana*, Western Bluebird
*Sialia currucoides*, Mountain Bluebird
*Myadestes townsendi*, Townsend's Solitaire
*Myadestes myadestinus*, Kamao
*Myadestes lanaiensis*, Olomao
*Myadestes obscurus*, Omao
*Myadestes palmeri*, Puaiohi
*Catharus aurantiirostris*, Orange-billed Nightingale-Thrush
*Catharus mexicanus*, Black-headed Nightingale-Thrush
*Catharus fuscescens*, Veery
*Catharus minimus*, Gray-cheeked Thrush
*Catharus bicknelli*, Bicknell's Thrush
*Catharus ustulatus*, Swainson's Thrush
*Catharus guttatus*, Hermit Thrush
*Hylocichla mustelina*, Wood Thrush
*Turdus obscurus*, Eyebrowed Thrush
*Turdus naumanni*, Dusky Thrush
*Turdus pilaris*, Fieldfare
*Turdus grayi*, Clay-colored Robin
*Turdus assimilis*, White-throated Robin
*Turdus rufopalliatus*, Rufous-backed Robin
*Turdus migratorius*, American Robin
*Turdus plumbeus*, Red-legged Thrush
*Ixoreus naevius*, Varied Thrush
*Ridgwayia pinicola*, Aztec Thrush

Family MIMIDAE
*Dumetella carolinensis*, Gray Catbird
*Melanoptila glabrirostris*, Black Catbird
*Mimus polyglottos*, Northern Mockingbird
*Mimus gundlachii*, Bahama Mockingbird
*Oreoscoptes montanus*, Sage Thrasher
*Toxostoma rufum*, Brown Thrasher
*Toxostoma longirostre*, Long-billed Thrasher
*Toxostoma bendirei*, Bendire's Thrasher
*Toxostoma curvirostre*, Curve-billed Thrasher
*Toxostoma redivivum*, California Thrasher
*Toxostoma crissale*, Crissal Thrasher
*Toxostoma lecontei*, Le Conte's Thrasher
*Melanotis caerulescens*, Blue Mockingbird

27

*Margarops fuscatus,* Pearly-eyed Thrasher
Family STURNIDAE
　*Sturnus philippensis,* Chestnut-cheeked Starling
　*Sturnus cineraceus,* White-cheeked Starling
Family PRUNELLIDAE
　*Prunella montanella,* Siberian Accentor
Family MOTACILLIDAE
　*Motacilla tschutschensis,* Eastern Yellow Wagtail
　*Motacilla citreola,* Citrine Wagtail
　*Motacilla cinerea,* Gray Wagtail
　*Motacilla alba,* White Wagtail
　*Anthus trivialis,* Tree Pipit
　*Anthus hodgsoni,* Olive-backed Pipit
　*Anthus gustavi,* Pechora Pipit
　*Anthus cervinus,* Red-throated Pipit
　*Anthus rubescens,* American Pipit
　*Anthus spragueii,* Sprague's Pipit
Family BOMBYCILLIDAE
　*Bombycilla garrulus,* Bohemian Waxwing
　*Bombycilla cedrorum,* Cedar Waxwing
Family PTILOGONATIDAE
　*Ptilogonys cinereus,* Gray Silky-flycatcher
　*Phainopepla nitens,* Phainopepla
Family PEUCEDRAMIDAE
　*Peucedramus taeniatus,* Olive Warbler
Family PARULIDAE
　*Vermivora bachmanii,* Bachman's Warbler
　*Vermivora pinus,* Blue-winged Warbler
　*Vermivora chrysoptera,* Golden-winged Warbler
　*Vermivora peregrina,* Tennessee Warbler
　*Vermivora celata,* Orange-crowned Warbler
　*Vermivora ruficapilla,* Nashville Warbler
　*Vermivora virginiae,* Virginia's Warbler
　*Vermivora crissalis,* Colima Warbler
　*Vermivora luciae,* Lucy's Warbler
　*Parula superciliosa,* Crescent-chested Warbler
　*Parula americana,* Northern Parula
　*Parula pitiayumi,* Tropical Parula
　*Dendroica petechia,* Yellow Warbler
　*Dendroica pensylvanica,* Chestnut-sided Warbler
　*Dendroica magnolia,* Magnolia Warbler
　*Dendroica tigrina,* Cape May Warbler
　*Dendroica caerulescens,* Black-throated Blue Warbler
　*Dendroica coronata,* Yellow-rumped Warbler
　*Dendroica nigrescens,* Black-throated Gray Warbler
　*Dendroica chrysoparia,* Golden-cheeked Warbler
　*Dendroica virens,* Black-throated Green Warbler
　*Dendroica townsendi,* Townsend's Warbler
　*Dendroica occidentalis,* Hermit Warbler
　*Dendroica fusca,* Blackburnian Warbler
　*Dendroica dominica,* Yellow-throated Warbler
　*Dendroica graciae,* Grace's Warbler
　*Dendroica adelaidae,* Adelaide's Warbler
　*Dendroica pinus,* Pine Warbler
　*Dendroica kirtlandii,* Kirtland's Warbler
　*Dendroica discolor,* Prairie Warbler
　*Dendroica palmarum,* Palm Warbler

*Dendroica castanea,* Bay-breasted Warbler
*Dendroica striata,* Blackpoll Warbler
*Dendroica cerulea,* Cerulean Warbler
*Dendroica angelae,* Elfin-woods Warbler
*Mniotilta varia,* Black-and-white Warbler
*Setophaga ruticilla,* American Redstart
*Protonotaria citrea,* Prothonotary Warbler
*Helmitheros vermivorum,* Worm-eating Warbler
*Limnothlypis swainsonii,* Swainson's Warbler
*Seiurus aurocapilla,* Ovenbird
*Seiurus noveboracensis,* Northern Waterthrush
*Seiurus motacilla,* Louisiana Waterthrush
*Oporornis formosus,* Kentucky Warbler
*Oporornis agilis,* Connecticut Warbler
*Oporornis philadelphia,* Mourning Warbler
*Oporornis tolmiei,* MacGillivray's Warbler
*Geothlypis trichas,* Common Yellowthroat
*Geothlypis poliocephala,* Gray-crowned Yellowthroat
*Wilsonia citrina,* Hooded Warbler
*Wilsonia pusilla,* Wilson's Warbler
*Wilsonia canadensis,* Canada Warbler
*Cardellina rubrifrons,* Red-faced Warbler
*Myioborus pictus,* Painted Redstart
*Myioborus miniatus,* Slate-throated Redstart
*Euthlypis lachrymosa,* Fan-tailed Warbler
*Basileuterus culicivorus,* Golden-crowned Warbler
*Basileuterus rufifrons,* Rufous-capped Warbler
*Icteria virens,* Yellow-breasted Chat
Family THRAUPIDAE
*Nesospingus speculiferus,* Puerto Rican Tanager
*Piranga flava,* Hepatic Tanager
*Piranga rubra,* Summer Tanager
*Piranga olivacea,* Scarlet Tanager
*Piranga ludoviciana,* Western Tanager
*Piranga bidentata,* Flame-colored Tanager
*Spindalis zena,* Western Spindalis
*Spindalis portoricensis,* Puerto Rican Spindalis
*Euphonia musica,* Antillean Euphonia
Family EMBERIZIDAE
*Sporophila torqueola,* White-collared Seedeater
*Tiaris olivacea,* Yellow-faced Grassquit
*Tiaris bicolor,* Black-faced Grassquit
*Loxigilla portoricensis,* Puerto Rican Bullfinch
*Arremonops rufivirgatus,* Olive Sparrow
*Pipilo chlorurus,* Green-tailed Towhee
*Pipilo maculatus,* Spotted Towhee
*Pipilo erythrophthalmus,* Eastern Towhee
*Pipilo fuscus,* Canyon Towhee
*Pipilo crissalis,* California Towhee
*Pipilo aberti,* Abert's Towhee
*Aimophila carpalis,* Rufous-winged Sparrow
*Aimophila cassinii,* Cassin's Sparrow
*Aimophila aestivalis,* Bachman's Sparrow
*Aimophila botterii,* Botteri's Sparrow
*Aimophila ruficeps,* Rufous-crowned Sparrow

*Aimophila quinquestriata*, Five-striped Sparrow
*Spizella arborea*, American Tree Sparrow
*Spizella passerina*, Chipping Sparrow
*Spizella pallida*, Clay-colored Sparrow
*Spizella breweri*, Brewer's Sparrow
*Spizella pusilla*, Field Sparrow
*Spizella wortheni*, Worthen's Sparrow
*Spizella atrogularis*, Black-chinned Sparrow
*Pooecetes gramineus*, Vesper Sparrow
*Chondestes grammacus*, Lark Sparrow
*Amphispiza bilineata*, Black-throated Sparrow
*Amphispiza belli*, Sage Sparrow
*Calamospiza melanocorys*, Lark Bunting
*Passerculus sandwichensis*, Savannah Sparrow
*Ammodramus savannarum*, Grasshopper Sparrow
*Ammodramus bairdii*, Baird's Sparrow
*Ammodramus henslowii*, Henslow's Sparrow
*Ammodramus leconteii*, Le Conte's Sparrow
*Ammodramus nelsoni*, Nelson's Sharp-tailed Sparrow
*Ammodramus caudacutus*, Saltmarsh Sharp-tailed Sparrow
*Ammodramus maritimus*, Seaside Sparrow
*Passerella iliaca*, Fox Sparrow
*Melospiza melodia*, Song Sparrow
*Melospiza lincolnii*, Lincoln's Sparrow
*Melospiza georgiana*, Swamp Sparrow
*Zonotrichia albicollis*, White-throated Sparrow
*Zonotrichia querula*, Harris's Sparrow
*Zonotrichia leucophrys*, White-crowned Sparrow
*Zonotrichia atricapilla*, Golden-crowned Sparrow
*Junco hyemalis*, Dark-eyed Junco
*Junco phaeonotus*, Yellow-eyed Junco
*Calcarius mccownii*, McCown's Longspur
*Calcarius lapponicus*, Lapland Longspur
*Calcarius pictus*, Smith's Longspur
*Calcarius ornatus*, Chestnut-collared Longspur
*Emberiza leucocephalos*, Pine Bunting
*Emberiza pusilla*, Little Bunting
*Emberiza rustica*, Rustic Bunting
*Emberiza elegans*, Yellow-throated Bunting
*Emberiza aureola*, Yellow-breasted Bunting
*Emberiza variabilis*, Gray Bunting
*Emberiza pallasi*, Pallas's Bunting
*Emberiza schoeniclus*, Reed Bunting
*Plectrophenax nivalis*, Snow Bunting
*Plectrophenax hyperboreus*, McKay's Bunting
Family CARDINALIDAE
*Rhodothraupis celaeno*, Crimson-collared Grosbeak
*Cardinalis cardinalis*, Northern Cardinal
*Cardinalis sinuatus*, Pyrrhuloxia
*Pheucticus chrysopeplus*, Yellow Grosbeak
*Pheucticus ludovicianus*, Rose-breasted Grosbeak
*Pheucticus melanocephalus*, Black-headed Grosbeak
*Cyanocompsa parellina*, Blue Bunting

*Passerina caerulea*, Blue Grosbeak
*Passerina amoena*, Lazuli Bunting
*Passerina cyanea*, Indigo Bunting
*Passerina versicolor*, Varied Bunting
*Passerina ciris*, Painted Bunting
*Spiza americana*, Dickcissel
Family ICTERIDAE
*Dolichonyx oryzivorus*, Bobolink
*Agelaius phoeniceus*, Red-winged Blackbird
*Agelaius tricolor*, Tricolored Blackbird
*Agelaius humeralis*, Tawny-shouldered Blackbird
*Agelaius xanthomus*, Yellow-shouldered Blackbird
*Sturnella magna*, Eastern Meadowlark
*Sturnella neglecta*, Western Meadowlark
*Xanthocephalus xanthocephalus*, Yellow-headed Blackbird
*Euphagus carolinus*, Rusty Blackbird
*Euphagus cyanocephalus*, Brewer's Blackbird
*Quiscalus quiscula*, Common Grackle
*Quiscalus major*, Boat-tailed Grackle
*Quiscalus mexicanus*, Great-tailed Grackle
*Quiscalus niger*, Greater Antillean Grackle
*Molothrus bonariensis*, Shiny Cowbird
*Molothrus aeneus*, Bronzed Cowbird
*Molothrus ater*, Brown-headed Cowbird
*Icterus wagleri*, Black-vented Oriole
*Icterus dominicensis*, Greater Antillean Oriole
*Icterus spurius*, Orchard Oriole
*Icterus cucullatus*, Hooded Oriole
*Icterus pustulatus*, Streak-backed Oriole
*Icterus bullockii*, Bullock's Oriole
*Icterus gularis*, Altamira Oriole
*Icterus graduacauda*, Audubon's Oriole
*Icterus galbula*, Baltimore Oriole
*Icterus parisorum*, Scott's Oriole
Family FRINGILLIDAE
Subfamily FRINGILLINAE
*Fringilla coelebs*, Common Chaffinch
*Fringilla montifringilla*, Brambling
Subfamily CARDUELINAE
*Leucosticte tephrocotis*, Gray-crowned Rosy-Finch
*Leucosticte atrata*, Black Rosy-Finch
*Leucosticte australis*, Brown-capped Rosy-Finch
*Pinicola enucleator*, Pine Grosbeak
*Carpodacus erythrinus*, Common Rosefinch
*Carpodacus purpureus*, Purple Finch
*Carpodacus cassinii*, Cassin's Finch
*Carpodacus mexicanus*, House Finch
*Loxia curvirostra*, Red Crossbill
*Loxia leucoptera*, White-winged Crossbill
*Carduelis flammea*, Common Redpoll
*Carduelis hornemanni*, Hoary Redpoll
*Carduelis spinus*, Eurasian Siskin
*Carduelis pinus*, Pine Siskin
*Carduelis psaltria*, Lesser Goldfinch
*Carduelis lawrencei*, Lawrence's Goldfinch
*Carduelis tristis*, American Goldfinch
*Carduelis sinica*, Oriental Greenfinch
*Pyrrhula pyrrhula*, Eurasian Bullfinch
*Coccothraustes vespertinus*, Evening Grosbeak

29

*Coccothraustes coccothraustes*, Hawfinch

Subfamily DREPANIDINAE

*Telespiza cantans*, Laysan Finch
*Telespiza ultima*, Nihoa Finch
*Psittirostra psittacea*, Ou
*Loxioides bailleui*, Palila
*Pseudonestor xanthophrys*, Maui Parrotbill
*Hemignathus virens*, Hawaii Amakihi
*Hemignathus flavus*, Oahu Amakihi
*Hemignathus kauaiensis*, Kauai Amakihi
*Hemignathus ellisianus*, Greater Akialoa
*Hemignathus lucidus*, Nukupuu
*Hemignathus munroi*, Akiapolaau
*Magumma parva*, Anianiau
*Oreomystis bairdi*, Akikiki
*Oreomystis mana*, Hawaii Creeper
*Paroreomyza maculata*, Oahu Alauahio
*Paroreomyza flammea*, Kakawahie
*Paroreomyza montana*, Maui Alauahio
*Loxops caeruleirostris*, Akekee
*Loxops coccineus*, Akepa
*Vestiaria coccinea*, Iiwi
*Palmeria dolei*, Akohekohe
*Himatione sanguinea*, Apapane
*Melamprosops phaeosoma*, Poo-uli

[75 FR 9299, Mar. 1, 2010]

*OMB Approval Number:* 1018–0084.
*Description and use:* To evaluate whether an import permit can be issued to a person to import pet bird(s) under the Wild Bird Conservation Act (WBCA).

*Description of respondents:* Individuals or households.
*Number of respondents:* 500.
*Estimated completion time:* 30 minutes.
*Total annual burden:* 250 hours.
28. Title: *Import of Birds for Scientific Research or Zoological Breeding Display.*
*Service form number:* 3–200.47.
*OMB Approval Number:* 1018–0084.
*Description and use:* To evaluate whether an import permit can be issued to allow the import of birds under the WBCA approved cooperative breeding program. The applicant must first have a cooperative breeding program approved (using form 3–200.49) prior to applying for this permit.

*Description of respondents:* Individuals or households; business or other for-profit; not-for-profit institutions; state, local, or tribal government; federal government.
*Number of respondents:* 100.
*Estimated completion time:* 2 hours.
*Total annual burden:* 200 hours.
29. Title: *Import of Birds under an Apprived Cooperative Breeding Program.*
*Service form number:* 3–200.48.
*OMB Approved Number:* 1018–0084.
*Description and use:* To evaluate whether an import permit can be issued to allow import of birds under a WBCA approved cooperaitve breeding program. The applicant must first have a cooperaitve breeding program approved (using form 3–200.49) prior to applicaiton.

*Description of respondents:* Individuals or households; business or other for-profit; not-for-profit institutions.
*Number of respondents:* 100.
*Estimated completion time:* 1 hour.
*Total annual burden:* 100 hours.
30. title: *Approval under a Cooperative Breeding Program.*
*Service form number:* 3–200.49
*OMB Approved Number:* 1018–0084.
*Description and use:* To evaluate whether a cooperative breeding program can be approved for the import of birds as regulated by the WBCA.

*Description of respondents:* Individuals or households; business or other for-profit; not-for-profit institutions; state, local, or tribal government; federal government.
*Number of respondents:* 100.
*Estimated completion time:* 3 hours.
*Total annual burden:* 300 hours.

31. Title: *Reissuance of CITIES Permit/Certificate of Renewal of Fish and Wildlife Permits or Registrations.*
*Service form number:* 3–200.52
*Description and use:* Necessary for applicants to apply for reissuance or renewal of previously issued permits, certificates or registrations.

*Description of respondents:* Individuals or households; business or other for-profit; not-for-profit institutions; state, local, or tribal government; federa government.
*Number of respondents:* 200.
*Estimated completion time:* .25 hours (15 minutes).
*Total annual burden:* 50 hours.
32. Title: *Export Re-export of Marine Mammals under CITIES.*
*Service form number:* 3–200.53
*Description and use:* To evaluate whether a CITIES export permit or re-export certificate can be issued to allow the export or re-export of marine mammals protected under the MMPA.

*Description of respondents:* Individuals or households; business or other for-profit; not-for-profit institutions; state, local, or tribal government; federal government.
*Number of respondents:* 20.
*Estimated completion time:* 2 hours.
*Total annual burden:* 40 hours.

Dated March 3, 1997.

**Marshall P. Jones, Jr.,**

*Assistant Director—International Affairs.*
[FR Doc. 97–6268 Filed 3–12–97; 8:45 am]
BILLING CODE 4310–55–M

## Fish and Wildlife Service

## Proposed Information Collection To Be Submitted to the Office of Management and Budget (OMB) for Extension Approval

**SUMMARY:** The proposed collections of information listed below will be submitted to the OMB for extension approval under the provisions of the Paperwork Reduction Act of 1995. Copies of specific information collection requirements, related forms and explanatory material may be obtained by contacting the Service Information Collection Clearance Officer at the address and/or phone numbers listed below.

**DATES:** Comments must be submitted on or before May 12, 1997.

**ADDRESSES:** Comments and suggestions on specific requirements should be sent to the Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, MS 224–ARLSQ; 1849 C Street, NW., Washington, DC 20240.

**FOR FURTHER INFORMATION CONTACT:** Phyllis H. Cook, Service Information

Collection Clearance Officer, 703/358–1943; 703/358–2269 (fax).

**SUPPLEMENTARY INFORMATION:** The Service proposes to submit the following information collection clearance requirements to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are invited on (1) whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) the accuracy of the agency's estimate of burden, including whether the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility and clarity of the information to be collected; and (4) ways to minimize the burden of the collection of information those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Under the present clearance, the Service submitted the following requirements in one submission, and they were assigned OMB Approval Number 1018–0022, the Federal Fish and Wildlife License/Permit Application and related reports, Service form number 3–200. In an attempt to facilitate the comment process, and to make the application process more ''user friendly,'' similar types of permits have been grouped together and numbered. The application to apply for Service permits issued under subchapter B of Title 50 of the Code of Federal Regulations (CFR), will still require completion of the 3–200 form. In addition to the permit application, attachments are often necessary to provide additional information required for each specific type of permit and these attachments have been assigned numbers, e.g., 3–200.2.

The information on the application form will be used by the Service to review permit applications and allow the Service to make decisions, according to criteria established in various Federal wildlife conservation statues and regulations, on the issuance, suspension, revocation or denial of permits. The frequency of response for the following types of permit applications/licenses is on occasion, and all have been currently assigned OMB Approval Number 1018–0022, unless otherwise noted.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB

approval number and the agency informs the potential persons who are to respond to such collections that they are not required to respond to the collection of information unless it displays a currently valid OMB approval number.

*1. Title:* Permits to Import/Export Migratory Birds.

*Service form number:* 3–200.6

*Description and use:* Used by the Service to determine whether or not an applicant is qualified to posses and use an import/export permit with respect to migratory birds. The information is also used as an enforcement and management aid in regulating the possession, transportation, and sale of lawfully acquired and mounted migratory birds and their parts, nests, or eggs.

*Description of respondents:* Individuals and households; business or other for-profit; not-for-profit institutions; and local, State or Federal government.

*Number of respondents:* 93.

*Estimated completion time:* 30 minutes.

*Total annual burden:* 465 hours.

*2. Title:* Scientific Collecting Permits.

*Service form number:* 3–200.7.

*Description and use:* Used will be used by the Service to determine if a permit should be issued to an individual. Additional information is required beyond completion of the standard application form to determine whether there is a *bona fide* scientific or educational need for the issuance of scientific collecting permit.

*Description of respondents:* Individuals and households; individuals acting on behalf of an educational or scientific institution and/or agency.

*Number of respondents:* 310.

*Estimated completion time:* 2 hours.

*Total annual burden:* 620 hours.

*3. Title:* Taxidermist Permits.

*Service form number:* 3–200.8.

*Description and use:* Used to determine whether an applicant is qualified to engage in taxidermy with respect to migratory birds in a specific State, particularly if that State requires a permit. The information is also used as a enforcement and management aid in regulation the possession, transportation, and sale of lawfully acquired and mounted migratory birds and their parts, nest, or eggs.

*Description of respondents:* Individuals or households.

*Number of respondents:* 2,286.

*Estimated completion time:* .25 hours (15 minutes).

*Total annual burden:* 572 hours.

*4. Title:* Waterfowl Sale and Disposal Permits.

*Service form number:* 3–200.9.

*Description and use:* Used by the Service to ensure compliance with the Migratory Bird Treaty Act (MBTA) regulations that prohibit the sale, purchase, or barter of migratory waterfowl. The information collected from persons wishing to sell captive-reared migratory waterfowl is the minimum necessary that still allows the Service to fulfill the mandate of protecting waterfowl populations form illegal commercial exploitation. This information also enables the Service to determine if an applicant with any State laws requiring a person to obtain a game breeder's license prior to conducting commercial sale activities. Once the permit is issued, the permittee is require to keep accurate records of activities conducted within the authority of the permit. This information is also used as an enforcement and management aid in regulating the take, transportation, and possession of wild migratory waterfowl, and sale, trade, or other transfer of captive-reared properly marked waterfowl.

*Description of respondents:* Individuals or households; Individuals acting on behalf of not-for-profit institutions such as zoos.

*Number of respondents:* 704.

*Estimated completion time:* 30 minutes.

*Total annual burden:* 352 hours.

*5. Title:* Special Purpose Permits.

*Service form number:* 3–200.10.

*Description and use:* Used by the Service to determine whether there is a *bona fide* scientific, educational, rehabilitation or other need or benefit to wildlife for the issuance of a special purpose permit. In addition, the year end report of the collecting activities conducted by permittee is necessary to ensure compliance with permit conditions, and to identify inactive permit holders who are no longer collecting migratory birds. This information is also used as an enforcement and management aid in regulating the taking, transportation, and possession of migratory birds, for scientific research or educational purposes.

*Description of respondents:* Individuals and households; not-for-profit institutions; and local, state, federal governments.

*Number of respondents:* 2,753.

*Estimated completion time:* 2.5 hours (2 hours and 15 minutes).

*Total annual burden:* 6,883.

*6. Title:* Falconry Permits.

*Service form number:* 3–200.11.

*Description and use:* Used by the Service to determine if a falconry permit should be issued to an individual. This information is also used by the Service

to determine if a falconry permit should be issued to an individual. This information is also used by the Service as an enforcement and management aid in regulating the taking, transportation, and possession of wild migratory birds, and the sale, trade, or transfer of certain captive-bred migratory birds. A copy of the applicant's State falconry permit is needed by the Service to ensure that the applicant has complied with the Federal regulation regulation requiring the prior issuance of a State falconry permit as a pre-requisite for the issuance of a Federal falconry permit.

In addition, permittee as required to prepare and submit a Service form 3–186A documenting the acquisition and disposition of each bird. This information is needed by the Service to monitor the take, possession, purchase, sale, and other acquisition or disposition raptors to prevent the illegal possession by unauthorized persons and the illegal taking of birds from the wild. One copy of the form is retained by the seller and another copy is kept by the purchaser to document the legal transaction. The use of this form precludes the need for an annual report that was previously required.

*Description of respondents:* Individuals and households.

*Number of respondents:* 1,964.

*Estimated completion time:* .083 hours (5 minutes) per application; 083 hours (5 minutes) per report (form 3–185A).

*Total annual burden:* 163 hours (application); 163 hours (form 3–186A).

*7. Title:* Raptor Propagation Permits.

*Service form number:* 3–200.13.

*Description and use:* Used by the Service to determine whether or not an applicant is qualified to conduct raptor propagation in a specific State, particularly if that State requires a permit. The information is also used as an enforcement and management aid in regulating the possession, transportation, and sale of lawfully acquired migratory birds and their parts, nests, or eggs. In addition, permittee are required to complete a form 3–186A as described above.

*Description of respondents:* Individuals and households; not-for-profit institutions (specifically, zoos).

*Number of respondents:* 143.

*Estimated completion time:* 1.5.

*Total annual burden:* 215 hours.

8. Depredation Permits.

*Service form number:* 3–200.13.

*Description and use:* Used by the Service in conducting investigations to ascertain the degree of damage to crops and/or property and determine the most suitable methods of reducing present and abating subsequent damage.

*Description of respondents:* Individuals and households; business or other for-profit; not-for-profit-institutions; farms; federal government; State, local or tribal government.

*Number of respondents:* 1,406.

*Estimated completion time:* 15 minutes.

*Total annual burden:* 352 hours.

*9. Title(s) and Service form numbers:* Eagle Permits.

(1) Eagle Permits for Scientific Collection or Exhibition, form number 3–200.14; (2) Eagle Permits for Native American Religious Purposes, form number 3–200.15; (3) Eagle permits for Depredating Golden or Bald Eagles, form number 3–200.16; (4) Eagle Permits for the use or Depredating Gold or Bald Eagles for Falconry, form number 3–200.17; (5) Permits to Take Inactive Golden Eagle Nests, form number 3–200.18.

*Description and use:* Used by the Service to determine whether an applicant qualifies for a permit to take, possess, or transport a bald or golden eagle or their parts, nests, or eggs, if there is a *bona fide* need, and if issuance of the permit is compatible with conservation measures protecting national eagle populations.

*Description of respondents:* Individuals and households; businesses or other for-profit; not-for-profit institution; farms, Federal government; State, local or Tribal government.

*Number of respondents:* 3–200.14 (156); 3–200.15 (756); 3–200.16 (11); 3–200.17 (10); 3–200.18 (10).

*Estimated completion time(s):* 3–200. 14 (30 minutes); 3–200.15 (5 minutes); 3–200.16 (30 minutes); 3–200.17 (25 minutes); 3–200.18 (30 minutes).

*Total annual burden:* 77.5 hours.

Dated: March 3, 1997.

**Robert G. Streeter,**

*Assistant Director—Refuges and Wildlife.*

[FR Doc. 97–6369 Filed 3–12–97; 8:45 am]

BILLING CODE 4310–55–M

## Endangered and Threatened Species Permit Application

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of receipt of application.

The following applicant has applied for a permit to conduct certain activities with endangered species. This notice is provided pursuant to section 10(c) of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531, *et seq.*).

PRT–826077

*Applicant:* Wayne P. Steffens, Superior, Wisconsin.

The applicant requests a permit to take (capture and release; and take voucher specimens) Hines Emerald Dragonflies (*Somatochlora hineana*) throughout the Upper Peninsula of Michigan. Proposed activities are for documentation of presence/absence of the species and habitat monitoring for the purpose of survival and enhancement of the species in the wild.

Written data or comments should be submitted to the Regional Director, U.S. Fish and Wildlife Service, Division of Ecological Services Operations, 1 Federal Drive, Fort Snelling, Minnesota 55111–4056, and must be received within 30 days of the date of this publication.

Documents and other information submitted with these applications are available for review by any party who submits a written request for a copy of such documents to the following office on or before April 14, 1997: U.S. Fish and Wildlife Service, Division of Ecological Services Operations, 1 Federal Drive, Fort Snelling, Minnesota 55111–4056. Telephone: (612/725–3536 x250); FAX: (612/725–3526).

Dated: March 4, 1997.

**John A. Blankenship,**

*Assistant Regional Director, IL, IN, MO (Ecological Services), Region 3, Fort Snelling, Minnesota.*

[FR Doc. 97–6339 Filed 3–12–97; 8:45 am]

BILLING CODE 4310–55–P

## Bureau of Land Management

**[CA–067–7122–6606]; CACA–35511**

## Imperial Project; Draft Environmental Impact Statement Availability; Correction; Reopening of Comment Period

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Correction.

**SUMMARY:** In the **Federal Register** of November 1, 1996 (Vol. 61, p. 56567), a notice was published [FR Doc. 96–27519]. This amends that notice. Because of expressed interest, the comment period, which previously ended on December 31, 1996, is reopened until March 24, 1997.

**ADDRESSES:** Written comments should be addressed to Bureau of Land Management, El Centro Resource Area, 1661 South 4th Street, El Centro, CA 92243, Attention: Keith Shone.

**FOR FURTHER INFORMATION CONTACT:** Keith Shone (619) 337–4412 or Tom Zale (619) 337–4420.

Dated: February 28, 1997.

**Terry A. Reed,**

*Area Manager.*

[FR Doc. 97–6367 Filed 3–12–97; 8:45 am]

BILLING CODE 4310–40–P

product adhesive operations at Solar Corporation's Libertyville, Illinois facility from 3.5 pounds VOM per gallon to 5.75 pounds VOM per gallon.

*(i) Incorporation by reference.* July 20, 1995, Opinion and Order of the Illinois Pollution Control Board, AS 94–2, effective July 20, 1995.

3. Section 52.720 is amended by adding paragraph (c)(136) to read as follows:

§ 52.720  Identification of plan.

\*      \*      \*      \*      \*

(c) \* \* \*

(136) On January 9, 1997, Illinois submitted a site-specific revision to the State Implementation Plan which grants a temporary variance from certain automotive plastic parts coating volatile organic material requirements at Solar Corporation's Libertyville, Illinois facility.

*(i) Incorporation by reference.* September 5, 1996, Opinion and Order of the Illinois Pollution Control Board, PCB 96–239, effective September 13, 1996. Certificate of Acceptance signed September 13, 1996.

[FR Doc. 98–4378 Filed 2–20–98; 8:45 am]

BILLING CODE 6560–50–P

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### National Marine Fisheries Service

### 50 CFR Part 222

[Docket No. 980212035–8035–01]

RIN 1018–AE24

### Habitat Conservation Plan Assurances ("No Surprises") Rule

**AGENCY:** Fish and Wildlife Service, Interior; National Marine Fisheries Service, NOAA, Commerce.

**ACTION:** Final rule.

**DATES:** This rule is effective March 25, 1998.

**SUMMARY:** This final rule codifies the Habitat Conservation Plan assurances provided through section 10(a)(1)(B) permits issued under the Endangered Species Act (ESA) of 1973, as amended. Such assurances were first provided through the "No Surprises" policy issued in 1994 by the Fish and Wildlife Service (FWS) and the National Marine

Fisheries Service (NMFS), (jointly referred to as the "Services,") and included in the joint FWS and NMFS Endangered Species Habitat Conservation Planning Handbook issued on December 2, 1996 (61 FR 63854). The No Surprises policy announced in 1994 provides regulatory assurances to the holder of a Habitat Conservation Plan (HCP) incidental take permit issued under section 10(a) of the ESA that no additional land use restrictions or financial compensation will be required of the permit holder with respect to species covered by the permit, even if unforeseen circumstances arise after the permit is issued indicating that additional mitigation is needed for a given species covered by a permit. The Services issued a proposed rule on May 29, 1997 (62 FR 29091) and the comments received on that proposal have been evaluated and considered in the development of this final rule. This final rule contains revisions to parts 17 (FWS) and 222 (NMFS) of Title 50 of the Code of Federal Regulations necessary to implement the Habitat Conservation Plan assurances.

**ADDRESSES:** To obtain copies of the final rule or for further information, contact Chief, Division of Endangered Species, U.S. Fish and Wildlife Service, Washington, D.C., 20240; or Chief, Endangered Species Division, National Marine Fisheries Service, Office of Protected Resources, 1315 East-West Highway, Silver Spring, MD, 20910.

**FOR FURTHER INFORMATION CONTACT:** E. LaVerne Smith, Chief, Division of Endangered Species, U.S. Fish and Wildlife Service, (Telephone 703/358–2171, or Facsimile 703/358–1735), or Nancy Chu, Chief, Endangered Species Division, National Marine Fisheries Service (Telephone (301/713–1401, or 301/713–0376).

**SUPPLEMENTARY INFORMATION:** These final regulations and the background information regarding the final rule apply to both Services. The proposed rule has been revised based on the comments received. The final rule is presented in two parts because the Services have separate regulations for implementing the section 10 permit process. The first part is for the final changes in the FWS's regulations found at 50 CFR 17.22 and 17.32, and the second part is for the final changes in NMFS's regulations found at 50 CFR 222.22.

### Background

Section 9 of the ESA generally prohibits the "take" of species listed under the ESA as endangered. Pursuant to the broad grant of regulatory

authority over threatened species in section 4(d) of the ESA, the Services' regulations generally prohibit take of species listed as threatened. See, e.g., 50 CFR 17.31 and 17.21 (FWS). Section 3(18) of the ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." FWS regulations (50 CFR 17.3) define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."

Section 10 of the ESA, as originally enacted in 1973, contained provisions allowing the issuance of permits authorizing the taking of listed species under very limited circumstances for non-Federal entities. In the following years, both the Federal government and non-Federal landowners became concerned that these permitting provisions were not sufficiently flexible to address situations in which a property owner's otherwise lawful activities might result in limited incidental take of a listed species, even if the landowner were willing to plan activities carefully to be consistent with the conservation of the species. As a result, Congress included in the ESA Amendments of 1982 provisions under section 10(a) to allow the Services to issue permits authorizing the incidental take of listed species in the course of otherwise lawful activities, provided that those activities were conducted according to an approved conservation plan (habitat conservation plan or HCP) and the issuance of the HCP permit would not jeopardize the continued existence of the species. In doing so, Congress indicated it was acting to "\* \* \* address the concerns of private landowners who are faced with having otherwise lawful actions not requiring Federal permits prevented by section 9 prohibitions against taking \* \* \* " H.R. Rep. No. 835, 97th Cong., 2d Sess. 29 (1982) (hereafter "Conf. Report").

Congress modeled the 1982 section 10 amendments after the conservation plan developed by private landowners and local governments to protect the habitat of two listed butterflies on San Bruno Mountain in San Mateo County, California while allowing development activities to proceed. Congress recognized in enacting the section 10 HCP amendments that:

" \* \* \* significant development projects often take many years to complete and permit applicants may need long-term permits. In this situation, and in order to provide sufficient incentives for the private sector to

participate in the development of such long-term conservation plans, plans which may involve the expenditure of hundreds of thousands if not millions of dollars, adequate assurances must be made to the financial and development communities that a section 10(a) permit can be made available for the life of the project. Thus, the Secretary should have the discretion to issue section 10(a) permits that run for periods significantly longer than are commonly provided [for other types of permits]." (Conf. Report at 31).

Congress also recognized that long-term HCP permits would present unique issues that would have to be addressed if the permits were to function to protect the interests of both the species involved and the non-Federal community. For instance, Congress realized that "* * * circumstances and information may change over time and that the original [habitat conservation] plan might need to be revised. To address this situation, the Committee expects that any plan approved for a long-term permit will contain a procedure by which the parties will deal with unforeseen circumstances." (Conf. Report at 31). Congress also recognized that non-Federal property owners seeking HCP permits would need to have economic and regulatory certainty regarding the overall cost of species mitigation over the life of the permit. As stated in the Conference Report on the 1982 ESA amendments:

"The Committee intends that the Secretary may utilize this provision to approve conservation plans which provide long-term commitments regarding the conservation of listed as well as unlisted species and long-term assurances to the proponent of the conservation plan that the terms of the plan will be adhered to and that further mitigation requirements will only be imposed in accordance with the terms of the plan. In the event that an unlisted species addressed in the approved conservation plan is subsequently listed pursuant to the Act, no further mitigation requirements should be imposed if the conservation plan addressed the conservation of the species and its habitat as if the species were listed pursuant to the Act." (Conf. Report at 30 and 50 FR 39681–39691, Sept. 30. 1985).

Congress thus envisioned and allowed the Federal government to provide regulatory assurances to non-Federal property owners through the section 10 incidental take permit process. Congress recognized that conservation plans could provide early protection for many unlisted species and, ideally, prevent subsequent declines and, in some cases, the need to list covered species.

The Services decided that a clearer policy regarding the assurances provided to landowners entering into an HCP was needed. This need prompted the development of the No Surprises policy, which was based on the 1982 Congressional Report language and a decade of working with private landowners during the development and implementation of HCPs. The Services believed that non-Federal property owners should be provided economic and regulatory certainty regarding the overall cost of species conservation and mitigation, provided that the affected species were adequately covered by a properly functioning HCP, and the permittee was properly implementing the HCP and complying with the terms and conditions of the HCP permit in good faith. A driving concern during the development of the policy was the absence of adequate incentives for non-Federal landowners to factor endangered species conservation into their day-to-day land management activities.

The Services issued the ESA No Surprises policy in August of 1994. This policy was then included in the joint Endangered Species Habitat Conservation Planning Handbook, which was published in draft form for public review and comment on December 21, 1994 (59 FR 65782), and, after consideration of the comments, was issued as final in December 1996 (61 FR 63854). In addition to that opportunity for public comment on the No Surprises policy in general, the application of the policy and its assurances have been and continue to be subject to an opportunity for public comment on each proposed HCP permit under section 10(c) of the ESA on a case-by-case basis. The Services were subsequently sued in *Spirit of the Sage Council* v. *Babbitt,* No. 1:96CV02503 (SS) (D. D.C.), which challenged the procedures under which the No Surprises policy was adopted and under which subsequent HCP permits were issued. In settling this lawsuit, the Services agreed to submit the No Surprises Policy to further public comment and to consider public comment in deciding whether to adopt the No Surprises policy as a final regulation. The Services agreed to this approach because they recognized the benefits of permanently codifying the No Surprises policy as a rule in 50 CFR, as well as the value of soliciting additional comments on the policy itself.

**Summary of the Proposed Rule**

The proposed rule stated that the Services, when negotiating unforeseen circumstances provisions for HCPs, would not require the commitment of additional land, property interests, or financial compensation beyond the level of mitigation that was otherwise adequately provided for a species under the terms of a properly functioning conservation plan. Moreover, the Services would not seek any other form of additional mitigation from a permittee except under unforeseen circumstances. However, if additional mitigation measures were subsequently deemed necessary to provide for the conservation of a species that was otherwise adequately covered under the terms of a properly functioning conservation plan, the obligation for such measures would not rest with the permittee.

Under the proposed rule, if unforeseen circumstances warrant additional mitigation from a permittee who is in compliance with the conservation plan's obligations, such mitigation would, to the maximum extent possible, be consistent with the original terms of the conservation plan. Further, any such changes will be limited to modifications within conserved habitat areas, if any, or to the conservation plan's operating conservation program for the affected species. Additional mitigation requirements would not involve the payment of additional compensation or apply to parcels of land or the natural resources available for development under the original terms of the conservation plan without the consent of the permittee.

Criteria were also developed by the Services that must be used for determining whether and when unforeseen circumstances arise.

Under the proposed rule, the Services also would not seek *any* form of additional mitigation for a species from a permittee where the terms of a properly functioning conservation plan were designed to provide an overall net benefit for that species and contained measurable criteria for the biological success of the conservation plans which have been or are being met. Nothing in the proposed rule would limit or constrain the Services, or any other governmental agency, from taking additional actions at its own expense to protect or conserve a species included in a conservation plan.

The Services also proposed a permit-shield provision in the proposed rule that stated that compliance with the terms of an incidental take permit constitutes compliance with the requirements of sections 9 and 10 of the ESA with respect to the species covered by the permit regardless of changes in circumstances, policy, and regulation, unless a change in statute or court order specifically requires that assurances given in the original permit be modified or withdrawn.

The Services also clarified in the proposed rule that the regulatory and economic assurances provided to HCP permittees are limited to section 10(a)(1)(B) permits. In addition, the assurances are not provided to Federal agencies.

**Summary of Comments Received**

The Services received more than 800 comments on the proposed rule from a large variety of entities, including Federal, State, County, and Tribal agencies, industry, conservation groups, religious groups, coalitions, and private individuals. The Services considered all of the information and recommendations received from all interested parties on the proposed regulation during the public comment period and appreciated the comments received on the proposed rule. In addition to comments that specifically addressed the proposed No Surprises policy in the proposed rule, the Services received numerous additional comments on the HCP process itself, comments which were beyond the narrow scope of this particular rulemaking on the No Surprises policy. The Services will utilize these more generic comments on HCPs, as appropriate, as we continue to improve the implementation of our HCP programs. However, at this time, the Services will only address comments received that are specific to the proposed No Surprises rule.

The Services have made changes in the proposed rule where appropriate. In addition, the Services intend to revise the HCP Handbook, both to reflect the final No Surprises rule and to further enhance the effectiveness of the HCP process in general through expanded use of adaptive management, monitoring provisions, and the establishment of overall biological goals for HCPs.

The following is a summary of the comments on the proposed regulations, and the Services' response.

*Issue 1:* Many commenters believed that to provide regulatory No Surprises assurances, the Secretary was directed to ''* * * consider the extent to which the conservation plan is likely to enhance the habitat of the listed species or increase the long-term survivability of the species or its ecosystem * * *'' (Conf. Report at 31.) and that the Services have no legislative authority to provide regulatory assurances for HCPs that do not meet this standard.

*Response 1:* A proposed HCP must satisfy the specific issuance criteria enumerated in section 10(a)(2)(B) of the ESA. In deciding whether these criteria have been satisfied and whether the permit should be issued for a given species, the Services consider, among other things, the extent to which the habitat of the affected species or its long-term survivability may be improved or enhanced. While it may be appropriate to consider an ''enhancement factor'' for an HCP, it is not a mandatory section 10(a)(2)(B) issuance criterion for all species.

Each HCP is analyzed on a case-by-case basis, using the best scientific information available. Habitat conditions are part of the data the Services evaluate to determine whether a proposed HCP meets the section 10 issuance criteria. The legislative history of the 1982 amendments to section 10 of the ESA indicates that Congress viewed habitat improvement and species conservation as appropriate considerations in determining whether to issue long-term incidental take permits. Certain types of HCPs, such as forest HCPs that include aquatic species, often allow for significant timber harvest and consequent species impacts during the initial years, while it may take decades before the riparian measures under the plan produce stream conditions that provide essential habitat functions for the listed species. The Services agree that, in appropriate situations, the legislative history supports including measures to provide for improved habitat over the life of the plan in section 10 permits. Severely depleted species and species for which the HCP covers all or a significant portion of the range are examples of circumstances in which essential habitat functions must be addressed to ensure that the conservation measures in the HCP provide a high probability that the habitat functions essential to the species' long-term survival will be achieved and maintained during the term of the permit.

*Issue 2:* Many commenters felt that this proposed regulation was driven solely by the needs of private landowners, and is not in the best interests of the species or other public concerns. Many commenters noted that the proposed regulation did not have commensurate certainties for protection of biological resources.

*Response 2:* The section 10(a) HCP provisions of the ESA were designed to help alleviate section 9 ''take'' liability for species on non-Federal lands. The ESA, as originally enacted, allowed the taking of listed species only under very limited circumstances, and did not, for example, allow the incidental take of listed species in the course of otherwise lawful activities. The 1982 ESA amendments to section 10(a) authorize the Services to issue HCP permits allowing the incidental take of listed species in the course of otherwise lawful activities, provided the activities are conducted according to an approved habitat conservation plan that minimize and mitigate take and avoids jeopardy to the continued existence of the affected species.

The Services disagree that the No Surprises policy has a narrow focus that excludes the consideration of listed species conservation. To the contrary, a driving concern in the development of the policy was the absence of adequate incentives for non-Federal landowners to factor endangered species conservation into their day-to-day land management activities. The Services knew that much of the habitat of listed species is in non-Federal lands and believed that HCPs should play a major role in protecting this habitat. Yet, while thousands of acres of species habitat were disappearing each year, only a handful of HCPs had been sought and approved since 1982. The No Surprises policy was designed to rechannel this uncontrolled ongoing habitat loss through the regulatory structure of section 10(a)(1)(B) by offering regulatory certainty to non-Federal landowners in exchange for a long-term commitment to species conservation. Given the significant increase in landowner interest in HCPs since the development of the No Surprises policy, the Services believe that the policy has accomplished one of its primary objectives to act as a catalyst for integrating endangered species conservation into day-to-day management operations on non-Federal lands. The Services also believe that the HCP process, which is a mechanism that reconciles economic development and the conservation of listed species, is good for rare and declining species, and encourages the development of more of these plans. If species are to survive and recover, such plans are necessary because more than half of the species listed have 80 percent of their habitat on non-Federal lands.

*Issue 3:* Many commenters stressed that the proposed regulation would unlawfully allow the Services to avoid their mandatory duties under section 7 of the ESA. They argued that the proposed regulation precludes the Services from meeting the regulatory and statutory requirements under 50 CFR 402.16 and section 7(d) because it makes reinitiation of consultation useless and precludes any meaningful reexamination of mitigation measures if the measures in the HCP are later found to be inadequate to avoid jeopardy as required under section 7(a)(2). If jeopardy did arise, commenters do not

feel that the Services would be able to implement the necessary mitigation to avoid the jeopardy because of lack of funding. Other concerns were also raised by commenters regarding the respective balance of responsibilities among the participants to an HCP containing a No Surprises assurance. Also, some commenters suggested the Services would not be fulfilling their mandatory conservation obligations under section 7(a)(1).

*Response 3:* The Services are committed to meeting their responsibilities under section 7(a)(2) of the ESA. As required by law, the Services conduct a formal intra-Service section 7 consultation regarding the issuance of each permit issued under section 10(a)(1)(B). The purpose of any consultation is to insure that any action authorized, funded, or carried out by the Federal government, including the issuance of an HCP permit, is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat of such species. In addition, the Services encourage all applicants to maximize benefits to species covered by their HCPs because of the Services' responsibilities under 7(a)(1). Moreover, as discussed in Response #1, in appropriate situations, such as when an HCP covers most or the entire range of a species or covers severely depleted species, the Services will seek measures necessary for the long-term survival of the species and its habitat.

The Services do not believe they are disregarding the requirements of section 7(d) in providing assurances to landowners through the section 10 process. During the formal section 7(a)(2) consultation process, and prior to the issuance of a final biological opinion, the Services (like any other Federal action agency) must not make any irreversible or irretrievable commitments of resources (in the case of proposing to issue an HCP permit, the Services cannot authorize incidental take) that would preclude the development of reasonable and prudent alternatives in the event that the action, as proposed, violates section 7(a)(2) of the ESA. In the context of HCP permit procedures, the only manner in which the Services could violate section 7(d) is if they authorized incidental take prior to making a final decision on a permit application, which is never the case.

In addition, the No Surprises assurances do not make reinitiation of consultation useless or preclude any meaningful reexamination of the HCP's operating conservation program. The Services will not require the landowner to provide additional mitigation measures in the form of additional land, water, or money. However, additional mitigation measures can be provided by another entity. Similarly, the No Surprises rule does not preclude the Services from shifting emphasis within an HCP's operating conservation program from one strategy to another in an effort to enhance an HCP's overall effectiveness, provided that such a shift does not increase the HCP permittee's costs. For example, if an HCP's operating conservation program originally included a mixture of predator depredation control and captive breeding, but subsequent research or information demonstrated that one of these was considerably more effective than the other, the Services would be able to request an adjustment in the proportionate use of these tools, provided that such an adjustment did not increase the overall costs to the HCP permittee.

Moreover, if the Services reinitiate consultation on the permitting action, and if additional measures are needed, the Services will work together with other Federal, State, and local agencies, Tribal governments, conservation groups, and private entities to ensure additional measures are implemented to conserve the species.

Regarding the concerns on the respective balance of responsibilities among the participants to an HCP containing a No Surprises assurance, the Services believe the No Surprises rule places the preponderance of the responsibility for protection beyond the terms of a specific HCP upon the Services. The only impediments to the Services' assumption of this additional responsibility will arise from limits on authority or funding to provide this additional protection.

The Services have significant resources and authorities that can be utilized to provide additional protection for threatened or endangered species that are the subject of a given HCP including land acquisition or exchange, habitat restoration or enhancement, translocation, and other management techniques. For example, lands managed by the Department of the Interior could be used to ensure listed species protection. Moreover, subsequent section 7 consultations and approval of subsequent section 10 permits will have to take into account the HCP and the status of the species at that time. The section 9 prohibition against unauthorized take by other landowners provides additional protection.

In addition, section 5 of the ESA authorizes the Services to acquire lands to conserve endangered and threatened fish, wildlife, and plants, and section 6 of the ESA authorizes the Services to cooperate with the States in conserving listed species. While many of these programs and authorities are subject to the availability of appropriations, others, such as the authority under the Federal Land Policy and Management Act to exchange land for conservation purposes, do not require appropriations. These authorities provide additional flexibility through which the Services could meet their section 7 responsibilities. While by no means exhaustive, the above discussion demonstrates the depth of authorities and resources available to the Services to meet their No Surprises commitments.

Utilizing these authorities and resources, the Services should be able to provide additional species protection that may be required in the unexpected event that an HCP falls short of providing sufficient protection.

*Issue 4:* Many commenters stated that the proposed regulation violates section 4(b)(8) of the ESA, which requires "* * * the publication in the **Federal Register** of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this ESA shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation * * *".

*Response 4:* The Services believe section 4(b)(8) is intended to apply only to listing and critical habitat decisions under section 4. However, even if section 4(b)(8) did apply to this rule, the Services have complied with its requirements. The proposed rule contained a thorough discussion of the basis for the proposed rule (62 FR 29091, May 29, 1997). In addition, the Services had previously explained the background of the No Surprises Policy in the draft HCP Handbook, which was published for public comment in the **Federal Register** (59 FR 65782, December 21, 1994).

*Issue 5:* Many commenters believe that the Secretary of the Interior does not have the authority to issue assurances for species covered by the Migratory Bird Treaty Act (MBTA) and the Bald and Golden Eagle Protection Act (BGEPA).

*Response 5:* The FWS believes that the ESA is more restrictive and protective of species than the MBTA and the BGEPA, and that species covered under an HCP that are also covered by the MBTA and the BGEPA will adequately be protected as long as the HCP is properly implemented. The FWS has concluded that under certain

conditions, a section 10 permit allowing incidental take of listed migratory birds is sufficient to relieve the permittee from liability under the MBTA and BGEPA for taking those species. For the MBTA, this is accomplished by having the HCP permit double as a Special Purpose Permit authorized under 50 CFR 21.27. For the BGEPA, the FWS would exercise its prosecutorial discretion not to prosecute an incidental take permittee under the BGEPA if such take is in compliance with a section 10 permit under the ESA.

However, there are conditions that must be satisfied before either of these protections apply, which are explained on pages 3–40 to 3–41 in the joint Endangered Species Habitat Conservation Planning Handbook (61 FR 63854, December 2, 1996). The FWS believes this approach is warranted because the permittee already would have agreed to an operating conservation program designed to conserve the species and minimize and mitigate the impacts of take of the listed species of migratory birds to the maximum extent practicable. Through the permitting provisions of the MBTA and the FWS's discretion in the enforcement of the BGEPA and the ESA, the FWS has the authority to provide a permittee with assurance that they will not be prosecuted under the MBTA or BGEPA for take expressly allowed under the ESA.

*Issue 6:* Many commenters stated that HCPs with No Surprises assurances are in conflict with the issuance criteria in the ESA because, in the event of unforeseen circumstances, the project impacts may not be fully mitigated and the plan may reduce the survival and recovery of a covered species.

*Response 6:* The assurances provided through this regulation are consistent with the issuance criteria of the ESA. Before issuing a permit, the Services ensure that the applicant minimizes and mitigates the project impacts, to the maximum extent practicable, and that the permitted activities avoid jeopardy to the continued existence of the affected species.

In addition, in cases where significant data gaps exist, adaptive management provisions are included in the HCP. The primary reason for using adaptive management in HCPs is to allow for up-front, mutually agreed upon changes in the operating conservation program that may be necessary in light of subsequently developed biological information. In the event of unforeseen circumstances, these strategies may be redirected as long as the redirection is consistent with the scope of the

mutually agreed-upon adaptive management provisions of the HCP.

*Issue 7:* Many commenters stated that the applicant is legally required to address all unforeseen circumstances in the HCP pursuant to section 10. They noted that fire, disease, drought, flood, global climate change, and non-point source pollution may be unforeseen, but are not uncommon. Also the proposed regulation does not direct the applicant to provide for all unforeseen circumstances that might occur during the length of the permit because it is the Services' responsibility to determine that there was an unforeseen circumstance that was not addressed and is not the fault of the permittee implementing the HCP. In addition, commenters noted that the nature of many of the HCPs that the Services are approving increases the likelihood for unforeseen events to happen (i.e., the permits are issued for many years and cover large areas and many species).

*Response 7:* The Services disagree that HCPs must address *all* hypothetical future events, no matter how remote the probability that they may occur. Rather, the Services believe that only reasonably foreseeable changes in circumstances need to be addressed in an HCP. Moreover, these circumstances are likely to vary from HCP to HCP given the ever changing mix of species and affected habitats covered by a given plan. Nevertheless, the Services agree that the proposed rule's treatment of unforeseen circumstances could be strengthened, and a definition of unforeseen circumstances has been codified in this rule. In particular, the Services would like to clarify that unforeseen circumstances will only include events that could not reasonably have been anticipated. *All reasonably foreseeable circumstances, including natural catastrophes that normally occur in the area, should be addressed in the HCP.* The final rule specifies how unforeseen circumstances will be addressed if they occur during the life of the permit.

*Issue 8:* Commenters believe that the proposed regulation would not allow for social changes that could occur over the lifetime of the permit. For example, they claim that the development and implementation of the Emergency Salvage Timber rider has affected the success of the conservation measures of several HCPs.

*Response 8:* There may be situations that do arise related to social changes that could occur during the lifetime of the permit. In these situations, the Services will use all of their legal authorities to adequately address the changes. The Timber Salvage rider to

the Appropriations bill is actually a good example of how the Administration responded to a change in social policy. On July 27, 1995, the President signed the Rescission Act (Public Law 104–19) that provided funds for disaster relief and other programs. This bill contained provisions for an emergency salvage timber sale, and directed the preparation, offer, and award of timber salvage sales nationwide. Although the bill passed, the President did not support the provision that waived compliance with environmental laws during timber salvage and directed the Secretaries of Agriculture, the Interior and Commerce, and the heads of other agencies, to move forward to implement the timber-related provisions of the bill in an expeditious and environmentally-sound manner. The Services worked with other Federal agencies to develop a process that, as a matter of Administration policy, addressed compliance with all environmental laws while also meeting the requirements of Pub. L. 104–19. An interagency team of Federal agencies then drafted a process that addressed compliance with the ESA through a streamlined section 7 consultation procedure to ensure that these sales did not jeopardize listed species. In this case, the Services and other Federal agencies cooperatively used their administrative discretion and legal authorities to ameliorate adverse impacts upon listed species conservation.

*Issue 9:* Several commenters believe that the proposed No Surprises rule negates adaptive management provisions incorporated into HCPs, and may not allow future jeopardy situations to be addressed, because adaptive management must allow for adaptions to changes as they occur rather than trying to plan for everything up front. In addition, many commenters believe that in order to get No Surprises assurances, an HCP must have an adaptive management program that addresses all foreseeable biological and environmental changes and that is designed so that new applicable scientific information and information developed through a monitoring program is incorporated into the plan.

*Response 9:* The Services do not believe that the proposed rule negates adaptive management provisions incorporated into HCPs for the species with biological data gaps. The No Surprises assurances only apply to an approved HCP that has otherwise satisfied the issuance criteria under section 10(a)(2)(B) of the ESA. When considering permits where there are significant biological data gaps, the

Services have two choices: either deny an HCP permit application due to the inadequacy of the overall proposed plan, or build in adaptive management and monitoring provisions where warranted because of biological data gaps and issue the permit. If there is significant uncertainty associated with the operating conservation program, adaptive management becomes an integral component of the HCP. Incorporating adaptive management provisions into the HCP becomes important to the planning process and the long-term interest of affected species when HCPs cover species with significant biological data gaps. Through adaptive management, the biological objectives of an operating conservation program are defined using techniques such as models of the ecological system that includes its components, interactions, and natural fluctuations. If existing data makes it difficult to predict exactly what conservation and mitigation measures are needed to achieve a biological objective, then an adaptive management approach should be used in the HCP. Under adaptive management, the HCP's operating conservation program can be monitored and analyzed to determine if it is producing the desired results (*e.g.*, properly functioning riparian habitats). If the desired results are not being achieved, then adjustments in the program can be considered through an adaptive management clause of the HCP. Thus, adaptive management can be an integral part of the operating conservation program for an HCP and can be implemented to adjust strategies accordingly. The Services support continuing to strengthen the effectiveness of adaptive management provisions in HCPs and intend to do so in further revisions to the HCP Handbook.

*Issue 10:* Numerous commenters stated that the proposed regulation should identify secured sources of funding that do not rely on appropriations for the implementation of conservation measures that may be needed to address unforeseen circumstances.

*Response 10:* Funding mechanisms of this type would have to be established through Congressional action. Absent Congressional action on this matter, the Services must operate with the fiscal resources otherwise made available to them through the appropriations process. Moreover, in approving an HCP in the first instance, the Services must conclude that the permittee has provided for adequate funding to implement the terms of the HCP.

*Issue 11:* Many commenters stated that the Federal government is not capable of shouldering the financial burden of funding the implementation of conservation measures that may be needed to address unforeseen circumstances. The hardship of paying for any changes needed in the HCP on the government may have severe and far reaching effects on funding for other Federal activities. In addition, some commenters noted that the proposed regulation unlawfully shifts the burden of funding to the Services when section 10 clearly states that the applicant will provide the funding. Numerous commenters stated that the government does not have guaranteed funding for covering unforeseen circumstances and cannot make such guarantees in violation of the Anti-Deficiency Act.

*Response 11:* The ESA requires the Service to find that an incidental take permittee has provided adequate funding to implement an HCP in the first instance. In addition, the Services must ensure that HCPs are designed to adequately mitigate the incidental take authorized by the permit, include measures to deal with unforeseen circumstances that may arise, and comply with such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan. Once the Services have concluded that a permittee has initially satisfied the issuance criteria in section 10(a), there is nothing in the ESA that precludes the Services from assuming additional responsibility for species covered under the terms of an HCP, especially when such responsibilities are limited to highly unlikely unforeseen circumstances. In fact, the Services have responsibility for listed species conservation regardless of whether an HCP is involved or not, and carrying out that responsibility (for example, through the initiation of litigation to enforce section 9 of the ESA) is also dependent upon the availability of appropriated funds. Therefore, at a conceptual level, the lack of guaranteed funding to handle a breakdown of an HCP due to unforeseen circumstances is no different from a lack of guaranteed funding to enforce the ESA generally.

The Anti-Deficiency Act applies to the Services' activities under the ESA as it does to their activities under all other environmental laws. In the face of an unexpected species decline, where additional conservation efforts are warranted, the Services have significant resources at their disposal to address the comparative needs of the species. As noted earlier in Response #3, the Services can also work with Congress,

other Federal, State, and local agencies, tribes, environmental groups, and private entities to help ensure the continued conservation of the species in the wild. The Services have a variety of tools available to ensure that the needs of the species affected by unforeseen circumstances are adequately addressed, including land acquisition or exchange, habitat restoration or enhancement, translocation, and other management techniques. Thus, the Services believe they have a wide array of options and resources available to respond to any unforeseen circumstances.

*Issue 12:* Many commenters noted that many HCPs do not have adequate funding, and the Services must not issue an incidental take permit unless an applicant has secured adequate funding to address all foreseeable changes that might be needed in the conservation measures during the lifetime of the permit. County or State Bonds that are not guaranteed should not be considered ''adequate funding.''

*Response 12:* Section 10(a)(2)(B)(iii) requires incidental take permit applicants to ''ensure that adequate funding for the plan will be provided.'' This issuance criterion requires that the applicant detail the funding that will be available to implement the proposed operating conservation program. Therefore, all conservation plans specify funding requirements necessary to implement the plan. The Services issue a permit only when they have concluded that the operating conservation program will be adequately funded. No Surprises only applies to an HCP that is being properly implemented, and if a major component of an HCP, like its funding strategy, is never initiated or implemented, then No Surprises no longer applies and the assurances lapse.

The FWS has incorporated provisions into HCPs that allow for a reevaluation of species coverage in case a County or State Bond that is supposed to meet the adequate funding issuance criterion ultimately is not passed. Under these provisions, the list of species authorized for incidental take may be diminished if funding is not in place within a specified time frame, and any incidental take that would occur before the bond measure is acted upon would have to be adequately mitigated up-front. This reevaluation mechanism was used in the Multiple Species Conservation Program for southwestern San Diego County, California. This type of reevaluation process will be incorporated into other HCPs that rely on proposed bonds to provide required funding.

*Issue 13:* Many commenters stated that funding and accountability mechanisms are more complicated for permits that involve third party beneficiaries (*e.g.,* certificates of inclusion), and that these types of permits should not include assurances.

*Response 13:* The Services believe that the assurances provided by the final rule should be available to individuals who participate in HCPs through a larger regional planning process. These large-scale, regional HCPs can significantly reduce the burden of the ESA on small landowners by providing efficient mechanisms for compliance, distributing the economic and logistical impacts of endangered species conservation among the community, and bringing a broad range of landowner activities under the HCPs' legal protection. In addition, these large-scale HCPs allow for ecosystem planning, which can provide benefits to more species than small-scale HCPs. Large-scale HCPs also provide the Services with a better opportunity for analyzing the cumulative effects of the projects, which is more efficient than the piecemeal approach that could result if each landowner developed his/her own HCP. The Services do believe, however, that the party that holds the "overarching" permit, and issues subpermits (*e.g.,* Certificates of Inclusion or Participation Certificates) must have the legal authority to enforce the terms and conditions of the permit and the underlying funding mechanisms for the HCP.

*Issue 14:* Many commenters requested the Services to remove the permit-shield provision from the proposed regulation because it improperly restricts the authority of the Secretary and citizens to enforce the requirements of the ESA. These commenters assert that the Services do not have the authority to prevent citizens from suing those who are in violation of the ESA. One commenter stated that the permit-shield provision lacks important limitations found in other permit-shield provisions, such as the Clean Water Act and Resource Conservation and Recovery Act. Commenters also stated that the proposed permit-shield provision conflicts with the citizen suit provision in section 11(g) of the ESA. Other commenters supported the proposed permit-shield provision and urged the Service to incorporate it into the final rule. These commenters believe failure to include a permit-shield provision would undercut the No Surprises assurances by exposing permit holders to potential enforcement actions even if they are complying fully with the terms and conditions of valid permits.

*Response 14:* After further review of the permit-shield concept, including a review of legal authorities, the Services have decided not to include a legally binding permit-shield provision in the final rule. The purpose of the permit-shield provision was to provide certainty to permittees regarding their legal obligations. The current statutory and regulatory framework appears to already provide permittees with that certainty. Although commenters stated that a permit holder might still be vulnerable to government-initiated enforcement actions notwithstanding the No Surprises assurances, the Services cannot identify situations in which a permittee would be in violation of Sections 9 or 11 of the ESA, if in fact they were acting within the permit's authorization and were complying with the terms and conditions of the permit.

In addition, as part of the review of legal authorities, the Services reviewed the court decision in *Shell Oil Company* v. *Environmental Protection Agency,* 950 F.2d 741, 761–765 (D.C. Cir. 1991), which addressed the legality of the Environmental Protection Agency's permit-shield rule for permits issued under the Resource Conservation and Recovery Act (RCRA). Although that decision upheld the RCRA permit-shield rule promulgated by the EPA, 40 CFR 270.4(a), the Services are concerned that the incidental take permit program is sufficiently different from the RCRA permit program that the *Shell Oil* decision may not support a permit-shield rule for incidental take permits. For instance, the court noted that the maximum term of RCRA permits is 10 years, which is considerably shorter than the terms of most incidental take permits. In addition, the EPA retains explicit authority to modify or terminate RCRA permits in response to information arising after a permit is issued that would have justified different permit terms had it existed when the permit was issued. In contrast, the No Surprises rule commits the Service to issue permits that do not require additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources if unforeseen circumstances arise.

Although the Services have decided not to include a legally binding permit-shield provision in the final rule, they nonetheless strongly support a policy that permittees should feel free of potential prosecution if they are acting under the authorizations of their permit and are complying with the terms and conditions of the permit. The Services therefore will continue their policy of not enforcing the prohibitions of Section 9 of the ESA against any incidental take permittee who complies fully with the terms and conditions of the permit.

Many commenters requested that the Services remove the permit-shield provision from the proposed regulation because it improperly restricts the authority of citizens to enforce the requirements of the ESA. The purpose of the proposed permit-shield provision was to provide that the Services would not utilize Section 11(e) of the ESA to enforce Section 9 prohibitions against a permittee who is in full compliance with the terms and conditions of a permit. The permit-shield provision would not, therefore, have restricted citizen suits.

*Issue 15:* Commenters believe that the regulatory assurances provided to the permittee deprive citizens of the right to have general oversight of HCPs, including challenging government's management decisions, guaranteeing that landowners are in compliance with the agreements, and ensuring that the plans are actually working to conserve listed species.

*Response 15:* The No Surprises assurances do not deprive citizens of HCP oversight or of their ability to challenge an improperly issued HCP permit. In addition, all Service decision documents (such as approval of HCP management plans) are part of the Administrative Record for any individual HCP and are available to any member of the public upon request. Nothing in this rule prevents citizens from challenging the adequacy of those decisions or bringing HCP permit terms and conditions compliance issues to the Services' attention. The Services welcome citizen input on HCP implementation. Public comments must be considered in all permit decisions. Providing No Surprises assurances to an HCP permittee does not eliminate this public comment period. In addition, the Services or any party designated as responsible by the Services (*e.g.,* State wildlife agency, local government) in the HCP will be expected to monitor the project for compliance with the terms of the incidental take permit and HCP. The Services also require periodic reporting from the permittee in order to maintain oversight to ensure the implementation of the HCP's terms and conditions. The final rule does nothing to affect these reporting requirements.

*Issue 16:* Numerous commenters stated that the proposed regulation should provide for permits to contain a reopener clause. Any entity (*e.g.,* landowners, government agencies, ecologists, environmentalists) would then be able to reopen the permit for any of the following reasons: 1) Any

party fails to implement the terms and conditions of the permit; (2) new listings of any species not covered; and (3) monitoring indicates that conservation goals are not being met and that the operating conservation program is ineffective.

*Response 16:* The HCP process already provides various mechanisms for reopening an HCP. First, the Services may suspend, or in certain circumstances, revoke all or part of the privileges authorized by a permit if the permittee does not comply with the terms and conditions of the permit or with applicable laws and regulations governing the permitted activity. If an HCP permit is suspended or revoked, incidental take must cease. The provisions of most HCPs expressly address permit suspension or revocation procedures. Second, if a species was not initially listed on an HCP permit, it may not be automatically covered by an HCP when subsequently listed. For example, if a species was not originally listed on a permit, the HCP must be formally amended. Amendment of a section 10(a)(1)(B) permit is also required when the permittee wishes to significantly modify the project, activity, or conservation program as described in the original HCP. Such modifications might include significant boundary revisions, alterations in funding or schedule, or an addition of a species to the permit that was not addressed in the original HCP. The Services encourage the public to provide them with applicable information concerning any approved HCP that would be useful in evaluating the effectiveness of the HCP or other concerns they may have.

*Issue 17:* Numerous commenters stated that the assurances provided through these proposed regulations should not be automatic and should be commensurate with risk, and that the Services should provide assurances to a permittee only if the HCP includes specific objectives or measurable biological goals that must be met and that would ensure the conservation of the species, if they are attained.

*Response 17:* The Services believe that the commitments of an HCP must be specifically identified and scientifically based, reflecting the particular needs of the species that are covered. Thus, the concept of comparative risk to various species is factored in by the Services as they assess the adequacy of the operating conservation program for a given HCP. The Services will not approve an HCP permit request found to be inadequate, but will provide No Surprises assurances to all HCPs that are found to be adequate.

For many recent HCPs, the Services are defining specific biological goals. Furthermore, comprehensive monitoring programs provide added value for measuring progress toward meeting the goals and commitments and ensuring that the permittee is in compliance with the permit. The Services often incorporate monitoring measures to assess whether goals are being met, especially in cases where additional information may be desirable or there is significant scientific uncertainty. If existing data makes it difficult to predict exactly what measures are needed to achieve a biological objective, then an adaptive management strategy is usually required. Adaptive management, which then becomes an integral component of the operating conservation program, is not negated by the No Surprises assurances because it was a part of the HCP's operating conservation program as approved by the Services.

*Issue 18:* Most commenters stated that to get assurances, a multispecies HCP must adequately cover each individual species rather than collectively cover a group of species defined by some type of commonality (*e.g.,* guild or habitat).

*Response 18:* The Services believe that each species in a multispecies HCP must be adequately addressed by satisfying the permit issuance criteria under section 10(a)(2)(B) of the ESA. The Services believe, nevertheless, that in some cases, using a "guilding" or habitat-based approach to craft preserve designs or management measures may be appropriate.

However, even when such tools are used, the Services will ensure that for each species that receives assurances, the species must be specifically named in the HCP, and adequate conservation measures are included in the plan.

*Issue 19:* Commenters believe that to get assurances, an HCP must have an adequate and comprehensive biological monitoring program that addresses all foreseeable changes in circumstances that may occur over the lifetime of the permit.

*Response 19:* Monitoring is already an element of HCPs under the Services' Federal regulations [50 CFR 17.22(b)(1), 17.32(b)(1), and 222.22]. Monitoring is also an important tool for HCPs, and their associated permit and Implementing Agreements, and should be properly designed and implemented. The scope of the monitoring program should be sufficient to address reasonably foreseeable changes in circumstances that occur during the life of the permit. Monitoring is needed to obtain the information necessary to properly assess the impacts from the

HCP and to ensure that HCPs are properly implemented. Monitoring will also allow the use of the scientific data obtained on the effects of the plan's operating conservation program to modify specific strategies through adaptive management, and to enhance future strategies for the conservation of species and their habitat.

While the Services appreciate the numerous benefits of a well-developed monitoring program, some low-effect HCPs have minimal monitoring requirements because the impacts from the plan are minor or negligible, and the attempt by the commenters to make an extensive monitoring program a requirement for No Surprises assurances is misplaced. A well-developed monitoring program will add to the credibility of an HCP proposal and will facilitate the eventual approval of the HCP. Thus, the Services believe that the real test for receiving the No Surprises assurances should be whether the issuance criteria under section 10(a) have been satisfied, and not whether a particular conservation tool, such as monitoring, has been extensively employed under an HCP whether it is needed or not.

*Issue 20:* Numerous commenters stated that to get assurances for unlisted species, a plan must be in place that describes what is necessary for their long-term conservation. Commenters encouraged a standard for unlisted species equal to that used in the proposed policy and regulations for the Candidate Conservation Agreements (CCAs).

*Response 20:* While the Services agree that these two types of agreements are similar, the purposes of the proposed CCA policy and the No Surprises rule are somewhat different. As stated in the proposed CCA policy, the ultimate goal of these agreements is to encourage landowners and State and local land managing agencies to manage their lands in a manner that, if adopted on a broad enough scale by similarly situated landowners, would remove threats to species and thereby obviate the need to list them under the ESA. The purposes of including unlisted species in HCPs and of making them subject to No Surprises assurances, are to enlist landowners in efforts to conserve these species and to provide certainty to landowners who are willing to make long-term commitments to the conservation of listed and unlisted species that they will not be subjected to additional conservation and mitigation measures if one of the species is listed, except as provided in their HCPs. The standards for including an unlisted species under an HCP are the

issuance criteria under section 10(a)(2)(B) of the ESA. For HCPs, the Services will continue to use the conservation standard identified in the Habitat Conservation Planning Handbook for unlisted species. The Handbook clearly states that an unlisted species is ''adequately covered'' in an HCP only if it is treated as if it were listed pursuant to section 4 of the ESA, and if the HCP meets the permit issuance criteria in section 10(a)(2)(B) of the ESA with respect to the species. The No Surprises assurances apply only to species (listed and unlisted) that are adequately covered in the HCP. Species, whether listed or nonlisted, will not be included in the HCP permit if data gaps or insufficient information make it impossible to craft conservation and mitigation measures for them, unless these data gaps can be overcome through the inclusion of adaptive management clauses in the HCP.

*Issue 21:* Many commenters requested an addition to the rule that would address the early termination of an HCP. Commenters want the Services to discuss the possibility of terminating an HCP, including how the assurances and applicable mitigation apply to the termination.

*Response 21:* The Services believe that such a requested change is unnecessary. The No Surprises assurances apply during the life of the permit, provided that the HCP is properly implemented and the terms and conditions of the HCP incidental take permit are being followed. Should a permit be terminated early, the No Surprises assurances also terminate as of the same date. The question of how outstanding mitigation responsibilities should be handled upon early termination is a more generic HCP policy issue that is unrelated to the No Surprises assurances and is, therefore, beyond the scope of this particular rulemaking.

*Issue 22:* Several commenters stated that the proposed rule was confusing regarding the different level of assurances established in the proposed rule (for regular HCPs and for HCPs that provide a ''net benefit'' to the covered species) and that the distinction between the two levels should be clarified further or only one level of assurances should be provided to HCP permittees.

*Response 22:* The Services agree that these distinctions were unnecessarily confusing and have revised the final rule accordingly. The final rule requires the Services to provide only one level of assurances to any permittee that has an approved HCP permit. The Services eliminated the level of assurances for

HCPs that were developed to provide a net benefit for the covered species since the distinction between the two types of HCPs were very difficult to delineate in practice.

*Issue 23:* Commenters noted that there were differences between the regulations, such as FWS use of the term ''unforeseen'' circumstances throughout the proposed rule, whereas NMFS used the terms ''unforeseen'' and ''extraordinary'' circumstances in their proposed rule.

*Response 23:* The Services agree that there was some confusion and have made the regulations consistent between the two agencies, where possible. Moreover, there was never an intention in the August 1994 No Surprises announcement to create a substantive difference between ''unforeseen'' and ''extraordinary'' circumstances. NMFS will use the term ''unforeseen'' in its regulations in place of ''extraordinary.''

**Revisions to the Proposed Rule**

The following represents a summary of the revisions to the proposed rule as a result of the consideration of the public comments received during this rulemaking process. The Services have rewritten the ''Assurances'' section of the preamble and regulatory language to improve clarity and readability. Many commenters were confused by the language in the proposed rule, and asked the Services to provide a clearer explanation of this section. Accordingly, the Services have edited and reorganized the Assurances provision, but have not made any substantive changes.

(1) Some of the definitions used in this rulemaking process will now be codified as definitions in 50 CFR 17.3 for FWS and 50 CFR 222.3 for NMFS. These definitions were concepts identified in the ''Background'' section of the proposed rule.

(2) The rule was revised so the Services will only provide assurances for species listed on a permit that are adequately covered in the conservation plan and specifically identified on the permit.

(3) The Services have clarified that the duration of the assurances is the same as the length of the permit.

(4) The Services revised the rule so that there is only one level of assurances provided to permittees, instead of one level of assurances for standard HCPs and another level for HCPs that were developed to provide a ''net benefit'' for the covered species.

(5) The Services have clarified the rule so that it is apparent that No Surprises assurances do not apply to Federal agencies who have a continuing

obligation to contribute to the conservation of threatened and endangered species under section 7(a)(1) of the ESA.

(6) The Services believe that HCPs are, and will continue to be, carefully crafted so that unforeseen circumstances will be rare, if at all, and that the Services will be able to successfully handle any unforeseen circumstance so that species are not jeopardized. To help ensure that unforeseen circumstances are a rare occurrence, the Service revised the rule in appropriate areas.

(7) The Services replaced the term ''properly functioning,'' which was used in the proposed rule to ''properly implemented.'' This change accurately reflects the intent of the Services when discussing the implementation of HCPs.

(8) The Services eliminated the permit-shield provisions from the final rule.

(9) The Services revised the final rule by replacing the term ''property interests'' with the term ''natural resources,'' which more accurately describes the intent of the Services.

**Description/Overview of the Final Habitat Conservation Plan Assurances ( No Surprises Policy) Rule**

The information presented below briefly describes the ''No Surprises'' assurances adopted in this final rule. These assurances provide economic and regulatory certainty for non-Federal property owners that participate in the ESA's section 10(a)(1)(B) permitting process through the following:

*1. General assurances.* The No Surprises assurances apply only to incidental take permits issued in accordance with the requirements of the Services' regulations where the conservation plan is being properly implemented, and apply only to species adequately covered by the conservation plan.

*Discussion:* Once an HCP permit has been issued and its terms and conditions are being fully complied with, the permittee may remain secure regarding the agreed upon cost of conservation and mitigation. If the status of a species addressed under an HCP unexpectedly worsens because of unforeseen circumstances, the primary obligation for implementing additional conservation measures would be the responsibility of the Federal government, other government agencies, or other non-Federal landowners who have not yet developed an HCP.

''Adequately covered'' under an HCP for listed species refers to any species addressed in an HCP that has satisfied the permit issuance criteria under section 10(a)(2)(B) of the ESA. For

unlisted species, the term refers to any species that is addressed in an HCP *as if it* were listed pursuant to section 4 of the ESA and is adequately covered by HCP conditions that would satisfy permit issuance criteria under section 10(a)(2)(B) of the ESA if the species were actually listed. For a species to be covered under a HCP it must be listed on the section 10(a)(1)(B) permit. These assurances apply *only* to species that are "adequately covered" in the HCP.

"Properly implemented conservation plan" means any HCP, Implementing Agreement, and permit whose commitments and provisions have been and are being fully implemented by the permittee and in which the permittee is in full compliance with the terms and conditions of the permit, so the HCP is consistent with the agreed-upon operating conservation program for the project.

*2. Changed circumstances provided for in the plan.* If additional conservation and mitigation measures are deemed necessary to respond to changes in circumstances that were provided for in the plan's operating conservation program, the permittee will be expected to implement the measures specified in the plan.

*3. Changed circumstances not provided for in the plan.* If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances that were not provided for in the plan's operating conservation program, the Services will not require any conservation and mitigation measures in addition to those provided for in the plan without the consent of the permittee, provided the plan is being properly implemented.

*Discussion:* It is important to distinguish between "changed" and "unforeseen" circumstances. Many changes in circumstances during the course of an HCP can reasonably be anticipated and planned for in the conservation plan (*e.g.,* the listing of new species, or a fire or other natural catastrophic event in areas prone to such events), and the plans should describe the modifications in the project or activity that will be implemented if these circumstances arise. "Unforeseen circumstances" are changes in circumstances affecting a species or geographic area covered by an HCP that could not reasonably have been anticipated by plan developers or the Services at the time of the HCP's negotiation and development, and that result in a substantial and adverse change in the status of a covered species (e.g., the eruption of Mount St. Helens was not reasonably foreseeable).

*4. Unforeseen circumstances.* In negotiating unforeseen circumstances,

the Services will not require without the consent of the permittee, the commitment of additional land, water or financial compensation or additional restrictions on the use of land, water, including quantity and timing of delivery, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan.

If additional conservation and mitigation measures are deemed necessary to respond to unforeseen circumstances, the Services may require additional measures of the permittee where the conservation plan is being properly implemented, but only if such measures are limited to modifications within conserved habitat areas, if any, or to the conservation plan's operating conservation program for the affected species, and maintain the original terms of the conservation plan to the maximum extent possible. Additional conservation and mitigation measures will not involve the commitment of additional land, water or financial compensation or restrictions on the use of land, water (including quantity and timing of delivery), or other natural resources otherwise available for development or use under the original terms of the conservation plan, without the consent of the permittee.

In determining unforeseen circumstances, the Services will have the burden of demonstrating that such unforeseen circumstances exist, using the best scientific and commercial data available. These findings must be clearly documented and based upon reliable technical information regarding the status and habitat requirements of the affected species. The Services will consider, but not be limited to, the following factors: size of the current range of the affected species; percentage of range adversely affected by the conservation plan; percentage of range conserved by the conservation plan; ecological significance of that portion of the range affected by the conservation plan; level of knowledge about the affected species and the degree of specificity of the species' conservation program under the conservation plan; and whether failure to adopt additional conservation measures would appreciably reduce the likelihood of survival and recovery of the affected species in the wild.

*Discussion:* The first criterion is self-explanatory. The second identifies factors to be considered by the Services in determining whether the unforeseen circumstances are biologically significant. Generally, the inquiry would focus on the level of biological threats to the affected species covered by the HCP and the degree to which the

welfare of those species is tied to a particular HCP. For example, if a species is declining rapidly, and the HCP encompasses an ecologically insignificant portion of the species' range, then unforeseen circumstances warranting reconsideration of an HCP's conservation program typically would not exist because the overall effect of the HCP upon the species would be negligible or insignificant. Conversely, if a species is declining rapidly and the HCP in question encompasses a majority of the species' range, then unforeseen circumstances warranting a review of an HCP's conservation program probably would exist. If unforeseen circumstances are found to exist, the Services will consider changes in the operating conservation program or additional mitigation measures. However, measures required of the permittee must be as close as possible to the terms of the original HCP and must be limited to modifications within any conserved habitat area or to adjustments within lands or waters that are already set aside in the HCP's operating conservation program. "Conserved habitat areas" are areas explicitly designated for habitat restoration, acquisition, protection, or other conservation uses under an HCP. An "operating conservation program" consists of the conservation management activities, which are expressly agreed upon and described in an HCP or its Implementing Agreement and that are undertaken for the affected species when implementing an approved HCP. Any adjustments or modifications will not include requirements for additional land, water, or financial compensation, or additional restrictions on the use of land, water (including quantity and timing of delivery), or other natural resources otherwise available for development or use under the HCP, unless the permittee consents to such additional measures.

Modifications within conserved habitat areas or to the HCP's operating conservation program means changes to the plan areas explicitly designated for habitat protection or other conservation uses under the HCP, or changes that increase the effectiveness of the HCP's operating conservation program, provided that any such changes do not impose new restrictions or require additional financial compensation on the permittee's activities. Thus, if an HCP's operating conservation program originally included a mixture of predator depredation control and captive breeding, but subsequent

research or information demonstrated that one of these was considerably more effective than the other, the Services would be able to request an adjustment in the proportionate use of these tools, provided that such an adjustment did not increase the overall costs to the HCP permittee. Additionally, the No Surprises assurance does not preclude any Federal agency from exercising its Federal reserved water rights.

The ''Unforeseen circumstances'' section of the HCP should discuss the process for addressing those future changes in circumstances surrounding the HCP that could not reasonably be anticipated by HCP planners. While HCP permittees will not be responsible for bearing any additional economic burden for more mitigation measures, other methods remain available to respond to the needs of the affected species and to assure that the goals of the ESA are satisfied. These include increasing the effectiveness of the HCP's operating conservation program by adjusting the program in a way that does not result in a net increase in costs to the permittee, and actions taken by the government or voluntary conservation measures taken by the permittee.

When negotiating the unforeseen provisions in an HCP, the permittee cannot be required to commit additional land, funds, or additional restrictions on lands, water (including quantity and timing of delivery) or other natural resources released under an HCP for development or use from any permittee who is implementing the HCP and is abiding by all of the permit terms and conditions in good faith or has fully implemented their commitments under an approved HCP. Moreover, this rule does not preempt or affect any Federal reserved water rights.

In the event of unforeseen circumstances, the Services will work with the permittee to increase the effectiveness of the HCP's operating conservation program to address the unforeseen circumstances without requiring the permittee to provide an additional commitment of resources as stated above. The specific nature of the requested changes to the operating conservation program will vary among HCPs depending upon individual habitat and species needs.

5. Nothing in this rule will be construed to limit or constrain the Services, any Federal, State, local, or Tribal government agency, or a private entity, from taking additional actions at its own expense to protect or conserve a species included in a conservation plan.

*Discussion:* This means the Services or other entities can intervene on behalf

of a species at their own expense at any time and be consistent with the assurances provided to the permittee under this final rule. However, it is unlikely that the Services would have to resort to protective or conservation action requiring new appropriations of funds by Congress in order to meet their commitment under this final rule (consistent with their obligations under the ESA). If this unlikely event occurred, these actions would be subject to the requirements of the Anti-Deficiency Act and the availability of funds appropriated by Congress.

Also, nothing in this final rule prevents the Services from asking a permittee to voluntarily undertake additional mitigation on behalf of affected species. While an HCP permittee who has been implementing the HCP and permit terms and conditions in good faith would not be obligated to provide additional mitigation, the Services believe that many landowners would be willing to consider additional conservation assistance on a voluntary basis if a compelling argument for assistance could be made.

The Services believe that it will be rare for unforeseen circumstances to result in a jeopardy situation. However, in such cases, the Services will use all of their authorities, will work with other Federal agencies to rectify the situation, and work with the permittee to redirect conservation and mitigation measures so as to offset the likelihood of jeopardy. The Services have a wide array of authorities and resources that can be used to provide additional protection for threatened or endangered species covered by an HCP.

**Required Determinations**

A major purpose of this final rule is to provide section 10(a)(1)(B) permittees regulatory assurances related to the issuance of an HCP permit. From the Federal government's perspective, implementation of this rule would not result in additional expenditures to the permittee that are above and beyond that already required through the section 10(a)(1)(B) permitting process. There are, however, benefits derived from HCPs for both the non-Federal permittees and the species covered by the HCPs. HCPs are mechanisms that allow non-Federal entities to continue with economic use or development activities, while factoring species' conservation needs into natural resource management decisions. Benefits to the covered species may include the conservation of lands and waters upon which the species depends, decreased habitat fragmentation, the removal of

threats to candidate, proposed, or other unlisted species, and in various instances, advancement of the recovery of listed species. Non-Federal entities are then provided regulatory assurances pursuant to an approved incidental take permit under section 10(a)(1)(B) of the ESA for those species that are adequately covered by the permit, conditioned, of course, on the proper implementation of the HCP. Since the Habitat Conservation Plan Assurances (''No Surprises'' policy) impose no additional economic costs or burdens upon an HCP permittee, the Services have determined that the final rule would not result in significant costs of implementation to non-Federal entities.

*Information Collection/Paperwork Reduction Act*

No significant effects are expected on non-Federal entities exercising their option to enter into the HCP planning program because there is no additional information required during the HCP development or processing phase due solely to these regulatory assurances.

The Services have examined this final rule under the Paperwork Reduction Act of 1995 and found it to contain no requests for additional information or increase in the collection requirements associated with incidental take permits other than those already approved for incidental take permits with OMB approval #1018–0094, which has an expiration date of February 28, 2001.

*Economic Analysis*

This final rule was subject to Office of Management and Budget review under Executive Order 12866. However, the Services have determined that there will be no additional costs placed on the non-Federal entity associated with this final regulation. The No Surprises policy, which was drafted in 1994, went through a public comment period as part of the draft *1994 Habitat Conservation Planning Handbook* (59 FR 65782, December 21, 1994), was included in the final *1996 Habitat Conservation Planning Handbook* (61 FR 63854, December 2, 1996), and currently is being implemented in individual HCP permits as they are issued after an opportunity for public comment. The No Surprises assurances provided to permittees through these final rules apply to the HCP permitting process only, and the Services have determined that there will be no additional information required of non-Federal entities through the HCP permitting process to provide assurances to the permittee.

The Department of the Interior has certified that this rulemaking will not

have a significant economic impact on a substantial number of small entities, which includes businesses, organizations, or governmental jurisdictions. This final rule will provide non-Federal entities regulatory certainty pursuant to an approved incidental take permit under section 10(a)(1)(B) of the Act. No significant effects are expected on non-Federal entities exercising their option to enter into the HCP planning program because there will be no additional information required through the HCP process due to the application of assurances or ''No Surprises.'' Therefore, this rule would have a minimal effect on such entities. NMFS has also reviewed this rule under the Regulatory Flexibility Act of 1980 and concurs with the above certification.

The implementation of the final Habitat Conservation Plan Assurances rule does not require any additional data not already required by the HCP process. Regulatory assurances are provided to the permittee if the HCP is properly implemented, and if all the terms and conditions of the HCP, permit, or Implementing Agreement are all being met. The underlying economic basis of comparing the final rule with and without the assurances was used to determine if there existed any potential economic effects from implementing this policy. Since the rule is being implemented with existing data, there are no incremental costs being imposed on non-Federal landowners. The benefits generated by this rule are being shared by the Services (*i.e.,* less habitat fragmentation, habitat management, and protection for covered species) and by non-Federal landowners (*i.e.,* assurances that approved HCPs will allow for future economic uses of non-Federal land without further conservation and mitigation measures).

There are no specific data to assess the effects on businesses from this rule. To the extent businesses are affected, however, such effects would be positive, not negative. Until specific HCPs are approved, it is not possible to determine effects on commodity prices, competition or jobs. Moreover, any economic effects would likely be tied to the cost of the development and implementation of the HCP itself and not to these assurances. There is a positive effect expected on the environment because these assurances act as an incentive for non-Federal entities to seek HCPs and to factor species conservation needs into national resources management decisions. No effect on public health and safety is expected from this rule. Therefore, this rule most likely would not have a

significant effect on a substantial number of small entities.

The Services have determined and certify pursuant to the Unfunded Mandates Act, 2 U.S.C. 1502 *et seq.,* that this rulemaking will not impose a cost of $100 million or more in any given year on local or State governments or private entities. No additional information will be required from a non-Federal entity solely as a result of these assurances.

*Civil Justice Reform*

The Departments have determined that these final regulations meet the applicable standards provided in sections 3(a) and 3(b)(2) of Executive Order 12988.

*National Environmental Policy Act*

The Department has determined that the issuance of the final rule is categorically excluded under the Department of the Interior's NEPA procedures in 516 DM 2, Appendix 1.10. NMFS concurs with the Department of Interior's determination that the issuance of the final rule qualifies for a categorical exclusion and falls within the categorical exclusion criteria in NOAA 216–3 Administrative Order, Environmental Review Procedure.

**List of Subjects**

*50 CFR Part 17*

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

*50 CFR Part 222*

Administrative practices and procedure, Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

For the reasons set out in the preamble, the Services amend Title 50, Chapter I, subchapter B; and Title 50, Chapter II, subchapter C of the Code of Federal Regulations, as set forth below:

**PART 17—[AMENDED]**

**Subpart C—Endangered Wildlife**

1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500; unless otherwise noted.

2. The FWS amends  17.3 by adding the following definitions alphabetically to read as follows:

\* \* \* \* \*

*Adequately covered* means, with respect to species listed pursuant to

section 4 of the ESA, that a proposed conservation plan has satisfied the permit issuance criteria under section 10(a)(2)(B) of the ESA for the species covered by the plan, and, with respect to unlisted species, that a proposed conservation plan has satisfied the permit issuance criteria under section 10(a)(2)(B) of the ESA that would otherwise apply if the unlisted species covered by the plan were actually listed. For the Services to cover a species under a conservation plan, it must be listed on the section 10(a)(1)(B) permit.

\* \* \* \* \*

*Changed circumstances* means changes in circumstances affecting a species or geographic area covered by a conservation plan that can reasonably be anticipated by plan developers and the Service and that can be planned for (*e.g.,* the listing of new species, or a fire or other natural catastrophic event in areas prone to such events).

*Conserved habitat areas* means areas explicitly designated for habitat restoration, acquisition, protection, or other conservation purposes under a conservation plan.

*Conservation plan* means the plan required by section 10(a)(2)(A) of the ESA that an applicant must submit when applying for an incidental take permit. Conservation plans also are known as ''habitat conservation plans'' or ''HCPs.''

\* \* \* \* \*

*Operating conservation program* means those conservation management activities which are expressly agreed upon and described in a conservation plan or its Implementing Agreement, if any, and which are to be undertaken for the affected species when implementing an approved conservation plan, including measures to respond to changed circumstances.

\* \* \* \* \*

*Properly implemented conservation plan* means any conservation plan, Implementing Agreement and permit whose commitments and provisions have been or are being fully implemented by the permittee.

\* \* \* \* \*

*Unforeseen circumstances* means changes in circumstances affecting a species or geographic area covered by a conservation plan that could not reasonably have been anticipated by plan developers and the Service at the time of the conservation plan's negotiation and development, and that result in a substantial and adverse

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Parts 13 and 22**

[FWS-R9-MB-2008-0057; 91200-1231-9BPP-L2]

**RIN 1018-AV81**

**Eagle Permits; Take Necessary To Protect Interests in Particular Localities**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** In conjunction with release of a final environmental assessment of this action, the U.S. Fish and Wildlife Service ("we" or "the Service") is finalizing permit regulations to authorize limited take of bald eagles (*Haliaeetus leucocephalus*) and golden eagles (*Aquila chrysaetos*) under the Bald and Golden Eagle Protection Act (Eagle Act), where the take to be authorized is associated with otherwise lawful activities. These regulations also establish permit provisions for intentional take of eagle nests under particular, limited circumstances.

**DATES:** This rule goes into effect on November 10, 2009.

**FOR FURTHER INFORMATION CONTACT:** Eliza Savage, Division of Migratory Bird Management, via e-mail at *eliza_savage@fws.gov;* telephone: 703-358-2329; or U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Mailstop 4107, Arlington, Virginia 22203-1610.

**SUPPLEMENTARY INFORMATION:**

**Background**

These final regulations authorize the limited take of bald eagles and golden eagles under the Bald and Golden Eagle Protection Act (Eagle Act) (16 U.S.C. 668–668d), where the take to be authorized is associated with otherwise lawful activities. These regulations also establish permit provisions for intentional take of eagle nests where necessary to ensure public health and safety and in other limited circumstances. We proposed these regulations on June 5, 2007 (72 FR 31141) and provided a 90–day public comment period, which closed on September 4, 2007. The Service received approximately 21,500 comments, about 21,400 of which are essentially identical. Thirty-five respondents provided substantive input that was helpful in crafting final regulations. The 35 respondents consisted of: one Federal agency, three tribes, six State

conservation agencies, four flyway committees (associations of State conservation agencies), one State department of transportation, five environmental non-governmental organizations (NGOs), four industry associations, three law firms/consultants on behalf of Florida development companies, two power companies, one Federal reclamation project, one airport, three rail transportation companies (commenting together), and three private citizens.

We released a draft environmental assessment (DEA) of the action on August 14, 2008 (73 FR 47574) and re-opened the public comment period on the proposed rule with some revisions noted in the August 14 **Federal Register** notice. During that 30–day comment period, we received 58 comments from: one airport, three electric utilities, three Federal agencies, ten individuals (non-tribal), five industry associations, nine NGOs, one conglomeration of railroad companies, 13 State agencies, three flyway committees, one transportation association, three Native American tribal members one tribal Department of Natural Resources, three tribes, and two confederations of tribes.

Based on public comment received on the June 5, 2007 proposed rule, new information compiled through the process of drafting the DEA, and public comment on the DEA and re-opened rule, we developed this final rule, the final environmental impact assessment (FEA), and a Finding of No Significant Impact. Along with a variety of small changes, this final rule contains the following significant additions and revisions from the June 5, 2007, proposed rule:

• The rule was split into two rules to be finalized separately from one another. The original proposal to extend (or "grandfather") Eagle Act take authorization to take previously authorized under the Endangered Species Act (ESA) (16 U.S.C. 1531 *et seq.*) has been separated from the remainder of the provisions in order to finalize the "grandfathering" provisions more expeditiously. Those provisions were published as a final rule on May 20, 2008 (73 FR 29075).

• We modified our interpretation (provided in the June 5, 2007, proposed rule) of the statutory mandate that permitted take be "compatible with the preservation of the bald eagle or the golden eagle." In the original proposal, we proposed to use the standard that regional and national eagle populations not decline at a rate greater than 0.54% annually. In this final rule, we interpret the "preservation" standard to allow actions that are consistent with the goal

of stable or increasing breeding populations.

• The rule includes new issuance criteria to ensure that, except for safety emergencies, Native American religious needs are given first priority if requests for eagle take permits exceed take thresholds that are compatible with the preservation of the bald eagle or the golden eagle.

• The rule no longer provides different issuance criteria for lethal versus non-lethal take. Rather, it contains separate provisions for programmatic take versus individual instances of take.

• We amend the existing Eagle Depredation Permit regulations at 50 CFR 22.23 to extend permit tenure from 90 days to up to 5 years for purposes of hazing eagles. The purpose of these revisions is to enable issuance of permits that combine programmatic authorizations provided under § 22.23 and the regulations in this final rule. We are also taking the opportunity to revise terminology throughout § 22.23 to clarify that we can issue permits under that section to prevent or resolve safety emergencies as well as to protect agriculture and wildlife.

• The rule expands (from the June 2007 proposed rule) the purposes for which eagle nests may be taken to include take necessary to ensure public health and safety. The proposed rule limited nest removal to emergencies where human or eagle safety was imminently threatened.

• Nest take permits may be issued for projects that will provide a net benefit to eagles (including projects where the net benefit is the result of compensatory mitigation measures).

• Permits may also be issued to take eagle nests built on human-engineered structures where the nest interferes with the intended use of the structure.

• The rule redefines some terms and includes new definitions for a number of additional terms used in the regulations.

The Bald and Golden Eagle Protection Act (16 U.S.C. 668-668d) (Eagle Act) prohibits the take of bald eagles and golden eagles unless pursuant to regulations (and in the case of bald eagles, take can only be authorized under a permit). While the bald eagle was listed under the ESA, authorizations for incidental take of bald eagles were granted through the ESA's section 10 incidental take permits and ESA's section 7 incidental take statements, both of which were issued with assurances that the Service would exercise enforcement discretion in relation to violations of the Eagle Act and Migratory Bird Treaty Act (MBTA) (16 U.S.C. 703-712). Upon delisting, all

prohibitions contained in the ESA, such as those that prescribe the take of bald eagles, no longer apply. However, the potential for human activities to violate Federal law by taking eagles remains under the prohibitions of the Eagle Act and the MBTA. The Eagle Act defines the "take" of an eagle to include a broad range of actions: "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, or molest or disturb." "Disturb" is defined in regulations at 50 CFR 22.3 as: "to agitate or bother a bald or golden eagle to a degree that causes, or is likely to cause, based on the best scientific information available, (1) injury to an eagle, (2) a decrease in its productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior, or (3) nest abandonment, by substantially interfering with normal breeding, feeding, or sheltering behavior."

Many actions that are considered likely to incidentally take (harm or harass) eagles under the ESA will also disturb or otherwise take eagles under the Eagle Act. Until now, there was no regulatory mechanism in place under the Eagle Act to permit take of bald or golden eagles comparable to incidental take permits under the ESA. This rule adds a new section at 50 CFR 22.26 to authorize the issuance of permits to take bald eagles and golden eagles on a limited basis. The regulations are applicable to golden eagles as well as bald eagles. We will authorize take of bald or golden eagles only if we determine that the take (1) is compatible with the preservation of the bald eagle and the golden eagle and (2) cannot practicably be avoided. For purposes of these regulations, "compatible with the preservation of the bald eagle or the golden eagle" means "consistent with the goal of stable or increasing breeding populations." Although the biologically-based take thresholds for permitting under these regulations will be based on regional populations (as explained below and in more detail in the FEA), we will also consider other factors, such as cultural significance, that may warrant protection of smaller and/or isolated populations within a region.

We are adding a second new section at 50 CFR 22.27 to authorize the removal of bald eagle and golden eagle nests where (1) necessary to alleviate a safety hazard to people or eagles, (2) necessary to ensure public health and safety, (3) the nest prevents the use of a human-engineered structure, or (4) the activity, or mitigation for the activity, will provide a net benefit to eagles. We are also promulgating new definitions under the Eagle Act to clarify terms used in the permit regulations. Permit

issuance under § 22.26 and § 22.27 will be governed by the permit provisions presently in 50 CFR parts 13 and 22, and new provisions we are finalizing as § 22.26 and § 22.27.

In our June 5, 2007, proposed rule, we also proposed certain provisions to extend Eagle Act authorizations to persons previously granted authorization to take eagles under the ESA. We split the rulemaking into two separate rules and finalized the ESA-related provisions separately on May 20, 2008 (73 FR 29075).

Most rules take effect 30 days after **Federal Register** publication; however, more time is needed to work out important details about how this program will be implemented. Therefore this rule has an effective date of 60 days after publication in the **Federal Register**. We are drafting implementation guidance, and will release it for public notice and comment before officially adopting it. Although the implementation guidance will not be finalized by the rule's effective date, the extra 30 days will help promote consistency in the initial permit administration, and we can begin issuing permits using the draft guidance.

*History*

On August 8, 2007, the bald eagle was removed from the List of Threatened and Endangered Wildlife (72 FR 37345, July 9, 2007). The final delisting rule also constituted our final decision that the Sonoran Desert population of bald eagles did not qualify as a distinct population segment (DPS), and was therefore not a listable entity under the ESA. Our finding on the status of the Sonoran Desert population was challenged in court. A March 5, 2008, ruling by the U.S. District Court for the District of Arizona (*Center for Biological Diversity* v. *Kempthorne*, CV 07-0038-PHX-MHM (D. Ariz)) ruled in favor of the plaintiffs. As a result of the court order, we published two documents in the **Federal Register**. First, on May 1, 2008, we published a final rule reinstating ESA threatened status for bald eagles in the Sonoran Desert area of central Arizona (73 FR 23966). The final rule also included a map showing the geographic area where bald eagles are protected as a threatened species. Second, on May 20, 2008, we published a notice initiating a status review for bald eagles in the Sonoran Desert area of central Arizona (73 FR 29096). Once the status review is completed, we will issue a 12–month finding on whether listing these bald eagles as a DPS under the ESA is warranted, and if so, whether

that DPS should be listed as threatened or endangered.

We estimate the current number of breeding pairs in the 48 contiguous States to be over 9,700. Bald eagles were never listed as threatened or endangered in Alaska, where we currently estimate bald eagles to number between 50,000 and 70,000 birds, including approximately 15,000 breeding pairs. Bald eagles do not occur in Hawaii.

Under sections 7(b)(4) and 10(a)(1)(B) of the ESA, we may authorize the incidental take of listed wildlife that occurs in the course of otherwise lawful activities. Thus, while the bald eagle was listed under the ESA in the lower 48 States (and where it is still listed, i.e., the Sonoran Desert area of central Arizona), two mechanisms were available to authorize take that was associated with, but not the purpose of, a human activity. Eagle take that was prohibited under the ESA is, in many instances, also prohibited under the Eagle Act. Now that the bald eagle is delisted (except for the Sonoran Desert population), a mechanism is needed to authorize take of bald eagles pursuant to the Eagle Act. The mechanism should also be available to authorize take of golden eagles, which were never listed as threatened or endangered under the ESA, as long as it is crafted with sufficient safeguards to ensure the preservation of both species.

The Eagle Act provides that the Secretary of the Interior may authorize certain otherwise prohibited activities through promulgation of regulations. The Secretary is authorized to prescribe regulations permitting the "taking, possession, and transportation of [bald or golden eagles] . . . for the scientific or exhibition purposes of public museums, scientific societies, and zoological parks, or for the religious purposes of Indian tribes, or . . . for the protection of wildlife or of agricultural or other interests in any particular locality," provided such permits are "compatible with the preservation of the bald eagle or the golden eagle" (16 U.S.C. 668a). In accordance with this authority, the Secretary has previously promulgated Eagle Act permit regulations for scientific and exhibition purposes (50 CFR 22.21), for Indian religious purposes (50 CFR 22.22), to take depredating eagles (50 CFR 22.23), to possess golden eagles for falconry (50 CFR 22.24), and for the take of golden eagle nests that interfere with resource development or recovery operations (50 CFR 22.25). This rulemaking establishes permit regulations to authorize eagle take "for the protection of . . . other interests in any particular locality." This statutory language accommodates a

broad spectrum of public and private interests (such as utility infrastructure development and maintenance, road construction, operation of airports, commercial or residential construction, resource recovery, recreational use, etc.) that might "take" eagles as defined under the Eagle Act.

In accordance with the National Environmental Policy Act (42 U.S.C. 4321 *et seq.*), we have prepared a final environmental assessment (FEA) of this action. You can obtain a copy of the FEA from *http://www.fws.gov/ migratorybirds/baldeagle.htm.*

**Description of the Rulemaking**

*Take Permit Regulations Under 50 CFR 22.26.*

We promulgate a new permit regulation under the authority of the Eagle Act for the limited take of bald eagles and golden eagles "for the protection of . . . other interests in any particular locality" where the take is compatible with the preservation of the bald eagle and the golden eagle, is associated with and not the purpose of an otherwise lawful activity, and cannot practicably be avoided. "Practicable" in this context means "capable of being done after taking into consideration, relative to the magnitude of the impacts to eagles (1) the cost of remedy compared to proponent resources; (2) existing technology; and (3) logistics in light of overall project purposes."

We anticipate that permits issued under this regulation will usually authorize take that occurs in the form of disturbance; however, in some limited cases, a permit may authorize lethal take that results from but is not the purpose of an otherwise lawful activity. Programmatic take (take that is recurring and not in a specific, identifiable timeframe and/or location) will be authorized only where it is unavoidable despite implementation of comprehensive measures developed in cooperation with the Service to reduce the take below current levels (see discussion below, under "Programmatic permits"). This type of authorization can be extended to industries, such as electric utilities or transportation industries, that currently take eagles in the course of otherwise lawful activities but who can work with the Service to develop and implement additional, exceptionally comprehensive measures to reduce take to the level where it is essentially unavoidable. A programmatic take permit could also be issued to State and Federal agencies that take eagles in the course of their activities (e.g., construction and maintenance of roads and other critical infrastructure) if they adopt such advanced conservation measures.

Purposeful take will not be authorized under this permit. In rare cases where purposeful take may be necessary to avoid incidental take (such as relocating birds or a nest from a critical project area), it may be authorized under 50 CFR 22.23 (for purposeful take of eagles to protect agriculture, wildlife, and other interests), 50 CFR 22.25 (take of golden eagle nests for resource development and recovery operations), or new 50 CFR 22.27 (take of nests for health and safety). The latter regulation is finalized as part of this rulemaking. Where appropriate, the Service will issue a single permit that combines authorizations provided under the various regulations. For example, an airport that meets the obligations of its Wildlife Hazard Management Plan and adopts measures developed in cooperation with the Service to minimize the potential for take of eagles, could be issued a programmatic permit under these regulations (§ 22.26) that would be valid for up to 5 years to authorize eagle take that occurs as the result of unavoidable collisions between eagles and planes. One of the stipulations of the permit would likely be the requirement to haze eagles in the vicinity of airports, which in some cases could constitute disturbance (for example, to prevent eagles from re-nesting at a hazardous location). Because this hazing is intentional and the effects on the eagles purposeful, it does not meet the issuance criteria for the § 22.26 permit, which requires the taking to be associated with, but not the purpose of, the activity. Therefore, we would issue the permit with the combined authority of both § 22.26 and § 22.23. However, the regulations at § 22.23 had previously limited permit tenure to 90 days because the need for programmatic authorization was not contemplated at the time that regulation was developed. In order to have the ability to extend this type of authorization to "Advanced Conservation" programmatic permittees, we are amending the regulations at § 22.23 to allow permits to also be valid for up to five years. We are also taking the opportunity to make additional minor revisions throughout § 22.23 to clarify that we may issue permits under that section to alleviate safety emergencies, and not just to protect agriculture, wildlife or other interests from depredating eagles. Hazing eagles at airports has been the primary purpose for which we have exercised this option, but there may be other scenarios where eagles are not depredating on any resource or private property, but their presence poses a danger to themselves or to people (e.g. at uncovered landfills where eagles may ingest toxic substances). Other than these clarifying revisions, including to the section title, and amending the permit tenure, we are not making any substantive revisions to the regulations at § 22.23 in this rulemaking.

*Population Assessment and Take Thresholds.* Permit issuance will be conditioned on various criteria, the most important of which is that the permitted take is compatible with the preservation of the bald eagle and the golden eagle. The statutory requirement that the authorized activities be compatible with the preservation of bald eagles and golden eagles ensures the continued protection of the species while allowing some impacts to individual eagles. For purposes of these regulations, "compatible with the preservation of the bald eagle and golden eagle" means "consistent with the goal of stable or increasing breeding populations."

In our June 5, 2007, proposed rule, we proposed to use 0.54% as the threshold rate of decline, which is the rate of decline used by Partners in Flight (PIF) as one of the factors for designating an avian species to their Continental Watch List. However, steady declines, even as small as 0.54% annually, would cumulatively result in an unacceptably large decrease in eagle populations over time. For this and other reasons (see Responses to Public Comments), we agree that the original proposed management scenario was not sufficiently conservative and will instead adopt as our management goal increasing or stable breeding populations.

In the DEA and notice re-opening of the comment period on the rule (73 FR 47574, August 14, 2008), to elucidate the statutory standard of "preservation of the bald eagle or the golden eagle," we proposed the following terminology: "maintaining increasing or stable populations." We continue to support the essential meaning of that standard, but recognized that it could be misapplied to constrain any authorization of take because any take of a bald or golden eagle by some degree results in a population decrease, even if short-term and inconsequential for the long-term preservation of the species. Thus, if interpreted so narrowly, the word "maintaining" would render us unable to authorize any take. Therefore, we are revising our interpretation of "preservation of the eagle" to read "consistent with the goal of stable or increasing breeding populations." The

phrase "consistent with the goal of" will allow take that is compatible with long-term stability or growth of eagle populations. Adding the word "breeding" clarifies the significance of the number of breeding pairs for maintaining or growing populations, versus floaters (non-breeding adults). For more discussion on the biological basis for distinguishing between breeding eagles and floaters, see the FEA.

To establish management populations for bald eagles, we used natal populations (eagles within the median natal dispersal range of each other, estimated at 43 miles) in our evaluation in order to look at distribution across the landscape. Being able to see where natal populations appear sparser, rather than concentrated, allows us to determine natural boundaries between regional eagle populations, reducing the risk that we would issue take permits in any one regional management area in a manner that is disproportionate to the population in the area.

We acknowledge that this approach is somewhat subjective, and that the regional management populations delineated are not, in most cases, genetically or even demographically isolated. However, we believe the approach does serve to identify biologically-based, regional populations at a scale meaningful for eagle conservation. The Service's goal in managing bald eagles at this scale is to ensure permitted take does not negatively affect the species' status in any regional management population.

Because the management populations delineated by this approach roughly correspond to the Service's organizational structure made up of eight Service Regional Offices, we will manage bald eagles based on populations within the eight Service Regions, with some shared populations. Permits will be administered by Service Regions in coordination with each other, especially where a management area lies in more than one Service Region. We plan to evaluate this management and administrative approach regularly, at least once every five years.

For golden eagles, available data on distribution are not as spatially precise as data for bald eagles. We will manage take of golden eagles according to thresholds set at the Bird Conservation Region (BCR) level because the only range-wide estimates available for golden eagles are BCR-scale population estimates. BCRs are ecologically distinct regions in North America with similar bird communities, habitats, and resource management issues. Developed by a mapping team at the first international meeting of the North American Bird Conservation Initiative (NABCI) in 1998, BCRs are an application of the framework of nested ecological units delineated by the Commission for Environmental Cooperation (CEC).

Because Service Regions are not administered according to BCR boundaries, we will administer permits by Service Regional Permit offices. Service Regions will coordinate closely when issuing permits to ensure that the threshold for that BCR is not exceeded. Unfortunately, there is little reliable recent data for breeding golden eagles. Many States have not had the resources to conduct monitoring of golden eagle populations, in some cases for up to 20 or more years. However, we will base thresholds on existing data and modeling until better data become available. As discussed further below and in greater detail in the FEA, the best available data we have for golden eagles indicate modest declines in the four BCRs that constitute 80 percent of its range in the lower 48 states. As a result, until we have additional data to show that populations can withstand additional take, we are deferring implementation of the new permit types for golden eagles, except for safety emergencies and programmatic permits. We will continue to issue historically-authorized take permits under existing permit types at the level of take carried out under those permits (average over 2002-2007).

We will use modeling to evaluate the level of take we can permit that is compatible with this statutory threshold, taking into consideration the cumulative effects of all permitted take, including other forms of lethal take permitted under this section and other causes of mortality and nest loss. Due to the inherent limits of monitoring to detect precise fluctuations in bald eagle and golden eagle numbers, coupled with the uncertainty as to whether individual actions being permitted will in fact result in a "take," we cannot precisely correlate each individual permit decision with a specific population impact. However, we will periodically re-calibrate regional take thresholds, using the best available data, including reporting data from permittees, data from post-delisting monitoring (for bald eagles), WEST surveys (for golden eagles), the Breeding Bird Survey, and fall and winter migration counts to assess the status of eagle populations and adjust permitting thresholds on an ongoing basis as appropriate.

In our June 5, 2007, proposed rule, we stated that our preliminary analysis indicated that demand for permits under these regulations, and the effects of issuing those permits, including mitigation measures, would not be significant enough to cause a decline in eagle populations from current levels. (We recognized that take of bald eagles in the Southwest would need to be extremely limited, if permitted at all.) However, further analysis indicates that there are additional populations where a relatively modest level of demand for take permits could exceed the level of take that would be compatible with maintaining current population levels, particularly for golden eagles.

A 2006 survey (Good and others, 2007) showed decreasing golden eagle populations in two BCRs. A draft report of 2007 surveys in the same areas (BCRs 9, 10, 16, and 17, hereinafter WEST areas) found decreasing golden eagle populations in two BCRs, one of which was the same as the previous report (Good and others, 2008). Kirk and Hyslop (1998) indicated that golden eagle populations may be declining in some areas of Canada. Good and others (2004) estimated that there were just over 27,000 golden eagles in the 4 BCRs in which the species is of conservation concern. These BCRs encompass much of the western U.S. population and most of the North American population of this species. Breeding bird surveys and migration counts are inconclusive but suggest lowered reproduction rates in the western United States, possibly due to habitat alteration and loss, with concomitant declines in prey (Kochert and others, 2002). A preliminary report on the 2008 surveys in the WEST areas showed population declines in all four BCRs covered in the survey, an area which is believed to contain approximately 80% of the golden eagle population in the lower 48 states.

These new permits represent a somewhat different approach to eagle management and have significant policy implications and uncertainties. Those uncertainties and stochasticity (natural variability in vital rates affecting population trends) for both species support a more conservative approach than we proposed in our DEA, which proposed capping threshold at ‡ maximum sustainable yield (MSY). The MSY is the greatest harvest rate over an indefinite period that does not produce a decline in the number of breeding adults in the population.

For a number of reasons (outlined in the following discussion) we intend to initially cap permitted take of bald eagles at 5% estimated annual productivity. This approach is consistent with the recommendations made by Millsap and Allen (2006) for

permitting take of various raptor species for falconry purposes. For golden eagles west of 100 degrees West longitude, including in Alaska, we will initially implement this rule only insofar as issuing take permits based on levels of historically-authorized take, safety emergencies, and take permits designed to reduce ongoing mortalities and/or disturbance. Future projects seeking programmatic permits would need to minimize their own take of golden eagles to the point that it is unavoidable and also reduce take from another source to completely offset any new take from the new activity. Estimates of golden eagle population size in Alaska are coarse, based upon even fewer data sources than in the lower 48 states, and juvenile survival may be significantly lower, so management would therefore need to be conservative. In addition, McIntyre *et al.* (2008) suggested that conservation strategies for migratory golden eagles require a continental approach.

For golden eagles east of 100 degrees West longitude, we will not issue any take permits unless necessary to alleviate an immediate safety emergency. We do not have enough data on rates of golden eagle mortality in the eastern U.S. to issue programmatic take permits.

Our modeling showed there would be negative effects to the floater portion of the bald eagle population (using population trend data from Florida) at ½ MSY and even some minor effects with setting take at 5% of estimated annual productivity. Floaters, for which monitoring is rarely conducted, serve to buffer populations from decline in times when productivity does not offset mortality, and also serve to provide a buffer for unforeseen effects to populations. Importantly, the models did not factor in the cumulative impacts that were discussed in the DEA. Furthermore, the lack of annual monitoring to ensure we are not having a negative effect on populations, particularly when the thresholds we are establishing would be in effect for five years, compels us to adopt the more conservative approach. Some commenters, including eagle experts in various parts of the U.S. believe the DEA's population numbers and survival rates for bald eagles may have been too high for some areas of the country.

Additionally, the caps recommended in Millsap and Allen were in the context of falconry, where removal of birds from the population has no associated impacts to habitat, whereas many permits issued under both these new regulations will have long-term or permanent habitat-related impacts in addition to the removal of an individual from the population. Therefore, we believe that caps should be no less conservative than recommended for falconry take.

The lower take thresholds also reflect the cultural significance of both species. Cultural significance is not limited to Native American religious purposes, but encompasses a broad cultural regard for both species. Although collected by some Native American tribes for ceremonial purposes, the overall cultural value placed on bald eagles and golden eagles is generally quite distinct from the value of harvesting them. This fact warrants a different, significantly more conservative approach than for managing game bird populations wherein allowable take approaches MSY.

We intend, through a structured coordination process with States and tribes, to develop monitoring and research adequate to both resolve current uncertainties in the data and to provide enhanced ability to detect the effects of the permit program. If, after implementation for a time period commensurate with the normal population cycles of the eagle, data then indicate take thresholds can be increased in certain regions, we will increase thresholds accordingly to allow more take. One factor that should allow us to increase take thresholds in some regions for both species is the implementation of advanced conservation measures through programmatic permits to reduce ongoing take that is currently unauthorized. (See our discussion below under "Programmatic Permits.") For more detailed discussion of population modeling and permitting thresholds, please see our final environmental assessment of this action, available on our website at *http://www.fws.gov/migratorybirds/baldeagle.htm.*

To address the possibility that demand exceeds our scientifically-based take thresholds, the final regulation contains permit issuance criteria to ensure that requests by Native Americans to take eagles from the wild—where the take of live, wild eagles is absolutely necessary to meet the religious purposes of the tribe, as opposed to the use of feathers and parts that may be obtained from the National Eagle Repository—are given first priority over all other take, except as necessary to alleviate safety emergencies. (Permit regulations governing take and possession of eagles by Native Americans are set forth in 50 CFR 22.22) The American Indian Religious Freedom Act (42 U.S.C. 1996), sets forth Federal policy to protect and preserve the inherent right of American Indians to express and exercise their traditional religions, including but not limited to, access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

If emergency and Native American religious needs can be met, the issuance criteria further provide that programmatic permit renewals are given third priority. Projects to promote and maintain public health and safety have fourth priority. For golden eagle nest take permits, resource development and recovery operations have fifth priority. Assuming those interests can be met, bald eagle take for other interests may be permitted as long as total take authorizations do not surpass 5% estimated annual productivity for the regional bald eagle population. Initially, until we have data to show that golden eagles can withstand additional take, we will issue permits at historically-authorized take levels under existing permits, for emergency take, and for programmatic take (west of 100 degrees West longitude). If, in the future, data and modeling suggest golden eagle populations can support additional take, we would, in accordance with the prioritization criteria, begin to authorize golden eagle take at up to 1% of annual productivity, unless information available at that time demonstrates that higher levels of take can be supported (following Millsap and Allen 2006).

The Service's Regional Directors each will be responsible for developing a structured allocation process consistent with the rule's prioritization criteria to be implemented in each Service Region if there is evidence that demand for take will exceed take thresholds for either species of eagle.

Because we need, at least initially, to limit take permits for golden eagles to historically-authorized take levels, we will use the prioritization issuance criteria from this rule to guide permit decisions with regard to allocating all golden eagle take permits. For example, in Service Region 2, the Service has issued permits to take 28 golden eagles per year on average from 2002 – 2007 under the various permit types that allow take (e.g., scientific collecting, depredation, Native American religious purposes, etc.). On average, 23 of the golden eagles were taken for Native American religious purposes. If next year, the demand from qualified Native Americans increases to 28, we will issue *all* the available take permits (28) to Native Americans—unless there is a need to take eagles to alleviate a safety emergency (to protect either eagles or

people from physical harm or death), in accordance with the prioritization order.

A wide variety of activities, including various types of development, resource extraction, and recreational activities near sensitive areas such as nesting, feeding, and roosting sites, can disrupt or interfere with the behavioral patterns of bald eagles. We developed National Bald Eagle Management Guidelines (NBEMG or Guidelines) as a tool for landowners, project proponents, and the general public engaged in activities in the vicinity of bald eagles. The NBEMG are available at *http://www.fws.gov/ migratorybirds.baldeagle.htm*. The NBEMG address potential negative effects of human activities on bald eagles, based on observed bald eagle behavior, and provide guidance on what types of activities are likely to cause bald eagle disturbance at varying distances to nests, communal roosts, and foraging areas, and how to avoid such disturbance.

We intend to use the *Draft U.S. Fish and Wildlife Service Raptor Conservation Measures* (soon to be released for public notice and comment) as interim guidance for golden eagle disturbance, until species-specific guidance can be developed. When referring to both the NBEMG and the *U.S. Fish and Wildlife Raptor Conservation Measures* in this rulemaking document, we refer to both documents together as "guidelines" with a lower case "g."

By adhering to the guidelines, landowners and project proponents should be able to avoid eagle disturbance most of the time. If avoiding disturbance is not practicable, the project proponent may apply for a take permit. A permit is not required to conduct any particular activity, but is necessary to avoid potential liability for take caused by the activity.

Disturbance may also result from human activity that occurs *after* the initial activities (e.g., residential occupancy or the use of commercial buildings, roads, piers, and boat-launching ramps). In general, we do not intend to issue permits for routine activities such as hiking, driving, normal residential activities, and ongoing use of existing facilities, where take could occur but is unlikely. New uses or uses of significantly greater scope or intensity may raise the likelihood that eagles will be disturbed, and as such could require authorization for take under these regulations.

To assess whether the Service's predictions regarding the likelihood of disturbance are generally sound, and thereby ensure that permit requirements are not unnecessarily burdensome to the public and are adequately protecting eagles, we will require permittees to provide basic post-activity monitoring (described below) by determining whether the nest site, communal roost, or important foraging area continues to be used by eagles for up to three years following completion of the activity for which the permit was issued, depending on the form and magnitude of the anticipated take and the objectives of the associated conservation measures. Where an activity is covered by a management plan that establishes monitoring protocols (e.g., an airport Wildlife Hazard Management Plan), the permit may specify that monitoring shall be conducted according to the pre-existing management plan.

We will use reporting data, as well as supplemental data we collect from some permittees' project areas, to ascertain how the activity actually affected the eagles in the area. With this information, we may be able to adjust take thresholds if take does not occur. The report data also will help us to assess how likely it is that future activities will result in loss of one or more eagles, a decrease in productivity of bald or golden eagles, and/or the permanent abandonment or loss of a nest site, communal roost site, or important foraging area. The outcome of disturbance permits, recorded in this way, may allow us to recalibrate the number of annual permits available in a Service Region, and to refine recommendations in future versions of the guidelines regarding buffer distances, timing of activities, and other practices that minimize take of eagles.

Although the information we will ask permittees to provide is relatively basic—whether eagles are observed at the nest, roost site or foraging area—we realize that reporting will not always be accurate. In addition to errors, some permittees may (unjustifiably) be concerned about law enforcement and may under-report take without fully understanding that the take has been authorized by their permits and thus is not a violation of the law. Overall, however, we expect most permittees will make a good-faith effort to honestly report eagle use of the area, resulting in a substantial body of useful information we do not otherwise have the resources to collect.

Along with annual report data, we will periodically assess overall population trends of both species of eagles, taking into consideration the cumulative effects of other activities that take eagles and eagle mortalities due to other factors. Based on the modeling we will use to set take thresholds, we do not expect population declines as the result of the authorizations granted through these regulations. However, it is also possible that external factors could arise that negatively affect eagle populations. Whatever the cause, in order to ensure that take is compatible with the preservation of the bald or golden eagle, we will not issue permits for take within a regional eagle population without sufficient data indicating the take will not result in a population decline.

*Programmatic permits.* The June 2007 proposed rule distinguished between lethal and non-lethal take (e.g., disturbance), and proposed that lethal take would be authorized only if it was unavoidable even when Best Management Practices (BMPs) were followed. We revised this concept to remove the distinction between lethal and non-lethal take, and replace it with a distinction between individual or "one-time" [1] take versus programmatic take. A programmatic permit will be available to industries or agencies undertaking activities that may disturb or otherwise take eagles on an on-going operational basis. We are defining "programmatic take" as "take that (1) is recurring, but not caused solely by indirect effects, and (2) occurs over the long term and/or in a location or locations that cannot be specifically identified." The second criterion is the one that distinguishes programmatic take from any other take that has indirect effects that continue to cause take after the initial action. It is the key factor that makes programmatic take programmatic.

We define "programmatic permit" as "a permit that authorizes programmatic take. A programmatic permit can cover other take in addition to programmatic take." We can issue programmatic permits for disturbance as well as take resulting in mortalities, based on implementation of "advanced conservation practices" developed in coordination with the Service. "Advanced conservation practices" (ACPs) refers to scientifically-supportable measures that are approved by the Service and represent the best-available techniques to reduce eagle disturbance and/or ongoing mortalities to a level where remaining take is unavoidable. The Federal Highway Administration is an example of an agency for which this streamlined

---

[1] By describing the standard (non-programmatic) permit as authorizing "individual" or "one-time" take, we do not mean to infer that only one eagle can be taken under a standard permit, or that if more than one eagle is taken, the take must occur simultaneously. We use the term, "one-time" for lack of a better word to refer to take is quantifiable and of a specified amount.

approach may benefit the agency and eagles. A programmatic take permit may be appropriate for industries such as the energy and transportation providers, among others, if they elect to work with the Service to develop ACPs. The ACPs and plan specifications will then become permit conditions, along with monitoring and reporting requirements more comprehensive than those for individual take permits. Programmatic permits are designed to provide a net benefit to eagles by reducing ongoing unauthorized take. Accordingly, programmatic permit conditions will be designed to provide ongoing long-term benefits to eagles. Recipients of programmatic permits must perform more rigorous monitoring than is required for standard, individual take permits.

Because the requirements for obtaining programmatic take authorization are designed to reduce take, the take authorized by programmatic permits for ongoing activities will not be subtracted from regional thresholds, nor would they be subject to the prioritization criteria. The reductions in take that result from implementation of new measures to reduce take from ongoing activities under programmatic permits may allow the Service to increase take thresholds and make additional permits available for other activities likely to result in take.

Applicants for programmatic permits for *new* activities will be subject to the same rigorous standards and may also be required to apply conservation measures at other sites (possibly owned or operated by a third party) where eagles are taken by existing operations. The purpose of the off-site measures would be to reduce take to a level that offsets some or all of the new take from the applicant's activity. The degree to which the applicant would be required to offset the take will depend on the status of eagle populations in the region; if populations of the particular eagle species are robust, the Service may not require any off-site reductions in take. However, if regional populations cannot absorb significant new take, the Service may require the project proponent to completely offset the effects of the new activity with reductions in take elsewhere.

To encourage potential applicants to seek programmatic permits (versus standard permits), the regulations contain issuance criteria that give priority to those seeking renewal of programmatic permits. These criteria will provide programmatic permittees with some assurance (though never an absolute guarantee) that previously

authorized levels of take from on-going operations will continue to be authorized in the future. Programmatic permit renewals will have third priority, after (1) safety emergencies, and (2) take necessary to meet Native American religious needs, but before (4) non-emergency public health and safety.

A programmatic permit is optional. Entities that engage in programmatic take and who wish to obtain authorization for the take can choose whether to apply for the programmatic take permit or apply for standard permits for individual takes. One advantage of opting for the programmatic permit is it would remove liability comprehensively. It also lessens concern about whether additional take can be authorized under take thresholds in the future. The disadvantage is that the process of working with the Service to develop the permit conditions is likely to be time-consuming and more expensive than seeking a standard permit. Also, implementation of the ACPs will in most cases require substantial resources. In the long term, however, depending on the scale of an applicant's operations, programmatic permits should be the most economical approach for authorizing long-term or wide-ranging take of eagles.

A programmatic permit is not available where the only long-term take is due to indirect effects from an initial action. Programmatic take is the direct result of ongoing operations. The following are *examples of programmatic take:*

1. A railroad that routinely strikes eagles feeding on carcasses on the tracks.

2. Utilities that kill eagles through collisions and electrocutions from contact with power lines.

3. Ongoing disturbance at a port due to vessel traffic and/or other port operations.

4. Construction and maintenance of highways throughout a State or other jurisdiction that routinely disturbs eagles.

5. Airports that periodically (but immediately upon discovery) need to remove eagle nests to protect human and eagle safety.

*Below are examples of what is not programmatic take:*

1. Construction of a boat ramp, with or without long-term indirect effects that take eagles (boat traffic).

2. Construction of a port when eagles are disturbed by pile driving and other construction activities.

3. Construction of a single highway, or multiple highways, where eagle take can be projected to occur at particular

locations and during specific project phases.

Although we define "programmatic take" as take that results from an activity and not from the activity's indirect effects, many activities that result in programmatic take will also have adverse indirect effects on eagles. Therefore, most programmatic permits will authorize other take in addition to the programmatic take, to cover the indirect effects. The Service will consider indirect effects of activities under both types of permits, first when deciding whether to issue the permit, and again when establishing conservation measures. Because programmatic permits are designed to reduce take to the level where it is unavoidable, if there are ACPs that will reduce take caused by indirect effects, those ACPS will be required conditions of the programmatic permit.

As further illustration of the differences between programmatic and standard permits, and the need to consider indirect effects under both, the following are two distinct activities that each directly take eagles and also have indirect effects that continue to take eagles; however, only one programmatically takes eagles and can be covered with a programmatic take permit.

First, a large housing development provides buffers around each nest on the property as recommended by the Service to avoid disturbing eagles. However, due to various constraints, the developer is unable to avoid impacts to the eagles' prey base, resulting in take of eagles in the form of lost productivity or abandonment of nesting territories. In this case, the construction of the development is not ongoing. What continues are the indirect effects of depriving eagles of their prey base. Therefore, the take caused by the housing development is not programmatic take, and to be authorized, would have to be covered under a standard permit.

Our second example is a company interested in siting a wind-power facility. We are currently unaware of any measures that would eliminate eagle mortalities when turbines are sited in golden eagle habitat (including migration corridors). If ACPs can be developed to significantly reduce the take, the operator may qualify for a programmatic take permit, since the ongoing mortalities are the direct result of the operation of the turbines. In addition to measures designed to reduce take directly, ACPs should also include measures to reduce indirect effects that contribute to the level of take, such as ensuring the project site does not

provide enhanced habitat for small mammals that eagles feed on, which would attract eagles to the area and increase the likelihood of collision with turbines.

*Permit application process.* Permits are available to Federal, State, municipal, or tribal governments; corporations and businesses; associations; and private individuals, all of which are subject to the prohibitions of the Eagle Act. Persons and organizations that obtain licenses, permits, grants, or other such services from government agencies are responsible for their own compliance with the Eagle Act and should individually seek permits for their actions that may take eagles. Government agencies must obtain permits for take that would result from agency actions that are implemented by the agency itself (including staff and contractors responsible for carrying out those actions on behalf of the agency).

The final regulations do not specify what information an applicant must submit to apply for an eagle take permit or to file an annual report, other than that he or she must submit a complete application form, including any required attachments to apply for a permit, and for annual reporting, the permittee must submit all the information required on the report form. By avoiding codification of application and reporting requirements, we can revise application and reporting requirements without undergoing the time-consuming rulemaking process. However, the public will have the opportunity to provide input on the content of these forms. All forms must be approved by the President's Office of Management and Budget (OMB) every three years, and as part of that process, all new forms and all changes to forms are subject to public review via a series of notices in the **Federal Register**. The forms we will use when this rule takes effect were subject to the OMB and public review process while this rule was being developed.

The new Service permit application Form 3–200–71 requires the following information from the applicant as part of the application process (in addition to the requirements of § 13.12(a) of this subchapter, which apply to all types of permits issued by the Service):

1. A detailed description of the activity that will cause the disturbance or other take of eagles;

2. The species and number of eagles that will be taken and the likely form of that take;

3. Maps and digital photographs that depict the locations of the proposed

activity, including the area where eagles are likely to be taken;

4. For activities that are likely to disturb eagles (versus other take),

a. Maps and digital photographs of the eagle nests, foraging areas, and concentration sites where eagles are likely to be disturbed by the proposed activity (including the geographic coordinates of the activity area and important eagle-use area(s) and the distance(s) between those areas);

b. Whether or not the important eagle-use area(s) is visible from the activity area, or if screening vegetation or topography blocks the view; and

c. The nature and extent of existing activities in the vicinity that are similar to the proposed activity, and the distance between those activities and the important eagle-use area(s);

5. The date the activity will start and is projected to end;

6. An explanation of what interests(s) in a particular locality will be protected by the take, including any anticipated benefits to the applicant or to the public;

7. An explanation of why avoiding the take is not practicable, including at a minimum, a description of why take cannot be avoided after taking into consideration, relative to the magnitude of the impacts to eagles, (1) the cost of the remedy comparative with proponent resources; (2) existing technology; and (3) logistics in light of overall project purposes; or

8. For programmatic take, why take is unavoidable; and

9. A description of measures proposed to offset the detrimental impact of the proposed activity on the regional eagle population.

The Service's Ecological Services Field Offices may provide technical assistance prior to development of permit applications. In many cases, the Service may be able to recommend measures to reduce the likelihood of take, negating the need for a permit. The technical assistance that we provide from the field will reduce the number of applications to our permit offices for activities that (1) are unlikely to take eagles, or (2) can practicably be modified to avoid the take. The Service may elect to conduct an on-site assessment to determine whether the proposed activity is likely to take eagles and whether reasonable modifications to the project will alleviate the probability of take. In addition, State and tribal natural resources agencies may also be able to provide information pertaining to the number and location of eagles, eagle nests and other important eagle-use areas within the area potentially affected by the activity.

*Application Evaluation Process.* An initial consideration is whether take is likely to occur. Ideally, most potential applicants whose activities will not likely result in take will be dissuaded from applying for a permit after voluntary technical consultation with a Service field biologist. If, after an application is submitted, the Service determines that take is not likely to occur, we may issue the permit (if permit issuance criteria are met); however, if we do not consider take likely to occur, we will not subtract the authorized take from Regional take thresholds—unless follow-up monitoring reveals that it did actually occur.

Our primary consideration when issuing permits under this regulation is whether the take would be compatible with the preservation of the bald eagle and the golden eagle, including consideration of the cumulative effects of other permitted take and additional factors affecting eagle populations. When evaluating the take that may result from an activity for which a permit is sought (e.g., residential development), we will consider the effects of the preliminary activity (construction) as well as the effects of the foreseeable ongoing future uses (activities associated with human habitation). The impacts and threshold distances that we will consider will not be limited to the footprint of the initial activity if it is reasonably foreseeable that the activity will lead to adverse indirect effects on eagles. For example, when evaluating the effects of expanding a campground, in addition to considering the distance of the expansion from important eagle-use areas, we would consider the effects of increased pedestrian and motor traffic to and from the expanded campground. In many cases, the potential for take could be greater as a result of the activities that follow the initial project. For example, the installation of a boat ramp 500 feet from an important eagle foraging area may not disturb eagles during the construction phase, but the ensuing high levels of boat traffic through the area during peak feeding times may cause disturbance. Trail construction 400 feet from a nest is generally unlikely to take eagles, but if the trail will be open to off-road vehicle use during the nesting season, we would need to consider the impacts of the vehicular activity as part of the impacts of the trail construction.

If demand will exceed regional take thresholds (see above discussion under *Population Assessment and Take Thresholds*), the permit office will need to evaluate how the proposed activity

should be prioritized in accordance with the Regional structured allocation process established to ensure the Service adheres to the prioritization issuance criteria set forth in § 22.26(e) and § 22.27(d)(5) of the regulations.

We must then consider whether the take is associated with the permanent abandonment or loss of a nest site, territory, or other important eagle-use area. In reality, this evaluation would be tied to our primary consideration of whether the take would be compatible with the preservation of the bald eagle or the golden eagle because take associated with the loss of an important eagle-use area will generally have larger population impacts than a single, one-time disturbance. Depending on the magnitude of the impacts, the potential take could exceed the thresholds we establish as necessary to safeguard eagle populations. If so, we must deny the permit unless the applicant commits to compensatory mitigation measures that would offset the take to the level where it is compatible with the preservation of eagles.

Additional evaluation criteria include whether: (1) the take is necessary to protect a legitimate interest in a particular locality; (2) the take is associated with, but is not the purpose of the activity; (3) the take cannot practicably be avoided (or for programmatic authorizations, the take is unavoidable); and (4) the applicant has minimized impacts to eagles to the extent practicable, and for programmatic authorizations, the taking will occur despite application of Advanced Conservation Practices developed in coordination with the Service.

Before issuing a permit, we will consult with federally-recognized tribes if issuance of the permit might affect traditional tribal activities, practices, or beliefs. The Service's obligation to consult on a government-to-government basis with Native American tribes is set forth in Executive Order 13175, Consultation with Indian Tribal Governments (Nov. 6, 2000) and the Service's own ''Native American Policy'' (*http://www.fws.gov/ nativeamerican/Graphics/ Native_Amer_Policy.pdf*). The areas where eagles would be taken have the potential of being regarded as areas of traditional religious and cultural importance to Indian tribes, commonly referred to as Traditional Cultural Properties (TCP). Eagles are highly significant species for Native American culture and religion, and as such they might be viewed as contributing elements to a TCP. Take of one or more eagles from a TCP area could potentially be considered an adverse effect to the

TCP. Eagles also have cultural significance to the wider American public, with the result that the Service will need to consider the concerns of any party with cultural interest in eagles, eagle nests, and eagle habitat under Section 106 of the National Historic Preservation Act (NHPA) (16 U.S.C. 470). (For more discussion on the NHPA, see our discussion in the **Required Determinations** section below under *National Historic Preservation Act.*)

*Permit Conditions.* Under the Service Mitigation Policy (46 Fed. Reg. 7644-7663, January 23, 1981) and the President's Council on Environmental Quality regulations (40 CFR Part 1508.20 (a-e)), mitigation includes: avoidance, minimization, rectification, reduction over time, and compensation for negative impacts, in this case to bald eagles and golden eagles. Under these regulations, all permittees will be required to avoid and minimize the potential for take to the degree practicable, and for programmatic permits, to the point where take is unavoidable.

Depending on the scale of the take, and the particular circumstances, the Service may require rectification (taking corrective action) and/or reduction over time from some permittees. However additional compensatory mitigation will be required only (1) for programmatic take and other multiple take authorizations; (2) for disturbance associated with the permanent loss of a breeding territory or important traditional communal roost site; or (3) as necessary to offset impacts to the local area population. Because our take permit thresholds are population-based, we have already determined before issuing each individual take permit that the population can withstand that level of take. Therefore, compensatory mitigation for one-time, individual take permits will not typically be necessary for the preservation of eagles. This approach is based on our analysis of *regional* population thresholds, and does not preclude a State or tribe from requiring additional mitigation for impacts authorized by a State or tribal permit or authorization within its jurisdiction. However, we intend to work with States and tribes to ensure that the total mitigation required of applicants by the Service and the State and/or tribe does not exceed what is appropriate to offset impacts to eagles from the proposed activity.

These regulations contain general conditions that will apply to all permits we issue under this section. If the permit expires or is suspended or revoked before the required measures

are completed, the permittee will remain obligated to carry out those measures necessary to mitigate for take that has occurred up to that point. Permittees must allow Service personnel, or other qualified persons designated by the Service, access to the areas where take is anticipated, within reasonable hours and with reasonable notice from the Service, for purposes of monitoring eagles at the site(s). Although we do not anticipate the necessity for ongoing monitoring by the Service at the majority of permit locations, we will use the data collected from limited site visits to reevaluate, as appropriate, the recommendations we provide in the guidelines as well as through case-by-case technical assistance to ensure that eagles are adequately protected without unnecessarily hindering human activity.

If a permit is revoked or expires, the permittee must submit a report of activities conducted under the permit to the Service's Regional Migratory Bird Permit Office within 60 days of the revocation or expiration. The permit provides take authorization only for the activities set forth in the permit conditions. If the permittee subsequently contemplates different or additional activities that may take eagles, he or she must contact the Service to determine if a permit amendment is required to retain the level of take authority desired. Additionally, the validity of all permits issued under these regulations is conditioned on the permittee's compliance with all applicable Federal, tribal, State, and local laws and regulations governing the activity. Thus, if conduct of the activity violates State, tribal, or other laws, the Federal authorization granted by this permit is invalid.

We are defining one term in § 22.26 that will apply only to the regulations in that section and not to eagle permits, generally. ''Eagle'' under § 22.26 means ''a live bald eagle (*Haliaeetus leucocephalus*), live golden eagle (*Aquila chrysaetos*), a bald eagle egg, or a golden eagle egg.'' Eagle take under § 22.26 is limited to live birds and eggs, and excludes non-living specimens, feathers, parts, and nests.

We are in the process of developing implementation guidance to address procedural aspects of the permitting process. The guidance will cover time frames for permit issuance; identification of project impacts; appropriate mitigation measures; monitoring; coordination with States, tribes, and other Federal agencies; compliance with environmental reviews; and other specifics of the

permit process, in order to ensure consistency in implementation throughout the Service. We will work with interested States and tribes in developing the implementation guidance, and the general public will also have the opportunity to provide input once we make a draft available through a notice in the **Federal Register**.

*Eagle Nest Take Under 50 CFR 22.27*

Some eagles nest on or near electrical transmission towers, communication towers, airport runways, or other locations where they endanger themselves or create a hazard to humans. Regulations under this section, § 22.27, authorize removal and/or relocation of active and inactive eagle nests in what we expect to be the rare cases where genuine safety concerns necessitate the take. Examples include: (1) a nest tree that appears likely to topple onto a residence; (2) at airports to avoid collisions between eagles and aircraft; and (3) to relocate a nest built within a reservoir that will be flooded. Compensatory mitigation will sometimes but not always be required when nests must be removed for safety emergency purposes.

This permit will also be available to take *inactive* nests only, in three additional types of situations. First, we may issue a permit to remove an inactive eagle nest where, although the presence of the nest does not create an immediate safety emergency, the take is necessary to ensure public health and safety. For purposes of this regulation, "necessary to ensure public health and safety" means "required to maintain society's well-being in matters of health and safety." For example, if the take would be compatible with the preservation of the eagle, and there is no practicable alternative to nest removal, a permit could be issued under this section to remove an inactive eagle nest located in the only feasible site for a hospital that is needed in a particular locality.

Second, a permit may be issued to take an inactive nest that is built on a human-engineered structure and creates a functional hazard that renders the structure inoperable for its intended use. For example, recently in Alaska, a pair of bald eagles nested on a crane that was temporarily not being used by the crane operator. Under these regulations, after waiting out the eagles' breeding cycle, the crane operator could be issued a permit to remove the inactive nest and reclaim the use of his crane.

Finally, the nest could be removed for an activity that will provide a net benefit to eagles, or for any purpose if the permittee conducts or secures

mitigation measures that more than offset the impacts of removing the nest, creating a net benefit to eagles. For example, we may issue a permit to take a nest where necessary to carry out a habitat restoration project that will enhance habitat for eagles. Also, a homeowner could potentially obtain a permit to remove one of multiple nests in a territory, one which has not been used for several years, if compensatory mitigation measures will produce a net benefit to eagles (e.g., the landowner donates a permanent conservation easement to protect the riparian area where the nesting pair and wintering eagles traditionally forage). The scale of mitigation will depend on the degree of biological impact. To remove a nest from what is apparently the only viable nest site in a territory would have a greater biological impact than in the example just provided, and more mitigation might be necessary in order to realize a net benefit to eagles.

Where the nest would be taken for purposes other than to alleviate an immediate threat to safety, two additional criteria must be met before we may issue the permit. First, we may not issue the permit unless alternative suitable nesting and foraging habitat is available. Second, compensatory mitigation is required in every case.

Except for applications associated with safety emergencies, prior to authorizing nest removal, we will review the availability of potential alternative suitable habitat (nest substrate, foraging areas, etc.) and the distance to those areas, in order to reasonably assess the likelihood of total loss of the territory. When known, we will consider such factors as the number of nests in a particular breeding pair's nesting territory and the last known date when the nest under consideration for take was used, in order to try to assess the relative value of the nest to the breeding pair. We will also consider the density of surrounding territories and the nests within those territories to evaluate the ability of the area to support a displaced pair and assess whether the loss of a particular nest may have negative local population impacts. For overall permit management, we will consider local-area population effects within the species-specific natal dispersal distances (43 miles for bald eagles, 140 miles for golden eagles). However, we believe it would be too burdensome to ask the proponent to provide data on that large a scale. We have found, in implementing the resource-recovery permit for take of inactive golden eagle nests (50 CFR 22.25), that data within a 10-mile radius of the nest provides us with adequate

information to evaluate many of the factors noted above.

Where practicable, nests should be relocated, or a substitute nest provided, in a suitable location within the same territory from which they were removed to provide a viable nesting site for breeding purposes of eagles within that territory, unless such relocation would create a similar threat to safety. Permits may also be issued to remove nests when it is determined by the Service that the nests cannot be relocated.

We may issue programmatic nest take permits under this section if the permittee commits to comprehensive measures (ACPs) to reduce the need for take. For example, programmatic authorization could be an appropriate means of authorizing take at airports that, despite scientifically-based measures developed in coordination with the Service to reduce take, cannot completely avoid some take in the form of disturbance and emergency nest removal (when nests are discovered despite diligent efforts to prevent eagles from occupying the area). Authorizing programmatic nest take, where such comprehensive measures are being taken by airports to reduce take, will help to minimize "last minute" nest removal emergencies, thus providing better protection from liability for the airports and enhanced protection of eagles.

We envision that there will be a need for permits that combine the two types of authorizations we are creating through this regulation (§ 22.26 and § 22.27), and perhaps additional authorizations as well. In such cases, we will usually issue one permit with dual (or multiple) authorizations. For example, to ensure safety at airfields, we would evaluate the airfield's wildlife hazard management plan to determine if it uses a progressive approach that starts with measures to reduce the presence of features attractive to eagles and ends with nest removal as a final option. If the management-plan components are adequate for protection of eagles, they would then become part of the permit conditions. The programmatic permit will not require re-application each year, but may be valid for up to 5 years, at which time the applicant could submit a request for renewal. There are annual reporting requirements and an option for the Service to re-evaluate the permit conditions if more take is occurring than anticipated. A permit such as described would be issued under the multiple authorities of existing § 22.23 (as revised by this rulemaking to extend permit tenure), new § 22.26, and new § 22.27.

As with other eagle take permits, nest take permits issued under § 22.27 will be subject to the take thresholds discussed earlier and more fully in the final environmental assessment of this action.

Similar to our approach to § 22.26 and some other recent Service regulations, we have not codified the application requirements within the regulation so we can more easily modify them based on new information and public input gathered through the triennial OMB information collection process (see above discussion under § 22.26, *Permit Application Process*). The current application form we will use for this regulation requires applicants to submit the following information:

(1) The number of nests proposed to be taken, whether the nest(s) is a bald eagle or golden eagle nest, and whether the nest(s) is active or inactive; and if known, whether it has been active in the 5 preceding breeding seasons.

(2) Why the removal of the nest(s) is necessary, including the interest to be served in a particular locality;

(3) A description of the property, including maps and digital photographs that show the location of the nest in relation to buildings, infrastructure, and human activities;

(4) The location of the property, including latitude and longitude;

(5) The length of time for which the permit is requested, including beginning and ending dates;

(6) A statement indicating the intended disposition of the nest(s), and if active, the nestlings or eggs;

(7) A calculation of the bald eagle or golden eagle area nesting population, including an appropriately-scaled map or plat showing the location of each eagle nest used to calculate the area nesting population unless the Service has sufficient data to independently calculate the area nesting population. (Not applicable for immediate safety emergencies.)

(8) A description of the avoidance, minimization, and mitigation measures the applicant proposes to reduce take and offset the detrimental impact of the permitted activity. (Not applicable for immediate safety emergencies.)

Even though the application form does not require applicants to describe proposed mitigation measures in cases of safety emergencies, we may require compensatory mitigation as a permit condition if appropriate to offset the detrimental impacts to eagles.

*New and Modified Definitions Under 50 CFR 22.3*

These regulations revise three definitions and codify 13 new terms in

§ 22.3, the section of eagle permit regulations that defines terms and is applicable to all eagle permit regulations in part 22. We amend the regulatory definition of "take," to add the term "destroy," to apply to bald eagle nests, to ensure consistency with the Eagle Act's intention to prohibit unpermitted eagle nest destruction. We define "eagle nest" as a "readily identifiable structure built, maintained, or used by bald eagles or golden eagles for breeding purposes." This definition is based on, and replaces, the existing "golden eagle nest" definition, in order to apply with respect to both species. We are removing the existing definition of "golden eagle nest" from the list of definitions.

Similarly, this rule replaces the old definition "inactive nest" with a new definition that differs primarily insofar as it includes bald eagles as well as golden eagles. The new definition reads: "a bald eagle or golden eagle nest that is not currently being used by eagles as determined by the continuing absence of any adult, egg, or dependent young at the nest for at least 10 consecutive days immediately prior to, and including, at present. An inactive nest may become active again and remains protected under the Eagle Act." All nests are protected by the Eagle Act, whether active or inactive, and the take of any nest requires a permit. The reason for distinguishing between active nests and inactive nests and for defining the term "inactive nest" is because the new nest-take-permit regulation, as well as existing regulations for take of golden eagle nests for resource development and recovery operations (50 CFR 22.25), regulate nests differently depending on whether they are currently active or inactive. Under § 22.25, a permit may be issued only for inactive nests. Under the regulations being finalized by this rulemaking, a permit can be issued for an active nest only if the location of the nest poses an immediate threat to safety. This definition is intended to be applied only to questions of whether or not a nest may be taken with reduced risk of associated take of birds. It is not intended to convey any other biological status, nor will it be the only criterion for permit evaluation.

We are codifying the term "important eagle-use area" in these permit regulations under § 22.26 to refer to nests, biologically important foraging areas, and communal roosts where eagles are potentially likely to be taken as the result of interference with breeding, feeding, or sheltering behaviors. We define "important eagle-use area" as "an eagle nest, foraging

area, or communal roost site that eagles rely on for breeding, sheltering, or feeding, and the landscape features surrounding such nest, foraging area, or roost site that are essential for the continued viability of the site for breeding, feeding, or sheltering eagles." This term refers to the particular areas, within a broader area where human activity occurs, where eagles are more likely to be taken (e.g., disturbed) by the activity because of the higher probability of interference with breeding, feeding, or sheltering behaviors at those areas.

To clarify terms used within the definition of "important eagle-use area," we define "foraging area" to mean "an area where eagles regularly feed during one or more seasons." We define "communal roost site" as "an area where eagles gather repeatedly in the course of a season and shelter overnight and sometimes during the day in the event of inclement weather." Not all foraging areas and communal roost sites are important enough such that interfering with eagles at the site will cause disturbance (resulting in injury or nest abandonment). Whether eagles rely on a particular foraging area or communal roost site to that degree will depend on a variety of circumstances—most obviously, the availability of alternate, suitable sites for feeding or sheltering.

"Territory" is defined as "a defended area that contains, or historically contained, one or more nests within the home range of a mated pair of eagles." "Cumulative effects" means "the incremental environmental impact or effect of the proposed action, together with impacts of past, present, and reasonably foreseeable future actions." We define "indirect effects" as "effects for which a proposed action is a cause, and which may occur later in time and/or be physically manifested beyond the initial impacts of the action, but are still reasonably likely to occur."

The regulations include the requirement that an applicant have avoided and minimized impacts to eagles to the maximum extent practicable. "Practicable" is defined as "capable of being done after taking into consideration, relative to the magnitude of the impacts to eagles (1) the cost of remedy comparative with proponent resources; (2) existing technology; and (3) logistics in light of overall project purposes." For programmatic permits, the comparable standard is "maximum degree achievable," defined as "the standard at which any take that occurs is unavoidable despite implementation of Advanced Conservation Practices."

"Necessary to ensure public health and safety" is one criterion for obtaining a nest removal permit, and it is a criterion for prioritization in the regulations for both new permit types if demand exceeds take thresholds. We define it as "required to maintain society's well-being in matters of health and safety." "Safety emergency" means "a situation that necessitates immediate action to alleviate a threat of bodily harm to humans or eagles." Safety emergencies take precedence over take that is merely necessary to ensure public health and safety (as does take necessary for Native American religious use and renewal of programmatic permits). We may issue a permit to remove an active eagle nest in a safety emergency, but not for any other purpose.

We are defining "programmatic take" as "take that (1) is recurring, but not caused by indirect effects (2) occurs over the long term and/or in a location or locations that cannot be specifically identified." We define "programmatic permit" as "a permit that authorizes programmatic take." A programmatic permit can cover other take in addition to programmatic take. We can issue programmatic permits for disturbance and as well as take resulting in mortalities, based on implementation of "advanced conservation practices" developed in coordination with the Service. "Advanced Conservation Practices" means "scientifically-supportable measures that are approved by the Service and represent the best-available techniques to reduce eagle disturbance and ongoing mortalities to a level where remaining take is unavoidable."

Since § 22.26 does not apply to nests or non-living eagle parts, with regard to that section, we define "eagle" to mean only live eagles or eggs. This definition does not apply within any regulations other than § 22.26.

*Revisions to Permit Regulations at 50 CFR 22.28*

On May 20, 2008, the Service published regulations creating a new permit category at 50 CFR § 22.28 to provide expedited Eagle Act permits to entities authorized to take bald eagles through ESA section 7 incidental take statements (73 FR 29075, May 20, 2008). That new permit category applies to past section 7 take statements as well as any that may have been issued after the rule took effect. (e.g., for take of Sonoran Desert nesting bald eagles, or if bald eagles or golden eagles were ESA-listed in any other portion of their respective ranges). Now that a permit is available to authorize eagle take not associated

with an ESA take authorization, for purposes of accountability and consistency, the same process and procedures should be used to authorize take under the Eagle Act regardless of whether it was also exempted under ESA section 7. Accordingly, as part of the regulations we are promulgating today, we are amending the regulations at § 22.28 to restrict their application to section 7 incidental take statements issued prior to the date today's rule becomes effective. For any incidental take exempted under ESA section 7 that is authorized after the date specified in DATES and that also constitutes take under the Eagle Act, the only permit that is available to provide Eagle Act take authorization is the § 22.26 permit being finalized herein. Therefore, except for take authorized through ESA section 10 permits (which confer authority to take under both the ESA and the Eagle Act under the new provision at 50 CFR § 22.11), any take we authorize that is associated with, but not the purpose of an activity, would be provided under the singular regulatory authority we are finalizing today, 50 CFR § 22.26, rather than 50 CFR § 22.28.

*Revisions to Information Collection Requirements at 50 CFR 22.4*

This section describes the requirement that Federal information collections, such as permit applications and report forms related to Federal permits, be reviewed and approved by the OMB. It also provides the approval number(s) (OMB Control Numbers) for the forms used to collect information related to eagle permits. We are removing the language describing the average reporting burden for all the collections related to eagle permits because that figure varies as new forms are added or removed and we are no longer required to provide this estimate.

*Revisions to General Permit Conditions at 50 CFR 13*

As part of establishing the new permit authorizations under 50 CFR 22.26 and 22.27, we amend 50 CFR 13.12 to add the new permit types to be issued under 50 CFR 22.26 and 22.27. We also amend 50 CFR 13.11(d), the nonstandard fee schedule, to establish application-processing fees (user fees) for the permits. The general statutory authority to charge fees for processing applications for permits and certificates is found in 31 U.S.C. 9701, which states that services provided by Federal agencies are to be "self-sustaining to the extent possible." Federal user-fee policy, as stated in OMB Circular No. A-25, requires Federal agencies to recoup the costs of "special services" that

provide benefits to identifiable recipients. Permits are special services authorizing identifiable recipients to engage in activities not otherwise authorized for the general public.

For the standard § 22.26 take permit and the § 22.27 nest take permit, we will assess a $500 permit application fee and a $150 permit amendment fee. For programmatic permits under either permit type, the application fee is $1,000 and the amendment fee is $500. While higher than many other Service permit application processing fees, these fees are comparable to those assessed for other migratory bird permits relative to the level of review necessary to process and evaluate an application for a permit to take eagles or to remove eagle nests under the authorities of the Eagle Act.[2] Furthermore, we expect these fees to make up less than half the permit-processing costs to the Service.

The typical permit-application process will be less burdensome for the applicant than the permit process under the ESA, since an HCP is not required. Preparing an HCP can be time-consuming and is usually delegated to a professional consultant. HCPs often cover large geographic areas—some larger than a million acres—and set forth terms and mitigation measures designed to protect species for up to 100 years. In contrast, the information required to apply for an individual Eagle Act permit does not include an extensive habitat analysis, is easier to compile, and will require less information, since permits will be valid for no more than five years.

Service biologists at GS-11 to 13 grade levels on the Office of Personnel Management General Pay Schedule, with support of GS-7 staff, would be responsible for pre-application technical assistance; reviewing and determining the adequacy of the information provided by an applicant; conducting any internal research necessary to verify information in the application or evaluate the biological impact of the proposed activity; assessing the biological impact of the proposed activity on the bald or golden eagle; evaluating whether the proposed activity meets the issuance criteria; preparing or reviewing NEPA documentation; determining consistency with other laws such as the

---

[2] The notable exception is the permit-application-processing fee for take of golden eagle nests for resource recovery and development operations under 50 CFR 22.25, which is currently set at $100. We intend to propose a regulation in the near future to raise the processing fee to a level commensurate with the processing fees for the new § 22.27 nest take permit.

section 106 of the NHPA; coordination and consultation with States and tribes; and preparing either a permit or a denial letter for the applicant. To evaluate the impact of the proposed activity, Service biologists may also need to visit the location to examine site-specific conditions.

Programmatic permits will take considerably longer to craft and process. We expect most industry-wide or agency-wide standard practices for programmatic permits will be developed with the respective entities and Service staff who work on policy development in the Washington Office, in coordination with Service Regions. We anticipate that some programmatic permits, particularly early ones will require the Service to convene and lead meetings of workgroups representing the entities seeking permits. The workgroups would develop metrics for establishing/quantifying baseline effects through estimates or a sampling scheme; identify the best-available techniques and mutually-approved standard practices for minimizing the likelihood of take of eagles; and develop standards for system or program risk analyses, guidance for determining reasonable timeframes for completion of any required retro-fitting, standards and guidelines for effective monitoring programs and reports of eagle take to the Service, and measurable criteria for evaluating the implementation and efficacy of practices. Over the long term, we estimate it will take about 100 Service staff hours to process the average programmatic take permit. The programmatic permits we develop initially will likely take longer, as will large-scale and more complex programmatic permits. Those may take up to 400 Service staff hours to prepare.

We estimate it will cost the Service approximately $1,750 to process the average § 22.26 permit application, including $940 for pre-application technical assistance from Field Office biologists, and $810 for the Regional Migratory Bird Permit Office once it receives the application. For § 22.27 permits, we estimate the cost to the Service to be $1,950. We estimate it will cost the Service about $650 to amend the average permit. The average programmatic permit application under either § 22.26 or § 22.27 is likely to cost the Service $5,000. We estimate the average cost to the Service for substantive amendments to programmatic permits to be $1,500. These estimates include technical assistance provided by the Field Office, as do the hourly estimates below.

On average, we estimate that it will take Service employees approximately

42 hours to process each individual § 22.26 permit application, approximately 46 hours for each § 22.27 permit application for take of an eagle nest, and approximately 120 hours for a programmatic permit under either permit type. Therefore, an application fee of $500 will offset only about 28% of the cost to the Government of responding to a request for a § 22.26 and about 25% of the cost of processing a § 22.27 nest-take-permit application. The $150 standard amendment fee will make up about 27% of the Service's costs. The $1,000 programmatic permit application fee will recoup about 20% of the permit processing cost to the Service. The $500 programmatic-permit amendment fee will recoup about 33% of the cost to the Service. Although these fees are not high enough to allow the Service to recoup even half the cost of issuing them, they are significantly higher than other permit application processing fees we assess. The fees associated with these regulations must be manageable to small business owners, home owners, and other members of the public who may find a higher fee prohibitive.

*Economic Analysis*

A brief assessment to clarify the costs and benefits associated with this rule follows:

*Change.* This rule will provide for the authorization of activities that take bald eagles and golden eagles under the Bald and Golden Eagle Protection Act (Eagle Act). Under the rule, the public will have the opportunity to apply for permits to authorize the take of bald eagles and golden eagles under the Eagle Act. Some incidental take of eagles was previously authorized under the Endangered Species Act, primarily bald eagles covered by an incidental take statement issued pursuant to ESA section 7. Some bald eagle take was authorized under ESA section 10 incidental-take permits. Twelve ESA section 10 permits authorized take of golden eagles as covered listed species. However, ESA take authorization for eagles has not been issued in Alaska, where neither species of eagles were ever listed under the ESA. Thus, any authorization for take in Alaska would be newly available. Authorizations for take of bald eagles and golden eagles are expected to increase from what was authorized under the ESA.

*Baseline.* The costs and benefits will result from (1) the authorization of take of bald eagles and golden eagles throughout the United States under § 22.26, and (2) the number of permits for take of bald eagle and golden eagle nests throughout the United States under § 22.27.

*Costs Incurred.* In general, the costs incurred due to the rule would relate to the costs of assembling the necessary information for the permit application, permit fees, and the costs of monitoring and reporting requirements associated with the permit. As explained below, it is difficult to predict the number of applications the Service should anticipate under these regulations. However, due to various factors, we expect that demand for eagle-take permits will increase, from about 54 authorizations per year under the ESA to approximately 910 permits per year under the two new Eagle Act permit regulations. Therefore, using the current number of authorizations issued under the ESA as a baseline, approximately 856 permit authorizations would be new.

Some of these entities (those that are non-governmental) would bear the higher permit application fees under the Eagle Act as compared to the current fee for an ESA incidental-take permit (to capture a more equitable share of the costs to the Service that would otherwise be borne by taxpayers), although many applicants will be State, local, tribal, or Federal agencies, which are exempt from application processing fees for Service permits. Costs for other aspects of the permit-application process will generally be lower than costs associated with the ESA section 10 permit application process (e.g., less information needs to be compiled and provided to the Service as part of this permit application versus the requirement to create a Habitat Conservation Plan (HCP) under the ESA).

We are establishing a $500 permit application processing fee for the standard § 22.26 take permit and standard § 22.27 nest-take permit. Each of these permit categories will require a $150 fee for permit amendments. Programmatic permits under both regulations require a $1,000 processing fee and a $500 amendment fee. We anticipate receiving about 1,120 take permit applications under § 22.26 nationwide annually, and 20 applications for programmatic permits under § 22.26. We anticipate receiving 70 nest-take-permit applications under § 22.27 and 20 applications for programmatic nest-take permits. (We anticipate that we will issue permits in response to the majority of these applications, particularly the programmatic permit applications, because applicants will already have coordinated with the Service before applying for a permit, and many project proponents will have either adjusted their projects so as not to need a permit

or concluded that a permit will not be issued for the take associated with the proposed project. The remaining potential applicants are those who are likely to need and qualify for a permit.) Approximately 60 standard permits and 16 programmatic permits may need amendment annually.

We expect about half of the applicants for both types of permits to be Federal, State, local, or tribal governments, none of which are required to pay a permit-application processing fee or amendment-processing fee. Therefore, we estimate that annual application fees and amendments will total approximately $320,000 (560 permit applications under § 22.26 x $500 fee, + 35 nest-take-permit applications under § 22.27 x $500 fee, + 20 programmatic permit applications x $1,000 fee, + 30 standard amendments x $150 amendment fee, + 8 amendments to programmatic permits x $500 amendment fee). There is no fee for processing annual reports.

These permit fees would be new costs related to this rule. There may be additional costs associated with the permit process, which may include mitigation costs and, if the applicant engages a consultant or attorney, consultant and legal fees. The information required to apply for an individual Eagle Act permit is less extensive and easier to compile than permits under the ESA. Information such as latitude and longitude are publicly available (e.g., Google Earth). The majority of people will be able to submit this information to the Service without the need to hire a consultant, especially with the help of local and State government staff who may be willing to provide assistance with location and distance information between the project and the eagle nest or use area. The Service will direct applicants to available, free or inexpensive tools and services for obtaining the necessary information.

Larger project proponents may prefer to hire consultants. Consultant fees could range from $300 to many thousands of dollars, depending on the scale of the project, but presumably still would be cost-effective, as compared to avoiding the take, since the choice is the applicant's to make. In many cases, for larger projects, project proponents will have hired consultants to address a multitude of other factors unrelated to impacts to eagles, so additional costs related to Eagle Act authorizations would be minimal.

We anticipate that there will be many instances where project proponents approach the Service, and based on preliminary coordination with us, adjust project plans to reduce the likelihood of take to the point where no permit is needed, and none is therefore issued. Some costs will be associated with this process. However, these costs are not the result of this permit regulation, but stem from the statutory prohibitions against taking eagles.

Costs may have been incurred related to current projects that are in process and are delayed and potential projects that were not initiated due to the lack of availability of ESA permits during the period after the bald eagle was delisted in most parts of the lower 48 States and prior to Eagle Act take permits becoming available under this rule. These costs would be attributed to the determination to delist the bald eagle. Therefore, this analysis does not quantify these costs.

In addition to costs to the public, the Service will incur administrative costs due to this rulemaking. We do not have a firm basis on which to confidently predict how much demand there will be for permits under these regulations. We estimate that the number of eagle-take permits will increase under the rule from an average of 54 authorizations previously issued under the ESA, to 830 Eagle Act § 22.26 take permits, 40 nest-take permits issued under § 22.27, and 40 programmatic permits issued under both regulations, annually. We expect an increase because: (1) many smaller projects will no longer be able to get under the ESA section 7 "umbrella" of a Federal project when seeking authorization to take bald eagles; (2) following delisting, it is now more acceptable and less burdensome to get a permit to take eagles; (3) most bald eagle populations are increasing; (4) permits will be available for golden eagle take, and (5) ESA take permits were not issued in Alaska, but Eagle Act permits may be issued there under these permit regulations.

The cost of issuing most permits will decrease, but many authorizations similar to those we previously granted under section 7 of the ESA (where the consultation covered numerous species in addition to bald eagles) would now require the issuance of an Eagle Act permit in addition to a biological opinion. On average, we estimate it will cost the Service approximately $1,750 to process the average § 22.26 permit application (including pre-application technical assistance). Assuming approximately 1,120 permit applications under § 22.26, 70 nest-take-permit applications under § 22.27, 40 programmatic permit applications, 60 standard permit amendments, and 16 programmatic amendments, per year, the annual costs associated with

processing permit applications to the Service would total approximately $2,348,500 (1,120 x $1,750 for § 22.26 permit applications, + 70 x $1,950 for § 22.27 nest-take-permit applications, + 40 x $5,000 for programmatic-permit applications, plus 60 x $600 for standard amendments, plus 16 x 1,000 for programmatic amendments).

The Service will also incur the cost of providing technical assistance, even where no permit is issued. The workload associated with each such consultation will generally be less than for situations where a permit is issued, but it will often be substantial. We estimate the average technical consultation will require 20 hours of staff time, and we anticipate the number of such consultations not resulting in permits will be about 800 per year, resulting in $628,000 in increased costs to the Service from technical consultations. All estimated costs for staff time include salary and benefits.

Overall, we estimate that new administrative costs for the Service to implement this rule will be over $3 million per year, including the costs to Regional and Field Offices for actual implementation of the permit program, plus costs associated with the development and maintenance of the program (e.g., training, developing implementing policies, responding to Freedom of Information Act requests, budget formulation, etc.), which will be borne by the Service's Migratory Bird and Ecological Services program offices.

*Benefits Accrued.* Under the rule, benefits to the public will accrue from issuance of permits to take bald eagles and golden eagles throughout the United States. In general, benefits will include increased value in land that can now be developed or harvested for timber, as well as the elimination of the risk and future costs associated with the potential unpermitted take of eagles that could occur from the development activities. Benefits will depend on the level of potential future growth associated with the authorized permit activity.

Only minimal take of golden eagles (as covered non-listed species in HCPs) has been authorized under the ESA prior to proposing this rule. However, because population data indicate that take of golden eagles should be extremely limited, we anticipate issuing only a minimal number of new take authorizations for golden eagles under these new regulations. Some take of golden eagles throughout the United States that may be authorized by these regulations may result in new development and activities that could not have proceeded legally without this

rule. We expect that economic benefits may accrue as a result of the implementation of this rule for oil and gas development operations, farming and ranching operations, mining companies, utilities, the transportation sector, and private land owners.

Overall, we anticipate issuing approximately 910 take permits per year, under both regulations. We have completed a final environmental assessment (FEA) of the effects of this rulemaking, which is available on our website at *http://www.fws.gov/ migratorybirds/baldeagle.htm*). Under the FEA, we developed take thresholds that will guide permit issuance to ensure that take is compatible with the preservation of the bald eagle and the golden eagle. As a result, we anticipate that the amount of take that will be requested and authorized under this permit regulation will not significantly affect bald or golden eagle populations.

## Response to Public Comments

Unless otherwise noted, each subject heading includes all substantive comments we received on both the June 5, 2007, proposed rule and the proposed revisions to the rule noted in our August 14, 2008, notice re-opening of the comment period on the rule and announcing the availability of the DEA. We are responding to the comments concerning the environmental analysis, population modeling, take thresholds, and other aspects of the DEA in the FEA. Copies of the FEA are available at *http://www.fws.gov/migratorybirds/ baldeagle.htm*.)

*Populations and Take Thresholds.*

(The comments addressed under this heading were all made on the June 5, 2007, proposed rule. Comments addressing populations and take thresholds that we received after release of the draft environmental assessment are addressed in the FEA.)

*Comment:* The use of the Partners in Flight (PIF) threshold for rate of population decline beyond which permits would not be issued is inappropriate. The PIF threshold is unacceptable because it amounts to a 15% loss over 30 years.

*Service response:* The final regulation caps the number of permits we can issue with thresholds designed to ensure increasing or stable breeding populations. Our reasoning is based on the fact that steady declines, even as small as 0.54% annually, the rate we proposed in the June 5, 2007, proposed rule (72 FR 31141), will cumulatively result in an unacceptably large decrease in population over time. Accordingly, we are establishing take thresholds

consistent with the goal of stable or increasing breeding populations.

Therefore, for purposes of this regulation, "compatible with the preservation of the bald eagle and the golden eagle" means "consistent with the goal of stable or increasing breeding populations." Although take thresholds are based on regional populations, the regulation requires the Service to consider additional factors, such as cultural significance, that may warrant protection of smaller and/or isolated populations within a region.

We anticipate no more than modest increases in bald eagle populations in the future. We have no evidence at this time that leads us to expect any increase in golden eagle populations. Golden eagles appear more likely to experience declines, due to loss of prey base, disturbance, and loss of habitat due to resource extraction activities, and other factors. For more discussion on population thresholds, see our FEA of this action.

*Comment:* The appropriate population threshold on which to base the number of permits that can be issued (to be compatible with the preservation of the bald eagle and the golden eagle) should be "no negative impact on the eagle's population growth rate."

*Service response:* We disagree with this comment. Even if considered a desirable goal, maintaining the same growth rate indefinitely is unrealistic. How large a population is ideal for either species of eagle depends on a range of factors, but as with any other species, there are ecological limits that weigh against and ultimately prevent continuous growth. Although we do not predict either species of eagle will become overabundant in the foreseeable future, some regional populations of bald eagles will likely level out after reaching an ecologically-sustainable size. To prohibit human activity within those areas because the growth rate of eagles has slowed would overly burden people without any benefit to eagles.

*Comment:* The Service should clarify the relationship between the permit regulation and the draft bald eagle post-delisting monitoring plan (PDMP). The PDMP data will not be adequate for purposes of detecting the rate of decline the Service will use for permitting purposes, and neither will the other monitoring sources referenced in the rule. The Service should instead apply a harvest model that takes into consideration current population trend and assumes that permits issued will result in take.

*Service response:* We acknowledge that our description in the June 5, 2007,

proposed rule of how we intended to analyze appropriate levels of take was not as clear as it could have been (72 FR 31141). Our intent was always to use modeling, similar to harvest modeling we conduct for other migratory bird species.

The PDMP is a national-level monitoring plan designed to detect declines that would merit reconsideration of the bald eagle as threatened or endangered under the ESA, whereas the population trends on which we would base take thresholds under this take permit regulation will be smaller in scale and at levels that are below the detectability of the PDMP.

To establish take thresholds for this permit regulation, we will rely on the best data we can obtain, including the sources noted in the proposed rule. We will use models to ascertain how much take could be permitted before causing impacts to eagle populations that would not be compatible with the preservation of the species. If we have inadequate data to run the models and no other means of assessing the status of the population where the take will occur, we may not be able to determine that the take is compatible with the preservation of the species. If we are unable to make that determination, we cannot authorize take under the Eagle Act.

*Comment:* Take thresholds should be assessed based on the national population as a whole. (The commenter did not provide a basis for this recommendation.)

*Service response:* Under the ESA, listing and delisting decisions must be made purely on the basis of the "best scientific and commercial data available." Effects on the economy are excluded from the analysis, as are other human social or cultural values beyond those furthered by the ESA. Because the Eagle Act is not delimited by such statutory constraints, and because protecting regional and local populations of bald eagles and golden eagles is culturally important to the American people, this regulation interprets compatibility with the preservation of the species to include maintaining regional and locally-important populations. Take thresholds would be based on modeling of regional population data, but within a regional population, as part of our evaluation of take applications, we will take into consideration factors that may warrant protection of more localized populations, including the cultural significance of a local population.

*Comment:* In addition to the nine bald eagle management populations mentioned in the proposed rule, the

Service needs to assess eagle populations by State and NABCI bird conservation area, or local areas. Otherwise some regional and local populations would be threatened. Local populations can be of unique importance, including to the public.

*Service response:* We are using the NABCI bird conservation regions (BCRs) to manage golden eagle populations, further broken down by portion of BCR within each Service Region. For bald eagles, we are not using nine management populations as we referred to in the proposed rule. Instead, to establish management populations for bald eagles, we used natal populations to look at distribution across the landscape, allowing us to determine rough natural "boundaries" between regional eagle populations. Because the management populations delineated by this approach roughly correspond to the Service's organizational structure made up of 8 Service Regional Offices, we will manage bald eagles using populations within Service Regions, with some adjustments, explained in more detail in the FEA.

Regarding the concern that local populations will not be adequately protected, as part of our evaluation of take applications, we will take into consideration biological and human-induced pressures on, and cultural significance of, more localized populations. In evaluating whether the take is compatible with the preservation of the eagle, we must consider cumulative effects, which will help ensure adverse impacts are not concentrated in one locality.

*Comment:* The regulations should explicitly state that permits will be denied if the population declines to the threshold level.

*Service response:* The regulations explicitly state that before issuing a permit, the Service must determine that the take is compatible with the preservation of the bald eagle or the golden eagle, which is the statutory mandate. If data indicate populations at either national or regional scales are declining, depending on the source and severity of the decline, the Service may establish lower take permit thresholds where appropriate or suspend permitting until data confirm the population can support take.

*Comment:* The Service provides no assurances that bald eagles in Arizona will be protected. Arizona bald eagles must be considered separately.

*Service response:* As explained in greater detail within our FEA, we will not issue permits that would result in declines in the Sonoran Desert bald eagle population. Permit thresholds for

all regions of the U.S. will be consistent with the goal of stable or increasing breeding populations.

*Comment:* The proposed rule stated that, if populations decline to the threshold level, the Service will refrain from issuing permits "until such time that the take would be compatible with the preservation of the bald or golden eagle." That statement should be amended to add "unless human life may be impacted."

*Service response:* Depending on what factors are responsible for the decline and whether the decline is likely to be short-term (part of a recurring population cycle) or long-term, the Service may not need to suspend permit issuance, and may merely reduce the number of permits issued. However, if the breeding population is reduced to the degree that issuance of a permit would be incompatible with the preservation of the bald eagle or the golden eagle, we cannot issue that permit and remain in compliance with the Eagle Act, which authorizes the Secretary of the Interior to issue take permits only if he finds that the take would be compatible with the preservation of the bald eagle or golden eagle (16 U.S.C. 668a). Fortunately, in the majority of cases, emergency take will meet that standard, since many threats to human life that could be caused by eagles may also threaten the eagles themselves. For example, if for human safety purposes, a utility needed to remove a nest to prevent an electrical fire or an airport needed to haze eagles to prevent them from nesting near runways, the authorized take would prevent both eagle and human mortalities. Because issuing a permit in these types of situations would prevent harm to the eagle, the action would be compatible with the preservation of the eagle.

Nevertheless, to ensure that safety emergencies can be legally redressed, we are adding issuance criteria to the regulations to ensure that take associated with safety emergencies is given priority over take for any other purpose.

*Comment:* The statement that permits will be issued on a limited basis raises concerns that a predictable incidental take process will not be available.

*Service response:* The Service has the responsibility to implement certain laws that protect wildlife, including eagles. The Eagle Act contains a mandate that take of eagles be compatible with the preservation of the species. Unlimited authorizations for take would be compatible with the preservation of the bald eagle and the golden eagle only if demand for permits remains below the

level that would cause population declines. If demand is higher than that threshold, we must limit the number of permits we issue. Hence, the availability of permits will depend on the level of demand and the availability of reliable data reflecting healthy eagle populations. In addition, the process will be predictable in that the take thresholds for each year in each region will be known.

*Comment:* Since the Service cannot issue permits unless the take will be compatible with the preservation of the species, meaning that permits cannot be issued without adequate data, the Service should consider either requiring permittees to contribute to monitoring efforts, or making the availability of permits expressly contingent on there being in place a monitoring program sufficiently rigorous to detect the threshold decline upon which permit issuance will be predicated.

*Service response:* As discussed earlier in the preamble, and more fully in the FEA, we have reduced initial take thresholds for both species, capping permitted take for bald eagles at 5% of estimated annual productivity and for golden eagles at historically-authorized take levels. This more conservative approach will buffer the natural variability in vital rates affecting population trends and, perhaps more importantly, ensure against gaps in our data.

*"Other interests in a particular locality"*

*Comment:* The Service states that the Eagle Act's authority for granting the proposed permits stems from the Act's provision that the Secretary of the Interior may issue permits "for the protection of wildlife or of agricultural or other interests in a particular locality." The final rule must define "other interests." Without doing so, the rule is an overbroad interpretation of the Eagle Act because it ignores the fact that "other interests" is associated with "wildlife" and "agricultural" interests, and does not comport with the remainder of the statute's provisions restricting the purposes for which take can be authorized.

The proposal is not consistent with the Eagle Act because it would authorize take for any purpose or activity, whereas the statute clearly intended to limit the purposes for which take could be authorized. Furthermore, the proposal fails to show what "other interests" have been jeopardized by the long-standing legal prohibition on taking eagles. At the very least, the Service needs to delineate what "other interests" will qualify for the permit. The proposal's over-broad interpretation

of "other interests," would allow permits for a vastly broader range of purposes than is currently authorized under the MBTA, which is nonsensical, since the Eagle Act clearly restricts take to certain purposes, whereas the MBTA can authorize take wherever it is consistent with the treaties.

*Service response:* We read Congress's inclusion of the phrase "or other interests in any particular locality" as intended to ensure that other interests besides wildlife and agricultural claims would be able to seek remedy through a permit issued pursuant to regulations. In drafting the statute as it did, Congress gave the Secretary broad discretion to determine what types of other interests might be jeopardized by the broad protections afforded to eagles. When the statutory language was developed, the perception that eagles were a significant threat to livestock was widespread. Today, the American economy is comprised of numerous additional "interests" that have largely supplanted ranching in many areas of the country. These "other interests" provide jobs and support our infrastructure and quality of life, and by so doing merit similar protection as agriculture and livestock. Therefore these regulations provide a means to authorize eagle take to protect "other" interests such as transportation needs, electric utility maintenance, residential and commercial development, forestry, resource development and recovery, and other public and private interests.

*Comment:* In contrast to the restrictive process for authorizations for Native American religious use, the Service here proposes a sweeping process for allowing a broad spectrum of public and private interests to take eagles where their locations stand in the way of development and utility interests. The disparate treatment between these approaches must be reconciled.

*Service response:* The process by which we issue permits to Native Americans for take of eagles from the wild and permits for possession of eagle parts and feathers from the National Eagle Repository are the least restrictive means of doing so while protecting other compelling interests. Unlike under the permit regulations we are finalizing through this rulemaking, we do not require any mitigation or other conservation measures to offset the impacts of Native American religious take permits.

Furthermore, the effect of issuing permits under this proposed regulation will not impinge on Native Americans' access to eagles for religious/ceremonial use. This regulation includes provisions to ensure that, if overall demand for

authorizations to take eagles approaches what would be compatible with the preservation of the bald eagle or the golden eagle, requests related to Native American religious/ceremonial use will be authorized before other requests for take.

*Scope and Criteria of § 22.26*

*Comment:* The proposed rule states that a permit may be issued when several criteria are met including where "the take cannot practicably be avoided." The use of a "practicable avoidance" standard is inconsistent with the Eagle Act because it elevates cost and overall project concerns over protecting bald eagles. The Eagle Act provides that take should be authorized only where it is *necessary* to protect a legitimate interest, not merely a facilitating factor. The applicant should have to affirmatively demonstrate that, in the absence of the permit, the legitimate interest cannot be met, and the applicant must not be allowed to define the goals in an overly narrow manner.

*Service response:* We agree with the commenter that the goal for which the take is necessary must not be defined too narrowly by the applicant. For example, if a municipality is installing a bike trail with the goal to create a trail with an unbroken view of the river, it may be more difficult to avoid disturbing eagles along the river, than were the goal less narrowly defined—for example, to create a bike path that loosely parallels the river. Where possible, interests should be defined broadly enough to allow plans to be reasonably modified if necessary to protect bald eagles or golden eagles.

We do not agree that the practicable avoidance standard elevates the interest of the project proponent over eagles because whether the impact can practicably be avoided is only one of the factors we will weigh before issuing a permit, and it is secondary to whether the take will be compatible with the preservation of the bald eagle or the golden eagle. Nevertheless, to address this concern, when we re-opened the comment period on the regulation in August 2008, we modified the proposed definition of "practicable" to incorporate the need to consider the feasibility of the action relative to the scope of the impact on eagles. The final definition of "practicable" reads: "capable of being done after taking into consideration, relative to the magnitude of the impacts to eagles (1) the cost of remedy comparative with proponent resources; (2) existing technology; and (3) logistics in light of overall project purposes."

*Comment:* The applicant should not have to show that the take cannot practicably be avoided or that he has minimized impacts to the extent practicable. The language is similar to that used under the Clean Water Act section 404 wetlands permit program, which raises the concern that the Service will require applicants to conduct a detailed alternatives analysis test, including consideration of project purpose and alternative project sites. The Service should identify the authority under the Eagle Act for requiring that impacts be minimized to the extent practicable.

*Service response:* The Eagle Act stipulates that permits may be issued where the take is *necessary* to protect ... other interests in any particular locality (italics added for emphasis). Some could argue that, to be *necessary*, a thing is absolutely required and cannot be omitted or avoided. We believe a less strict interpretation is reasonable and justified to ensure that human activity is not overly restricted, and so interpret "necessary" as something that cannot *practicably* be avoided. In short, we view the practicability standard as less burdensome than other reasonable interpretations of the statute's purpose and intent, and therefore appropriate to adopt for purposes of this rulemaking.

*Comment:* Take authorized by these permits should be limited to activities that benefit the public welfare.

*Service response:* The Eagle Act does not limit take to activities that benefit the public as opposed to private interests. The statute specifically provides that take can be authorized to protect agriculture, which in this case primarily meant privately-owned livestock.

*Comment:* The Service should model the regulation on the U.S. Army Corps of Engineers' requirements for avoidance, minimization, and mitigation of unavoidable impacts, and these should be clearly set forth in the regulation.

*Service response:* While it was not our goal to model this proposed rule on Corps' regulations, the Service's official mitigation policy as set forth in the U.S. Fish and Wildlife Service Manual (501 FW 2) and reflected in this rule, is based on a similar tiered approach to reducing the overall impact of activities, beginning with avoidance and minimization, and requiring compensatory mitigation for large-scale activities with greater impacts.

*Comment:* Permits for take that results in mortality should be issued only for human health and safety.

*Service response:* Our goal and responsibility under the Eagle Act is to

preserve bald eagles and golden eagles, which we interpret and define as consistent with the goal of stable or increasing breeding populations of both species, but not protecting each and every eagle. Take that results in a loss of productivity and take that results in mortality must be assessed primarily in terms of affects to the regional and local area populations. Depending on the age and breeding status of an individual eagle, some take that results in mortality will have less impact than some disturbance take. Therefore, we believe there is no rationale to enact a prohibition on take that results in mortality—versus take in the form of disturbance—for commercial purposes.

*Comment:* There is a big difference between lethal vs. non-lethal take in terms of the significance of the eagle as a sacred being for Native Americans. Native Americans will not support lethal take for commercial purposes.

*Service response:* First, see our preceding response. We will, however, when appropriate, undertake consultation with tribes that may be affected by the lethal take of an eagle on a case-by-case basis, and will consider the cultural and spiritual significance of eagles and how take that results in mortality could adversely affect tribal cultural values at that time.

*Comment:* Where take resulting in mortality is authorized for an industry or other non-tribal entity, tribal members should be given the opportunity to physically take the eagles.

*Service response:* If feasible and appropriate, we may encourage a tribe that applies to take eagles to take ones that would otherwise be taken under the regulations herein. However, as a generality, we think it will be difficult to meet the purposes of both permits with a single take. Tribes that qualify for a take permit must certify that the take itself is an integral aspect of the religious ceremony in order to justify why an eagle from another source will not meet the tribe's needs. In other words, presenting the tribe with an eagle carcass will not suffice. Most eagle mortalities authorized under the permit regulations at § 22.26 are "non-controllable," that is, the timing and location of each take is not precisely known before it occurs. When discovered, the carcasses of eagles killed under these permits will be sent to the National Eagle Repository to meet the religious needs of tribal members where the take itself is not necessary to carry out the religious ceremony for which eagle parts and feathers are sought. This provision provides an equitable opportunity for members of all federally-recognized tribes to use feathers and parts from such eagles for religious purposes.

*Comment:* The consideration of secondary impacts must be in the regulations, not just the preamble.

*Service response:* We agree, and have added language addressing consideration of secondary impacts— now denoted as "indirect effects"—to the regulations under § 22.26 at (e)(1), (e)(2) and (f)1, and under § 22.27 at (b)(7) and (e)(1).

*Comment:* Secondary impacts will sometimes affect eagles that are known to breed, feed, or shelter on tribal land, and the tribes should be consulted before a permit is issued that would affect such eagles.

*Service response:* Before issuing a permit under these regulations, the Service will consider whether proposed plans might affect tribal rights to trust resources. If the Service determines that such effects might occur, we will notify the affected tribe(s) and consult with them if requested.

*Comment:* The use of "means test," requiring the Service to consider "the cost of a remedy comparative with proponent resources" in determining whether a measure is practicable, is arbitrary and will result in more stringent requirements for project proponents with more financial means, rather than basing measure purely on what is practical.

*Service response:* In fact, we do believe that more stringent measures are appropriate for project proponents with more financial means. The plainest meaning of "practicable" is "capable of being done." Greater resources, financial and otherwise, enhance capability and increase options. For example, a large landowner will generally have more options when designing a project than a small landowner. Thus, a large land-holding company building on 500 acres should be able to site proposed buildings farther from a communal roost than would a private homeowner on a 2-acre lot. Similarly, if the potential remedies for avoiding the take entail more money as opposed to more land, a proposed, large commercial project that is likely to take eagles may be able to alter the project design in a manner that requires additional financial resources but avoids the take, and still make enough money to be profitable.

*Comment:* Concentration areas need more protection than is proposed. The Service should designate areas like the Chesapeake Bay as critical to the continued recovery and maintenance of bald eagles, and establish higher standards for permitting take in those areas.

*Service response:* The commenter's suggestion is beyond the Service's authority under the Eagle Act. However, to the degree that the Chesapeake Bay and other areas are critical to the preservation of bald eagles, take in those areas will be more highly scrutinized, since we must consider compatibility with the preservation of the eagle before issuing a take permit. Part of that assessment will be an analysis of cumulative impacts, which will help safeguard particular localities that are critical for bald eagles.

*Comment:* The same consideration of whether alternative habitat is available that is proposed to be used for nest take should also be a criterion for disturbance permits when the disturbance is associated with the permanent loss of a nest, foraging area, or roost site.

*Service response:* We agree with this comment and have added this consideration to § 22.26(e), *Evaluation of applications.*

### Prioritization Criteria

*Comment:* There needs to be a system of prioritization. Otherwise, the demand will threaten to reverse population recovery.

*Service response:* Recognizing the possibility that demand could exceed what would be compatible with the preservation of the bald or golden eagle in certain regions, we established regional take thresholds and will not issue permits in excess of those limits. We agree with the commenter that a system of prioritization is needed in case demand runs up against the thresholds, particularly in light of other types of eagle take permits we issue. Therefore, in the event demand exceeds take thresholds, the regulations include issuance criteria to ensure eagle take permits are issued according to following prioritization order:

1. Safety emergencies (§ 22.23 and new §§ 22.26 and 22.27);

2. Native American religious use for rites and ceremonies that require eagles be taken from the wild (§ 22.22);

3. Renewal of programmatic permits (§§ 22.26 and 22.27, and possibly other sections);

4. Non-emergency activities necessary to ensure public health and safety (§ 22.23 and new §§ 22.26 and 22.27);

5. (For golden eagle nests only) resource development and recovery operations (§ 22.25);

6. Other interests (§§ 22.21, 22.22, 22.23, and new § 22.26).

*Comment:* The Service should give priority to projects that are in the public interest.

*Service response:* If demand exceeds take thresholds that would be compatible with the preservation of the bald eagle or the golden eagle, we will prioritize Native American religious and cultural use and activities that serve the public interest over those that would largely benefit private or commercial interests.

*Comment:* Will the criteria giving Native Americans preference for eagle take mean that they will get depredating golden eagles instead of falconers?

*Service response:* Yes; although this rulemaking is separate from the regulations governing take of depredating eagles, the same principals that underlie the prioritization criteria in this regulation would apply to take of depredating golden eagles. Thus, if both a tribe (for religious purposes) and falconer request possession of such an eagle, we will give priority to the tribe.

*Comment:* The provisions giving first priority to tribes should require them to take from areas with the highest thresholds (if location not dictated by their religion).

*Service response:* If demand is greater than take thresholds in a given region, and a tribe requesting take can practicably take an eagle in another region that has take thresholds that are higher than demand while meeting the religious needs of the tribe, we may require the tribe to take the eagle in that other region.

*Comment:* The prioritization criteria and allocation process could affect the ability of the U.S. Department of Agriculture's Wildlife Services' program to manage depredating golden eagles.

*Service response:* The prioritization criteria could affect Wildlife Services' management of depredating golden eagles in rare cases. Where feasible and in accordance with tribal religious needs, if requests for take exceed take thresholds, we will direct tribes to take depredating eagles that would otherwise be taken by Wildlife Services or falconers.

### Relationship to the National Bald Eagle Management Guidelines

*Comment:* The rule is unclear as to whether a permit is required for take that results from activities conducted in accordance with the Guidelines and other best management plans. The final rule should explicitly state that compliance with the Guidelines amounts to a de facto permit, or at least creates a presumption of compliance with the Eagle Act. The new bald eagle management scheme in Florida clearly

states that no permit will be required for activities that conform to the Guidelines. The Service should do the same.

*Service response:* The State of Florida's new bald eagle management scheme is based on Florida law and does not require a permit to take bald eagles. Our regulations are authorized by the Eagle Act, which specifically requires a permit to take bald eagles. Therefore, we cannot do as Florida has done, that is: promulgate regulations that authorize some take without a permit. We believe take is generally unlikely to occur when our Guidelines are used to conduct of activities near eagles. Therefore, most activities that clearly conform to the recommendations provided by the Guidelines would not necessitate a permit. However, adherence to the Guidelines is not always as straightforward as simply keeping the project footprint 330 or 660 feet from an eagle nest, based on a category of activities. The Guidelines are *guidance*, and do not dictate what effects will *actually* happen to eagles from any particular activity. Many activities entail a variety of impacts, sometimes to eagles in more than one location, sometimes as the result of subsequent, foreseeable effects. Accordingly, to avoid take of eagles, more than the immediate project footprint should be considered. Also, some activities will not fit neatly into the categories provided in the Guidelines, and sometimes special circumstances may be present that make take more or less likely to occur. Examples of such circumstances include unusually open topography, acoustic anomalies, scarcity of alternative resources in a particular vicinity, and so forth. In summary, "adherence to the Guidelines," is not a simple formula that will uniformly predict whether take will occur.

*Comment:* The Service should consider ways to allow for minor exceptions to the Guidelines without requiring a permit.

*Service response:* See our response to the preceding comment. We do not prohibit or authorize exceptions to the Guidelines. All we can prohibit or authorize are certain impacts to eagles. Anyone may choose to ignore the Guidelines, and that choice requires no authorization from us. However, if an eagle is disturbed or otherwise taken without a permit, it will be a violation of the Eagle Act.

*Comment:* The Service should make permits available for activities that conform to the Guidelines. At the very least, the Service should issue "No-take" letters to give landowners written

protection from take liability for activities consistent with the Guidelines.

*Service response:* Due to the limited staff and resources of our agency, we want to discourage applications for permits to cover take of eagles that is in fact unlikely to occur. We believe our conservation mission is better served by helping the public reduce the likelihood of take by providing permits in appropriate circumstances where take is likely (and cannot practicably be avoided). If, after an application is submitted, the Service determines that take is not likely to occur, we may issue the permit (if permit issuance criteria are met); however, if we do not consider take likely to occur, we will not subtract the authorized take from Regional take thresholds—unless follow-up monitoring reveals that it did actually occur.

*Comment:* The Service should use the various guidelines that have been developed for specific States or regions when evaluating take.

*Service response:* The guidelines developed by different States and regions largely predate the Federal regulatory definition of "disturb." To the degree that "disturb" has been interpreted relatively consistently by the different State and Federal agencies that developed the various guidance, those documents were useful to us when we developed our National Bald Eagle Management Guidelines. Because the Guidelines are designed to prevent an impact (disturbance) that is a Federal prohibition, we believe that a single set of recommendations for avoiding a violation of that prohibition should be applied throughout the United States. This in no way precludes States from enforcing their own statutory and regulatory protections for eagles, and applying their own guidance for minimizing State-prohibited impacts to eagles.

### Mitigation

*Comment:* The proposed rule was unclear as to whether mitigation will be required for every permit issued, and also as to the range and types of mitigation that will be used.

*Service response:* Mitigation includes: avoidance, minimization, rectification, reduction over time, and compensation for negative impacts. Under these regulations, all permittees are required to avoid and minimize the potential for take to the degree practicable, and for programmatic permits, to the point where take is unavoidable. Depending on the scale of the take, and the particular circumstances, the Service may require rectification and/or

reduction over time from some permittees. Additional compensatory mitigation will usually be required only for (1) programmatic take, and other multiple take authorizations; (2) disturbance associated with the permanent loss of a breeding territory or important traditional communal roost site; or (3) as necessary to offset impacts to local area populations. The take thresholds associated with this permitting process will ensure that each authorized take, along with cumulative take, is compatible with the preservation of bald eagles and golden eagles. Permit issuance is based on our making a finding that the population can withstand the take that will be authorized without experiencing a decline. Therefore, compensatory mitigation for one-time, individual take permits will not typically be necessary for the preservation of eagles. For projects with long-term impacts and/or impacts of a greater magnitude, compensatory mitigation will generally be required to reasonably offset the magnitude of the impacts.

We are developing implementation guidance to ensure consistency in how these permits are administered. Mitigation will be addressed in more detail in that document, which will be made available for public notice and comment before being finalized. Some compensatory mitigation options we are considering at this point include: purchase and preservation of habitat or potential habitat; use of conservation easements to protect important eagle-use areas or potential nest sites; and contributions to a fund established to benefit eagles.

*Comment:* Requiring compensatory mitigation for every permit will create a disincentive for landowners who would seek a permit in lieu of following the Guidelines.

*Service response:* Permit issuance is predicated on the requirement that the take cannot practicably be avoided and that the applicant has proposed avoidance and minimization measures to the extent practicable. Under those circumstances, if the applicant can practicably avoid the take, he must. Requiring additional compensatory mitigation should have no effect on whether the applicant can follow the Guidelines.

*Comment:* The final rule itself (and not just the preamble) must be explicit that secondary, foreseeable impacts will be assessed for purposes of determining what mitigation will be required.

*Service response:* The rule provides that we must consider reasonably foreseeable secondary impacts when assessing the overall level of take. Also,

we added language to the permit conditions at § 22.26(c)(1) that requires the Service to consider indirect effects for purposes of determining whether compensatory mitigation is appropriate.

*Comment:* Mitigation must be geared to preservation of the local/regional population.

*Service response:* Avoidance and minimization are inextricably tied to the local population. Generally, rectification and reduction over time also benefit the local population. Ideally, as provided in our Service Mitigation Policy, the benefits of compensatory mitigation would accrue to the area where the take will occur and second priority would be in proximity to that area. However, if compensatory mitigation within or in proximity to the planning area is not practicable or a significantly larger benefit could be realized in another locality or region, the permit may include mitigation measures that benefit eagles in a different locality.

*Comment:* Any funding from mitigation should be used to protect eagle habitat.

*Service response:* We agree that protecting eagle habitat should be a high priority. However, there may be other beneficial uses for mitigation funds—for example to support surveys and population monitoring.

*Comment:* The Service must affirmatively describe the required minimization measures within the terms and conditions of the permit. As written, the rule allows the applicant to propose his or her own measures.

*Service response:* The project proponent must provide as part of his or her application a description of the measures to which he or she is prepared to commit. Without that information, we cannot evaluate the overall impact of the project. If the proposed measures are not adequate, we will not issue the permit as proposed. The regulations preclude us from issuing a permit if the applicant has not proposed measures to minimize impacts to the degree practicable. In such a case, we will work with the applicant to develop stronger minimization measures or we must deny the permit. In reality, we will often work with the applicant during the application process, so the terms and conditions proposed by the applicant have already been evaluated by us when we receive the completed application. The final terms and conditions will be explicitly spelled out on the permit.

*Comment:* Mitigation funding should be required and should go to States to compensate for their monitoring costs.

*Service response:* As explained above, we will not always require compensatory mitigation for take that

we think is likely to amount to a one-time loss of productivity. Also, compensatory mitigation may not be in the form of payment. For example, it might be fulfilled by donation of an easement. If compensatory mitigation is required in the form of payment to a fund established to offset the impacts of take, the disposition of those funds will depend on various factors, such as whether the funds could be used to benefit local eagle populations and whether the Service has entered into agreements with the State or tribe to apply such funding. If States or tribes conduct surveys and monitoring of bald or golden eagles, mitigation funds could be directed to help offset the costs.

*Comment:* The rule should allow compensatory mitigation only in extraordinary circumstances.

*Service response:* We interpret this comment to mean that the Service should always require avoidance and minimization, and not allow compensatory mitigation to take the place of such measures. We agree, and the regulations require that applicants for both types of permits must take all practicable steps to avoid and minimize take. If this condition is not met, the regulations do not allow us to issue a permit.

*Comment:* The Service needs to clarify which Service program office (Ecological Services or the Migratory Bird Program), will be responsible for determining impacts and how much take will occur. It is important that the Service adopt a consistent methodology across regions.

*Service response:* Evaluation of impacts will be consistent across Service Regions and between Service programs, which will all be using national implementation guidance (to be developed) addressing this and other aspects of permit issuance.

*Comment:* Compensatory mitigation should not exceed the level of measurable impacts.

*Service response:* We agree with this comment, but note that compensatory mitigation will rarely precisely counteract impacts to eagles. In reality, for the largest impacts, compensatory mitigation is more likely to fall short of, rather than exceed impacts, since it is difficult to replace the loss of territory or communal roost site with creation of new ones.

*Comment:* If an applicant conducts avoidance and minimization to the point where take will likely be avoided, he will probably want a permit to justify his efforts, resulting in a bigger workload than the Service appears to be anticipating.

*Service response:* We now anticipate a larger workload than when we proposed the June 2007 rule, partially because of the demand from project proponents who re-design projects to avoid take. First, the process of providing them with the technical assistance needed to avoid the take may require significant staff resources from our Ecological Services biologists, and second because our Migratory Bird Permit Offices will still need to consider every permit application we receive and either deny or issue a permit. For this reason, we discourage permit applications from people who are not likely to take eagles. However, issuing permits to some of these applicants will provide a benefit: the permittees will be required to monitor the activity site and report how eagles react to the activity, providing us with valuable information on whether take that we believe is unlikely to occur does not in fact occur.

*Comment:* Will compensatory mitigation be required for removal of nests that are of low biological value?

*Service response:* We are unlikely to require compensatory mitigation for removal of nests that have very low biological value.

*Permit Conditions*

*Comment:* The public should be given the opportunity to comment on each permit after public notice.

*Service response:* While bald eagles were listed under the ESA, the public was provided an opportunity to comment before the Service issued each section 10 incidental take permit that authorized take of eagles. That process is a statutory requirement of the ESA (16 U.S.C. 1539(a)(2)(B)). The Eagle Act has no such requirement. While that does not preclude us from creating such a requirement under these regulations, we do not believe a public-comment period for each permit would provide an additional benefit to eagles that would justify the regulatory burden on the public and on our limited staff and resources.

*Comment:* The permit must be specific as to how much take is authorized and how it will occur. Otherwise, the permit may inadvertently grant indemnity for all take, whether anticipated or not.

*Service response:* Most permits will be specific as to how much take is authorized and how and roughly when it will occur. The exception will be programmatic permits, which will authorize take for large-scale and or long-term activities where take is anticipated but the exact amount, location, and timeframes are impossible to identify. Rather than "grant

indemnity for all take," programmatic permits will authorize only the take that occurs despite implementation of stringent ACPs designed to reduce take to the point where it is essentially unavoidable (yet anticipated). The overall effect of these types of permits will be a reduction in mortalities and other adverse impacts to eagles.

*Comment:* Permits should not specify exact numbers of authorized take. Rather, levels of take should be identified regionally.

*Service response:* Levels of take will be identified regionally in order to establish population thresholds up to which take can be authorized. However, each permit (except programmatic permits designed to reduce ongoing take) will authorize a specific amount of take to ensure that the cumulative take authorized under all the permits in a region does not exceed the regional population threshold.

*Comment:* The time period for a permit should be identified. Permits should not exceed one year.

*Service Response:* Each permit will have a limited tenure specified on the face of the permit. These final regulations limit the tenure for all permits to five years or less. Many projects are multi-year projects, and a 1–year tenure would introduce unnecessary uncertainty for a project proponent that cannot identify exactly when the take will occur. Receiving applications for the same take in consecutive years would also create more work for our permit offices without providing any benefit to eagles. That said, the rule limits permit tenure to five years or less because factors may change over a longer period of time such that a take authorized much earlier would later be incompatible with the preservation of the bald eagle or the golden eagle. Accordingly, we believe that five years is a long enough period within which a project proponent can identify when the proposed activity will result in take.

*Comment:* The rule should provide for inspections at any hour with no notice from the Service.

*Service Response:* The rule provides that the Service, or a designated agent, may inspect the area "where eagles are likely to be affected, at any reasonable hour, and with reasonable notice from the Service, for purposes of monitoring eagles at the site(s)." The purpose of the inspection is to determine whether eagles are using the site, not to surprise and scrutinize the permittee's activities.

*Comment:* The final rule should contain provisions for review, denial, modification, and revocation. Of particular concern is the potential

situation where populations decline unexpectedly, or new information reveals the take would not be compatible with the preservation of the bald or golden eagle.

*Service response:* Provisions for review, denial, modification, and revocation, and other general processes and procedures that apply to all the types of permits the Service issues are found in 50 CFR part 13. For that reason, we do not reiterate those provisions within each section of regulations that govern individual permit types. Regarding the scenario raised by this commenter, 50 CFR 13.28(a)(5) provides that a permit may be revoked if "the populations of the wildlife or plant that is the subject of the permit declines to the extent that continuation of the permitted activity would be detrimental to maintenance or recovery of the affected population."

*Comment:* The rule should address unanticipated take by specifying that the permittee must contact the Service immediately and apply for a new permit.

*Service response:* We have added language to the rule requiring the permittee to contact the Service if unanticipated take occurs. As to whether a new permit would be required, that will depend on the circumstances. Some situations may be more appropriately addressed by amending the existing permit or taking some other action.

*Monitoring*

*Comment:* Monitoring should not be required of the permittee. It is the responsibility of the Service. A three-year monitoring period is overly burdensome and would not result in useful information. Public reporting is not accurate or timely. The Service should develop a research project to monitor eagles to obtain accurate information.

*Service response:* The monitoring that will be required of the permittee is relatively minimal yet will serve several important purposes. The monitoring simply entails observing periodically, during the season(s) when eagles would normally be present, the area where the take is likely to occur and noting whether eagles continue to nest, roost, or forage there. Even this minimal monitoring will be important, however, because it will provide the Service with the best information available as to how human activities impact eagles. If we find that take does not occur as frequently as we anticipated, we can adjust the recommendations we provide in management guidelines and technical assistance. Also, if demand for take is

high enough to approach take thresholds, ascertaining that it did not occur under some permits could enable us to issue other permits where we otherwise would not. We know that reporting will not always be accurate, but even so, it is our best available option for garnering this data, since we do not have the staff and resources to monitor every site ourselves.

*Comment:* The Service needs to provide methodology for monitoring. The Service should be more specific as to what information is required by "information on eagle use of important eagle-use areas potentially affected."

*Service Response:* The monitoring requirements are relatively simple and require little in the way of methodology. The annual report form requires the permittee to submit the dates, times and numbers of eagle sightings at the important use areas where eagles are likely to be affected. Also, the report requires monitoring the site(s) periodically during the season that eagles normally breed, feed, or shelter in the area, at a time of day when eagles are most likely to be in the vicinity, if applicable (e.g., for communal roosts in the evening; for foraging areas, in the morning or afternoon).

*Comment:* The rule should require that monitoring be conducted by professional raptor biologists. Permittees will not be able to ascertain whether eagles adopt alternative nest sites or how the permitted activity may have affected the dynamics of a communal roost or feeding area.

*Service response:* We agree that more extensive monitoring would be very useful for purposes of understanding how eagles are affected by human activities. However, we expect that many permittees will not have the resources to hire professional biologists to perform that service. Our agency also does not have the resources to monitor all project sites. Therefore, the rule requires very minimal monitoring that the average person can easily perform. However, the rule also provides that the permittee must allow the Service or a designated representative to visit the area for purposes of monitoring eagle use. During those visits, we should be able to collect more extensive information regarding the dynamics of eagle behavior at the site. Although we do not have the capacity to carry out that function at the majority of permit sites, we can use the data we collect from the limited site visits to extrapolate eagle responses to permitted actions over a larger geographic scale.

*Comment:* The post-delisting monitoring plan should be adequate for purposes of monitoring bald eagles.

*Service response:* The PDMP is a national-level plan designed for an entirely different purpose than the monitoring that would be required under this permit regulation. The purpose of the PDMP is to detect declines in bald eagle populations that could trigger relisting. The purpose of the permittee's monitoring requirements in this rule is to ascertain whether permitted take actually occurs.

*Comment:* Is a permittee (such as an electric utility) only required to implement post-activity monitoring for three years after the initial construction of the site or for ongoing unavoidable take? Will its monitoring plan need Service approval, and will the results need to be furnished to the Service?

*Service response:* Monitoring is related to the activity that is likely to take eagles. If a project is likely to take eagles during an initial construction phase, but take is unlikely to occur during the subsequent, ongoing use of the facility, then monitoring may be required for up to three years after the construction is completed. If the ongoing activity is likely to take eagles, then the monitoring may be required for up to three years after cessation of the activity. For programmatic permits, the permitted industry may develop, in coordination with the Service, a specific, more extensive monitoring protocol, adherence to which would be a condition of the permit. Otherwise, as discussed above, monitoring for most permits is relatively straightforward and will not require any plan that needs approval from the Service. Monitoring results will need to be reported on an annual basis to the Service, for as long as monitoring is required.

*Comment:* Monitoring and report data should be provided to the State, particularly when activities could affect nesting results during State surveys.

*Service response:* We will make monitoring and report data available to States and tribes whenever requested (to the degree allowable by laws such as the Privacy Act). As with other data we collect, as well as data collected by the States and tribes, we support the sharing of information that pertains to joint interests between our governments.

*Comment:* The proposal's reliance on permittee self-monitoring is misplaced and threatens the long-term preservation of eagles. A detailed plan for achieving compliance, consistency, and confidentiality is needed. The rule should require monitoring to be conducted by a disaffected third party approved by the Service. Permittees should pay into a fund for experienced, independent organizations to provide or verify data.

*Service response:* We may include a requirement that monitoring be conducted by a third party as a permit condition for some larger projects and programmatic permits. However, although it might sometimes improve accuracy, we do not think it would be reasonable to require all permittees to enlist a third party to conduct the required monitoring. Also, we are not confident that enough disaffected third-party entities would be available to permittees in every location. We believe most permittees will try to provide accurate information. To increase the chances of that, we added language to the annual report form emphasizing that (1) filing an accurate report is a condition of the permit and (2) reporting the absence of eagles from the monitoring site will not, by itself, affect the continued validity of the permit.

*Application and Issuance Process*

*Comment:* The proposed rule requires the permit applicant to provide a certification that the proposed activity is in compliance with local, State, and Federal laws. What is meant by "certification"? Who is responsible for this evaluation?

*Service response:* We meant that the application form would require the applicant to sign a statement that the proposed activity is in compliance with other applicable laws. However, we have revised the draft application form. It no longer requires that certification, but instead asks the applicant to state whether he or she has obtained the State or tribal authorizations necessary to conduct the activity. All of our migratory bird and eagle-related permits contain the standard condition that the Federal authorization is not valid unless the activity complies with all other applicable laws, including State and local laws. Permits issued under this regulation will include that condition and clarify that the activity must also be in accordance with any applicable tribal laws.

*Comment:* Can a landowner apply for a permit for multiple takes in an entire area of ownership that is not contiguous?

*Service response:* A landowner can apply for as many takes as he or she wants in different locations. However, each take we authorize will have to meet the permit-issuance criteria (e.g., it must be compatible with the preservation of the eagle, cannot be practicably avoided, etc.). Depending on the particular circumstances and in order to ensure that issuance criteria are met, we may authorize only a portion of the requested take (or all or none).

*Comment:* The Service should be required to coordinate with State wildlife agencies when issuing permits. The Service should work with the States to develop implementation guidance to avoid incompatibilities.

*Service response:* We intend to work with States to establish protocols for coordination between the Service and States during the permit process.

*Comment:* The rule should contain timelines for how long the Service can take to issue permits. Projects are often subject to very specific construction and financing constraints.

*Service response:* Timelines for permit issuance do not belong in a regulation, but rather in internal implementation guidance. We plan to include target processing times in the implementation guidance associated with this permit program.

*Comment:* The Service should establish the expectation for and a process of pre-application consultation to direct potential applicants, establish the need for a permit, and protect the eagle resource. It is essential that the Service make technical assistance readily available to advise project proponents regarding how to avoid impacts and to help in preparation of permit applications. However, it appears that neither the Service nor the States have the resources for technical assistance and consultation with applicants. Who will be providing this service (and how) needs to be addressed.

*Service response:* We agree that technical assistance is a vital customer service. It enables us to provide our best advice as to whether take will occur and how to avoid or minimize any take, and, at the same time reduces uncertainty for the public. It will also reduce unnecessary permitting workload and better protect eagles. For these reasons, we are committed to providing technical assistance early in the process to the extent our limited staffing and resources will allow.

*Comment:* The requirement that the applicant be responsible for field surveys and providing data on the location of nests and important-use areas is overly onerous and would make it difficult to apply for a permit.

*Service response:* We removed this language from the regulation because many projects will not require field surveys and we felt that language might intimidate people whose activities were relatively straightforward. Nevertheless, it is the applicant's responsibility to provide us with a complete application before we can process it. We will assist those in need to the degree our staffing and resources allow.

*Comment:* Provisions should be added for expedited permit issuance for emergency situations. Under the ESA, there are provisions for emergency take that the Service should adopt for eagles, wherein the take can be documented through emergency consultation done after the emergency response has been completed.

*Service response:* The Eagle Act does not allow the Service to authorize bald eagle take without issuing a permit (16 U.S.C. 668a). We will make every effort to expedite issuance of a permit in situations where take is unavoidable due to an emergency. If circumstances are such that a permit cannot be issued prior to the take in cases of genuine emergencies despite the best efforts of the parties involved, we are unlikely to refer such take for prosecution under the MBTA or the Eagle Act. Procedures for addressing emergency take will be addressed in implementation guidance.

*Comment:* Any eagle take permit must be reviewed under section 106 of the National Historic Preservation Act (NHPA) because any such take has the potential to affect historic properties and culturally significant sites. Eagle nests and other sites where eagles are present may be considered culturally significant to Native Americans as well as other American citizens, requiring the Service to conduct a cultural-resource assessment prior to issuing these permits.

*Service response:* We appreciate this comment, and will comply with Section 106 on a case-by-case basis when issuing permits that have the potential to result in effects on historic properties. We also plan to consult with appropriate stakeholders, including tribes, to develop State or regional agreement to govern how the Service will comply with the NHPA when issuing permits to take eagles in specific States or regions.

*Comment:* Even if not on tribal land, eagles, eagle nests, and other sites have cultural significance to many Native American tribes and tribal members. For that reason, tribes should be consulted before any eagle take permit is issued.

*Service response:* Before issuing a permit, we will consult with federally-recognized tribes if issuance of the permit may adversely affect their traditional tribal activities, practices, or beliefs; or if issuance of the permit may adversely affect the tribe's ability to regulate, protect, provide services to, or otherwise govern their tribal membership, lands and resources. We plan to work with tribes to develop guidance for us to use when processing permits to manage and resolve tribal concerns.

*Comment:* The proposal implies that permits will never be denied because the number of anticipated applications (300) is the same as the number of permits the Service anticipates issuing (300) (see discussion under *Regulatory Planning and Review* at 72 FR 31148). Will the Service not deny any permit applications?

*Service response:* Our intent is to use technical assistance at the Field Office level to minimize potential take from proposed activities. Service Field Office biologists will assist project proponents by assessing whether take is likely to occur and how it can be avoided or minimized. The Field Office should also inform applicants if permits will not be available to them because they do not meet the issuance criteria or because take thresholds for the species preclude further issuance of permits. If this process works successfully, most people who actually submit applications for permits will qualify for a permit. Thus, the pre-application process will reduce take and the need for permits, and serve as a filter through which qualifying applicants will pass before submitting a completed application. For that reason, we anticipate issuing permits for the majority of the complete applications we receive.

We have increased our estimates of permit applications received and permits issued to 1,168 applications received and 910 permits issued, annually, under both new permit regulations.

*Comment:* The Service should consider ways to allow its Ecological Services Field Office staff to handle bald eagle and golden eagle permitting on behalf of the Migratory Birds Division. Field Office biologists have experience and established relationships with project proponents such as State departments of transportation. Also, having to work with multiple offices will place a burden on applicants. Permitting should be done in conjunction with any ESA consultation that needs to be done as part of the proposed project.

*Service response:* We agree that technical assistance should be streamlined where feasible to address the requirements necessary to comply with more than one regulatory program. In accordance with Service Mitigation Policy (501 FW 2), we will provide assistance to project proponents in crafting conservation measures early in the planning phases of projects so that all conservation mandates are integrated into the project rather than introduced later in the planning process. In many cases, other trust resources such as wetlands or endangered and threatened

species may be affected in addition to eagles. Many requests for eagle-take authorization will be associated with projects that have a Federal nexus, including energy, transportation, water, and restoration projects, and thus could be assessed in conjunction with the section 7 consultation process. The Service's Ecological Services Field Office staff provide conservation planning assistance that uses a streamlined approach to incorporate the requirements of multiple environmental reviews into a single integrated process.

For example, as provided in our Habitat Conservation Planning Handbook, we recommend "integration of the National Environmental Policy Act (NEPA) analysis with the other planning and environmental review requirements" so that "all procedures run concurrently rather than consecutively." Thus, for projects that involve other planning and review requirements in addition to under the Eagle Act, the Field Offices would integrate the assessment of the impacts of the eagle take authorization into the NEPA process.

After projects are designed with the technical assistance provided by our Field Offices, the project proponent will submit his or her completed application to the Regional Migratory Bird Permit Office for processing.

*Comment:* Permits should be expedited for recipients of technical assistance letters. Recipients of technical assistance letters that authorized activities inconsistent with the National Bald Eagle Management Guidelines may be subject to Eagle Act prosecution.

*Service response:* Technical assistance letters did not provide any authorization to take eagles. The only means available to gain authorization to take eagles under the ESA was by means of the permit issued under section 10 or an incidental take statement issued under section 7. The role of technical assistance letters was to inform the landowner or project proponent that the Service did not consider take likely to occur. Generally we issued these letters after providing technical assistance to the project proponent that included recommended modifications to the planned activity to minimize the possibility of take, and after the project proponent agreed to incorporate the measures. Technical assistance letters do not authorize take should it occur despite the recommended measures; only a permit or incidental take statement could absolve a person of liability for take of eagles. In situations where these letters were issued and the activity proceeds, there is no Eagle Act

violation unless an eagle is disturbed or otherwise taken, regardless of whether the activity was consistent with the National Bald Eagle Management Guidelines.

If take does occur, the Service is unlikely to prioritize enforcement actions against a party that followed the Service's written advice (in the form of the technical assistance letter) as to what steps were necessary to avoid taking eagles. Furthermore, although take of bald eagles under the Eagle Act can be authorized only by permit, it is not our goal to encourage applications for permits to cover take of eagles that is in fact very unlikely to occur. We believe our conservation mission is better served by helping the public reduce the likelihood of take, and to provide permits in appropriate circumstances where take is likely (and cannot practicably be avoided).

*Comment:* The approval process should give "substantial weight" to findings of consistency with a State management plan where such plans are consistent with the Eagle Act's goal of preservation of the eagle (examples: FL and MD Chesapeake Bay Critical Area Program).

*Service response:* We encourage consistency with State management plans. However, the need for Eagle Act authorization is not based on State land-use planning or habitat protection. Though we recognize the vital importance of those tools in protecting eagles, the Eagle Act directly protects eagles, eggs, and nests, rather than habitat. State management plans such as the ones cited by the commenter are designed to help guide development away from areas that may be more important to eagles or other wildlife or natural resources. To the degree that a take that is consistent with a State management plan may be more compatible with the preservation of the bald eagle or the golden eagle, we are more likely to authorize it. However, we will evaluate it under the statutory mandate of the Eagle Act rather than a State management plan. At the same time, we plan to establish protocols for coordination with States and tribes during the permit review process. Some will desire a greater degree of coordination than others, but we will involve the States and tribes in developing processes for coordination between agencies.

*Comment:* The Service needs to address how it will ensure compliance with State regulations, particularly in light of the need to protect local populations. Because most States do not have a regulatory process to address much of this take, the Service should

clearly state that its Regional Offices will coordinate closely with and receive approval (if requested) from any State where take would be authorized. Also, States need to be kept apprised of the level of take currently authorized in each management population. A nationwide database accessible to the States or regular (e.g., bi-weekly) reports to the States may be needed.

*Service response:* As discussed above, we will coordinate with States and tribes as appropriate. The level of coordination may differ from State to State (and tribe) depending to some degree on how closely each wants to be involved. However, we do not currently envision seeking approval from the State or tribe for each permit we issue. The permit is a Federal authorization for an impact to eagles that would otherwise be prohibited under Federal law. If the State or tribal law also prohibits the action, the Federal permit does not insulate the permittee from liability under such State and tribal laws. In addition to our direct communications with States and tribes, we will try to ensure that permit applicants understand the need to comply with State and tribal laws and regulations.

We like the idea of a database we could make available to States and tribes, and may pursue that option if we have the resources to do so. Biweekly reports are probably not a realistic option due to limited staffing and busy schedules, but are not out of the question. At a minimum, we anticipate working with the Flyway Nongame Technical Committees to keep them apprised of applications that are likely to be of high interest, as well as pending and issued permits in their States. We hope to establish a process comparable to the Flyway structure, but comprised of representatives from tribal wildlife agencies to allow us to share information with tribes in a coordinated manner.

*Comment:* To ensure that State programs for eagle management are considered before permits are issued, the Service should develop a comprehensive compilation of State regulations for both species, including how take is defined and regulated in each State, and it should be published in the final EA.

*Service response:* We agree that a compilation of State and tribal regulations could be useful and have included a simplified version of such in Appendix B of the FEA. However, to do full justice to the complexity and nuances of the different approaches taken by States and tribes in protecting eagles would require considerably more

time, effort and resources than we have been able to supply for such an effort at this time. There is enormous variation in how States and tribes manage eagles. Some have no regulations that pertain to eagles specifically, some are habitat management plans, some are permit programs, but the prohibitions are not the same as Federal prohibitions, while others have similar or even stricter prohibitions but completely different issuance criteria for permitting. This high degree of variability may be difficult to capture in a single, user-friendly compilation. More effective, at least for the short term, will be for each Service Regional Migratory Bird Office to familiarize themselves with the laws and regulations of States and tribes within their respective regions that apply to eagle management. We already operate in this manner when issuing other types of permits. For example, we will not issue a permit to possess a red-tailed hawk in Hawaii, because Hawaii regulations do not allow raptors within the State.

*Comment:* The government should give the tribes notice of all pending and future applications for permits, particularly where eagles may be affected on or near tribal lands.

*Service response:* As with States, some tribes will want closer coordination with us than others. We plan to work with each tribe that is interested to establish implementation protocols regarding the level of coordination desired by the tribe.

*Comment:* The regulation needs to include stronger, more explicit language regarding the need to be compliant with tribal law.

*Service response:* The requirement to be in compliance with other laws and regulations is a standard condition of all Service Migratory Bird permits and it is spelled out on the face of each permit. However, to ensure this condition is given sufficient weight, we have added the following new regulatory language to the permit conditions in both § 22.26 and § 22.27: "The authorization granted by permits issued under this section is not valid unless you are in compliance with all applicable Federal, tribal, State, and local laws and regulations applicable to take of eagles."

*Comment:* The Service should issue programmatic permits to the Corps, other Federal agencies, and State agencies, allowing them to provide take authority subject to their own programs where they are consistent with the Eagle Act's requirements.

*Service response:* Our ability to delegate permit authority to outside agencies is limited because the Eagle Act does not allow take of bald eagles unless a permit is procured from the Secretary of the Interior. However, within our statutory authority and to the degree that is compatible with the preservation of eagles, we intend to explore ways of streamlining the permit-issuance process, which might include issuing a "Master permit" to other agencies, allowing them to allocate take authorization where needed. One of many complicating factors is that requests for permits may exceed what would be compatible with eagle preservation in some areas, in which case the issuance criteria governing prioritization to certain interests (safety emergencies, Native American religious needs, and so forth) will come into play. If permits are "re-distributed" by a third party, the coordination needed to ensure the prioritization issuance criteria are met could be rather challenging.

*Programmatic Permits*

*Comment:* The June 2007 proposed rule suggested that permits for lethal take would only be available if the take was unavoidable and best management practices (BMPs) are being implemented. The proposed definition of "unavoidable" is flawed because it relies on industry-accepted measures for avoiding take, but in most circumstances, industry-accepted measures will not be all that can be done to avoid take. Are the BMPs limited to those developed specifically for the purpose of reducing eagle mortality? What would happen if different BMPs proscribe conflicting actions? Clarification is needed as to what constitutes lethal take; disturbance can sometimes result in eagle mortalities.

*Service response:* Our reference to BMPs caused understandable confusion because it was interpreted to mean any type of industry-accepted BMPs for the conduct of the activity, regardless of whether the BMPs were designed to reduce eagle mortalities or serve some entirely unrelated function (such as human safety and hygiene). Our intent was that the BMPs would have to be designed to reduce eagle mortalities and other take of eagles. We have revised this part of the rule. Rather than referencing BMPs, we are clarifying that we will work with industries to develop what we are calling "Advanced Conservation Practices" (ACPs), designed specifically to reduce take of eagles (and sometimes other migratory birds). Implementation of ACPs will qualify some entities for programmatic take permits, and can be used to authorize ongoing unavoidable disturbance as well as unavoidable mortalities. The ACPs will be developed by the applicant in coordination with the Service and will be scientifically-supportable measures representing the best-available techniques designed to reduce disturbance and ongoing mortalities to a level where remaining take is unavoidable.

*Comment:* Will lethal take permits be issued for industries that have no such measures?

*Service response:* These regulations allow us to authorize take that results in mortality as long as the issuance criteria for a standard permit under this section are met, but would not allow us to issue a permit for programmatic take without development and implementation of ACPs.

*Comment:* Programmatic permits will increase mortalities by giving the perpetrators a "free pass."

*Service response:* The design and intent of programmatic permits is exactly the opposite of what the commenter suggests. Programmatic permits will be issued and valid only where the applicant/permittee implements rigorous conservation measures to reduce take to the point where it is unavoidable.

*Comment:* The regulation should be clear that development of programmatic permits will entail coordination with States where the activity will occur.

*Service response:* We envision close coordination with States and tribes when developing programmatic permits. We will address such in forthcoming implementation guidance, which we intend to develop in coordination with States and tribes, as well as the general public, via a public comment period.

*Comment:* The Service should codify programmatic permit conditions through the **Federal Register** process.

*Service response:* Programmatic permits are designed to reduce mortalities and other take. In our view, a public comment period for each programmatic permit would not provide an additional benefit to eagles sufficient to justify the delay, regulatory burden, and the substantial additional resources from our agency needed to navigate the **Federal Register** process.

*Comment:* Programmatic permits are not acceptable unless the Service retains the authority to decide what constitutes advanced conservation practices, required mitigation, and how much take is unavoidable.

*Service response:* Although we will develop ACPs in coordination with applicant industries and other entities, the Service will make the final decision as to what measures constitute the ACPs that will serve as required conditions of programmatic permits.

A-61

*Comment:* Current best management practices such as those developed by the Avian Power Line Interaction Committee (APLIC) should be the baseline, and more should not be required to get a permit.

*Service response:* The voluntary recommendations for avoiding avian mortality developed by APLIC are much more comprehensive than any we are aware of for other industries. However, most utilities that have adopted them have done so in a relatively piecemeal manner, using some recommendations in some areas, applying others in different places, and very rarely implementing all the measures that could be used to reduce eagle mortalities. Furthermore, there are practices over and above what APLIC recommends that could further reduce take in some situations. Programmatic permits are premised on the permittee implementing all achievable measures to reduce take to the point where it is unavoidable.

*Comment:* Programmatic permits must include provisions to safeguard local populations (geographic limits) and mechanisms to restrict permits when and where populations decline. Programmatic permits should contain provisions subjecting them to revocation if eagle take resulting from the activity is greater than anticipated.

*Service response:* We have added the following language to both permit regulations: ''The Service may amend, suspend, or revoke programmatic permits if new information indicates that revised conditions, suspension, or revocation is necessary to safeguard local or regional eagle populations.''

*Comment:* Programmatic permits should be issued for multi-year periods to provide certainty.

*Service response:* Most programmatic permits will be issued for the full five years that a permit can be valid under these regulations. Furthermore, renewal of programmatic permits will have priority over other permits for eagle take except to address safety emergencies and meet the religious needs of tribes.

*Comment:* There should be no time limit for programmatic permits because they are based on the premise that there is nothing more the permittee can do to minimize take.

*Service response:* We expect that circumstances will often change such that the original ACPs may no longer be considered the most effective measures that could be adopted. There are likely to be technological advances in some industries that would warrant adoption of new, more effective conservation measures. Also, new information regarding eagle biology, behavior, and responses to the permitted activity may warrant re-examination of the effects of the permitted activity and re-evaluation of the permit conditions.

*Comment:* Programmatic permittees should not be subject to enhanced monitoring and reporting requirements; so long as the ACPs are being carried out, no further information should be necessary for the Service to know as far as population impacts are concerned.

*Service response:* See our response to the comment above. Also, the monitoring we will require for programmatic permits will not be large-scale population monitoring (such as the bald eagle post-delisting monitoring plan). Rather, the monitoring required of programmatic permittees will be focused on assessing how effective the ACPs actually are, how much take is actually occurring, and overall eagle presence and use of the project area. This type of information will be critical for evaluating the impact of the permit program on eagles, as well as for crafting future guidance for minimizing human impacts outside the permitting program as necessary to maintain healthy eagle populations.

*Comment:* The final rule must provide for the situation where there are no practicable ACPs that can mitigate ongoing, unavoidable take.

*Service response:* There are probably very few situations where nothing can be done to reduce impacts to eagles. All sorts of factors will be in play, such as timing and siting of the activity; timing and siting of surrounding activities being conducted by different entities that can come to the table; technological advances; additional staff; and other factors. Creativity may be required in some cases to find effective, achievable measures. However, in the rare situation where all parties agree that nothing can be done to decrease the take from an activity that is a legitimate interest in a particular locality, compensatory mitigation can be used, and the measures required for compensatory mitigation would need to result in a reduction of take at a different location and/or from a separate activity. Those measures would be the ACPs for the permit.

*Comment:* The final EA and regulation should make clear that the permitted entity may implement measures that do not fully avoid or minimize take where doing so is not within the authority of the entity.

*Service response:* Generally, if measures to reduce take are outside the authority of the entity, then liability for the take rests elsewhere too. Usually, whoever has the authority to affect the level of take will be the entity responsible for the take. There will be some situations where one industry takes eagles in part because of the actions of another entity. Even then, however, the liability would usually be shared. An example would be a railroad company with trains that sometimes strike bald eagles that are attracted to an artificially baited site nearby. The person feeding the eagles may be in violation of the Eagle Act because of its prohibition on disturbance, since the feeding interferes with normal feeding behaviors and results in injury of eagles, which meets the definition. However, the railroad company is also in violation, since its trains are actually killing eagles. In a situation this straightforward, enforcing against the feeder would be appropriate, and would reduce eagle mortality to a point where the only remaining, effective measures to further reduce take would be the railroad company's responsibility. If one entity's actions are not themselves a violation but do contribute to a violation on the part of another entity, we envision that a dialogue would be necessary between the two actors to arrive at joint measure to reduce take. We may aid in the process of dialogue if we have the resources, but the responsibility to comply with the Eagle Act preceded the existence of this permit program, and remains with the actors regardless of the availability of these permits.

*Comment:* The process for developing industry metrics should be set forth in the rule.

*Service response:* At this time, we have not established a process for developing industry metrics. We plan to do so as part of crafting implementation guidance. There will be an opportunity for public notice and comment before any such process is formalized.

*Comment:* The final rule should make clear that industry standards can be developed over time as various entities from different locations (with different conditions) apply for permits, and it is not necessary for the entire industry to be regulated with a national standard.

*Service response:* Yes, our intent mirrors what the commenter suggests: we anticipate that ''an industry'' will often be a single large utility, or one major railroad line, or one transportation agency. Circumstances for that single entity may be quite different than for a comparable entity in another part of the U.S., warranting ACPs that might be ineffective or counterproductive if applied elsewhere. ''An industry'' could also be an association of participating smaller entities who will be permitted under the standards developed by the association.

We agree that industry standards will evolve over time. After several programmatic permits are in place for one type industry, we may, in developing ACPs for another entity within the same industry, arrive at superior measures that can be achieved. If appropriate, those can be applied to the earlier programmatic permits when those permittees apply for renewal.

*Comment:* Programmatic permits should not include an estimate of mortality because: (1) it is too difficult to estimate; (2) even if the ACPs are effective, increasing eagle populations can still result in increased mortality, and (3) by definition, the ongoing operations will improve mortality rates.

*Service response:* We think estimates of mortality are possible. The Eagle Act requires that we determine that take is compatible with eagle preservation prior to issuing a permit. Therefore, if data on effects of an activity on eagles are so spotty that no estimate is possible, a permit may not be appropriate. The only activities that will qualify for programmatic permits are those that have been studied fairly rigorously in order to develop comprehensive ACPs to reduce take to the maximum level achievable. This level of research should typically yield data sufficient to develop reasonable estimates of eagle mortality before and after implementation of the ACPs.

*Comment:* Programmatic permits should not be issued for unlimited take; otherwise there will be no incentive to pursue additional methods to minimize take.

*Service response:* Programmatic permits will all include estimates of take. To ensure that take does not continue to be authorized if it exceeds the estimate and is incompatible with the eagle preservation, we added a condition to each regulation that we can amend, suspend, or revoke a programmatic permit if ''new information indicates that revised conditions, suspension, or revocation is necessary to safeguard local or regional eagle populations'' (§ 22.26(c)(7) and § 22.27(b)(8)).

*Comment:* It should be possible to meet the requirement that an applicant demonstrate reduced mortality before getting the permit via scientifically-based predictions, rather than requiring field data; many operations will not have good historical baseline with which to compare data.

*Service response:* If an applicant for a programmatic permit cannot establish a historical baseline, we may use estimates of take based on predictions generated by sound scientific research. This applies to development of ACPs, as

well. It may not be feasible for an industry to demonstrate the effectiveness of the ACPs or to fully implement them prior to obtaining the permit. We envision that in many cases, programmatic permits will be issued before all ACPs are completely implemented; however, the validity of the permit is conditioned on implementation of ACPs where the take occurs. In other words, if ACPs are phased into a project, any take that occurs outside of the area where the required ACPs have not been implemented, is not authorized by the permit.

*Comment:* Programmatically authorizing eagle mortalities under the Eagle Act is of limited value to the power industry because utilities will still be liable under the Migratory Bird Treaty Act for incidental take of other birds, since no permit is available for incidental take under the MBTA.

*Service response:* No permit is currently available to authorize incidental take under the MBTA. However, many of the ACPs that would minimize eagle take will also reduce other avian mortalities with the result that utilities that implement the ACPs under these Eagle Act regulations will minimize take of other migratory birds in addition to eagles, decreasing their liability under the MBTA. The Service focuses its enforcement resources on investigating and prosecuting individuals and companies that take migratory birds without regard for the consequences of their actions and the law, especially when available conservation measures have not been implemented.

*Comment:* It would be impossible to demonstrate that all avoidable eagle mortality has been eliminated. Recommended practices cannot completely eliminate the risk of mortality. Programmatic permits should not be based on a standard of ''unavoidable''; rather, they should be based on the practicability standard applied to individual permits.

*Service response:* We agree it would be impossible to demonstrate that all avoidable eagle mortality has been eliminated. What we expect instead is that the permittee fully implement the ACPs agreed to by the Service as conditions of the permit, which are measures designed to reduce take to the maximum degree achievable. The standard for programmatic permits is higher than the practicability standard applied to ''individual'' permits because programmatic permits authorize more take on a larger scale than individual permits. Where an individual permittee's required conservation

measures will factor in the ''cost of remedy comparative with proponent resources,'' a programmatic take permit will be available only if the applicant can implement all available, technically-achievable measures to reduce take. We believe this higher standard is necessary to protect eagles from large-scale and cumulatively significant take.

*Comment:* Will the development of programmatic permits be subject to NEPA? A full environmental analysis must be done on a case-by-case basis for programmatic permits.

*Service response:* Programmatic permits will each be subject to NEPA.

*Comment:* The regulations should include the requirement that industry standards required for programmatic permits must specifically include facility-siting criteria.

*Service response:* The location of facilities often can have significant impacts to eagles (e.g., wind farms), and some industries may be able to reduce take substantially by selecting particular sites over others. However, for other industries or entities seeking programmatic permits, location of facilities may not be a primary factor in reducing eagle take, and for that reason we have not included language in the regulations to require facility siting criteria as conditions of the permit. However, we intend to ensure that siting criteria are emphasized in the implementation guidance that we will develop for programmatic permits and adopted where applicable.

*Definitions*

*Comment:* Adding ''destroy'' to the ''take'' definition enlarges the statutory definition of ''take,'' but the Service has no authority to do so. The Service should say what the intended effect is of adding ''destroy'' to the definition of ''take.''

*Service response:* We have the authority to define ''take'' in a way that includes more than just the specific examples Congress included in the statutory definition. The Eagle Act, expressly states ''take *includes also* pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb.'' 16 U.S.C. 668c (emphasis added). If Congress had intended to restrict the definition to the terms included in the Act, it would have stated what take *means*, not what it *also includes*. The intended effect of adding ''destroy'' is to clarify the meaning of ''take'' in a way consistent with Congressional intent. Legislative history demonstrates that the Eagle Act was intended to protect nests from destruction, and we have previously

interpreted "take" to include "destruction." However, as written, the statutory definition of "take" does not include any term that explicitly applies to nest destruction. Therefore, we are adding "destroy" to the regulatory definition to codify our long-standing informal interpretation and to ensure that the public has adequate notice of this interpretation.

*Comment:* By defining "important eagle-use area," the Service has gone beyond its statutory authority. The definition "appears to cast a wide regulatory net over areas that may be used by eagles" by implying that eagle take permits will be required for activities within these areas. Also, who will determine what is "essential" to the viability of the eagle? What if the important eagle-use area is on someone else's property?

*Service response:* Defining a "term of art" is not the same as regulating it. Sometimes, as in this case, a definition can be used in order to refer to multiple objects by applying a single name to them as a group, eliminating the need to reiterate each component of the group whenever they are referenced.

In this case, because eagles can only be disturbed if their breeding, feeding, or sheltering behaviors are substantially interfered with, disturbance is likely to occur near important breeding, feeding, and roosting areas. Therefore, in assessing whether disturbance is likely to occur, it is logical to evaluate the relationship between the potentially disturbing activity and the important breeding, feeding, and sheltering areas. To more succinctly address this concept, we will use the term "important eagle use-area" to refer to one or more of the areas where eagles will potentially be disturbed by an activity. Naming this term in no way extends our regulatory reach over these areas, but rather provides a logical means to evaluate potential take. It does not matter on whose property the important eagle-use area is located; the important eagle-use area is not being regulated. What is regulated are certain impacts of an activity on eagles.

Finally, what is "essential" to the viability of the site for breeding, feeding, and sheltering eagles will depend on the various factors that affect the degree to which eagles depend on the site. Those best able to evaluate what is "essential" are likely to be State and Federal biologists or other eagle experts. Many important eagle-use areas are well-documented, and even where not specifically documented, bald eagles are relatively well-surveyed, and much is known about behaviors of eagles in particular localities.

*Comment:* Additionally, the terms within the phrase "important eagle-use area" need to be defined (e.g., "foraging area," "communal roost site"). "Foraging area" should be defined narrowly to mean only those areas used during migration and wintering periods at traditionally-used sites, perhaps as those "containing traditionally-used concentrations of preferred prey."

*Service response:* We agree that defining "foraging area" and "communal roost site" would be helpful and we have done so, as follows: "foraging area" means "an area where eagles regularly feed during one or more seasons"; "communal roost site" means "an area where eagles gather repeatedly in the course of a season and shelter overnight and sometimes during the day in the event of inclement weather." Not all foraging areas and communal roost sites are important enough such that interfering with eagles at the site will cause disturbance (resulting in injury or nest abandonment). Whether eagles rely on a particular foraging area or communal roost site to that degree will depend on a variety of circumstances—most obviously, the availability of alternate sites for feeding or sheltering.

*Comment:* "Important eagle-use areas" should include migration corridors.

*Service response:* We agree that take of eagles within migratory corridors is a significant concern with regard to certain activities, particularly wind-power facilities. However, we think the majority of applicants for individual permits will not be engaging in activities that are likely to take eagles in migration corridors, so have left them out of the definition of "important eagle-use areas."

*Comment:* "Nest" should be defined more narrowly than was proposed, to account for whether the structure was ever used, has been abandoned, or is occupied by great-horned owls, etc. The proposed definition is inconsistent with the five-year period specified in the Guidelines after which a nest can be considered abandoned for purposes of maintaining the buffers recommended in the Guidelines. The definition should limit nests to those that are maintained or used within twelve months.

*Service response:* The Guidelines do not define a nest as "abandoned" after five years. The Guidelines suggest that buffers may no longer be warranted after five years of disuse because the likelihood of disturbing eagles is decreased by that point. However, under the Guidelines, the term "nest abandonment" has no relation to that five-year period. The definition of "nest abandonment" in the Guidelines does

not necessarily entail permanent rejection of the nest. In fact, the Guidelines specifically state that "nest abandonment occurs when adult eagles desert or stop attending a nest and do not subsequently return and successfully raise young in that nest *for the duration of a breeding season.*" NBEMG, p. 17 (emphasis added).

We based the definition of "eagle nest" on the existing regulatory definition of "golden eagle nest" (50 CFR 22.3), which has no expiration date. As we note in the Guidelines, the probability of disturbance occurring at a nest decreases the longer the nest goes unused. However, it would be arbitrary to state a time limit after which an eagle nest no longer meets the definition of a nest, given that suitable nest sites are limited in many areas of the country and are often re-occupied by eagles after many years of disuse. The definition provided by this rule is consistent with the long-standing definition of golden eagles nests and better satisfies the statute's intent to protect eagles by protecting nests: until the structure is no longer "readily identifiable as a structure that is built, maintained, or used by eagles for purposes of reproduction," it is protected as a nest by the Eagle Act.

*Comment:* Clarification is requested as to whether the definition of "nest" includes alternate nests as well as the primary nest site.

*Service response:* To clarify that the definition includes alternate nests, we revised it by changing "a" to "any." The definition now reads: "any readily identifiable structure built, maintained, or used by bald eagles or golden eagles for the purpose of reproduction."

*Comment:* The rule should use the definition of "eagle nest" already in the Code of Federal Regulations.

*Service response:* In addition to applying to bald eagle nests as well as golden eagle nests, the new definition differs from the old one in two ways. First, the new definition substitutes "used" for "occupied" in order to avoid confusion with the term as used in scientific literature where it has very specific connotations. Second, the new definition replaces "for propagation purposes" with "for purposes of reproduction," because "propagation" sometimes refers to human-induced breeding, whereas "reproduction" more plainly means what is intended.

*Comment:* The definition of "inactive nest" is inconsistent with the National Bald Eagle Management Guidelines, which use the terms "active nest" and "alternate nest."

*Service response:* The NBEMG use the following terminology: An "active nest"

A-64

is a nest that is attended (built, maintained or used) by a pair of bald eagles during a given breeding season, whether or not eggs are laid. An "alternate nest" is a nest that is not used for breeding by eagles during a given breeding season (NBEMG, pg. 17). The definition of "inactive nest" in these regulations is not consistent with the terminology applied in the Guidelines because the definitions serve different purposes. The Guidelines distinguish between "active" and "alternate nests" in order to recommend different practices to avoid disturbing eagles. An "alternate nest" as defined in the Guidelines is not the same concept as an "inactive nest" in the regulations. As defined in the Guidelines, an "alternate nest" can also be an "active nest" if it was attended during the breeding season, but not used for breeding. This distinguishes it from a nest that is completely unattended during the course of a breeding season (which had it been defined, might have been called an "inactive nest," although that definition should also include any nest outside the breeding season). The Guidelines recognize that disturbance can only occur if eagles at some point notice something that agitates them (in addition to other factors), and therefore an eagle could be disturbed at an attended nest during the breeding season, thereby causing the attended nest to become alternate. Therefore, recommendations for conducting activities during the nesting season near nests that might go either way (might become alternate nests or might be used for breeding purposes), when no nest has yet been definitively selected by eagles in the territory, are as strong as for nests that are selected for breeding purposes.

In contrast, the regulations distinguish between nests that are not being used at present for breeding purposes (including the 10 days just prior to an egg being laid) to ensure there is no associated take of eggs or nestlings, and that eagles are not prevented from laying eggs in a nest they have selected to breed in that season. An "inactive nest" under the regulations would theoretically include some nests deemed "active" under the Guidelines if it was attended by eagles during that breeding season (at least 10 days prior), but not used for breeding purposes. The aim is different: eagles at that nest could have been disturbed during the earlier period when they attended the nest—hence its designation as "active" under the Guidelines to minimize that possibility. But if eagles are not using it for breeding purposes as

evidenced by lack of attendance for at least 10 days (whether within or outside of the nesting season) its removal would have significantly different impacts to eagles than removal of a nest that is occupied or attended during the past 10 days for purposes of breeding, leading to the designation in the regulations of such nests as "inactive nests."

*Comment:* The definition of "inactive nest" is inconsistent with the existing definition.

*Service response:* The new definition is consistent with the old definition, which, in any case, is being removed. The new definition differs primarily in that it includes bald eagle nests as well as golden eagle nests. The second difference is replacement of the phrase "absence of any adult, egg, or dependent young at the nest for 10 days before the nest is taken" with "continuing absence of any adult, egg, or dependent young at the nest for 10 consecutive days immediately prior to, and including, at present." The change serves dual purposes. First, it eliminates the inadvertent implication in the old definition that a nest cannot be inactive unless it has been taken. Second, it clarifies that the period of when the nest is not attended has to be current in order for the nest to be considered inactive. The last difference is the addition of the following sentence: "An inactive nest may become active again and remains protected under the Eagle Act." This sentence is included to clarify that nests that become inactive generally retain significant biological value to eagles, and are subject to the same prohibitions against take as active nests. None of these revisions are inconsistent with the old definition of "inactive nest."

*Comment:* Because an inactive nest may become active again and remains protected under the Eagle Act, there should be no distinctions in the level of protection afforded to active and inactive nests. Designation of the nest as inactive for the purposes of this rule might allow for easier granting of permits, even though such a nest might be the only nest or structure within a particular pair's territory.

*Service response:* The reason for distinguishing between active nests and inactive nests and for defining the term "inactive nest" is because the new nest-take-permit regulation, as well as existing regulations for take of golden eagle nests for resource development and recovery operations (50 CFR 22.25), regulate differently depending on whether they are currently active or inactive. Under existing § 22.25, a permit may only be issued for inactive nests. Under the regulations being

finalized by this rulemaking, a permit can be issued for an active nest only if the location of the nest poses an immediate threat to safety. This definition is intended to be applied only to questions of whether or not a nest may be taken with reduced risk of associated take of birds. It is not intended to convey any other biological status.

We will consider whether the nest is the only one in the territory. If the take is not necessary to alleviate a safety emergency, before issuing a permit we must find that "suitable nesting and foraging habitat is available to the area nesting population of eagles to accommodate any eagles displaced by the nest removal" (§ 22.27(e)(6)).

*Comment:* Is a nest considered "abandoned" under the Guidelines still protected by the Eagle Act? The rule should clarify how the Eagle Act applies in this case. Does it prohibit only removal of the structure?

*Service response:* A nest that has been abandoned is not necessarily *permanently* abandoned and remains protected under the Eagle Act. The NBEM Guidelines refer to nest abandonment as follows: "Nest abandonment occurs when adult eagles desert or stop attending a nest and do not subsequently return and successfully raise young in that nest for the duration of a breeding season .... [N]est abandonment can occur at any point between the time the eagles return to the nesting site for the breeding season and the time when all progeny from the breeding season have dispersed" (NBEMG, p. 17).

By "a nest considered abandoned under the Guidelines," the commenter may have been referring to the Service's recommendations for nests that have not been active for five years, in which case the Guidelines suggest that the buffer distances the Service recommends around nests may not need to be maintained at that point, since, in general, the probability of disturbing eagles at nests that have not been attended for five years is decreased. However, as the Guidelines continue on to state, "[t]he nest itself remains protected by other provisions of the Eagle Act, however, and may not be destroyed" (NBEMG, pg. 11).

*Comment:* "Territory" should be defined in the regulation.

*Service response:* This comment was made on the June 5, 2007, proposed rule. The regulations governing nest removal (new § 22.27) use the term "territory" to refer to the area where a nest could potentially be relocated. When we released the DEA and re-opened the comment period on the rule,

we proposed to define "territory" as "a defended area that contains, or historically contained, one or more nests within the home range of a mated pair of eagles, and where no more than one pair breeds at a time."

*Comment:* The last 10 words in the proposed definition of "territory" ("where no more than one pair breeds at a time") should be deleted, since this changes from year to year.

*Service response:* We deleted those last 10 words from the final definition so that it reads: "[t]erritory means a defended area that contains, or historically contained, one or more nests within the home range of a mated pair of eagles.

*Comment:* The definition of "territory" should not include the word "historically" because that would encompass areas that eagles have not occupied for many years. Perhaps it could be modified to read "recently contained" or "within 10 years."

*Service response:* We considered removing the word "historically" and adding some limit to the time frame in which a territory could be considered a territory, but rejected the suggestion because a time frame would be arbitrary, and the phrase "recently contained" does not have any biological basis. Primarily, we opted to leave "historically" within the definition because the rule does not use the word "territory" to restrict or authorize any action. The statute itself does not protect or even reference territory. Its only use within these regulations is to refer to the area that will be considered when a nest can feasibly be relocated "within the same territory to provide a viable nesting option for eagles within that territory, unless such relocation would create a similar threat to safety" (§ 22.27(a)(2)).

*Comment:* The definition of "practicable" is of central importance and should be incorporated into the regulation.

*Service response:* We agree and have defined "practicable" in the regulation as "capable of being done after taking into consideration, relative to the magnitude of the impacts to eagles: (1) the cost of remedy comparative with proponent resources; (2) existing technology; and (3) logistics in light of overall project purposes." The phrase "relative to the magnitude of the impacts to eagles" is important because whether something is practicable is relative to the risk of not doing it. If the adverse impact is small, it may be impracticable to undertake enormously costly measures to avoid it, but it if the impact will be extremely detrimental, increased measures may be deemed

reasonable and practicable. For example, it may not be practicable to find a new site for a proposed large-scale wind turbine project in order to avoid disturbing one nesting pair of eagles, whereas it may be considered practicable to find an alternative if the site originally proposed was within a major migration corridor for golden eagles and would likely result in significant eagle mortalities.

*Comment:* The definition of "practicable" must not include any consideration of the applicant's financial resources. (Some commenters asserted such a consideration would result in too high a bar for large projects with resources, while others were concerned it would result in too low a bar because applicants will always claim not to have enough resources to avoid or minimize impacts.)

*Service response:* We believe "practicable" inherently encompasses consideration of what the proponent can muster and marshal towards achieving a goal, whether it be money, time, ingenuity, or other factors that contribute to the chances of being able to accomplish something. Our inclusion of the phrase "the cost of remedy comparative with proponent resources" was intended to confirm the integral role such a consideration plays in determining what is practicable. For more discussion on this issue, see our related responses to comments under the heading *Scope and Criteria of 22.26.*

*Comment:* The rule should define "public welfare" as "the well-being of a community, state, region, or nation in matters of health, safety, or order."

*Service response:* When we released the DEA and re-opened the comment period on the proposed rule, we proposed to base some aspects of the new permit programs on the concept of "necessary for the public's welfare," which we proposed to define as "needed to maintain society's well-being in matters of health, safety, and order."

We would have used the concept when demand for take exceeds what is compatible with the preservation of the bald eagle or the golden eagle, to ensure that take that is necessary for the public's welfare be prioritized over other take for other purposes except for Native American religious use and safety emergencies. The concept would also have been central to issuance of eagle nest take permits under new § 22.27, expanding the reasons for which nests could be taken from safety emergencies only, to situations where the take is necessary to protect the public's welfare. However, as a number of commenters observed, the definition

was unacceptably broad and subjective, particularly when used as a qualifying factor for nest removal. For example, it could be argued to include any activity that increases a locality's tax base, which could include any commercial activity, and this was not our intent because we do not believe it accords with Congressional intent underpinning the Eagle Act. Although the Eagle Act does incorporate protection of private interests (e.g., protection of livestock from depredating eagles), the language and legislative history of the statute convey a greater degree of protection for eagle nests than for individual eagles. For that reason, we replaced the over-broad term "the public's welfare" with the narrower concept of "public health and safety." This will encompass projects that are genuinely necessary to protect people, while excluding projects that may have only intangible benefits incommensurate with the negative impact to eagles from removing a nest. The rule also provides that a nest may be taken for any purpose as long as there is a net benefit to eagles provided either by the activity itself or mitigation for the activity. Had we more time to develop this rule, we might consider adopting a permitting system wherein nests with lesser biological value could be removed for a broader range of purposes without requiring the permittee or activity to provide a net benefit to eagles. However, due to the importance of finalizing this rulemaking expeditiously, the analysis of the merits, complexities, and potential drawbacks of such an approach, if undertaken, will have to be addressed in the implementation guidance for this regulation or in a future rulemaking.

*Comment:* The definition of "public welfare" is too broad and vague and greatly exceeds the purposes for which golden eagle nest take now can be permitted. Clarification is needed as to what specific types of activities will fall under "public welfare."

*Service response:* We agree that "the public's welfare" was too vague a concept and very difficult to define. As discussed in the preceding response, the final rule incorporates the narrower concept of "public health and safety."

*Comment:* "Public welfare" should not include transportation projects, which should be treated like any construction or development.

*Service response:* We replaced the concept of "the public's welfare with "public health and safety," to provide parameters on what can qualify under the term. However, we intend that the concept of "public health and safety" will sometimes, though not necessarily always, apply to transportation projects.

For example, where a highway department proposes to modify a highway interchange to reduce a disproportionately high incidence of traffic accidents, if the modifications needed to improve safety cannot practicably avoid an eagle nest, the project may qualify for a nest removal permit, depending on whether the remaining permit issuance criteria can be met.

*Comment:* The rule should define "cumulative impacts" as "the incremental environmental impact or effect of the proposed action, together with impacts of past, present, and reasonably foreseeable future actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time."

*Service response:* We largely agree with this comment and have adopted the first sentence suggested by the commenter as the definition of "cumulative effects" within this rule. We omitted the second sentence because we believe it unnecessarily narrowed the definition by suggesting that cumulative impacts occur only over time, whereas cumulative impacts also can refer to multiple impacts from a variety of sources occurring concurrently with one another.

*Comment:* The rule should define "indirect effects" as "effects caused by the action and which are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. Indirect impacts include those impacts resulting from interrelated actions that are part of a larger action and depend on the larger action for their justification and from interdependent actions that have no independent utility apart from the proposed activity."

*Service response:* The definition suggested by the commenter is too broad for the context of this regulation. Beyond what is appropriate for us to consider as part of the NEPA analysis (where one is required), we do not intend to base permit decisions on how growth enabled by a proposed action would affect air, water, and other natural ecosystems. The permit authorizes eagle take and the issuance criteria will include consideration of reasonably foreseeable secondary effects *on eagles* to ensure that authorized take is compatible with the preservation of the bald eagle or the golden eagle. To

the degree that these secondary or "indirect effects" will foreseeably result in additional impacts to eagles, we will consider those impacts. However, impacts to air quality and water quality may require authorizations from other agencies, and the responsibility to authorize or prohibit such impacts is generally beyond our authority.

We agree with the commenter that a definition of secondary or indirect effects may be beneficial. In the proposed rule, we used the term "secondary impacts" to refer to impacts that result from an activity after an initial action (e.g. building a road has an impact, and the traffic that results is a secondary impact). We had considered using the term "indirect effects" but felt it was unsatisfactory because secondary impacts are often direct. They may occur somewhat later in time, but they are the direct result of the first action and may directly affect eagles (e.g., without the road having been built, there would be no vehicular traffic). However, the term "secondary impacts" has its own drawbacks; most notably it could be interpreted to omit any impacts that were tertiary or beyond. For that reason, and because "indirect effects" is used much more commonly, we are replacing the term "secondary impacts" with "indirect effects."

When we re-opened the comment period on the rule in August 2008, we proposed to define "indirect effects" as "effects that are caused by an action and either occur later in time or are physically manifested beyond the immediate impacts of the action, but are still reasonably foreseeable." We modified that proposed definition to clarify that the proposed action can be a contributing factor to the effect and does not have to be the sole cause. The final definition of "indirect effects" under this rule is: "effects for which a proposed action is a cause, and which may occur later in time and/or be physically manifested beyond the initial impacts of the action, but are still reasonably likely to occur."

*Comment:* "Indirect effects" must include the requirement of a reasonably close causal relationship between the environmental effect and the alleged cause.

*Service response:* We agree with this comment, and will address this issue in more depth in the implementation guidance for these regulations.

*Comment:* The rule should require the Director to consider both cumulative impacts and indirect effects before concluding compatibility with preservation of the eagle.

*Service response:* The final rule requires the Service to consider indirect

effects when assessing the scope of the impact, and it requires us to consider cumulative effects in determining whether the take will be compatible with the preservation of the bald eagle or the golden eagle.

*Comment:* "Cumulative effects" should not be considered because each permit application will be assessed at the time it is processed.

*Service response:* This comment appears to misunderstand the essential concept of cumulative effects, which no matter how defined, must include consideration of more than one effect at a time. The need to assess cumulative effects arises from the fact that combinations of effects can create impacts that would not result from a single effect, and which, in the case of eagles, could threaten their preservation. The assessment of cumulative effects will also be critical to protection of local eagle populations, since it will afford the Service a view of where a concentration of impacts may be occurring, a view that otherwise may not in every case be adequately examined during the permit-issuance process.

*Comment:* The definition of "cumulative effects" overreaches and is not supported by the Eagle Act. The regulations should adopt the approach the Service is imposing on itself in revisions to ESA interagency coordination regulations, that is: for the effect to be reasonably certain to occur, the Service must have clear and substantial information that the proposed action is an essential cause. It would put both statutes on the same definitional footing and eliminate confusion.

*Service response:* The revisions to ESA interagency coordination regulations have been withdrawn. Regardless, they pertained to a different statute, the ESA, and are not appropriate under the Eagle Act, which has separate standards and a different mandate. Also, the commenter appears to be merging the (now withdrawn) ESA section 7 definitions for "cumulative effects" and "indirect effects." Under both the retracted and the reinstated ESA regulations, "cumulative effects" are limited to effects that are "reasonably certain to occur." Preservation of the bald eagle and the golden eagle may not be achieved if the Service must carry the burden of proving an effect will occur before it can be prevented, which would effectively be the case if the only cumulative effects we could consider were those that are reasonably certain to occur. The ESA regulatory definition of "cumulative effects" is not related to the concept of an "essential cause," as the

commenter mistakenly suggests. "Essential cause" was used under the withdrawn ESA section 7 regulations to clarify the definition of "indirect effects." For purposes of permitting under the Eagle Act, we define "cumulative effects" as "the incremental environmental impact or effect of the proposed action, together with impacts of past, present, and reasonably foreseeable future actions."

*Other*

*Comment:* "Absence of data" should not be used to deny take authorization for infrastructure projects that promote public safety and welfare; rather the "best available science" should be used.

*Service response:* We certainly believe that the best available science should be used. However, the Eagle Act requires the Secretary of the Interior to determine that take will be compatible with the preservation of eagles before he or she may authorize the take. To permit take without sufficient data to show that it will not result in a decline in the eagle population would violate the statutory mandate.

*Comment:* Will any activities be exempt from the take provisions of the Eagle Act?

*Service response:* What is prohibited is "take," not the activities that result in take. In any case, we cannot exempt any take of bald eagles from the permit requirement imposed by the Eagle Act. Any such exemption would have to be provided by an amendment to the Act by Congress.

*Comment:* In addressing the information-collection requirements of the Paperwork Reduction Act, the Service has probably underestimated the public reporting burden for completing an application. Forest Service staff estimate it will take 3-6 person-days to complete the application process.

*Service Response:* The reporting burden we provided was an estimate of the *average* hourly burden we anticipate. For large-scale activities such as the Forest Service management plans, the application process will be much longer than the average. Nevertheless, we have increased our estimate of the average hourly burden from 10 hours to 16 hours and added an estimate of 40 hours for a programmatic take permit. Some programmatic permits may take longer than that to develop; however, once "templates" have been developed for particular industries or activities, the process will be more streamlined for subsequent programmatic permits for similar activities.

*Comment:* Far more than 300 permits per year will be needed, partially due to the "uncertainty caused by the definition of *disturb* and the fact that the guidelines are not possible to follow in general." The Service should revise its estimates to reflect the higher demand. The lower estimate is arbitrary and capricious and results in a cost estimate that is too low. The Service should provide documentation, evidence, or rationale for the time estimates.

*Service response:* We want to be clear about the fact that we do not have any reliable documentation or evidence to indicate how many people will seek permits under this regulation, and we received none from the public during the public comment period. These are new permit programs that will apply to a newly-delisted species (bald eagles) and a species for which no similar authorization was previously available (golden eagles). Having said that, we have increased our estimate to 1,168 permit applications and 910 permits issued under both regulations.

We do not agree that the number of permits is larger than it otherwise would be because of the "uncertainty caused by the definition of disturb." In the past, disturb was not defined at all, and the new definition limits the pool of impacts that might otherwise have been considered disturbance in the absence of a definition by establishing a relatively high threshold that requires injury or nest abandonment. We also disagree that the National Bald Eagle Management Guidelines are not possible to follow in general. The Guidelines are more flexible than any guidance that proceeded bald eagle delisting and they recommend the smallest buffers that applied in any part of the country prior to delisting. In Alaska, parts of which have the highest density of bald eagles in the United States, no ESA permits to take eagles were ever available because the bald eagle was never listed under the ESA in Alaska. Since guidelines similar to our National Guidelines (but less flexible) have proven to be possible to follow in Alaska, we believe they can be workably applied in other parts of the U.S. where eagles are present in lower densities.

Finally, as provided in these regulations, we will only issue permits where the take cannot practicably be avoided, which will help minimize the number of permits.

*Comment:* The Service should avoid heightening regulatory burdens with regard to the golden eagle. Golden eagles cause damage to crops and livestock and the location of their nests can restrict agricultural activities on farms and ranches. They are only protected under the Eagle Act in order to better protect juvenile bald eagles, which they resemble. Golden eagles are plentiful and will tolerate a much higher level of take than bald eagles. Therefore the permit-application process and issuance criteria should be much less rigorous than for bald eagles.

*Service response:* Rather than heightening regulatory restrictions, this regulation provides a mechanism for authorizing impacts that otherwise would be prohibited. The Eagle Act prohibits take of both bald eagles and golden eagles. Accordingly, this regulation provides a means to authorize take of golden eagles as well as bald eagles.

The need to protect juvenile bald eagles was the third of three reasons Congress provided for extending Eagle Act protection to golden eagles. In a joint resolution amending the Act, Congress stated "Whereas the population of the golden eagle has declined at such an alarming rate that it is now threatened with extinction; and Whereas the golden eagle should be preserved because of its value to agriculture in the control of rodents; and Whereas protection for the golden eagle will afford greater protection for the bald eagle..." (Bald and Golden Eagle Protection Act Amendments of 1962, Pub. L. No. 87-884, 76 Stat. 1246 (1962).

Contrary to the statements made by the commenter that golden eagles are plentiful and will tolerate a higher level of take, our data indicate the opposite. In contrast to bald eagles, golden eagle populations do not appear to be increasing, and may be declining in some parts of their range, possibly due to loss of habitat to support their prey base. Overall, our data for golden eagles are not as comprehensive as for bald eagles, and, under the Eagle Act, we cannot issue take permits for golden eagles unless we have enough data to make the determination that the take to be authorized will be compatible with the preservation of golden eagles.

Golden eagles do sometimes prey on newborn livestock, and losses to individual producers can occasionally be significant. However, the economic benefit provided by golden eagles (as recognized by Congress) consuming rabbits, rodents and other prey that otherwise would damage crops likely far outweighs any economic losses to the agricultural industry.

Finally, golden eagles have enormous cultural significance to many Americans, particularly many Native Americans. Even without consideration of the other reasons why golden eagles were protected by Congress, the cultural and spiritual value accorded to golden eagles justifies the level of protection

they share with bald eagles under the Eagle Act.

*Comment:* The economic analysis should not be limited to a pre- versus post-delisting assessment. Rather, the Service should consider the costs of the regulatory program in comparison to other recovered species.

*Service response:* Comparing the costs of this permit program to the costs of making a similar permit available for other recovered species would yield little or no useful information because we have never before created a new permit regulation to authorize take of a recently-delisted species. Even had we done so, we doubt the comparison would be very useful because, unlike any other species, bald eagles and golden eagles are protected by the Eagle Act, and it is the unique protections of that statute that fundamentally shape this regulation.

*Comment:* The Service, by stating that it only rarely expects to issue permits for take associated with activities that conform to the guidelines, appears to have foreclosed the option to seek and gain assurance against prosecution under the Eagle Act through issuance of a permit.

*Service response:* While we will continue to discourage applications for take we believe is unlikely to occur, preferring to put our agency's limited resources towards our mission of conserving wildlife, we anticipate issuing some of these permits. The monitoring and reporting that will be required of permittees will be of value, since it will provide documentation we rarely would otherwise obtain: whether the activities we thought would not disturb eagles do result in take. Normally, permittee monitoring will be for activities that are likely to take eagles. In addition, the Service may exercise enforcement discretion by not referring such take for prosecution under the MBTA or the Eagle Act if it occurs despite the low probability.

*Comment:* Sensitive nest data maintained by States will be made public through the Freedom of Information Act (FOIA) process, jeopardizing the safety of the nest.

*Service response:* Although we do not share this State commenter's concern that eagle nests will be less protected if their location is known, we respect the State's intentions, and to the degree we can under law, we will honor its wishes to safeguard State nest data. However, we cannot circumvent the requirements of the FOIA.

*Comment:* The tenure of depredation permits for hazing eagles should not be increased because it could lead to abuse.

*Service response:* In addition to amending the eagle-depredation-permit regulations under § 22.23 to extend potential permit tenure to up to five years, we included the following language: "We may amend, suspend, or revoke permits issued for a period of longer than 90 days if new information indicates that revised conditions, suspension, or revocation is necessary to safeguard local or regional eagle populations."

*Comment:* Penalties for violations should be dramatically increased and the compensation used to develop and implement management plans.

*Service response:* The Service does not establish and cannot effect changes to penalties for violations of the Eagle Act and other statutes we enforce. Congress establishes the penalties.

*Comment:* Due to the unique circumstances of Alaska, the Service should develop streamlined procedures for ensuring that infrastructure projects can comply with the Eagle Act.

*Service response:* We intend to establish working groups with interested States and tribes to develop streamlined procedures to boost the efficacy of this permit program and enhance compliance with the Eagle Act.

*Fees*

*Comment:* The permit-processing fees must be higher to comply with the Service's mandate that permit programs be "self-sustaining to the extent possible" as required by 31 U.S.C. 9701(a). The program will drain money that should be used for important conservation needs.

*Service response:* The commenter is correct that the permit application processing fees associated with the new permits are not high enough to allow the Service to recoup even half the cost of issuing them. However, the fees are significantly higher than other permit application processing fees we assess. The fees associated with these regulations must be manageable to small business owners, home owners, and other members of the public who may find a higher fee prohibitive. We are establishing a higher application fee for programmatic permits: $1,000, with a $500 amendment processing fee.

*Comment:* The proposed fees are too high, especially when encouraging landowners in conservation efforts. The Service should consider a designation of "low-effect" permits for which a lower permit-application-processing fee would be charged. Also, the Service should consider a lower fee for private landowners and small businesses.

*Service response:* Permits are a "service" provided to specific individuals and individual corporations within the public at large. Our agency is directed by Congress and OMB to recoup the costs of permit programs where feasible. The lower the permit processing fees, the larger are the percentage of costs that must be shifted to taxpayers or diverted from other Service responsibilities. Therefore, we do not believe the $500 permit processing fee is unreasonable for applications for individual permits.

While we are not adopting the commenter's suggestion that application fees be less for "low-effect" permits, we are establishing a higher fee for permits that will take longer to process; the application-processing-fee for programmatic permits is $1,000. While the typical programmatic permit will likely cost the Service more than twice as much as the typical individual-take permit, we believe the $1,000 application fee, rather than a higher fee more in line with our processing costs, is justified because programmatic permittees will be required to undertake rigorous and potentially costly conservation measures.

Regarding the suggestion that fees be lower than $500 for private landowners and small businesses, if we did that, we would recoup an unacceptably small percentage of the costs of the permit program. Federal, State, tribal and local government agencies will likely constitute a large portion of applicants, but they are exempt from permit application fees. It is inappropriate to require the American taxpayer to bear all the costs of administering permits that primarily benefit private individuals. We believe that the fees associated with this rulemaking are a fair compromise between recouping all of our costs and ensuring that no one is disqualified because he or she cannot afford the permit application-processing fee.

*Comment:* The Service should not charge fees for tribal religious purposes.

*Service response:* We do not charge permit application processing fees for permits for tribal religious purposes. This regulation has no effect on our policy regarding such fees.

*Permits for Take of Eagle Nests*

*Comment:* The final rule should clarify that a safety emergency means a threat to life, not a threat to property.

*Service response:* The regulation includes the following definition of "safety emergency": "a situation that necessitates immediate action to alleviate a threat of bodily harm to humans or eagles." However, the rule now provides that permits may be issued to remove inactive nests where

necessary to ensure public health and safety, which includes situations beyond immediate safety emergencies.

*Comment:* Nest removal permits should be available to avert severe financial impacts.

*Service response:* The plain language and legislative history of the Eagle Act prevent us from making permits available to remove eagle nests to reduce financial impacts. Congress amended the Act in 1978 to provide the Secretary of the Interior the ability to authorize take of golden eagle nests that ''interfere with resource development or recovery operations.'' Congress specifically did not include bald eagle nests in this narrowly-focused amendment, nor did it provide us with the ability to authorize golden eagle nest take for purposes as broad as financial impacts, even severe ones. Therefore, we interpret our authority to issue permits to take golden eagle nests as limited to purposes no broader than the 1978 amendment, and for bald eagle nests, even narrower. Take that is necessary to benefit eagles and protect public health and safety is conservative and falls within the narrow range of purposes for which we may issue eagle nest take permits for both species.

*Comment:* Relocation of nests is not always realistic. The final rule should not depend on that approach.

*Service response:* The regulation does not require that nests be relocated. It provides that ''[w]here practicable, the nest should be relocated, or a substitute nest provided, in a suitable site within the same territory to provide a viable nesting option for eagles within that territory, unless such relocation would create a similar threat to safety.'' The rule also specifically provides that permits may be issued under the regulation when nests cannot be relocated.

*Comment:* The rule should specifically state that the applicant must take all reasonable steps to minimize impacts to eagles before a nest is removed to ensure that all alternatives have been exhausted. Such alternatives would include take of nests outside of the breeding season. The applicant must be required to demonstrate that (1) the removal is in the public interest; (2) there is a clear threat to eagle or human safety; and (3) there is no alternative to removal that would alleviate the emergency.

*Service response:* Nests that need to be removed because they pose a safety hazard *should* be removed outside the breeding season. However, removing nests outside of nesting season is not always possible. Thus, the rule provides that, in a genuine safety emergency,

active nests can be removed if necessary to prevent imminent death or physical injury to people or eagles. We have added provisions to the rule for programmatic authorizations to remove nests for situations where the need for nest removal will be ongoing (e.g., at some airports or for utilities that maintain power lines). Programmatic nest-removal permits would be available only when the applicant has developed comprehensive measures to reduce take to the degree practicable.

In response to the commenter's specific suggestions, we consider (1) redundant with (2) because any time there is a clear threat to eagle or human safety, correcting the situation will be in the public interest. The proposed rule already incorporated the substance of (2). We have added the language suggested under (3) to the evaluation criteria of the rule at § 22.27(d).

*Comment:* Nest-removal permits for airports should be guaranteed. Denial of such an application should not be an option.

*Service response:* A permit is never ''guaranteed.'' The statutory mandate that the take be compatible with the preservation of the bald eagle or the golden eagle must be met. Also, the permit will not be issued if there is an alternative to nest removal that would alleviate the threat to human and/or eagle safety or public welfare.

*Comment:* Airports are a good example of how safety issues are invoked when they do not actually exist. Airports have done a poor job of assessing risks before resorting to lethal take and habitat destruction.

*Service response:* Although airports are already subject to FAA regulations that require them to assess and mitigate for wildlife hazards (14 CFR 139.337(b) and (c)), this permit should improve the alternatives analysis that airports undertake because the programmatic nest-take permit will require permittees to undertake comprehensive measures to reduce take.

*Comment:* Emergency nest take will need to be authorized more than five times a year, largely due to airport safety concerns.

*Service response:* We based our estimate on the number of emergency situations that arose in the past few years. However, we have revised our estimate for the number of nest take permits we anticipate issuing from five permits a year to 48 permits per year. The higher estimate is based on the somewhat broader parameters established in the final rule for when nest take may be authorized, as well as our expectation that bald eagle populations will continue to grow in

most regions. On the other hand, as airports develop comprehensive measures to reduce the need for take permits, we will issue them programmatic authorizations, lowering the total number of authorizations required.

*Comment:* The one-year tenure is not long enough to address the hazing needed to prevent re-nesting at airports.

*Service response:* Hazing requires a permit only if it is likely to result in disturbance as defined in regulation. Permits to haze eagles under those circumstances will not be authorized under either of the new permit categories, since § 22.26 applies only to take that is associated with, but not the purpose of the activity, whereas hazing is intentional; and § 22.27 authorizes nest take. Permits to haze eagles are already issued under existing regulations at § 22.23. However, those regulations until now did not allow us to issue permits for a period longer than 90 days. This rulemaking amends § 22.23 to allow an extended tenure of up to five years for hazing, only.

*Comment:* What if action is needed before a nest-removal permit can be issued? The proposed rule preamble states that it may take 40 hours to process such a permit. The time needs to be shorter and needs to be codified in the rule, or else a statement is needed that if the Service does not respond quickly enough, the take is authorized.

*Service response:* The rule estimates that it will take a total of 40 Service staff hours to process the nest-take permit, not 40 consecutive hours. More than one Service employee will need to participate in the process. We cannot authorize bald eagle take without issuing a permit. If a *bona fide* emergency response action must be taken before the permit can be issued, the Service may exercise enforcement discretion by not referring such take for prosecution under the MBTA or the Eagle Act.

*Comment:* An on-site inspection by the Service should be required before issuing a nest-take permit, for oversight.

*Service response:* We will not always be able to conduct an on-site inspection before issuing the permit. If the situation is an emergency, there may not be sufficient time for us to travel to the area. Second, some areas (e.g., parts of Alaska) may be remote, making travel expensive and time-consuming. Finally, due to limited staff resources, we will not necessarily have personnel available to conduct a site visit.

*Comment:* The rule should require the permittee to pay for any care needed for eggs or nestlings.

*Service response:* Active nests may only be taken in cases of *bona fide* safety emergencies. Therefore, care of viable eggs or nestlings will only be necessary in some emergency situations. Because emergencies are intrinsically unplanned, we do not consider it justified to ask the permittee to pay for rehabilitative care that may be necessitated by circumstances outside the permittee's control.

*Comment:* The rule should require mitigation payments for nest removal. Otherwise, it creates a financial incentive to remove nests.

*Service response:* Nest removal permits will be available only where: (1) necessary to alleviate a safety emergency; (2) necessary to ensure public health and safety; (3) the nest is built on, and obstructs the use of, a human-engineered structure; or (4) the project, or mitigation for project, will provide a long-term benefit to eagles. Under the first scenario, financial incentives are not germane. Under the second and third scenarios, some mitigation may be required, depending on the particular situation, including the availability of other nests in the territory, whether the applicant could have taken reasonable steps to prevent eagles from nesting on the structure, and other factors. Under (4), the permittee would be required to provide compensatory mitigation designed to provide a net benefit to eagles, that is, to more than compensate for the biological impacts of the nest removal. If, despite the cost of compensatory mitigation, the permittee profits from removing the nest, the profit should not be an issue, since the overall effect on eagles will be beneficial.

*Comment:* The rule should clarify that lethal take of eagles is not an option under this permit.

*Service response:* We added the following language to the final regulation: "This permit does not authorize intentional, lethal take of eagles."

*Comment:* The rule should provide that the permit "will" (rather than "may") authorize take of eagles, eggs, or nestlings associated with the removed nest to protect the permittee from liability due to incidental take.

*Service response:* The permit may or may not authorize take of eagles associated with nest removal, and where take is authorized, the method of take will be specified (e.g., collection and disposition of live nestlings, disturbance of adults, etc). For inactive nest take, authorization to take eagles in addition to the nest would usually not be necessary or appropriate.

*Comment:* A programmatic permit is needed for operations that need to remove nests regularly. For example, locations of all eagle nests on transmission and distribution facilities may not be known, complicating the permit process.

*Service response:* We agree with this comment and added provisions to the final regulation for programmatic nest removal "provided the permittee complies with comprehensive measures that are developed in coordination with the Service, designed to reduce take to the maximum degree practicable."

*Comment:* Will the new nest-take permit affect permits issued under 50 CFR 22.25 for take of golden eagle nests for resource-development-and-recovery operations?

*Service response:* The new permit for nest removal is unlikely to affect issuance of permits under § 22.25. Although, it includes permit issuance criteria that prioritize take for certain purposes over others, the interests that are prioritized above resource-development-and-recovery operations are compelling government interests: public health and safety, and upholding our trust responsibilities towards Native American tribes by ensuring that eagles continue to be available for religious ceremonies. Based on past history, we anticipate only a few requests to remove golden eagle nests for health and safety. Although regulations have existed for decades that would enable us to issue permits to tribes to take eagle nests for religious purposes, we have had only one such request to date. As such, we think the new nest take authorization under § 22.27 will not affect how we administer permits under § 22.25.

*Comment:* The provision to allow take of golden eagle nests during resource-recovery operations based on 10 days of nest inactivity is at odds with long-term occupancy of nests demonstrated by the species, and needs to be better evaluated.

*Service response:* The provision the commenter objects to is codified in existing regulations that predate this rulemaking. Nevertheless, we did re-examine the language during this rulemaking process, which extended the definition of "inactive nest" to apply to bald eagle nests in addition to golden eagle nests. As we explain in our discussion above regarding the new definition of "inactive nest," the distinction between active and inactive nests is for the purpose of evaluating whether or not a nest may be taken with reduced risk of associated take of birds. The nest is protected under the Eagle Act whether active or inactive and may not be taken without a permit.

*Comment:* The rule should explicitly state that when evaluating whether suitable habitat is available, constructed nest platforms are not considered available suitable habitat. Otherwise, entire local populations could be displaced to nest platforms if a highway was to go through nesting habitat.

*Service response:* Suitable habitat might include constructed nest platforms if they are located in areas with adequate foraging and perching sites, and other features necessary for them to be viable breeding sites.

*Comment:* We strongly suggest including a narrower and more detailed definition of "public's welfare," and a prioritization scheme where the highest priority for nest removal permits is given to "projects that are determined to promote the greatest common societal and environmental good."

*Service response:* We replaced the term "the public's welfare" with the narrower concept of "public health and safety." For more discussion of this issue, see our response to a comment under *Scope and Criteria of 22.2.*

*Comment:* The definition of "the public's welfare" may be interpreted too narrowly for purposes of nest removal. The final rule should explicitly provide that infrastructure projects "to maintain or expand domestic energy production and delivery fall within the scope of projects necessary for public welfare."

*Service response:* Under this final rule, permits to remove eagle nests will be available only for safety emergencies, public health and safety, nests located on human-engineered structures where the nest interferes with the intended use of the structure, or for projects that provide a net benefit to eagles. Thus, we can issue a permit to remove a nest where necessary to protect *any* interest, including where necessary "to maintain or expand domestic energy production," as long as the project proponent will implement conservation measures that provide an overall benefit to eagles greater than the adverse effect of nest removal (and the other permit issuance criteria are met).

*Comment:* A permit to take a nest for "the public's welfare" should be available whether the nest is active or inactive.

*Service response:* The Eagle Act requires the take to be *necessary* to protect an interest. Taking an active nest should only be necessary in a safety emergency; otherwise the take can be delayed until the nest is inactive so there is less risk of a loss of productivity and no risk of associated take of eggs or young.

*Comment:* Take of nests should not be allowed for anything other than a safety emergency.

*Service response:* Limiting nest take to safety emergencies has the potential to create unacceptable gridlock across the United States. Many projects and activities that benefit society would be disqualified, resulting in untenable degradation of social services and infrastructure.

*Comment:* The Service should not issue nest-take permits where the nest is the only structure in a territory or if its removal would interfere with future reproduction in that territory.

*Service response:* Where the take is not necessary to alleviate a safety emergency, we will consider whether the nest is the only one in the territory. Unless a safety emergency necessitates the nest removal, before issuing a permit under § 22.27, we must find that "suitable nesting and foraging habitat is available to the area nesting population of eagles to accommodate any eagles displaced by the nest removal."

*Comment:* The Service should not issue a programmatic nest permit to the Federal Aviation Administration for nationwide airport coverage because, with no biologists, it will err on the side of human safety and remove nests that pose little threat.

*Service response:* We do not anticipate issuing a single, nationally-applicable permit to the FAA. At this point, we envision issuing permits to individual airports and county or regional airport authorities.

*Comment:* The Service's estimate of only 30 programmatic nest take permits per year is too low. That many would probably be needed in Alaska alone.

*Service response:* We have increased our estimate of how many programmatic permits we will issue – but only by 10, to 40 permits, annually. Programmatic permits will be issued only where ACPs are implemented to reduce take to a level that is unavoidable. The process of developing most programmatic permits will be more time-consuming than for most individual permits, at least until we have developed "templates" applicable to other permits for the same or similar activities. Thus, we think it unlikely we will be issuing more than 40 such permits per year nationwide. The permits we are considering through this rulemaking are for take that is necessary, not take that is merely convenient or more profitable than avoiding the take.

*Comment:* The rule should include a separate nest-take category for situations where eagles nest on a pre-existing man-made structure.

*Service response:* We thought this idea had merit and added language to the final rule that provides for removal of nests that are built on human-engineered structures, creating "a functional hazard that renders the structure inoperable for its intended use."

*Rulemaking Process*

*Comment:* Tribal consultation should have been sought prior to proposing this regulation. How can the government claim to have considered cultural values without proper government-to-government consultation with the tribes?

*Service response:* We sent each federally-recognized tribe a letter soliciting input on this action when the proposed rule was published in the **Federal Register**. Even though the comment period was open for 90 days, we received only three letters from tribes and no requests to extend the comment period. The Service sent a second letter to the tribes when the DEA was released, and several Service Regional offices have hosted or attended meetings in order to clarify the Service's actions and hear tribal concerns. However, due to the need to promulgate permit regulations in an expeditious manner, there was not enough time to fully engage any tribes in formal government-to-government consultation during the rule-making period. We do intend to do so with interested tribes during the next phase: development of implementation guidance.

As part of developing the implementation guidance, we intend to work with tribes to establish protocols regarding the types of permit applications and potential actions on which individual tribes would like the Service to consult with them. We will also consider cultural values, including Native American cultural values as part of the NHPA's section 106 review. (See our discussion in the **Required Determinations** section below under *National Historic Preservation Act.*)

*Comment:* The comment period was too short for the public to provide meaningful input.

*Service response:* The initial comment period for the rule was 90 days, which is standard for a significant rule. We also re-opened the comment period on the rule for another 30 days when we released the DEA in August 2008. Therefore, the total length of time the rule was open for public comment (120 days) was longer than for most rules.

*Comment:* States should have been given a greater role in developing the regulation, particularly since it will require investment of significant State resources. The Service should delay completion of the regulations and form a work group with the State fish and wildlife agencies to develop more administratively- and economically-feasible regulations.

*Service response:* We did not delay completion of the regulations because there is a genuine, substantial, and impending public need for these permits. Without them, many activities, including critical infrastructure projects, that might disturb or otherwise take eagles have no means of gaining authorization for the take, and are either on hold or compelled to violate the law. Due to the need to promulgate the regulations without further delay, we were unable to coordinate closely with States and tribes during the rule-development phase. However, we plan to establish work groups with State and tribal representation to assist with development of implementation guidance for the regulations. The implementation guidance will address numerous important facets regarding administration of the permit program that have yet to be worked out, including how the Service will coordinate with States and tribes during the permit-application-and-processing phase.

*Comment:* The Service should delay implementation until it gets an adequate monitoring program in place for both species throughout the U.S. If the Service will not delay completion or implementation of the regulations, they should be enacted on a short-term basis, allowing the Service to work cooperatively with the States to develop a more comprehensive, data-driven permitting system.

*Service response:* If, after implementation, the regulations need revision, we can amend them. There is no need to finalize them with a built-in expiration clause. We agree that more data, monitoring, and surveys would be useful, and we plan to pursue possibilities for additional funding and partnerships to bolster the scientific data currently available for both eagle species.

*Comment:* The Service should publish the proposed rule with the changes noted in the DEA. Without being able to review the explicit regulatory changes in context, the public cannot adequately evaluate the proposal.

*Service response:* We believe the August 2008 Notice of Availability for the DEA and the DEA itself effectively described the changes that we were proposing from the rule we proposed in June 2007. Republishing a proposed rule incorporating the changes noted in the DEA would have triggered a number of

regulatory requirements that would have been onerous and—more important—time consuming. Due to the need to finalize the regulations expeditiously, we believe that the approach we took was in the best interests of the public.

*Endangered Species Act Consideration*

Consultation pursuant to section 7(a)(2) of the Endangered Species Act is not required for these regulations. The regulations do not directly or indirectly authorize any activities that would result in adverse effects to listed species, so they will not affect any listed species or critical habitat. We will conduct section 7 consultations on the issuance of any future permits where the authorized activities may affect listed species or critical habitat.

**Required Determinations**

*Energy Supply, Distribution or Use (E.O. 13211).* On May 18, 2001, the President issued Executive Order 13211 addressing regulations that affect energy supply, distribution, and use. E.O. 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. This rule is not expected to significantly affect energy supplies, distribution, and use, except that it provides means to authorize otherwise-prohibited impacts to eagles that may be necessary in the course of supplying and distributing some energy in particular localities. This action is not a significant energy action, and no Statement of Energy Effects is required.

*Regulatory Planning and Review (Executive Order 12866).* The Office of Management and Budget (OMB) has determined that this rule is significant and has reviewed this rule under Executive Order 12866 (E.O. 12866). OMB bases its determination upon the following four criteria:

(a) Whether the rule will have an annual effect of $100 million or more on the economy or adversely affect an economic sector, productivity, jobs, the environment, or other units of the government.

(b) Whether the rule will create inconsistencies with other Federal agencies' actions.

(c) Whether the rule will materially affect entitlements, grants, user fees, loan programs, or the rights and obligations of their recipients.

(d) Whether the rule raises novel legal or policy issues.

*Regulatory Flexibility Act.* Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996), whenever a Federal agency

publishes a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small government jurisdictions) (5 U.S.C. 601 *et seq.*). However, no regulatory flexibility analysis is required if the head of an agency certifies that the rule would not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for "significant economic impact" and a threshold for a "substantial number of small entities." See 5 U.S.C. 605(b). SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a rule would not have a significant economic impact on a substantial number of small entities.

This rule may benefit a variety of small businesses including real estate developers and brokers (NAIC 531); construction companies (NAIC 23); forestry and logging (NAIC 113), farming (NAIC 111), and ranching operations (NAIC 112); tourism companies (NAIC 713); utility companies (NAIC 221); and others. Across the United States, there are 285,571 small real estate companies; 617,737 small construction companies; 9,596 small forestry and logging companies; 46,730 small tourism companies; and 10,173 small utility companies. We anticipate receiving about 1,140 §22.26 take permit applications nationwide annually, and about 90 § 22.27 nest take applications (including 20 applications for programmatic permits under each of the two regulations).

We anticipate issuing approximately 830 standard § 22.26 take authorizations across the United States, 40 standard nest-take permits, and 40 programmatic permits, per year. Based on past permit authorizations under the ESA, we anticipate approximately one-third of new permit applicants would be small businesses. If 303 permittees are small businesses within 4–6 different industries across the United States, the demand would not represent a substantial number of small entities in individual industries. The economic impact to individual small businesses is dependent on the type of activity in which each business engages. As noted in the economic analysis in the preamble above, permit applicants will incur some costs assembling the necessary information for the permit application, permit fees, and the costs of monitoring and reporting associated

with the permit. For example, applicants will have to pay $500 for processing a permit application under § 22.26 and § 22.27, and $150 for permit amendments. In addition, particularly for larger projects, there may be consultant and/or attorney's fees ranging from a few hundred to thousands of dollars. However, if the permit applicant is successful, the economic benefits to the small entity should outweigh the economic costs of obtaining the permit. For some individual businesses, the benefit may be substantial.

The Department of the Interior certifies that this rule will not have a significant economic effect on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*).

*Small Business Regulatory Enforcement Fairness Act (SBREFA).* This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. This rule:

a. Will not have an annual effect on the economy of $100 million or more. The principal economic effect of the rule will be to allow the general public, small businesses, industry and government agencies to obtain take permits that allow activities on their property where avoiding impacts to eagles is not practicable. We are anticipating that, due to increasing bald eagle populations, there will be an increase in the number of applications for permits under this rule compared to the number of people who sought authorization to take eagles under the ESA, even though not all activities that require ESA authorization would require Eagle Act authorization. All types of small entities that benefited from the issuance of permits under the ESA will continue to benefit from permits issued under this rule.

b. Will not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions. Eagle take permits will not significantly affect costs or prices in any sector of the economy. This rule will provide a remedy that would allow various members of the general public to pursue otherwise lawful uses of their property where the activity will impact eagles. For example, a person wishing to build on his property in the vicinity of a bald eagle nest may apply under this proposed rule for a permit to disturb eagles, whereas the option would not be possible after delisting without the promulgation of these regulations. Another example would be a utility that wishes to

minimize eagle mortalities and liability to itself and so implements conservation measures to reduce take to the level where any remaining take is unavoidable and unauthorized. Whereas take of eagles is already prohibited by the Eagle Act, the permit represents an opportunity for the public to comply with the law, but it is not mandatory. These regulations make a permit available to authorize take that is currently prohibited under statute, enabling small businesses, industries, government agencies, corporations, and private individuals to conduct legitimate activities in accordance with the law.

c. Does not have a significant adverse effect on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises. This regulation establishes a mechanism to permit effects from activities within the United States that would otherwise be prohibited by law. Therefore, the effect on competition between U.S. and foreign-based enterprises will be to benefit U.S. enterprises. There is no anticipated negative economic effect to small businesses resulting from this rule.

*Unfunded Mandates Reform Act.* A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required.

a. This rule is not a significant regulatory action under the Unfunded Mandates Reform Act. A Small Government Agency Plan is not required. The permit regulations that are established through this rulemaking will not require actions on the part of small governments.

b. This rule is not a significant regulatory action under the Unfunded Mandates Reform Act. This rule does not impose an unfunded mandate on State, local, or tribal governments or the private sector of more than $100 million per year.

*Takings (E.O. 12630).* In accordance with Executive Order 12630, the rule does not have significant takings implications. This rule could affect private property by providing owners the opportunity to apply for a permit to authorize take that would otherwise violate the Eagle Act. A takings implication assessment is not required.

*Federalism (E.O. 13132).* In accordance with Executive Order 13132, the rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment. This rule will not interfere with the States ability to manage themselves or their funds. Changes in the regulations

governing the take of eagles should not result in significant economic impacts because this rule would allow for the continuation of a current activity (take of eagles) albeit under a different statute (shifting from the ESA to the Eagle Act). The new regulatory process provides States the opportunity to cooperate in management of bald eagle permits and eases the process for permit applications. A Federalism Assessment is not required.

*Civil Justice Reform (E.O. 12988).* In accordance with Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Government-to-Government Relationship with Tribes.* In accordance with Executive Order 13175, Consultation and Coordination with Tribal Governments (65 FR 67249, Nov. 9, 2000); the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951); and 512 DM 2, we have evaluated potential effects on Federally-recognized Indian tribes and have determined that there may be potential effects. Although this rule neither interferes with tribes' ability to manage themselves or their funds nor affects the operations of the eagle-distribution system of the National Eagle Repository, it does implement a new eagle-take permit policy, and some tribes have asserted that take of eagles has significant cultural and spiritual effects on them.

To meet our trust responsibility to tribes with regard to the unique traditional religious and cultural significance of eagles to Native American communities, we intend to minimize impacts by consulting with interested tribes prior to implementation of this rule, and on a case-by-case basis when issuance of individual permits may affect particular tribes. In addition, this rule provides that take of eagles for Native American religious purposes be given priority over take for any other purpose except safety emergencies, which should help ensure that Native American religious needs are not affected by this rule.

When we initially proposed this rule in June 2007, we contacted each recognized tribe with a letter describing this action and soliciting input from the tribe. We received only three comments from tribes on the proposal. We sent a second letter to the tribes when we released the DEA and re-opened the comment period on the proposed rule. In response to our draft EA, we heard

from five tribes, three tribal members, and three coalitions or confederations of tribes. The majority of these tribes either asked the Service to extend the comment period on the DEA and re-open rule, or asked the Service to delay finalizing the rulemaking until tribes were given the opportunity to consult with the Service on a government-to-government basis. We denied those requests because of the myriad of other interests that would go unmet if we did not complete and begin implementing the rule in an expeditious manner. However, as noted above, we will engage interested tribes in consultation as we develop the implementation guidance for these regulations.

*National Historic Preservation Act.* Section 106 of the National Historic Preservation Act of 1966, as amended (NHPA) (16 U.S.C 470 *et seq.*) requires Federal agencies to take into account the effects of their undertakings on historic properties. Federal agencies accomplish this by following the Section 106 regulations, "Protection of Historic Properties" (36 CFR part 800). The Section 106 regulations set forth a process by which agencies: (1) evaluate the effects of any Federal undertaking on historic properties (properties included in, or eligible for inclusion in, the National Register of Historic Places (National Register); (2) consult with State Historic Preservation Officers, Tribal Historic Preservation Officers, and other appropriate consulting parties regarding the identification and evaluation of historic properties, assessment of effects on historic properties, and the resolution of adverse effects; and (3) consult with appropriate American Indian tribes and Native Hawaiian organizations to determine whether they have concerns about historic properties of religious and cultural significance in areas of these Federal undertakings.

Some tribes and tribal members may consider eagle nests and other areas where eagles are present to be sacred sites provided for in the American Indian Religious Freedom Act of 1978 (42 U.S.C. 1996) (see below). Such sites may also be considered properties of traditional religious and cultural importance to an Indian tribe (commonly referred to as Traditional Cultural Properties or TCPs), and as potential historic properties of religious and cultural importance under the NHPA. Such sites are not limited to currently recognized Indian lands, and they occur across the entire aboriginal settlement area. TCPs may be areas where eagles nest and have nested within living memory. Thus, a landform or landscape known for eagle

habitation—a ridgeline, canyon, lakeshore, river valley, mesa, mountain, etc.—may be considered by tribes as suitable for TCP designation.

According to the Section 106 regulations, a property is considered an historic property if it is listed on, *or eligible for* (emphasis added) listing on, the National Register. Therefore, a lack of formal listing does not lessen the need to consider a property; instead, it emphasizes the need for close coordination with appropriate parties at the project planning stage.

Because an eagle or eagle nest can be considered a contributing feature or element of a TCP or sacred site, issuance of the proposed permits for eagles could constitute an undertaking requiring compliance with Section 106 of the NHPA, and may also require government-to-government consultation with tribes. The Service would comply with Section 106 on a case-by-case basis for permits that have the potential to have effects on historic properties. Where issuance of a permit has the potential to affect a TCP, the Service Regional Migratory Bird Permit Office will coordinate with the Service Regional Historic Preservation Officer to ensure necessary NHPA consultations take place with the appropriate parties. We may deny permits or attach additional conditions if necessary to avoid, minimize, or mitigate adverse effects to historic properties. Nothing in these regulations limits the Service from including additional conditions on individual permits for this purpose.

If it is determined to be more efficient for all parties, the Service may consult with appropriate stakeholders to develop State or regional agreements that would govern and resolve compliance with the NHPA for the issuance of permits in specific States or regions.

*American Indian Religious Freedom Act.* The American Indian Religious Freedom Act (AIRFA) (42 U.S.C. 1996) sets forth Federal policy to protect and preserve the inherent right of American Indians to express and exercise their traditional religions, including but not limited to, access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites. Given the special trust relationship between the Federal Government and federally-recognized Indian tribes, the accommodation of tribal religious practices is in furtherance of the duty of the Federal Government to promote tribal self-determination. AIRFA would be construed in conjunction with the Service's trust responsibility to federally-recognized tribes. The Service has incorporated these principles into this regulation. To address the possibility that demand exceeds our scientifically-based take thresholds, the regulation contains permit-issuance criteria to ensure that requests by Native Americans to take eagles from the wild, where the take is necessary to meet the religious purposes of the tribe, are given first priority over all other take except, as necessary, to alleviate safety emergencies.

*Paperwork Reduction Act.* This rule contains new information collection requirements that require approval by the Office of Management and Budget. The OMB has approved these revisions under OMB Control Number 1018-0136, which expires on August 31, 2012. We have addressed all comments received on the proposed rule above in this preamble.

*Title*: Eagle Take Permits, 50 CFR 22.26 and 22.27.

*Service Form Number(s)*: 3-200-71, 3-200-72, 3-202-15, and 3-202-16.

*Affected Public*: Individuals/households, businesses, and State, local, and tribal governments.

*Respondent's Obligation*: Required to obtain or retain a benefit.

*Frequency of Collection*: On occasion.

*Total Annual Nonhour Cost Burden*: $261,250 associated with application or processing fees.

| ACTIVITY/REQUIREMENT | ANNUAL NO. OF RESPONDENTS (non-Federal) | TOTAL ANNUALRESPONSES | COMPLE-TION TIME PER RESPONSE | TOTAL ANNUAL BURDEN HRS |
|---|---|---|---|---|
| FWS Form 3-200-71 – permit application (individual take) | 746 | 746 | 16 hrs | 11,936 |
| FWS Form 3-202-15 – annual report & monitoring under §22.26 | 1,119 | 1,119 | 30 hrs | 33,570 |
| FWS Form 3-200-72 – permit application | 46 | 46 | 16 hrs | 736 |
| FWS Form 3-202-16 monitoring & reporting for §22.27 permit | 40 | 40 | 16 hrs | 640 |
| FWS Forms 3-200-71 and 72 – permit application (programmatic take) | 26 | 26 | 40 hrs | 1,040 |
| Amendments to standard permits | 40 | 40 | 6 hrs | 240 |
| Amendments to programmatic permits | 10 | 10 | 20 hrs | 200 |
| **Totals** | **2,027** | **2,027** | | **48,362** |

We will use the information that we collect on permit applications to determine the eligibility of applicants for permits requested in accordance with the Eagle Act. Eagle permit regulations (50 CFR 22) and general permit regulations (50 CFR 13) stipulate general and specific requirements that when met allow us to issue permits to authorize activities that are otherwise prohibited.

All Service permit applications are in the 3-200 series of forms, each tailored to a specific activity based on the information requirements for specific types of permits. The application forms for other permits authorized under the Eagle Act are covered by OMB Control Number 1018-0022. After publication of this final rule, we will immediately incorporate the new information burdens for 22.26 and 22.27 into OMB Control Number 1018-0022.

We will use two additional forms as (1) the application for a § 22.26 take permit (FWS Form 3-200-71), and (2) the application for take of eagle nests under § 22.27 (FWS Form 3-200-72). We will use new FWS Form 3-202-15 as the annual report for the § 22.26 eagle take permit, and new FWS Form 3-202-16 as the report form for the § 22.27 nest take permit. The information collected for eagle permits is part of a system of

records covered by the Privacy Act (5 U.S.C. 552(a)).

We estimate receiving 1,120 permit applications for individual takes under § 22.26; 70 applications for nest take permits under § 22.27; and 40 applications for programmatic permits under § 22.26 & § 22.27, annually. We expect about one third may be Federal Government agencies. Therefore, we estimate that approximately 746 non-Federal applicants will apply for eagle-take permits, 46 non-Federal applicants will submit applications for eagle nest take permits, and 26 non-Federal applicants will apply for programmatic permits. We estimate it will take an average of 16 hours to complete an application for an individual take permit. Programmatic take permit applications will require more time, particularly at the outset as the first ones are developed for a given industry. As programmatic permits measures are developed for particular industries, the time it will take to apply for these permits will decrease. We estimate that the average programmatic take permit application will require 40 hours to prepare, although early programmatic permits that will serve as the "prototypes" for subsequent applications will require more time.

An agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The public may comment, at any time, on the accuracy of the information collection burden in this rule and may submit any comments to the Information Collection Clearance Officer, Fish and Wildlife Service, Department of the Interior, 1849 C Street, NW., (Mailstop 222-ARLSQ), Washington, D.C. 20240.

*National Environmental Policy Act.* The Service has prepared an environmental assessment of this action, pursuant to the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321 *et seq.*). Copies of the final environmental assessment are available on our website at *http://www.fws.gov/migratorybirds/baldeagle.htm*

*Literature Cited*

Good, R. E., R. M. Nielson, H. H. Sawyer, and L. L. McDonald. 2004. Population level survey of golden eagles (*Aquila chrysaetos*) in the Western United States. Final Report submitted to the Division of Migratory Bird Management, U.S. Fish and Wildlife Service. Western Ecosystems Technology, Incorporated; Cheyenne, Wyoming.

Good, R. E., R. M. Nielson, L. L. McDonald, and D. Tidhar. 2007. Results of the 2006 survey of golden eagles (*Aquila chrysaetos*) in the Western United States. Report submitted to the Division of Migratory Bird Management, U.S. Fish and Wildlife Service. Western Ecosystems Technology, Incorporated; Cheyenne, Wyoming.

Kirk, D. A. and C. Hyslop. 1998. Population status and recent trends in Canadian Raptors: A review. Biological Conservation 83:91-118.

Kochert, M. N., K. Steenhof, C. L. McIntyre, and E. H. Craig. 2002. Golden Eagle (*Aquila chrysaetos*). Number 684 in The Birds of North America, A. Poole and G. Gill, editors. The Birds of North America, Inc., Philadelphia, Pennsylvania.

McIntyre, C. L., D.C. Douglas, and M. W. Collopy. 2008. Movements of golden eagles (Aquila chrysaetos) from interior Alaska during their first year of independence. Auk 125:214-224.

Millsap, Brian and George Allen. 2006. Effects of Falconry Harvest on Wild Raptor Populations in the United States: Theoretical Considerations and Management Recommendations. Wildlife Society Bulletin, 34(5):1392-1400.

U.S. Fish and Wildlife Service. 2007. National Bald Eagle Management Guidelines, Arlington, Virginia.

List of Subjects in 50 CFR Part 13

Administrative practice and procedure, Exports, Fish, Imports, Plants, Reporting and record keeping requirements, Transportation, Wildlife.

List of Subjects in 50 CFR Part 22

Birds, Exports, Imports, Migratory Birds, Reporting and recordkeeping requirements, Transportation, Wildlife.

**Regulation Promulgation**

■ For the reasons described in the preamble, we amend Subchapter B of Chapter I, Title 50 of the Code of Federal Regulations, as set forth below:

**PART 13—GENERAL PERMIT PROCEDURES**

■ 1. The authority citation for part 13 continues to read as follows:

**Authority:** 16 U.S.C. 668a, 704, 712, 742j-1, 1374(g), 1382, 1538(d), 1539, 1540(f), 3374, 4901–4916; 18 U.S.C. 42; 19 U.S.C. 1202; 31 U.S.C. 9701.

■ 2. Amend the table in § 13.11(d)(4) as follows:

■ a. Under the heading "Bald and Golden Eagle Protection Act," remove the entry for "Eagle Depredation" and replace it with a new entry for "Eagle Take Permits—Depredation and Protection of Health and Safety"; and

■ b. Add four entries under "Bald and Golden Eagle Protection Act" in the table immediately following the entry for "Eagle Transport—Native American Religious Purposes," to read as follows:

**§ 13.11   Application procedures.**

\*      \*      \*      \*      \*

(d) \* \* \*

(4) *User fees.* \* \* \*

| Type of Permit | CFR citation | Fee | Amendment Fee |
|---|---|---|---|
| \*      \*      \*      \*      \* | | | |
| **Bald and Golden Eagle Protection Act** | | | |
| \* \* \* \* \* \* \* | | | |
| Eagle Take permits—Depredation and Protection of Health and Safety | 50 CFR 22 | 100 | |
| \* \* \* \* \* \* \* | | | |
| Eagle Take—Associated With but Not the Purpose of an Activity | 50 CFR 22 | 500 | 150 |
| Eagle Take—Associated With but Not the Purpose of an Activity—Programmatic | 50 CFR 22 | 1000 | 500 |
| Eagle Nest Take | 50 CFR 22 | 500 | 150 |
| Eagle Nest Take—Programmatic | 50 CFR 22 | 1000 | 500 |
| \* \* \* \* \* \* \* | | | |

* * * * *

■ 3. Amend the table in §13.12(b) as follows:

■ a. Under "Eagle permits," remove the entry for "Depredation control" and replace it with "Depredation and Protection of Health and Safety"; and

■ b. Add to the table the following entries in numerical order by section number to read as follows:

**§13.12  General information requirements on applications for permits.**

* * * * *

(b) * * *

| Type of permit | Section |
|---|---|
| *     *     *     *     * | |
| Eagle permits: | |
| *     *     *     *     * | |
| Depredation and Protection of Health and Safety | 22.23 |
| *     *     *     *     * | |
| Eagle Take—Associated With but Not the Purpose of an Activity | 22.26 |
| Eagle Nest Take | 22.27 |
| *     *     *     *     * | |

## PART 22—EAGLE PERMITS

■ 4. The authority citation for part 22 continues to read as follows:

**Authority:** 16 U.S.C. 668–668d; 16 U.S.C. 703–712; 16 U.S.C. 1531–1544.

■ 5. Amend § 22.3 as follows:
■ a. By revising the introductory paragraph to read as set forth below;
■ b. By removing the definition of "Golden eagle nest";
■ c. By revising the definitions of "Inactive nest" and Take" to read as set forth below; and
■ d. By adding new definitions for "Advanced conservation practices", "Communal roost site", "Cumulative effects", "Eagle nest", "Foraging area", "Important eagle-use area", "Indirect effects", "Maximum degree achievable", "Necessary to ensure public health and safety", "Practicable", "Programmatic permit", "Programmatic take", "Safety emergency" and "Territory" to read as set forth below.

**§22.3  What definitions do you need to know?**

In addition to the definitions contained in part 10 of this subchapter, and unless the context otherwise requires, in this part 22:

*Advanced conservation practices* means scientifically supportable measures that are approved by the Service and represent the best available techniques to reduce eagle disturbance and ongoing mortalities to a level where remaining take is unavoidable.

* * * * *

*Communal roost site* means an area where eagles gather repeatedly in the course of a season and shelter overnight and sometimes during the day in the event of inclement weather.

*Cumulative effects* means the incremental environmental impact or effect of the proposed action, together with impacts of past, present, and reasonably foreseeable future actions.

* * * * *

*Eagle nest* means any readily identifiable structure built, maintained, or used by bald eagles or golden eagles for the purpose of reproduction.

* * * * *

*Foraging area* means an area where eagles regularly feed during one or more seasons.

* * * * *

*Important eagle-use area* means an eagle nest, foraging area, or communal roost site that eagles rely on for breeding, sheltering, or feeding, and the landscape features surrounding such nest, foraging area, or roost site that are essential for the continued viability of the site for breeding, feeding, or sheltering eagles.

*Inactive nest* means a bald eagle or golden eagle nest that is not currently being used by eagles as determined by the continuing absence of any adult, egg, or dependent young at the nest for at least 10 consecutive days immediately prior to, and including, at present. An inactive nest may become active again and remains protected under the Eagle Act.

*Indirect effects* means effects for which a proposed action is a cause, and which may occur later in time and/or be physically manifested beyond the initial impacts of the action, but are still reasonably likely to occur.

*Maximum degree achievable* means the standard at which any take that occurs is unavoidable despite implementation of advanced conservation practices.

*Necessary to ensure public health and safety* means required to maintain society's well-being in matters of health and safety.

* * * * *

*Practicable* means capable of being done after taking into consideration, relative to the magnitude of the impacts to eagles, the following three things: the cost of remedy compared to proponent resources; existing technology; and

logistics in light of overall project purposes.

*Programmatic permit* means a permit that authorizes programmatic take. A programmatic permit can cover other take in addition to programmatic take.

*Programmatic take* means take that is recurring, is not caused solely by indirect effects, and that occurs over the long term or in a location or locations that cannot be specifically identified.

* * * * *

*Safety emergency* means a situation that necessitates immediate action to alleviate a threat of bodily harm to humans or eagles.

*Take* means pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, destroy, molest, or disturb.

*Territory* means an area that contains, or historically contained, one or more nests within the home range of a mated pair of eagles.

* * * * *

■ 6. Amend § 22.4 as follows:
■ a. In paragraph (a), the first sentence, by adding "and 1018-0136" immediately following "1018-0022"; and
■ b. By revising paragraph (b) to read as follows:

**§22.4  Information collection requirements.**

* * * * *

(b) Direct comments regarding any aspect of these reporting requirements to the Service Information Collection Control Officer, MS-222 ARLSQ, U.S. Fish and Wildlife Service, Washington, DC 20240, or the Office of Management and Budget, Paperwork Reduction Project (1018-0022 and 1018-0136), Washington, DC 20603.

■ 7. Amend § 22.23 by revising:
■ a. The section heading;
■ b. Paragraph (a) introductory text and paragraphs (a)(5) and (a)(6);
■ c. Paragraph (b) introductory text;
■ d. Paragraph (c) introductory text and paragraphs (c)(2) and (c)(3); and
■ e. Paragraph (d), to read as follows:

**§22.23  What are the requirements for permits to take depredating eagles and eagles that pose a risk to human or eagle health and safety?**

(a) *How do I apply for a permit?* You must submit applications for permits under this section to the appropriate Regional Director—Attention: Migratory Bird Permit Office. You can find addresses for the appropriate Regional Directors in 50 CFR 2.2. Your application must contain the information and certification required by § 13.12(a) of this subchapter, and the following additional information:

* * * * *

(5) Kind and number of livestock or domestic animals owned by applicant, if applicable;

(6) Kind and amount of alleged damage, or description of the risk posed to human health and safety or eagles; and

\* \* \* \* \*

(b) *What are the permit conditions?* In addition to the general conditions set forth in part 13 of this subchapter B, permits to take bald or golden eagles under this section are subject to the following conditions:

\* \* \* \* \*

(c) *Issuance criteria.* The Director will not issue a permit to take bald or golden eagles unless the Director has determined that such taking is compatible with the preservation of the bald or golden eagle. In making such determination, the Director will consider the following:

\* \* \* \* \*

(2) Whether evidence shows that bald or golden eagles have in fact become seriously injurious to wildlife or to agriculture or other interests in the particular locality to be covered by the permit and the injury complained of is substantial, or that bald or golden eagles pose a significant risk to human or eagle health and safety; and

(3) Whether the only way to abate or prevent the damage caused by the bald or golden eagle is to take some or all of the offending birds.

(d) *Tenure of permits.* The tenure of any permit to take bald or golden eagles under this section is that shown on the face of the permit. We will not issue these permits for terms longer than 90 days, except that permits to authorize disturbance associated with hazing eagles from the vicinity may be valid for up to 5 years. We may amend, suspend, or revoke permits issued for a period of longer than 90 days if new information indicates that revised permit conditions are necessary, or that suspension or revocation is necessary, to safeguard local or regional eagle populations.

■ 8. Amend part 22, subpart C, by adding new § 22.26 and § 22.27 to read as follows:

## Subpart C—Eagle Permits

\* \* \* \* \*

**§ 22.26  Permits for eagle take that is associated with, but not the purpose of, an activity.**

(a) *Purpose and scope.* This permit authorizes take of bald eagles and golden eagles where the take is compatible with the preservation of the bald eagle and the golden eagle;

necessary to protect an interest in a particular locality; associated with but not the purpose of the activity; and

(1) For individual instances of take: the take cannot practicably be avoided; or

(2) For programmatic take: the take is unavoidable even though advanced conservation practices are being implemented.

(b) *Definitions.* In addition to the definitions contained in part 10 of this subchapter, and § 22.3, the following definition applies in this section:

*Eagle* means a live bald eagle (*Haliaeetus leucocephalus*), live golden eagle (*Aquila chrysaetos*), a bald eagle egg, or a golden eagle egg.

(c) *Permit conditions.* In addition to the conditions set forth in part 13 of this subchapter, which govern permit renewal, amendment, transfer, suspension, revocation, and other procedures and requirements for all permits issued by the Service, your authorization is subject to the following additional conditions:

(1) You must comply with all avoidance, minimization, or other mitigation measures determined by the Director as reasonable and specified in the terms of your permit to compensate for the detrimental effects, including indirect effects, of the permitted activity on the regional eagle population;

(2) You may be required to monitor eagle use of important eagle-use areas where eagles are likely to be affected by your activities for up to 3 years after completion of the activity or as set forth in a separate management plan, as specified on your permit. Unless different monitoring protocols are required under a separate management plan approved by the Service and denoted on the permit, monitoring consists of periodic site visits, during the season(s) when eagles would normally be present, to the area where the take is likely to occur, and noting whether eagles continue to nest, roost, or forage there. The periodic monitoring is required for the duration of the activity that is likely to cause take (during the season(s) that eagles would normally be present). The frequency and duration of required monitoring *after* the activity is completed will depend on the form and magnitude of the anticipated take and the objectives of associated conservation measures, not to exceed what is reasonable to meet the primary purpose of the monitoring, which is to provide data needed by the Service regarding the impacts of human activity on eagles for purposes of adaptive management. Monitoring will not be required beyond 3 years after completion of an activity that was likely

to cause take. For ongoing activities and enduring site features that continue to be likely to result in take, periodic monitoring may be required for as long as the data are needed to assess impacts to eagles.

(3) You must submit an annual report summarizing the information you obtained through monitoring to the Service every year that your permit is valid and for up to 3 years after completion of the activity or termination of the permit, as specified in your permit. If your permit expires or is suspended or revoked before the activity is completed, you must submit the report within 60 days of such date. Reporting requirements include:

(i) Whether eagles are observed using the important eagle-use areas designated on the permit; and

(ii) Description of the human activities conducted at the site when eagles are observed.

(4) While the permit is valid and for up to 3 years after it expires, you must allow Service personnel, or other qualified persons designated by the Service, access to the areas where eagles are likely to be affected, at any reasonable hour, and with reasonable notice from the Service, for purposes of monitoring eagles at the site(s).

(5) The authorizations granted by permits issued under this section apply only to take that results from activities conducted in accordance with the description contained in the permit application and the terms of the permit. If the permitted activity changes after a permit is issued, you must immediately contact the Service to determine whether a permit amendment is required in order to retain take authorization.

(6) You must contact the Service immediately upon discovery of any unanticipated take.

(7) The Service may amend, suspend, or revoke a programmatic permit issued under this section if new information indicates that revised permit conditions are necessary, or that suspension or revocation is necessary, to safeguard local or regional eagle populations. This provision is in addition to the general criteria for amendment, suspension, and revocation of Federal permits set forth in §§ 13.23, 13.27, and 13.28.

(8) Notwithstanding the provisions of § 13.26 of this subchapter, you remain responsible for all outstanding monitoring requirements and mitigation measures required under the terms of the permit for take that occurs prior to cancellation, expiration, suspension, or revocation of the permit.

(9) You must promptly notify the Service of any eagle(s) found injured or

dead at the activity site, regardless of whether the injury or death resulted from your activity. The Service will determine the disposition of these eagles.

(10) The authorization granted by permits issued under this section is not valid unless you are in compliance with all Federal, tribal, State, and local laws and regulations applicable to take of eagles.

(d) *Applying for an eagle take permit.*

(1) You are advised to coordinate with the Service as early as possible for advice on whether a permit is needed and for technical assistance in assembling your permit application package. The Service may provide guidance on developing complete and adequate application materials and will determine when the application form and materials are ready for submission.

(2) Your application must consist of a completed application Form 3-200-71 and all required attachments. Send applications to the Regional Director of the Region in which the disturbance would occur—Attention: Migratory Bird Permit Office. You can find the current addresses for the Regional Directors in §2.2 of subchapter A of this chapter.

(e) *Evaluation of applications.* In determining whether to issue a permit, we will evaluate:

(1) Whether take is likely to occur based on the magnitude and nature of the impacts of the activity, which include indirect effects. For potential take in the form of disturbance, this evaluation would include:

(i) The prior exposure and tolerance to similar activity of eagles in the vicinity;

(ii) Visibility of the activity from the eagle's nest, roost, or foraging perches; and

(iii) Whether alternative suitable eagle nesting, roosting, and/or feeding areas that would not be detrimentally affected by the activity are available to the eagles potentially affected by the activity.

(2) Whether the take is:

(i) Compatible with the preservation of the bald eagle and the golden eagle, including consideration of indirect effects and the cumulative effects of other permitted take and other additional factors affecting eagle populations;

(ii) Associated with the permanent loss of an important eagle use area;

(iii) Necessary to protect a legitimate interest in a particular locality; and

(iv) Associated with, but not the purpose of, the activity.

(3) Whether the applicant has proposed avoidance and minimization measures to reduce the take to the maximum degree practicable, and for programmatic authorizations, the take is unavoidable despite application of advanced conservation practices developed in coordination with the Service.

(4) Whether issuing the permit would preclude the Service from authorizing another take necessary to protect an interest of higher priority, according to the following prioritization order:

(i) Safety emergencies;

(ii) Native American religious use for rites and ceremonies that require eagles be taken from the wild;

(iii) Renewal of programmatic take permits;

(iv) Non-emergency activities necessary to ensure public health and safety; and

(v) Other interests.

(5) Any additional factors that may be relevant to our decision whether to issue the permit, including, but not limited to, the cultural significance of a local eagle population.

(f) *Required determinations.* Before we issue a permit, we must find that:

(1) The direct and indirect effects of the take and required mitigation, together with the cumulative effects of other permitted take and additional factors affecting eagle populations, are compatible with the preservation of bald eagles and golden eagles;

(2) The taking is necessary to protect a legitimate interest in a particular locality;

(3) The taking is associated with, but not the purpose of, the activity;

(4) The taking cannot practicably be avoided; or for programmatic authorizations, the take is unavoidable;

(5) The applicant has avoided and minimized impacts to eagles to the extent practicable, and for programmatic authorizations, the taking will occur despite application of advanced conservation practices; and

(6) Issuance of the permit will not preclude issuance of another permit necessary to protect an interest of higher priority as set forth in paragraph (e)(4) of this section.

(g) We may deny issuance of a permit if we determine that take is not likely to occur.

(h) *Permit duration.* The duration of each permit issued under this section will be designated on its face, and will be based on the duration of the proposed activities, the period of time for which take will occur, the level of impacts to eagles, and mitigation measures, but will not exceed 5 years.

§ 22.27   **Removal of eagle nests.**

(a) *Purpose and scope.*

(1) A permit may be issued under this section to authorize removal or relocation of:

(i) An active or inactive nest where necessary to alleviate a safety emergency;

(ii) An inactive eagle nest when the removal is necessary to ensure public health and safety;

(iii) An inactive nest that is built on a human-engineered structure and creates a functional hazard that renders the structure inoperable for its intended use; or

(iv) An inactive nest, provided the take is necessary to protect an interest in a particular locality and the activity necessitating the take or the mitigation for the take will, with reasonable certainty, provide a clear and substantial benefit to eagles.

(2) Where practicable and biologically warranted, the permit may require a nest to be relocated, or a substitute nest provided, in a suitable site within the same territory to provide a viable nesting option for eagles within that territory, unless such relocation would create a threat to safety. However, we may issue permits to remove nests that we determine cannot or should not be relocated. The permit may authorize take of eggs or nestlings if present. The permit may also authorize the take of adult eagles (e.g., disturbance or capture) associated with the removal or relocation of the nest.

(3) A programmatic permit may be issued under this section to cover multiple nest takes over a period of up to 5 years, provided the permittee complies with comprehensive measures that are developed in coordination with the Service, designed to reduce take to the maximum degree technically achievable, and specified as conditions of the permit.

(4) This permit does not authorize intentional, lethal take of eagles.

(b) *Conditions.*

(1) Except for take that is necessary to alleviate an immediate threat to human or eagle safety, only inactive eagle nests may be taken under this permit.

(2) When an active nest must be removed under this permit, any take of nestlings or eggs must be conducted by a Service-approved, qualified, and permitted agent, and all nestlings and viable eggs must be immediately transported to foster/recipient nests or a rehabilitation facility permitted to care for eagles, as directed by the Service.

(3) Possession of the nest for any purpose other than removal or relocation is prohibited without a separate permit issued under this part authorizing such possession.

(4) You must submit a report consisting of a summary of the activities conducted under the permit to the Service within 30 days after the

permitted take occurs, except that for programmatic permits, you must report each nest removal within 10 days after the take and submit an annual report by January 31 containing all the information required in Form 3-202-16 for activities conducted during the preceding calendar year.

(5) You may be required to monitor the area and report whether eagles attempt to build or occupy another nest at another site in the vicinity for the duration specified in the permit.

(6) You may be required under the terms of the permit to harass eagles from the area following the nest removal when the Service determines it is necessary to prevent eagles from re-nesting in the vicinity.

(7) You must comply with all avoidance, minimization, or other mitigation measures determined by the Director as reasonable and specified in the terms of your permit to compensate for the detrimental effects, including indirect effects, of the permitted activity on—and for permits issued under paragraph (a)(1)(iv) of this section, to provide a net benefit to—the regional eagle population.

(8) The Service may amend or revoke a programmatic permit issued under this section if new information indicates that revised permit conditions are necessary, or that suspension or revocation is necessary, to safeguard local or regional eagle populations.

(9) Notwithstanding the provisions of §13.26 of this subchapter, you remain responsible for all outstanding monitoring requirements and mitigation measures required under the terms of the permit for take that occurs prior to cancellation, expiration, suspension, or revocation of the permit.

(10) The authorization granted by permits issued under this section is not valid unless you are in compliance with all Federal, tribal, State, and local laws and regulations applicable to take of eagles.

(c) *Applying for a permit to take eagle nests.*

(1) If the take is necessary to address an immediate threat to human or eagle safety, contact your local U.S. Fish and Wildlife Service Regional Migratory Bird Permit Office (*http://www.fws.gov/permits/mbpermits/addresses.html*) at the earliest possible opportunity to inform the Service of the emergency.

(2) Your application must consist of a completed application Form 3-200-72 and all required attachments. Send applications to the Regional Director of the Region in which the disturbance would occur—Attention: Migratory Bird Permit Office. You can find the current

addresses for the Regional Directors in §2.2 of subchapter A of this chapter.

(d) *Evaluation of applications.* In determining whether to issue a permit, we will evaluate:

(1) Whether the activity meets the requirements of paragraph (a)(1) of this section;

(2) The direct and indirect effects of the take and required mitigation, together with the cumulative effects of other permitted take and additional factors affecting eagle populations;

(3) Whether there is a practicable alternative to nest removal that will protect the interest to be served;

(4) Whether issuing the permit would preclude the Service from authorizing another take necessary to protect an interest of higher priority, as set forth in paragraph (e)(5) of this section;

(5) For take that is not necessary to alleviate an immediate safety emergency, whether suitable nesting and foraging habitat is available to accommodate eagles displaced by the nest removal; and

(6) Any additional factors that may be relevant to our decision whether to issue the permit, including, but not limited to, the cultural significance of a local eagle population.

(e) *Required determinations.* Before issuing a permit under this section, we must find that:

(1) The direct and indirect effects of the take and required mitigation, together with the cumulative effects of other permitted take and additional factors affecting eagle populations, are compatible with the preservation of the bald eagle or the golden eagle;

(2) For inactive nests:

(i) The take is necessary to ensure public health and safety;

(ii) The nest is built on a human-engineered structure and creates a functional hazard that renders the structure inoperable for its intended use; or

(iii) The take is necessary to protect a legitimate interest in a particular locality, and the activity necessitating the take or the mitigation for the take will, with reasonable certainty, provide a clear and substantial benefit to eagles;

(3) For active nests, the take is necessary to alleviate an immediate threat to human safety or eagles;

(4) There is no practicable alternative to nest removal that would protect the interest to be served; and

(5) Issuing the permit will not preclude the Service from authorizing another take necessary to protect an interest of higher priority, according to the following prioritization order:

(i) Safety emergencies;

(ii) Native American religious use for rites and ceremonies that require eagles be taken from the wild;

(iii) Renewal of programmatic nest-take permits;

(iv) Non-emergency activities necessary to ensure public health and safety;

(v) Resource development or recovery operations (under § 22.25, for golden eagle nests only); and

(vi) Other interests.

(6) For take that is not necessary to alleviate an immediate threat to human safety or eagles, we additionally must find that suitable nesting and foraging habitat is available to the area nesting population of eagles to accommodate any eagles displaced by the nest removal.

(f) *Tenure of permits.* The tenure of any permit to take eagle nests under this section is set forth on the face of the permit and will not be longer than 5 years.

■ 9. Amend § 22.28 by revising paragraphs (a) and (b) to read as follows:

### § 22.28  Permits for bald eagle take exempted under the Endangered Species Act.

(a) *Purpose and scope.* This permit authorizes take of bald eagles (*Haliaeetus leucocephalus*) in compliance with the terms and conditions of a section 7 incidental take statement under the Endangered Species Act of 1973, as amended (ESA) (16 U.S.C. 1531 *et seq.*; 50 CFR 402, Subpart B) issued prior to the effective date of 50 CFR 22.26.

(b) *Issuance criteria.* Before issuing you a permit under this section, we must find that you are in full compliance with the terms and conditions contained in the applicable ESA incidental take statement issued prior to the effective date of 50 CFR 22.26 for take of eagles, based on your certification and any other relevant information available to us, including, but not limited to, monitoring or progress reports required pursuant to your incidental take statement. The terms and conditions of the Eagle Act permit under this section, including any modified terms and conditions, must be compatible with the preservation of the bald eagle.

\*    \*    \*    \*    \*

Dated: May 18, 2009.

**Will Shafroth,**

*Acting Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. E9–21589 Filed 9–10– 09; 8:45 am]

**BILLING CODE 4310–55–S**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Parts 10 and 21

[Docket No. FWS–R9–MB–2010–0088, FF09M21200–134–FXMB1231099BPP0]

RIN 1018–AX48

### General Provisions; Revised List of Migratory Birds

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service, revise the List of Migratory Birds by both adding and removing species. Reasons for the changes to the list include adding species based on new taxonomy and new evidence of occurrence in the United States or U.S. territories, removing species no longer known to occur within the United States, and changing names to conform to accepted use. The net increase of 19 species (23 added and 4 removed) brings the total number of species protected by the Migratory Bird Treaty Act (MBTA) to 1,026. We regulate most aspects of the taking, possession, transportation, sale, purchase, barter, exportation, and importation of migratory birds. An accurate and up-to-date list of species protected by the MBTA is essential for public notification and regulatory purposes.

**DATES:** This rule is effective December 2, 2013.

**FOR FURTHER INFORMATION CONTACT:** George Allen at 703–358–1825.

**SUPPLEMENTARY INFORMATION:**

### Background

### What statutory authority does the service have for this rulemaking?

We have statutory authority and responsibility for enforcing the Migratory Bird Treaty Act (MBTA) (16 U.S.C. 703–712), the Fish and Wildlife Improvement Act of 1978 (16 U.S.C. 742l), and the Fish and Wildlife Act of 1956 (16 U.S.C. 742a–j). The MBTA implements Conventions between the United States and four neighboring countries for the protection of migratory birds, as follows:

(1) Canada: Convention between the United States and Great Britain [on behalf of Canada] for the Protection of Migratory Birds, August 16, 1916, 39 Stat. 1702 (T.S. No. 628);

(2) Mexico: Convention between the United States and Mexico for the Protection of Migratory Birds and Game

Mammals, February 7, 1936, 50 Stat. 1311 (T.S. No. 912);

(3) Japan: Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, March 4, 1972, 25 U.S.T. 3329 (T.I.A.S. No. 7990); and

(4) Russia: Convention between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and Their Environment (Russia), November 19, 1976, 29 U.S.T. 4647 (T.I.A.S. No. 9073).

### What is the purpose of this rulemaking?

Our purpose is to inform the public of the species protected by the MBTA and its implementing regulations. These regulations are found in Title 50, Code of Federal Regulations (CFR), Parts 10, 20, and 21. We regulate most aspects of the taking, possession, transportation, sale, purchase, barter, exportation, and importation of migratory birds. An accurate and up-to-date list of species protected by the MBTA is essential for regulatory purposes.

### Why is this amendment of the list of migratory birds necessary?

The amendment is needed to: (1) Add five species previously overlooked from a family protected under the MBTA; (2) correct the spelling of six species on the alphabetized list; (3) correct the spelling of three species on the taxonomic list; (4) add 11 species based on new distributional records documenting their natural occurrence in the United States since April 2007; (5) add one species from a family now protected under the MBTA as a result of taxonomic changes; (6) add six species newly recognized as a result of recent taxonomic changes; (7) remove four species not known to occur within the boundaries of the United States or its territories as a result of recent taxonomic changes; (8) change the common (English) names of nine species to conform with accepted use; and (9) change the scientific names of 36 species to conform to accepted use.

The List of Migratory Birds (50 CFR 10.13) was last revised on March 1, 2010 (75 FR 9282). These amendments were necessitated by three published supplements to the 7th (1998) edition of the American Ornithologists' Union's (AOU's) *Check-list of North American birds* (AOU 2008, AOU 2009, and AOU 2010).

In addition, we correct the legal authorities citations at 50 CFR 10.13(a). We also make a small change to a definition in 50 CFR 21.3. We update

the definition of "raptor" to also include the Order Accipitriformes, corresponding to recent taxonomic changes reflected in the List of Migratory Birds.

### What scientific authorities are used to amend the list of migratory birds?

Although bird names (common and scientific) are relatively stable, staying current with standardized use is necessary to avoid confusion in communications. In making our determinations, we primarily relied on the American Ornithologists' Union's *Check-list of North American birds* (AOU 1998), as amended (AOU 1999, 2000, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010), on matters of taxonomy, nomenclature, and the sequence of species and other higher taxonomic categories (orders, families, subfamilies) for species that occur in North America. The AOU Checklist contains all bird species that have occurred in North America from the Arctic through Panama, including the West Indies and the Hawaiian Islands, and includes distributional information for each species, which specifies whether the species is known to occur in the United States. For the 39 species that occur outside the geographic area covered by the *Check-list* (28 that occur in the Pacific island territories and 11 listed in the Japanese and/or Russian conventions that have not occurred in the AOU area), we relied primarily on Clements (2007). Although we primarily rely on the above checklists, when informed taxonomic opinion is inconsistent or controversial, we evaluate available published and unpublished information and come to our own conclusion regarding the validity of taxa.

### What criteria are used to identify individual species protected by the MBTA?

A species qualifies for protection under the MBTA by meeting one or more of the following four criteria:

(1) It is covered by the Canadian Convention of 1916, as amended in 1996, by virtue of meeting the following three criteria: (a) It belongs to a family or group of species named in the Canadian Convention, as amended; (b) specimens, photographs, videotape recordings, or audiotape recordings provide convincing evidence of natural occurrence in the United States or its territories; and (c) the documentation of such records has been recognized by the AOU or other competent scientific authorities.

(2) It is covered by the Mexican Convention of 1936, as amended in

1972, by virtue of meeting the following three criteria: (a) It belongs to a family or group of species named in the Mexican Convention, as amended; (b) specimens, photographs, videotape recordings, or audiotape recordings provide convincing evidence of natural occurrence in the United States or its territories; and (c) the documentation of such records has been recognized by the AOU or other competent scientific authorities.

(3) It is listed in the annex to the Japanese Convention of 1972, as amended.

(4) It is listed in the appendix to the Russian Convention of 1976.

In accordance with the Migratory Bird Treaty Reform Act of 2004 (MBTRA) (Pub. L. 108–447, 118 Stat. 2809, 3071–72), we include all species native to the United States or its territories, which are those that occur as a result of natural biological or ecological processes (see 70 FR 12710, March 15, 2005). We do not include nonnative species whose occurrences in the United States are solely the result of intentional or unintentional human-assisted introduction(s).

**How do the changes affect the list of migratory birds?**

Several taxonomic changes were made at the Order and Family level by the AOU since our 2010 publication of the list (75 FR 9282, March 1, 2010). These changes affect the inclusion and taxonomic order of species on this list. Specifically, the Orders Phaethontiformes and Suliformes were split from the Pelecaniformes. Phaethontiformes now includes the Family Phaethontidae (tropicbirds); Suliformes now includes the Families Fregatidae (frigatebirds), Sulidae (boobys), Phalacrocoracidae (cormorants), and Anhingidae (anhingas). In addition, the Order Accipitriformes was split from the Falconiformes and now include the Families Cathartidae (vultures), Pandionidae (Osprey), and Accipitridae (hawks and eagles). At the Family level, the Ardeidae (herons and egrets) and Threskiornithidae (ibis and spoonbills) were moved from the Ciconiiformes to the Pelecaniformes Order, the Pandionidae (Osprey) was split from the Accipitridae (hawks and eagles), and the Stercorariidae (jaegers and skuas) was split from the Laridae (gulls, terns, and skimmers). The Polioptilidae (gnatcatchers), Phylloscopidae (*Phylloscopus* warblers), Acrocephalidae (*Acrocephalus* warblers), and Megaluridae (*Locustella* warblers) were split from the Sylviidae, and the Calcariidae (longspurs and

snow buntings) was split from the Emberizidae (buntings and sparrows). The euphonias were put into their own Subfamily (Euphoniinae) and moved from the Thraupidae to the Fringillidae Family. All species within these newly created Families continue to be protected under the MBTA. In addition, the Wrentit was moved from the Timaliidae (babblers) to the Sylviidae and is now in a Family protected by the MBTA.

The amendments (23 additions, 4 removals, and 54 name changes) affect a grand total of 79 species and result in a net addition of 19 species to the List of Migratory Birds, increasing the species total from 1,007 to 1,026. Of the 23 species that we add to the list, 6 were previously covered under the MBTA as subspecies of listed species. These amendments can be logically arranged in the following 9 categories:

(1) Add five species from the family Muscicapidae, a family specifically listed in the 1996 protocol amending the 1916 convention with Canada. The omission of these species on the previous list was an oversight. All are considered accidental or casual in Alaska. The species and relevant AOU publication(s) are:

Mugimaki Flycatcher, *Ficedula mugimaki* (AOU 1987, 1997, 1998);

Taiga Flycatcher, *Ficedula albicilla* (AOU 1982, 1983, 1998, 2006);

Dark-sided Flycatcher, *Muscicapa sibirica* (AOU 1982, 1983, 1998, 2004);

Asian Brown Flycatcher, *Muscicapa dauurica* (AOU 1987, 1989, 1998); and

Spotted Flycatcher, *Muscicapa striata* (AOU 2004).

(2) Correct the spelling of six scientific names on the alphabetized list:

*Nesofregata fuliginosa* (Polynesian Storm-Petrel), becomes *Nesofregetta fuliginosa;*

*Thalleseus maximus* (Royal Tern), becomes *Thalasseus maximus;*

*Thalleseus sandvicensis* (Sandwich Tern), becomes *Thalasseus sandvicensis;*

*Vireo atricapillus* (Black-capped Vireo), becomes *Vireo atricapilla;*

*Phylloscopus siilatrix* (Wood Warbler), becomes *Phylloscopus sibilatrix;* and

*Locustella lanceoloata* (Lanceolated Warbler), becomes *Locustella lanceolata.*

(3) Correct the spelling of three scientific names on the taxonomic list:

*Nesofregetta fuiginosa* (Polynesian Storm-Petrel), becomes *Nesofregetta fuliginosa;*

*Vireo atricapillus* (Black-capped Vireo), becomes *Vireo atricapilla;* and

*Tiaris olivacea* (Yellow-faced Grassquit), becomes *Tiaris olivaceus.*

(4) Add 11 species based on review and acceptance by AOU (since April 2007) of new distributional records documenting their occurrence in the United States, Puerto Rico, or the U.S. Virgin Islands. These species belong to families covered by the Canadian and/or Mexican Conventions, and all are considered to be of accidental or casual occurrence. For each species, we list the State in which it has been recorded plus the relevant publication:

Parkinson's Petrel, *Procellaria parkinsoni*—California (AOU 2008);

Swinhoe's Storm-Petrel, *Oceanodroma monorhis*—North Carolina (AOU 2010);

Swallow-tailed Gull, *Creagrus furcatus*—California (AOU 2008);

Brown Hawk-Owl, *Ninox scutulata*—Alaska (AOU 2009);

White-crested Elaenia, *Elaenia albiceps*—Texas (AOU 2010);

Crowned Slaty Flycatcher, *Empidonomus aurantioatrocristatus*—Louisiana (AOU 2010);

Sinaloa Wren, *Thryothorus sinaloa*—Arizona (AOU 2010);

Pallas's Leaf-Warbler, *Phylloscopus proregulus*—Alaska (AOU 2008);

Sedge Warbler, *Acrocephalus schoenobaenus*—Alaska (AOU 2009);

Rufous-tailed Robin, *Luscinia sibilans*—Alaska (AOU 2010); and

Yellow-browed Bunting, *Emberiza chrysophrys*—Alaska (AOU 2009).

(5) Add one species because of recent taxonomic changes transferring a species in a family formerly not protected by the MBTA (Timaliidae) into a family protected under the MBTA (Sylviidae). We reference the AOU publication supporting the change:

Wrentit, *Chamaea fasciata* (AOU 2010).

(6) Add six species because of recent taxonomic changes in which taxa formerly treated as subspecies have been determined to be distinct species. Given that each of these species was formerly treated as subspecies of a listed species, these additions will not change the protective status of any of these taxa, only the names by which they are known. In each case, we reference the AOU publication supporting the change:

Eastern Spot-billed Duck, *Anas zonorhyncha*—formerly considered a subspecies of *Anas poecilorhyncha*, Spot-billed Duck (AOU 2008);

Black Scoter, *Melanitta americana*—formerly treated as a subspecies of *Melanitta nigra*, Common [Black] Scoter (AOU 2009);

Mexican Whip-poor-will, *Caprimulgus arizonae*—formerly treated as a subspecies of *Caprimulgus vociferus*, Whip-poor-will (AOU 2010);

Pacific Wren, *Troglodytes pacificus*—formerly treated as a subspecies of

*Troglodytes troglodytes,* Eurasian [Winter] Wren (AOU 2010).

Winter Wren, *Troglodytes hiemalis*—formerly treated as a subspecies of *Troglodytes troglodytes,* Eurasian [Winter] Wren (AOU 2010); and

Puerto Rican Oriole, *Icterus portoricensis*—formerly treated as a subspecies of *Icterus dominicensis,* Hispaniolan [Greater Antillean] Oriole (AOU 2010).

(7) Remove four species based on revised taxonomic treatments and distributional evidence confirming that their known geographic ranges lie entirely outside the political boundaries of the United States and its territories. In each case, we reference the AOU publication supporting these changes:

Spot-billed Duck, *Anas poecilorhyncha* (AOU 2008);

Common [Black] Scoter, *Melanitta nigra* (AOU 2009);

Eurasian [Winter] Wren, *Troglodytes troglodytes* (AOU 2010); and

Hispaniolan [Greater Antillean] Oriole, *Icterus dominicensis* (AOU 2010).

(8) Revise the common (English) names of nine species to conform to the most recent nomenclatural treatment. These revisions do not change the protective status of any of these taxa, only the names by which they are known. In each case, we reference the published source for the name change:

Greater Flamingo, *Phoenicopterus ruber,* becomes American Flamingo (AOU 2008);

Greater Shearwater, *Puffinus gravis,* becomes Great Shearwater (AOU 2010);

Whip-poor-will, *Caprimulgus vociferus,* becomes Eastern Whip-poor-will (AOU 2010);

Green Violet-ear, *Colibri thalassinus,* becomes Green Violetear (AOU 2008);

Blue Rock Thrush, *Monticola solitarius,* becomes Blue Rock-Thrush (Clements 2007);

Clay-colored Robin, *Turdus grayi,* becomes Clay-colored Thrush (AOU 2008);

White-throated Robin, *Turdus assimilis,* becomes White-throated Thrush (AOU 2008);

Nelson's Sharp-tailed Sparrow, *Ammodramus nelsoni,* becomes Nelson's Sparrow (AOU 2009); and

Saltmarsh Sharp-tailed Sparrow, *Ammodramus caudacutus,* becomes Saltmarsh Sparrow (AOU 2009).

(9) Revise the scientific names of 36 species to conform to the most recent nomenclatural treatment. These revisions do not change the protective status of any of these taxa, only the names by which they are known. In each case, we reference the AOU publication documenting the name change:

*Larus philadelphia* (Bonaparte's Gull) becomes *Chroicocephalus philadelphia* (AOU 2008);

*Larus cirrocephalus* (Gray-hooded Gull) becomes *Chroicocephalus cirrocephalus* (AOU 2008);

*Larus ridibundus* (Black-headed Gull) becomes *Chroicocephalus ridibundus* (AOU 2008);

*Larus minutus* (Little Gull) becomes *Hydrocoloeus minutus* (AOU 2008);

*Larus atricilla* (Laughing Gull) becomes *Leucophaeus atricilla* (AOU 2008);

*Larus pipixcan* (Franklin's Gull) becomes *Leucophaeus pipixcan* (AOU 2008);

*Cyanocorax morio* (Brown Jay) becomes *Psilorhinus morio* (AOU 2010);

*Poecile hudsonica* (Boreal Chickadee) becomes *Poecile hudsonicus* (AOU 2009);

*Poecile cincta* (Gray-headed Chickadee) becomes *Poecile cinctus* (AOU 2009);

*Calcarius mccownii* (McCown's Longspur) becomes *Rhynchophanes mccownii* (AOU 2010);

*Vermivora pinus* (Blue-winged Warbler) becomes *Vermivora cyanoptera* (AOU 2010);

*Vermivora peregrina* (Tennessee Warbler) becomes *Oreothlypis peregrina* (AOU 2010);

*Vermivora celata* (Orange-crowned Warbler) becomes *Oreothlypis celata* (AOU 2010);

*Vermivora ruficapilla* (Nashville Warbler) becomes *Oreothlypis ruficapilla* (AOU 2010);

*Vermivora virginiae* (Virginia's Warbler) becomes *Oreothlypis virginiae* (AOU 2010);

*Vermivora crissalis* (Colima Warbler) becomes *Oreothlypis crissalis* (AOU 2010);

*Vermivora luciae* (Lucy's Warbler) becomes *Oreothlypis luciae* (AOU 2010);

*Parula superciliosa* (Crescent-chested Warbler) becomes *Oreothlypis superciliosa* (AOU 2010);

*Seiurus noveboracensis* (Northern Waterthrush) becomes *Parkesia noveboracensis* (AOU 2010);

*Seiurus motacilla* (Louisiana Waterthrush) becomes *Parkesia motacilla* (AOU 2010);

*Pipilo fuscus* (Canyon Towhee) becomes *Melozone fusca* (AOU 2010);

*Pipilo crissalis* (California Towhee) becomes *Melozone crissalis* (AOU 2010);

*Pipilo aberti* (Abert's Towhee) becomes *Melozone aberti* (AOU 2010);

*Aimophila carpalis* (Rufous-winged Sparrow) becomes *Peucaea carpalis* (AOU 2010);

*Aimophila botterii* (Botteri's Sparrow) becomes *Peucaea botterii* (AOU 2010);

*Aimophila cassinii* (Cassin's Sparrow) becomes *Peucaea cassinii* (AOU 2010);

*Aimophila aestivalis* (Bachman's Sparrow) becomes *Peucaea aestivalis* (AOU 2010);

*Aimophila quinquestriata* (Five-striped Sparrow) becomes *Amphispiza quinquestriata* (AOU 2010);

*Carduelis flammea* (Common Redpoll) becomes *Acanthis flammea* (AOU 2009);

*Carduelis hornemanni* (Hoary Redpoll) becomes *Acanthis hornemanni* (AOU 2009);

*Carduelis spinus* (Eurasian Siskin) becomes *Spinus spinus* (AOU 2009);

*Carduelis pinus* (Pine Siskin) becomes *Spinus pinus* (AOU 2009);

*Carduelis psaltria* (Lesser Goldfinch) becomes *Spinus psaltria* (AOU 2009);

*Carduelis lawrencei* (Lawrence's Goldfinch) becomes *Spinus lawrencei* (AOU 2009);

*Carduelis tristis* (American Goldfinch) becomes *Spinus tristis* (AOU 2009); and

*Carduelis sinica* (Oriental Greenfinch) becomes *Chloris sinica* (AOU 2009).

For ease of comparison, changes are summarized in the following table (numbers reference the categories treated above). Species whose names have been revised (categories 2, 3, 8, and 9) appear in both the left-hand column (old name removed) and right-hand column (new name added), as are species that have been added based on taxonomic splits (category 6) of extralimital species that have been removed (category 7).

| Removed (taxonomically) | Added (taxonomically) |
| --- | --- |
| Spot-billed Duck, *Anas poecilorhyncha* (7) .......................................... | Eastern Spot-billed Duck, *Anas zonorhyncha* (6). |
| Common [Black] Scoter, *Melanitta nigra* (7) ........................................ | Black Scoter, *Melanitta americana* (6). |
| Greater Flamingo, *Phoenicopterus ruber* (8) ........................................ | American Flamingo, *Phoenicopterus ruber* (8). |
| | Parkinson's Petrel, *Procellaria parkinsoni* (4). |
| Greater Shearwater, *Puffinus gravis* (8) ............................................... | Great Shearwater, *Puffinus gravis* (8). |
| Polynesian Storm-Petrel, *Nesofregata fuliginosa* (2) .............................. | Polynesian Storm-Petrel, *Nesofregetta fuliginosa* (2). |

| Removed (taxonomically) | Added (taxonomically) |
|---|---|
| Polynesian Storm-Petrel, *Nesofregetta fuiginosa* (3) | Polynesian Storm-Petrel, *Nesofregetta fuliginosa* (3). |
| | Swinhoe's Storm-Petrel, *Oceanodroma monorhis* (4). |
| | Swallow-tailed Gull, *Creagrus furcatus* (4). |
| Bonaparte's Gull, *Larus philadelphia* (9) | Bonaparte's Gull, *Chroicocephalus philadelphia* (9). |
| Gray-hooded Gull, *Larus cirrocephalus* (9) | Gray-hooded Gull, *Chroicocephalus cirrocephalus* (9). |
| Black-headed Gull, *Larus ridibundus* (9) | Black-headed Gull, *Chroicocephalus ridibundus* (9). |
| Little Gull, *Larus minutus* (9) | Little Gull, *Hydrocoloeus minutus* (9). |
| Laughing Gull, *Larus atricilla* (9) | Laughing Gull, *Leucophaeus atricilla* (9). |
| Franklin's Gull, *Larus pipixcan* (9) | Franklin's Gull, *Leucophaeus pipixcan* (9). |
| Royal Tern, *Thalleseus maximus* (2) | Royal Tern, *Thalasseus maximus* (2). |
| Sandwich Tern, *Thalleseus sandvicensis* (2) | Sandwich Tern, *Thalasseus sandvicensis* (2). |
| | Brown Hawk-Owl, *Ninox scutulata* (4). |
| Whip-poor-will, *Caprimulgus vociferus* (8) | Eastern Whip-poor-will, *Caprimulgus vociferus* (8). |
| | Mexican Whip-poor-will, *Caprimulgus arizonae* (6). |
| Green Violet-ear, *Colibri thalassinus* (8) | Green Violetear, *Colibri thalassinus* (8). |
| | White-crested Elaenia, *Elaenia albiceps* (4). |
| | Crowned Slaty Flycatcher, *Empidonomus aurantioatrocristatus* (4). |
| Black-capped Vireo, *Vireo atricapillus* (2, 3) | Black-capped Vireo, *Vireo atricapilla* (2, 3). |
| Brown Jay, *Cyanocorax morio* (9) | Brown Jay, *Psilorhinus morio* (9). |
| Boreal Chickadee, *Poecile hudsonica* (9) | Boreal Chickadee, *Poecile hudsonicus* (9). |
| Gray-headed Chickadee, *Poecile cincta* (9) | Gray-headed Chickadee, *Poecile cinctus* (9). |
| | Sinaloa Wren, *Thryothorus sinaloa* (4). |
| | Pacific Wren, *Troglodytes pacificus* (6). |
| Eurasian [Winter] Wren, *Troglodytes troglodytes* (7) | Winter Wren, *Troglodytes hiemalis* (6). |
| Wood Warbler, *Phylloscopus siilatrix* (2) | Wood Warbler, *Phylloscopus sibilatrix* (2). |
| | Pallas's Leaf-Warbler, *Phylloscopus proregulus* (4). |
| Lanceolated Warbler, *Locustella lanceoloata* (2) | Lanceolated Warbler, *Locustella lanceolata* (2). |
| | Wrentit, *Chamaea fasciata* (5). |
| | Sedge Warbler, *Acrocephalus schoenobaenus* (4). |
| | Mugimaki Flycatcher, *Ficedula mugimaki* (1). |
| | Taiga Flycatcher, *Ficedula albicilla* (1). |
| | Dark-sided Flycatcher, *Muscicapa sibirica* (1). |
| | Asian Brown Flyctcher, *Muscicapa dauurica* (1). |
| | Spotted Flycatcher, *Muscicapa striata* (1). |
| Blue Rock Thrush, *Monticola solitarius* (8) | Blue Rock-Thrush, *Monticola solitarius* (8). |
| | Rufous-tailed Robin, *Luscinia sibilans* (4). |
| Clay-colored Robin, *Turdus grayi* (8) | Clay-colored Thrush, *Turdus grayi* (8). |
| White-throated Robin, *Turdus assimilis* (8) | White-throated Thrush, *Turdus assimilis* (8). |
| McCown's Longspur, *Calcarius mccownii* (9) | McCown's Longspur, *Rhynchophanes mccownii* (9). |
| Blue-winged Warbler, *Vermivora pinus* (9) | Blue-winged Warbler, *Vermivora cyanoptera* (9). |
| Tennessee Warbler, *Vermivora peregrina* (9) | Tennessee Warbler, *Oreothlypis peregrina* (9). |
| Orange-crowned Warbler, *Vermivora celata* (9) | Orange-crowned Warbler, *Oreothlypis celata* (9). |
| Nashville Warbler, *Vermivora ruficapilla* (9) | Nashville Warbler, *Oreothlypis ruficapilla* (9). |
| Virginia's Warbler, *Vermivora virginiae* (9) | Virginia's Warbler, *Oreothlypis virginiae* (9). |
| Colima Warbler, *Vermivora crissalis* (9) | Colima Warbler, *Oreothlypis crissalis* (9). |
| Lucy's Warbler, *Vermivora luciae* (9) | Lucy's Warbler, *Oreothlypis luciae* (9). |
| Crescent-chested Warbler, *Parula superciliosa* (9) | Crescent-chested Warbler, *Oreothlypis superciliosa* (9). |
| Northern Waterthrush, *Seiurus noveboracensis* (9) | Northern Waterthrush, *Parkesia noveboracensis* (9). |
| Louisiana Waterthrush, *Seiurus motacilla* (9) | Louisiana Waterthrush, *Parkesia motacilla* (9). |
| Yellow-faced Grassquit, *Tiaris olivacea* (3) | Yellow-faced Grassquit, *Tiaris olivaceus* (3). |
| Canyon Towhee, *Pipilo fuscus* (9) | Canyon Towhee, *Melozone fusca* (9). |
| California Towhee, *Pipilo crissalis* (9) | California Towhee, *Melozone crissalis* (9). |
| Abert's Towhee, *Pipilo aberti* (9) | Abert's Towhee, *Melozone aberti* (9). |
| Rufous-winged Sparrow, *Aimophila carpalis* (9) | Rufous-winged Sparrow, *Peucaea carpalis* (9). |
| Botteri's Sparrow, *Aimophila botterii* (9) | Botteri's Sparrow, *Peucaea botterii* (9). |
| Cassin's Sparrow, *Aimophila cassinii* (9) | Cassin's Sparrow, *Peucaea cassinii* (9). |
| Bachman's Sparrow, *Aimophila aestivalis* (9) | Bachman's Sparrow, *Peucaea aestivalis* (9). |
| Five-striped Sparrow, *Aimophila quinquestriata* (9) | Five-striped Sparrow, *Amphispiza quinquestriata* (9). |
| Nelson's Sharp-tailed Sparrow, *Ammodramus nelsoni* (8) | Nelson's Sparrow, *Ammodramus nelsoni* (8). |
| Saltmarsh Sharp-tailed Sparrow, *Ammodramus caudacutus* (8) | Saltmarsh Sparrow, *Ammodramus caudacutus* (8). |
| | Yellow-browed Bunting, *Emberiza chrysophrys* (4). |
| Hispaniolan [Greater Antillean] Oriole, *Icterus dominicensis* (7) | Puerto Rican Oriole, *Icterus portoricensis* (6). |
| Common Redpoll, *Carduelis flammea* (9) | Common Redpoll, *Acanthis flammea* (9). |
| Hoary Redpoll, *Carduelis hornemanni* (9) | Hoary Redpoll, *Acanthis hornemanni* (9). |
| Eurasian Siskin, *Carduelis spinus* (9) | Eurasian Siskin, *Spinus spinus* (9). |
| Pine Siskin, *Carduelis pinus* (9) | Pine Siskin, *Spinus pinus* (9). |
| Lesser Goldfinch, *Carduelis psaltria* (9) | Lesser Goldfinch, *Spinus psaltria* (9). |
| Lawrence's Goldfinch, *Carduelis lawrencei* (9) | Lawrence's Goldfinch, *Spinus lawrencei* (9). |
| American Goldfinch, *Carduelis tristis* (9) | American Goldfinch, *Spinus tristis* (9). |
| Oriental Greenfinch, *Carduelis sinica* (9) | Oriental Greenfinch, *Chloris sinica* (9). |

**How do the changes implemented here differ from those discussed in the proposed rule?**

The scientific name of one species spelled erroneously in the proposed rule is corrected to conform to the AOU Check-list (1998) and supplements:

Black-capped Vireo, *Vireo atricapillus* becomes *Vireo atricapilla*.

**How is the list of migratory birds organized?**

The species are listed in two formats to suit the needs of different segments of the public: alphabetically in 50 CFR 10.13(c)(1) and taxonomically in 50 CFR 10.13(c)(2). In the alphabetical listing, species are listed by common (English) group names, with the scientific name of each species following the English group name. This format, similar to that used in modern telephone directories, is most useful to members of the lay public. In the taxonomic listing, species are listed in phylogenetic sequence by scientific name, with the English name following the scientific name. To help clarify species relationships, we also list the higher-level taxonomic categories of Order, Family, and Subfamily. This format follows the sequence adopted by the AOU (1998, 2010) and is most useful to ornithologists and other scientists.

**What species are not protected by the Migratory Bird Treaty Act?**

The MBTA does not apply to:

(1) Nonnative species introduced into the United States or its territories by means of intentional or unintentional human assistance that belong to families or groups covered by the Canadian, Mexican, or Russian Conventions, in accordance with the MBTRA. See 70 FR 12710 (March 15, 2005) for a partial list of nonnative, human-introduced bird species in this category. Note, though, that native species that are introduced into parts of the United States where they are not native are still protected under the MBTA regardless of where they occur in the United States or its territories.

(2) Nonnative, human-introduced species that belong to families or groups not covered by the Canadian, Mexican, or Russian Conventions, including Tinamidae (tinamous), Cracidae (chachalacas), Megapodiidae (megapodes), Phasianidae (grouse, ptarmigan, and turkeys), Turnicidae (buttonquails), Odontophoridae (New World quail), Pteroclidae (sandgrouse), Psittacidae (parrots), Dicruridae (drongos), Rhamphastidae (toucans), Musophagidae (turacos), Bucerotidae (hornbills), Bucorvidae (ground-hornbills), Pycnonotidae (bulbuls), Pittidae (pittas), Irenidae (fairy-bluebirds), Timaliidae (babblers), Zosteropidae (white-eyes), Sturnidae (starlings; except as listed in the Japanese Convention), Passeridae (Old World sparrows), Ploceidae (weavers), Estrildidae (estrildid finches), and numerous other families not currently represented in the United States or its territories.

(3) Native species that belong to families or groups represented in the United States, but which are not expressly mentioned by the Canadian, Mexican, or Russian Conventions, including the Megapodiidae (megapodes), Phasianidae (grouse, ptarmigan, and turkeys), Odontophoridae (New World quail), Burhinidae (thick-knees), Glareolidae (pratincoles), Psittacidae (parrots), Todidae (todies), Meliphagidae (honeyeaters), Monarchidae (monarch flycatchers [elepaios]), Zosteropidae (white-eyes), and Coerebidae (bananaquit). It should be noted that this rule supersedes the 70 FR 12710 notice to the extent that they are inconsistent. Specifically, the 1996 amendment to the Canadian Convention included the family Muscicapidae (Old World flycatchers). Thus, all members of the Muscicapidae family are now included on this list. In addition, the Wrentit is now considered a member of the Sylviidae family rather than the Timaliidae family and is now included on this list.

Partial lists of the species included in categories 2 and 3 are available at *http://www.fws.gov/migratorybirds/RegulationsPolicies/mbta/MBTAProtectedNonprotected.html*.

**Responses to Public Comments**

On April 26, 2011, we published in the **Federal Register** (76 FR 23428) a proposed rule to revise the list of migratory birds at 50 CFR 10.13. We solicited public comments on the proposed rule for 90 days, ending on July 25, 2011.

We received 7 comments in response to the proposed rule; 5 were from agencies, and 2 were from private individuals. The following text discusses the substantive comments we received and provides our responses to them.

*Comment:* One individual indicated that Brown Hawk-Owl, and the 10 other species we proposed to add based on new distributional records (Category 4), should not be added because they are either extremely rare vagrants or were moved by humans. The commenter further pointed out that the MBTA loses biological and ecological credibility when species are added that do not naturally occur in the United States or its territories, and pointed to the Eurasian Kestrel as one example.

*Response:* In 2004, the Migratory Bird Treaty Reform Act (MBTRA; Pub. L. 108–447) amended the MBTA. While the primary purpose of the MBTRA was to eliminate protection for introduced species, it also defined native species as those "occurring in the United States or its territories as a result of natural biological or ecological processes." Vagrancy is a natural biological process, so these species are protected under the MBTA.

There is credible evidence to support our contention that these species have occurred in the United States as natural vagrants unhindered by human intervention. The AOU and other bird record committees take human intervention into account whenever they evaluate such records. Several of these species, including the Brown Hawk-Owl, have occurred in some of the remotest parts of Alaska, and are most unlikely to have been moved there by humans. Furthermore, multiple records of Eurasian Kestrel have been accepted from Western Alaska, and at scattered locations across North America, by the AOU and other competent scientific authorities.

*Comment:* The Arkansas Game and Fish Commission urged the Service to carefully consider the implications to State regulations when making recommendations, and ensure that they do not occur so frequently as to become burdensome. Specifically, they point out that the split of the order Accipitriformes from the Falconiformes will necessitate a change in State falconry regulations.

*Response:* The Service appreciates the State's concern regarding changes to Federal regulations that affect States, and we make a concerted effort to work closely with the States through the Flyway Councils. To comply with the intent of the migratory bird treaties and the MBTA, we are obligated to update the list at intervals. However, the List of Migratory Birds has been updated only twice since 1985, which is not frequently enough to stay current with changes in bird taxonomy. Consequently, we intend to update this list on a 5-year cycle to coincide with updates to the Birds of Conservation Concern, thus balancing the frequency of updates with the frequency of changes in bird taxonomy. In this update, taxonomic changes at the Order level did not change which species are protected under the MBTA, as the species within those families were previously protected. Furthermore, this is the first change we have made to the

Falconiformes since the families within that Order were first protected in 1972.

*Comment:* The Indiana Division of Fish and Wildlife (IDFW) was pleased that the Service intends to continue to treat cackling geese as Canada geese, pointing out that hunting management of white-cheeked geese could become more difficult if they were split. The IDFW also pointed out that the Mississippi Flyway Council is trying to simplify hunting regulations for Canada geese, and splitting them into two species for management purposes could cause progress toward simplification to stall.

*Response:* The Service recognizes the management concerns referred to by the commenter. While we appreciate the complexities of white-cheeked goose management, our decision to continue to include the Cackling Goose within the listing for Canada Goose is based on lingering uncertainty regarding their taxonomic relationship. Work is currently being conducted in Alaska and northern Canada to resolve that uncertainty. We will consider new information when it is available, at which time we may reconsider our decision. In any case, regardless of name, goose subspecies identified as Cackling Goose by the AOU are currently protected under the MBTA as Canada Goose.

**Required Determinations**

*Regulatory Planning and Review (Executive Order 12866)*

Executive Order (EO) 12866 provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget will review all significant rules. OIRA has determined that this rule is not significant.

EO 13563 reaffirms the principles of EO 12866, while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. EO 13563 directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives.

EO 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act (5 U.S.C. 601 et seq.)*

Under the Regulatory Flexibility Act (5 U.S.C. 601 et seq., as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996 (Pub. L. 104–121)), whenever an agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of an agency certifies the rule does not have a significant economic impact on a substantial number of small entities.

SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide the statement of the factual basis for certifying that a rule will not have a significant economic impact on a substantial number of small entities. We have examined this rule's potential effects on small entities as required by the Regulatory Flexibility Act, and have determined that this action will not have a significant economic impact on a substantial number of small entities, because we are simply updating the list of migratory bird species protected under the Conventions. Consequently, we certify that because this rule does not have a significant economic effect on a substantial number of small entities, a regulatory flexibility analysis is not required.

This rule is not a major rule under SBREFA (5 U.S.C. 804(2)). It does not have a significant impact on a substantial number of small entities.

a. This rule does not have an annual effect on the economy of $100 million or more.

b. This rule does not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions.

c. This rule does not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.), we have determined the following:

a. This rule does not "significantly or uniquely" affect small governments. A small government agency plan is not required. Actions under the regulation do not affect small government activities in any significant way.

b. This rule does not produce a Federal mandate of $100 million or greater in any year; i.e., it is not a "significant regulatory action" under the Unfunded Mandates Reform Act.

*Takings*

In accordance with Executive Order 12630, the rule does not have significant takings implications. This rule does not contain a provision for taking of private property. Therefore, a takings implication assessment is not required.

*Federalism*

This rule does not have sufficient Federalism effects to warrant preparation of a Federalism summary impact statement under Executive Order 13132. It does not interfere with the States' ability to manage themselves or their funds. No significant economic impacts are expected to result from the updating of the list of migratory bird species.

*Civil Justice Reform*

In accordance with Executive Order 12988, the Office of the Solicitor has determined that the rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Order.

*Paperwork Reduction Act*

We examined this rule under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). There are no new information collection requirements associated with this rule. We do not require any new permits, reports, or recordkeeping in this rule.

*National Environmental Policy Act (NEPA)*

Given that the revision of 50 CFR 10.13 is strictly administrative in nature and will have no or minor environmental effects, it is categorically excluded from further NEPA requirements (43 CFR 46.210(i)).

*Endangered Species Act (ESA)*

Seventy-four of the species on the List of Migratory Birds are also designated as endangered or threatened in all or some portion of their U.S. range under provisions of the Endangered Species Act of 1973 (16 U.S.C. 1531–44; 50 CFR 17.11). No legal complications arise from the dual listing as the two lists are developed under separate authorities and for different purposes. Because the rule is strictly administrative in nature, it has no effect on threatened or endangered species. It does not require ESA consultation.

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American tribal Governments" (59 FR 22951), Executive Order 13175, and 512 DM 2, we have evaluated potential effects on federally recognized Indian tribes and have determined that there are no potential effects. The revisions to existing regulations in this rule are purely administrative in nature and do not interfere with the tribes' ability to manage themselves or their funds or to regulate migratory bird activities on tribal lands.

*Energy Supply, Distribution, or Use (Executive Order 13211)*

On May 18, 2001, the President issued Executive Order 13211 addressing regulations that significantly affect energy supply, distribution, and use. Executive Order 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. Because this rule only affects the listing of protected species in the United States, it is not a significant regulatory action under Executive Order 12866, and does not significantly affect energy supplies, distribution, or use. Therefore, this action is not a significant energy action and no Statement of Energy Effects is required.

**References Cited**

A complete list of all references cited is available upon request (see **FOR FURTHER INFORMATION CONTACT** above).

**List of Subjects**

*50 CFR Part 10*

Exports, Fish, Imports, Law enforcement, Plants, Transportation, Wildlife.

*50 CFR Part 21*

Exports, Hunting, Imports, Reporting and recordkeeping requirements, Transportation, Wildlife.

**Regulation Promulgation**

For the reasons discussed in the preamble, we amend title 50, chapter I, subchapter B, parts 10 and 21 of the Code of Federal Regulations, as follows:

**PART 10—[AMENDED]**

■ 1. The authority citation for part 10 continues to read as follows:

**Authority:** 18 U.S.C. 42; 16 U.S.C. 703–712; 16 U.S.C. 668a–d; 19 U.S.C. 1202; 16 U.S.C. 1531–1543; 16 U.S.C. 1361–1384, 1401–1407; 16 U.S.C. 742a–742j–l; 16 U.S.C. 3371–3378.

■ 2. Revise § 10.13 to read as follows:

**§ 10.13  List of Migratory Birds.**

(a) *Legal authority for this list.* The legal authorities for this list are the Migratory Bird Treaty Act (MBTA; 16 U.S.C. 703–712), the Fish and Wildlife Improvement Act of 1978 (16 U.S.C. 742l), and the Fish and Wildlife Act of 1956 (16 U.S.C. 742a–742j). The MBTA implements Conventions between the United States and four neighboring countries for the protection of migratory birds, as follows:

(1) *Canada:* Convention between the United States and Great Britain [on behalf of Canada] for the Protection of Migratory Birds, August 16, 1916, 39 Stat. 1702 (T.S. No. 628), as amended;

(2) *Mexico:* Convention between the United States and Mexico for the Protection of Migratory Birds and Game Mammals, February 7, 1936, 50 Stat. 1311 (T.S. No. 912), as amended;

(3) *Japan:* Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, March 4, 1972, 25 U.S.T. 3329 (T.I.A.S. No. 7990); and

(4) *Russia:* Convention between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and Their Environment, November 19, 1976, 20 U.S.T. 4647 (T.I.A.S. No. 9073).

(b) *Purpose of this list.* The purpose is to inform the public of the species protected by regulations that enforce the terms of the MBTA. These regulations, found in parts 10, 20, and 21 of this chapter, cover most aspects of the taking, possession, transportation, sale, purchase, barter, exportation, and importation of migratory birds.

(c) *What species are protected as migratory birds?* Species protected as migratory birds are listed in two formats to suit the varying needs of the user: Alphabetically in paragraph (c)(1) of this section and taxonomically in paragraph (c)(2) of this section. Taxonomy and nomenclature generally follow the 7th edition of the American Ornithologists' Union's *Check-list of North American birds* (1998, as amended through 2010). For species not treated by the AOU *Check-list,* we generally follow *The Clements Checklist of Birds of the World* (Clements 2007).

(1) *Alphabetical listing.* Species are listed alphabetically by common (English) group names, with the scientific name of each species following the common name.

ACCENTOR, Siberian, *Prunella montanella*

AKEKEE, *Loxops caeruleirostris*

AKEPA, *Loxops coccineus*
AKIALOA, Greater, *Hemignathus ellisianus*
AKIAPOLAAU, *Hemignathus munroi*
AKIKIKI, *Oreomystis bairdi*
AKOHEKOHE, *Palmeria dolei*
ALAUAHIO, Maui, *Paroreomyza montana*
   Oahu, *Paroreomyza maculata*
ALBATROSS, Black-browed, *Thalassarche melanophris*
   Black-footed, *Phoebastria nigripes*
   Laysan, *Phoebastria immutabilis*
   Light-mantled, *Phoebetria palpebrata*
   Short-tailed, *Phoebastria albatrus*
   Shy, *Thalassarche cauta*
   Wandering, *Diomedea exulans*
   Yellow-nosed, *Thalassarche chlororhynchos*
AMAKIHI, Hawaii, *Hemignathus virens*
   Kauai, *Hemignathus kauaiensis*
   Oahu, *Hemignathus flavus*
ANHINGA, *Anhinga anhinga*
ANI, Groove-billed, *Crotophaga sulcirostris*
   Smooth-billed, *Crotophaga ani*
ANIANIAU, *Magumma parva*
APAPANE, *Himatione sanguinea*
AUKLET, Cassin's, *Ptychoramphus aleuticus*
   Crested, *Aethia cristatella*
   Least, *Aethia pusilla*
   Parakeet, *Aethia psittacula*
   Rhinoceros, *Cerorhinca monocerata*
   Whiskered, *Aethia pygmaea*
AVOCET, American, *Recurvirostra americana*
BEAN-GOOSE, Taiga, *Anser fabalis*
   Tundra, *Anser serrirostris*
BEARDLESS–TYRANNULET, Northern, *Camptostoma imberbe*
BECARD, Rose-throated, *Pachyramphus aglaiae*
BITTERN, American, *Botaurus lentiginosus*
   Black, *Ixobrychus flavicollis*
   Least, *Ixobrychus exilis*
   Schrenck's, *Ixobrychus eurhythmus*
   Yellow, *Ixobrychus sinensis*
BLACK–HAWK, Common, *Buteogallus anthracinus*
BLACKBIRD, Brewer's, *Euphagus cyanocephalus*
   Red-winged, *Agelaius phoeniceus*
   Rusty, *Euphagus carolinus*
   Tawny-shouldered, *Agelaius humeralis*
   Tricolored, *Agelaius tricolor*
   Yellow-headed, *Xanthocephalus xanthocephalus*
   Yellow-shouldered, *Agelaius xanthomus*
BLUEBIRD, Eastern, *Sialia sialis*
   Mountain, *Sialia currucoides*
   Western, *Sialia mexicana*
BLUETAIL, Red-flanked, *Tarsiger cyanurus*
BLUETHROAT, *Luscinia svecica*
BOBOLINK, *Dolichonyx oryzivorus*

BOOBY, Blue-footed, *Sula nebouxii*
  Brown, *Sula leucogaster*
  Masked, *Sula dactylatra*
  Red-footed, *Sula sula*
BRAMBLING, *Fringilla montifringilla*
BRANT, *Branta bernicla*
BUFFLEHEAD, *Bucephala albeola*
BULLFINCH, Eurasian, *Pyrrhula pyrrhula*
  Puerto Rican, *Loxigilla portoricensis*
BUNTING, Blue, *Cyanocompsa parellina*
  Gray, *Emberiza variabilis*
  Indigo, *Passerina cyanea*
  Little, *Emberiza pusilla*
  Lark, *Calamospiza melanocorys*
  Lazuli, *Passerina amoena*
  McKay's, *Plectrophenax hyperboreus*
  Painted, *Passerina ciris*
  Pallas's, *Emberiza pallasi*
  Pine, *Emberiza leucocephalos*
  Reed, *Emberiza schoeniclus*
  Rustic, *Emberiza rustica*
  Snow, *Plectrophenax nivalis*
  Varied, *Passerina versicolor*
  Yellow-breasted, *Emberiza aureola*
  Yellow-browed, *Emberiza chrysophrys*
  Yellow-throated, *Emberiza elegans*
BUSHTIT, *Psaltriparus minimus*
CANVASBACK, *Aythya valisineria*
CARACARA, Crested, *Caracara cheriway*
CARDINAL, Northern, *Cardinalis cardinalis*
CARIB, Green-throated, *Eulampis holosericeus*
  Purple-throated, *Eulampis jugularis*
CATBIRD, Black, *Melanoptila glabrirostris*
  Gray, *Dumetella carolinensis*
CHAFFINCH, Common, *Fringilla coelebs*
CHAT, Yellow-breasted, *Icteria virens*
CHICKADEE, Black-capped, *Poecile atricapillus*
  Boreal, *Poecile hudsonicus*
  Carolina, *Poecile carolinensis*
  Chestnut-backed, *Poecile rufescens*
  Gray-headed, *Poecile cinctus*
  Mexican, *Poecile sclateri*
  Mountain, *Poecile gambeli*
CHUCK–WILL'S–WIDOW, *Caprimulgus carolinensis*
CONDOR, California, *Gymnogyps californianus*
COOT, American, *Fulica americana*
  Caribbean, *Fulica caribaea*
  Eurasian, *Fulica atra*
  Hawaiian, *Fulica alai*
CORMORANT, Brandt's, *Phalacrocorax penicillatus*
  Double-crested, *Phalacrocorax auritus*
  Great, *Phalacrocorax carbo*
  Little Pied, *Phalacrocorax melanoleucos*
  Neotropic, *Phalacrocorax brasilianus*
  Pelagic, *Phalacrocorax pelagicus*
  Red-faced, *Phalacrocorax urile*

COWBIRD, Bronzed, *Molothrus aeneus*
  Brown-headed, *Molothrus ater*
  Shiny, *Molothrus bonariensis*
CRAKE, Corn, *Crex crex*
  Paint-billed, *Neocrex erythrops*
  Spotless, *Porzana tabuensis*
  Yellow-breasted, *Porzana flaviventer*
CRANE, Common, *Grus grus*
  Sandhill, *Grus canadensis*
  Whooping, *Grus americana*
CREEPER, Brown, *Certhia americana*
  Hawaii, *Oreomystis mana*
CROSSBILL, Red, *Loxia curvirostra*
  White-winged, *Loxia leucoptera*
CROW, American, *Corvus brachyrhynchos*
  Fish, *Corvus ossifragus*
  Hawaiian, *Corvus hawaiiensis*
  Mariana, *Corvus kubaryi*
  Northwestern, *Corvus caurinus*
  Tamaulipas, *Corvus imparatus*
  White-necked, *Corvus leucognaphalus*
CUCKOO, Black-billed, *Coccyzus erythropthalmus*
  Common, *Cuculus canorus*
  Mangrove, *Coccyzus minor*
  Oriental, *Cuculus optatus*
  Yellow-billed, *Coccyzus americanus*
CURLEW, Bristle-thighed, *Numenius tahitiensis*
  Eskimo, *Numenius borealis*
  Eurasian, *Numenius arquata*
  Far Eastern, *Numenius madagascariensis*
  Little, *Numenius minutus*
  Long-billed, *Numenius americanus*
DICKCISSEL, *Spiza americana*
DIPPER, American, *Cinclus mexicanus*
DOTTEREL, Eurasian, *Charadrius morinellus*
DOVE, Inca, *Columbina inca*
  Mourning, *Zenaida macroura*
  White-tipped, *Leptotila verreauxi*
  White-winged, *Zenaida asiatica*
  Zenaida, *Zenaida aurita*
DOVEKIE, *Alle alle*
DOWITCHER, Long-billed, *Limnodromus scolopaceus*
  Short-billed, *Limnodromus griseus*
DUCK, American Black, *Anas rubripes*
  Eastern Spot-billed, *Anas zonorhyncha*
  Falcated, *Anas falcata*
  Harlequin, *Histrionicus histrionicus*
  Hawaiian, *Anas wyvilliana*
  Laysan, *Anas laysanensis*
  Long-tailed, *Clangula hyemalis*
  Masked, *Nomonyx dominicus*
  Mottled, *Anas fulvigula*
  Muscovy, *Cairina moschata*
  Pacific Black, *Anas superciliosa*
  Ring-necked, *Aythya collaris*
  Ruddy, *Oxyura jamaicensis*
  Tufted, *Aythya fuligula*
  Wood, *Aix sponsa*
DUNLIN, *Calidris alpina*
EAGLE, Bald, *Haliaeetus leucocephalus*
  Golden, *Aquila chrysaetos*

  White-tailed, *Haliaeetus albicilla*
EGRET, Cattle, *Bubulcus ibis*
  Chinese, *Egretta eulophotes*
  Great, *Ardea alba*
  Intermediate, *Mesophoyx intermedia*
  Little, *Egretta garzetta*
  Reddish, *Egretta rufescens*
  Snowy, *Egretta thula*
EIDER, Common, *Somateria mollissima*
  King, *Somateria spectabilis*
  Spectacled, *Somateria fischeri*
  Steller's, *Polysticta stelleri*
ELAENIA, Caribbean, *Elaenia martinica*
  Greenish, *Myiopagis viridicata*
  White-crested, *Elaenia albiceps*
EMERALD, Puerto Rican, *Chlorostilbon maugaeus*
EUPHONIA, Antillean, *Euphonia musica*
FALCON, Aplomado, *Falco femoralis*
  Peregrine, *Falco peregrinus*
  Prairie, *Falco mexicanus*
  Red-footed, *Flaco vespertinus*
FIELDFARE, *Turdus pilaris*
FINCH, Cassin's, *Carpodacus cassinii*
  House, *Carpodacus mexicanus*
  Laysan, *Telespiza cantans*
  Nihoa, *Telespiza ultima*
  Purple, *Carpodacus purpureus*
FLAMINGO, American, *Phoenicopterus ruber*
FLICKER, Gilded, *Colaptes chrysoides*
  Northern, *Colaptes auratus*
FLYCATCHER, Acadian, *Empidonax virescens*
  Alder, *Empidonax alnorum*
  Ash-throated, *Myiarchus cinerascens*
  Asian Brown, *Muscicapa dauurica*
  Brown-crested, *Myiarchus tyrannulus*
  Buff-breasted, *Empidonax fulvifrons*
  Cordilleran, *Empidonax occidentalis*
  Crowned Slaty, *Empidonomus aurantioatrocristatus*
  Dark-sided, *Muscicapa sibirica*
  Dusky, *Empidonax oberholseri*
  Dusky-capped, *Myiarchus tuberculifer*
  Fork-tailed, *Tyrannus savana*
  Gray, *Empidonax wrightii*
  Gray-streaked, *Muscicapa griseisticta*
  Great Crested, *Myiarchus crinitus*
  Hammond's, *Empidonax hammondii*
  La Sagra's, *Myiarchus sagrae*
  Least, *Empidonax minimus*
  Mugimaki, *Ficedula mugimaki*
  Narcissus, *Ficedula narcissina*
  Nutting's, *Myiarchus nuttingi*
  Olive-sided, *Contopus cooperi*
  Pacific-slope, *Empidonax difficilis*
  Piratic, *Legatus leucophaius*
  Puerto Rican, *Myiarchus antillarum*
  Scissor-tailed, *Tyrannus forficatus*
  Social, *Myiozetetes similis*
  Spotted, *Muscicapa striata*
  Sulphur-bellied, *Myiodynastes luteiventris*
  Taiga, *Ficedula albicilla*
  Tufted, *Mitrephanes phaeocercus*
  Variegated, *Empidonomus varius*
  Vermilion, *Pyrocephalus rubinus*

Willow, *Empidonax traillii*
Yellow-bellied, *Empidonax flaviventris*
FOREST-FALCON, Collared, *Micrastur semitorquatus*
FRIGATEBIRD, Great, *Fregata minor*
Lesser, *Fregata ariel*
Magnificent, *Fregata magnificens*
FROG–HAWK, Gray, *Accipiter soloensis*
FRUIT–DOVE, Crimson-crowned, *Ptilinopus porphyraceus*
Many-colored, *Ptilinopus perousii*
Mariana, *Ptilinopus roseicapilla*
FULMAR, Northern, *Fulmarus glacialis*
GADWALL, *Anas strepera*
GALLINULE, Azure, *Porphyrio flavirostris*
Purple, *Porphyrio martinica*
GANNET, Northern, *Morus bassanus*
GARGANEY, *Anas querquedula*
GNATCATCHER, Black-capped, *Polioptila nigriceps*
Black-tailed, *Polioptila melanura*
Blue-gray, *Polioptila caerulea*
California, *Polioptila californica*
GODWIT, Bar-tailed, *Limosa lapponica*
Black-tailed, *Limosa limosa*
Hudsonian, *Limosa haemastica*
Marbled, *Limosa fedoa*
GOLDEN-PLOVER, American, *Pluvialis dominica*
European, *Pluvialis apricaria*
Pacific, *Pluvialis fulva*
GOLDENEYE, Barrow's, *Bucephala islandica*
Common, *Bucephala clangula*
GOLDFINCH, American, *Spinus tristis*
Lawrence's, *Spinus lawrencei*
Lesser, *Spinus psaltria*
GOOSE, Barnacle, *Branta leucopsis*
Canada, *Branta canadensis* (including Cackling Goose, *Branta hutchinsii*)
Emperor, *Chen canagica*
Greater White-fronted, *Anser albifrons*
Hawaiian, *Branta sandvicensis*
Lesser White-fronted, *Anser erythropus*
Ross's, *Chen rossii*
Snow, *Chen caerulescens*
GOSHAWK, Northern, *Accipiter gentilis*
GRACKLE, Boat-tailed, *Quiscalus major*
Common, *Quiscalus quiscula*
Great-tailed, *Quiscalus mexicanus*
Greater Antillean, *Quiscalus niger*
GRASSHOPPER-WARBLER, Middendorff's, *Locustella ochotensis*
GRASSQUIT, Black-faced, *Tiaris bicolor*
Yellow-faced, *Tiaris olivaceus*
GREBE, Clark's, *Aechmophorus clarkii*
Eared, *Podiceps nigricollis*
Horned, *Podiceps auritus*
Least, *Tachybaptus dominicus*
Pied-billed, *Podilymbus podiceps*
Red-necked, *Podiceps grisegena*
Western, *Aechmophorus occidentalis*
GREENFINCH, Oriental, *Chloris sinica*
GREENSHANK, Common, *Tringa nebularia*

Nordmann's, *Tringa guttifer*
GROSBEAK, Black-headed, *Pheucticus melanocephalus*
Blue, *Passerina caerulea*
Crimson-collared, *Rhodothraupis celaeno*
Evening, *Coccothraustes vespertinus*
Pine, *Pinicola enucleator*
Rose-breasted, *Pheucticus ludovicianus*
Yellow, *Pheucticus chrysopeplus*
GROUND-DOVE, Common, *Columbina passerina*
Friendly, *Gallicolumba stairi*
Ruddy, *Columbina talpacoti*
White-throated, *Gallicolumba xanthonura*
GUILLEMOT, Black, *Cepphus grylle*
Pigeon, *Cepphus columba*
GULL, Belcher's, *Larus belcheri*
Black-headed, *Chroicocephalus ridibundus*
Black-tailed, *Larus crassirostris*
Bonaparte's, *Chroicocephalus philadelphia*
California, *Larus californicus*
Franklin's, *Leucophaeus pipixcan*
Glaucous, *Larus hyperboreus*
Glaucous-winged, *Larus glaucescens*
Gray-hooded, *Chroicocephalus cirrocephalus*
Great Black-backed, *Larus marinus*
Heermann's, *Larus heermanni*
Herring, *Larus argentatus*
Iceland, *Larus glaucoides*
Ivory, *Pagophila eburnea*
Kelp, *Larus dominicanus*
Laughing, *Leucophaeus atricilla*
Lesser Black-backed, *Larus fuscus*
Little, *Hydrocoloeus minutus*
Mew, *Larus canus*
Ring-billed, *Larus delawarensis*
Ross's, *Rhodostethia rosea*
Sabine's, *Xema sabini*
Slaty-backed, *Larus schistisagus*
Swallow-tailed, *Creagrus furcatus*
Thayer's, *Larus thayeri*
Western, *Larus occidentalis*
Yellow-footed, *Larus livens*
Yellow-legged, *Larus michahellis*
GYRFALCON, *Falco rusticolus*
HARRIER, Northern, *Circus cyaneus*
HAWFINCH, *Coccothraustes coccothraustes*
HAWK, Broad-winged, *Buteo platypterus*
Cooper's, *Accipiter cooperii*
Crane, *Geranospiza caerulescens*
Ferruginous, *Buteo regalis*
Gray, *Buteo nitidus*
Harris's, *Parabuteo unicinctus*
Hawaiian, *Buteo solitarius*
Red-shouldered, *Buteo lineatus*
Red-tailed, *Buteo jamaicensis*
Roadside, *Buteo magnirostris*
Rough-legged, *Buteo lagopus*
Sharp-shinned, *Accipiter striatus*
Short-tailed, *Buteo brachyurus*
Swainson's, *Buteo swainsoni*

White-tailed, *Buteo albicaudatus*
Zone-tailed, *Buteo albonotatus*
HAWK-CUCKOO, Hodgson's, *Cuculus fugax*
HAWK-OWL, Brown, *Ninox scutulata*
HERON, Gray, *Ardea cinerea*
Great Blue, *Ardea herodias*
Green, *Butorides virescens*
Little Blue, *Egretta caerulea*
Tricolored, *Egretta tricolor*
HOBBY, Eurasian, *Falco subbuteo*
HOOPOE, Eurasian, *Upupa epops*
HOUSE-MARTIN, Common, *Delichon urbicum*
HUMMINGBIRD, Allen's, *Selasphorus sasin*
Anna's, *Calypte anna*
Antillean Crested, *Orthorhyncus cristatus*
Berylline, *Amazilia beryllina*
Black-chinned, *Archilochus alexandri*
Blue-throated, *Lampornis clemenciae*
Broad-billed, *Cynanthus latirostris*
Broad-tailed, *Selasphorus platycercus*
Buff-bellied, *Amazilia yucatanensis*
Bumblebee, *Atthis heloisa*
Calliope, *Stellula calliope*
Cinnamon, *Amazilia rutila*
Costa's, *Calypte costae*
Lucifer, *Calothorax lucifer*
Magnificent, *Eugenes fulgens*
Ruby-throated, *Archilochus colubris*
Rufous, *Selasphorus rufus*
Violet-crowned, *Amazilia violiceps*
White-eared, *Hylocharis leucotis*
Xantus's, *Hylocharis xantusii*
IBIS, Glossy, *Plegadis falcinellus*
Scarlet, *Eudocimus ruber*
White, *Eudocimus albus*
White-faced, *Plegadis chihi*
IIWI, *Vestiaria coccinea*
IMPERIAL-PIGEON, Pacific, *Ducula pacifica*
JABIRU, *Jabiru mycteria*
JACANA, Northern, *Jacana spinosa*
JAEGER, Long-tailed, *Stercorarius longicaudus*
Parasitic, *Stercorarius parasiticus*
Pomarine, *Stercorarius pomarinus*
JAY, Blue, *Cyanocitta cristata*
Brown, *Psilorhinus morio*
Gray, *Perisoreus canadensis*
Green, *Cyanocorax yncas*
Mexican, *Aphelocoma ultramarina*
Pinyon, *Gymnorhinus cyanocephalus*
Steller's, *Cyanocitta stelleri*
JUNCO, Dark-eyed, *Junco hyemalis*
Yellow-eyed, *Junco phaeonotus*
KAKAWAHIE, *Paroreomyza flammea*
KAMAO, *Myadestes myadestinus*
KESTREL, American, *Falco sparverius*
Eurasian, *Falco tinnunculus*
KILLDEER, *Charadrius vociferus*
KINGBIRD, Cassin's, *Tyrannus vociferans*
Couch's, *Tyrannus couchii*
Eastern, *Tyrannus tyrannus*
Gray, *Tyrannus dominicensis*
Loggerhead, *Tyrannus caudifasciatus*

Thick-billed, *Tyrannus crassirostris*
Tropical, *Tyrannus melancholicus*
Western, *Tyrannus verticalis*
KINGFISHER, Belted, *Megaceryle alcyon*
Collared, *Todirhamphus chloris*
Green, *Chloroceryle americana*
Micronesian, *Todirhamphus cinnamominus*
Ringed, *Megaceryle torquata*
KINGLET, Golden-crowned, *Regulus satrapa*
Ruby-crowned, *Regulus calendula*
KISKADEE, Great, *Pitangus sulphuratus*
KITE, Black, *Milvus migrans*
Hook-billed, *Chondrohierax uncinatus*
Mississippi, *Ictinia mississippiensis*
Snail, *Rostrhamus sociabilis*
Swallow-tailed, *Elanoides forficatus*
White-tailed, *Elanus leucurus*
KITTIWAKE, Black-legged, *Rissa tridactyla*
Red-legged, *Rissa brevirostris*
KNOT, Great, *Calidris tenuirostris*
Red, *Calidris canutus*
LAPWING, Northern, *Vanellus vanellus*
LARK, Horned, *Eremophila alpestris*
Sky, *Alauda arvensis*
LEAF-WARBLER, Pallas's, *Phylloscopus proregulus*
LIMPKIN, *Aramus guarauna*
LIZARD-CUCKOO, Puerto Rican, *Coccyzus vieilloti*
LONGSPUR, Chestnut-collared, *Calcarius ornatus*
Lapland, *Calcarius lapponicus*
McCown's, *Rhynchophanes mccownii*
Smith's, *Calcarius pictus*
LOON, Arctic, *Gavia arctica*
Common, *Gavia immer*
Pacific, *Gavia pacifica*
Red-throated, *Gavia stellata*
Yellow-billed, *Gavia adamsii*
MAGPIE, Black-billed, *Pica hudsonia*
Yellow-billed, *Pica nuttalli*
MALLARD, *Anas platyrhynchos*
MANGO, Antillean, *Anthracothorax dominicus*
Green, *Anthracothorax viridis*
Green-breasted, *Anthracothorax prevostii*
MARTIN, Brown-chested, *Progne tapera*
Caribbean, *Progne dominicensis*
Cuban, *Progne cryptoleuca*
Gray-breasted, *Progne chalybea*
Purple, *Progne subis*
Southern, *Progne elegans*
MEADOWLARK, Eastern, *Sturnella magna*
Western, *Sturnella neglecta*
MERGANSER, Common, *Mergus merganser*
Hooded, *Lophodytes cucullatus*
Red-breasted, *Mergus serrator*
MERLIN, *Falco columbarius*
MILLERBIRD, *Acrocephalus familiaris*
MOCKINGBIRD, Bahama, *Mimus gundlachii*

Blue, *Melanotis caerulescens*
Northern, *Mimus polyglottos*
MOORHEN, Common, *Gallinula chloropus*
MURRE, Common, *Uria aalge*
Thick-billed, *Uria lomvia*
MURRELET, Ancient, *Synthliboramphus antiquus*
Craveri's, *Synthliboramphus craveri*
Kittlitz's, *Brachyramphus brevirostris*
Long-billed, *Brachyramphus perdix*
Marbled, *Brachyramphus marmoratus*
Xantus's, *Synthliboramphus hypoleucus*
NEEDLETAIL, White-throated, *Hirundapus caudacutus*
NIGHT-HERON, Black-crowned, *Nycticorax nycticorax*
Japanese, *Gorsachius goisagi*
Malayan, *Gorsachius melanolophus*
Yellow-crowned, *Nyctanassa violacea*
NIGHTHAWK, Antillean, *Chordeiles gundlachii*
Common, *Chordeiles minor*
Lesser, *Chordeiles acutipennis*
NIGHTINGALE-THRUSH, Black-headed, *Catharus mexicanus*
Orange-billed, *Catharus aurantiirostris*
NIGHTJAR, Buff-collared, *Caprimulgus ridgwayi*
Gray, *Caprimulgus indicus*
Puerto Rican, *Caprimulgus noctitherus*
NODDY, Black, *Anous minutus*
Blue-gray, *Procelsterna cerulea*
Brown, *Anous stolidus*
NUKUPUU, *Hemignathus lucidus*
NUTCRACKER, Clark's, *Nucifraga columbiana*
NUTHATCH, Brown-headed, *Sitta pusilla*
Pygmy, *Sitta pygmaea*
Red-breasted, *Sitta canadensis*
White-breasted, *Sitta carolinensis*
OLOMAO, *Myadestes lanaiensis*
OMAO, *Myadestes obscurus*
ORIOLE, Altamira, *Icterus gularis*
Audubon's, *Icterus graduacauda*
Baltimore, *Icterus galbula*
Black-vented, *Icterus wagleri*
Bullock's, *Icterus bullockii*
Hooded, *Icterus cucullatus*
Orchard, *Icterus spurius*
Puerto Rican, *Icterus portoricensis*
Scott's, *Icterus parisorum*
Streak-backed, *Icterus pustulatus*
OSPREY, *Pandion haliaetus*
OU, *Psittirostra psittacea*
OVENBIRD, *Seiurus aurocapilla*
OWL, Barn, *Tyto alba*
Barred, *Strix varia*
Boreal, *Aegolius funereus*
Burrowing, *Athene cunicularia*
Elf, *Micrathene whitneyi*
Flammulated, *Otus flammeolus*
Great Gray, *Strix nebulosa*
Great Horned, *Bubo virginianus*
Long-eared, *Asio otus*

Mottled, *Ciccaba virgata*
Northern Hawk, *Surnia ulula*
Northern Saw-whet, *Aegolius acadicus*
Short-eared, *Asio flammeus*
Snowy, *Bubo scandiacus*
Spotted, *Strix occidentalis*
Stygian, *Asio stygius*
OYSTERCATCHER, American, *Haematopus palliatus*
Black, *Haematopus bachmani*
Eurasian, *Haematopus ostralegus*
PALILA, *Loxioides bailleui*
PALM-SWIFT, Antillean, *Tachornis phoenicobia*
PARROTBILL, Maui, *Pseudonestor xanthophrys*
PARULA, Northern, *Parula americana*
Tropical, *Parula pitiayumi*
PAURAQUE, Common, *Nyctidromus albicollis*
PELICAN, American White, *Pelecanus erythrorhynchos*
Brown, *Pelecanus occidentalis*
PETREL, Bermuda, *Pterodroma cahow*
Black-capped, *Pterodroma hasitata*
Black-winged, *Pterodroma nigripennis*
Bonin, *Pterodroma hypoleuca*
Bulwer's, *Bulweria bulwerii*
Cook's, *Pterodroma cookii*
Gould's, *Pterodroma leucoptera*
Great-winged, *Pterodroma macroptera*
Hawaiian, *Pterodroma sandwichensis*
Herald, *Pterodroma arminjoniana*
Jouanin's, *Bulweria fallax*
Juan Fernandez, *Pterodroma externa*
Kermadec, *Pterodroma neglecta*
Mottled, *Pterodroma inexpectata*
Murphy's, *Pterodroma ultima*
Parkinson's, *Procellaria parkinsoni*
Phoenix, *Pterodroma alba*
Stejneger's, *Pterodroma longirostris*
Tahiti, *Pterodroma rostrata*
White-necked, *Pterodroma cervicalis*
PEWEE, Cuban, *Contopus caribaeus*
Greater, *Contopus pertinax*
Hispaniolan, *Contopus hispaniolensis*
Lesser Antillean, *Contopus latirostris*
PHAINOPEPLA, *Phainopepla nitens*
PHALAROPE, Red, *Phalaropus fulicarius*
Red-necked, *Phalaropus lobatus*
Wilson's, *Phalaropus tricolor*
PHOEBE, Black, *Sayornis nigricans*
Eastern, *Sayornis phoebe*
Say's, *Sayornis saya*
PIGEON, Band-tailed, *Patagioenas fasciata*
Plain, *Patagioenas inornata*
Red-billed, *Patagioenas flavirostris*
Scaly-naped, *Patagioenas squamosa*
White-crowned, *Patagioenas leucocephala*
PINTAIL, Northern, *Anas acuta*
White-cheeked, *Anas bahamensis*
PIPIT, American, *Anthus rubescens*
Olive-backed, *Anthus hodgsoni*
Pechora, *Anthus gustavi*

Red-throated, *Anthus cervinus*
Sprague's, *Anthus spragueii*
Tree, *Anthus trivialis*
PLOVER, Black-bellied, *Pluvialis squatarola*
Collared, *Charadrius collaris*
Common Ringed, *Charadrius hiaticula*
Little Ringed, *Charadrius dubius*
Mountain, *Charadrius montanus*
Piping, *Charadrius melodus*
Semipalmated, *Charadrius semipalmatus*
Snowy, *Charadrius alexandrinus*
Wilson's, *Charadrius wilsonia*
POCHARD, Baer's, *Aythya baeri*
Common, *Aythya ferina*
POND–HERON, Chinese, *Ardeola bacchus*
POORWILL, Common, *Phalaenoptilus nuttallii*
POO–ULI, *Melamprosops phaeosoma*
PUAIOHI, *Myadestes palmeri*
PUFFIN, Atlantic, *Fratercula arctica*
Horned, *Fratercula corniculata*
Tufted, *Fratercula cirrhata*
PYGMY–OWL, Ferruginous, *Glaucidium brasilianum*
Northern, *Glaucidium gnoma*
PYRRHULOXIA, *Cardinalis sinuatus*
QUAIL–DOVE, Bridled, *Geotrygon mystacea*
Key West, *Geotrygon chrysia*
Ruddy, *Geotrygon montana*
QUETZEL, Eared, *Euptilotis neoxenus*
RAIL, Black, *Laterallus jamaicensis*
Buff-banded, *Gallirallus philippensis*
Clapper, *Rallus longirostris*
Guam, *Gallirallus owstoni*
King, *Rallus elegans*
Spotted, *Pardirallus maculatus*
Virginia, *Rallus limicola*
Yellow, *Coturnicops noveboracensis*
RAVEN, Chihuahuan, *Corvus cryptoleucus*
Common, *Corvus corax*
RAZORBILL, *Alca torda*
REDHEAD, *Aythya americana*
REDPOLL, Common, *Acanthis flammea*
Hoary, *Acanthis hornemanni*
REDSHANK, Spotted, *Tringa erythropus*
REDSTART, American, *Setophaga ruticilla*
Painted, *Myioborus pictus*
Slate-throated, *Myioborus miniatus*
REED–WARBLER, Nightingale, *Acrocephalus luscinia*
REEF–EGRET, Pacific, *Egretta sacra*
REEF–HERON, Western, *Egretta gularis*
ROADRUNNER, Greater, *Geococcyx californianus*
ROBIN, American, *Turdus migratorius*
Rufous-backed, *Turdus rufopalliatus*
Rufous-tailed, *Luscinia sibilans*
Siberian Blue, *Luscinia cyane*
ROCK–THRUSH, Blue, *Monticola solitarius*
ROSEFINCH, Common, *Carpodacus erythrinus*

ROSY–FINCH, Black, *Leucosticte atrata*
Brown-capped, *Leucosticte australis*
Gray-crowned, *Leucosticte tephrocotis*
RUBYTHROAT, Siberian, *Luscinia calliope*
RUFF, *Philomachus pugnax*
SANDERLING, *Calidris alba*
SANDPIPER, Baird's, *Calidris bairdii*
Broad-billed, *Limicola falcinellus*
Buff-breasted, *Tryngites subruficollis*
Common, *Actitis hypoleucos*
Curlew, *Calidris ferruginea*
Green, *Tringa ochropus*
Least, *Calidris minutilla*
Marsh, *Tringa stagnatilis*
Pectoral, *Calidris melanotos*
Purple, *Calidris maritima*
Rock, *Calidris ptilocnemis*
Semipalmated, *Calidris pusilla*
Sharp-tailed, *Calidris acuminata*
Solitary, *Tringa solitaria*
Spoon-billed, *Eurynorhynchus pygmeus*
Spotted, *Actitis macularius*
Stilt, *Calidris himantopus*
Terek, *Xenus cinereus*
Upland, *Bartramia longicauda*
Western, *Calidris mauri*
White-rumped, *Calidris fuscicollis*
Wood, *Tringa glareola*
SAND–PLOVER, Greater, *Charadrius leschenaultii*
Lesser, *Charadrius mongolus*
SAPSUCKER, Red-breasted, *Sphyrapicus ruber*
Red-naped, *Sphyrapicus nuchalis*
Williamson's, *Sphyrapicus thyroideus*
Yellow-bellied, *Sphyrapicus varius*
SCAUP, Greater, *Aythya marila*
Lesser, *Aythya affinis*
SCOPS-OWL, Oriental, *Otus sunia*
SCOTER, Black, *Melanitta americana*
Surf, *Melanitta perspicillata*
White-winged, *Melanitta fusca*
SCREECH-OWL, Eastern, *Megascops asio*
Puerto Rican, *Megascops nudipes*
Western, *Megascops kennicottii*
Whiskered, *Megascops trichopsis*
SCRUB-JAY, Florida, *Aphelocoma coerulescens*
Island, *Aphelocoma insularis*
Western, *Aphelocoma californica*
SEA-EAGLE, Steller's, *Haliaeetus pelagicus*
SEEDEATER, White-collared, *Sporophila torqueola*
SHEARWATER, Audubon's, *Puffinus lherminieri*
Black-vented, *Puffinus opisthomelas*
Buller's, *Puffinus bulleri*
Cape Verde, *Calonectris edwardsii*
Christmas, *Puffinus nativitatis*
Cory's, *Calonectris diomedea*
Flesh-footed, *Puffinus carneipes*
Great, *Puffinus gravis*
Little, *Puffinus assimilis*
Manx, *Puffinus puffinus*
Pink-footed, *Puffinus creatopus*

Short-tailed, *Puffinus tenuirostris*
Sooty, *Puffinus griseus*
Streaked, *Calonectris leucomelas*
Townsend's, *Puffinus auricularis*
Wedge-tailed, *Puffinus pacificus*
SHOVELER, Northern, *Anas clypeata*
SHRIKE, Brown, *Lanius cristatus*
Loggerhead, *Lanius ludovicianus*
Northern, *Lanius excubitor*
SILKY-FLYCATCHER, Gray, *Ptilogonys cinereus*
SISKIN, Eurasian, *Spinus spinus*
Pine, *Spinus pinus*
SKIMMER, Black, *Rynchops niger*
SKUA, Great, *Stercorarius skua*
South Polar, *Stercorarius maccormicki*
SMEW, *Mergellus albellus*
SNIPE, Common, *Gallinago gallinago*
Jack, *Lymnocryptes minimus*
Pin-tailed, *Gallinago stenura*
Swinhoe's, *Gallinago megala*
Wilson's, *Gallinago delicata*
SOLITAIRE, Townsend's, *Myadestes townsendi*
SORA, *Porzana carolina*
SPARROW, American Tree, *Spizella arborea*
Bachman's, *Peucaea aestivalis*
Baird's, *Ammodramus bairdii*
Black-chinned, *Spizella atrogularis*
Black-throated, *Amphispiza bilineata*
Botteri's, *Peucaea botterii*
Brewer's, *Spizella breweri*
Cassin's, *Peucaea cassinii*
Chipping, *Spizella passerina*
Clay-colored, *Spizella pallida*
Field, *Spizella pusilla*
Five-striped, *Amphispiza quinquestriata*
Fox, *Passerella iliaca*
Golden-crowned, *Zonotrichia atricapilla*
Grasshopper, *Ammodramus savannarum*
Harris's, *Zonotrichia querula*
Henslow's, *Ammodramus henslowii*
Lark, *Chondestes grammacus*
Le Conte's, *Ammodramus leconteii*
Lincoln's, *Melospiza lincolnii*
Nelson's, *Ammodramus nelsoni*
Olive, *Arremonops rufivirgatus*
Rufous-crowned, *Aimophila ruficeps*
Rufous-winged, *Peucaea carpalis*
Sage, *Amphispiza belli*
Saltmarsh, *Ammodramus caudacutus*
Savannah, *Passerculus sandwichensis*
Seaside, *Ammodramus maritimus*
Song, *Melospiza melodia*
Swamp, *Melospiza georgiana*
Vesper, *Pooecetes gramineus*
White-crowned, *Zonotrichia leucophrys*
White-throated, *Zonotrichia albicollis*
Worthen's, *Spizella wortheni*
SPARROWHAWK, Japanese, *Accipiter gularis*
SPINDALIS, Puerto Rican, *Spindalis portoricensis*

Western, *Spindalis zena*
SPOONBILL, Roseate, *Platalea ajaja*
STARLING, Chestnut-cheeked, *Sturnus philippensis*
  White-cheeked, *Sturnus cineraceus*
STARTHROAT, Plain-capped, *Heliomaster constantii*
STILT, Black-necked, *Himantopus mexicanus*
  Black-winged, *Himantopus himantopus*
STINT, Little, *Calidris minuta*
  Long-toed, *Calidris subminuta*
  Red-necked, *Calidris ruficollis*
  Temminck's, *Calidris temminckii*
STONECHAT, *Saxicola torquatus*
STORK, Wood, *Mycteria americana*
STORM-PETREL, Ashy, *Oceanodroma homochroa*
  Band-rumped, *Oceanodroma castro*
  Black, *Oceanodroma melania*
  Black-bellied, *Fregetta tropica*
  Fork-tailed, *Oceanodroma furcata*
  Leach's, *Oceanodroma leucorhoa*
  Least, *Oceanodroma microsoma*
  Matsudaira's, *Oceanodroma matsudairae*
  Polynesian, *Nesofregetta fuliginosa*
  Ringed, *Oceanodroma hornbyi*
  Swinhoe's, *Oceanodroma monorhis*
  Tristram's, *Oceanodroma tristrami*
  Wedge-rumped, *Oceanodroma tethys*
  White-faced, *Pelagodroma marina*
  White-bellied, *Fregetta grallaria*
  Wilson's, *Oceanites oceanicus*
SURFBIRD, *Aphriza virgata*
SWALLOW, Bahama, *Tachycineta cyaneoviridis*
  Bank, *Riparia riparia*
  Barn, *Hirundo rustica*
  Cave, *Petrochelidon fulva*
  Cliff, *Petrochelidon pyrrhonota*
  Mangrove, *Tachycineta albilinea*
  Northern Rough-winged, *Stelgidopteryx serripennis*
  Tree, *Tachycineta bicolor*
  Violet-green, *Tachycineta thalassina*
SWAMPHEN, Purple, *Porphyrio porphyrio*
SWAN, Trumpeter, *Cygnus buccinator*
  Tundra, *Cygnus columbianus*
  Whooper, *Cygnus cygnus*
SWIFT, Alpine, *Apus melba*
  Black, *Cypseloides niger*
  Chimney, *Chaetura pelagica*
  Common, *Apus apus*
  Fork-tailed, *Apus pacificus*
  Short-tailed, *Chaetura brachyura*
  Vaux's, *Chaetura vauxi*
  White-collared, *Streptoprocne zonaris*
  White-throated, *Aeronautes saxatalis*
SWIFTLET, Mariana, *Aerodramus bartschi*
  White-rumped, *Aerodramus spodiopygius*
TANAGER, Flame-colored, *Piranga bidentata*
  Hepatic, *Piranga flava*
  Puerto Rican, *Nesospingus speculiferus*
  Scarlet, *Piranga olivacea*
  Summer, *Piranga rubra*
  Western, *Piranga ludoviciana*
TATTLER, Gray-tailed, *Tringa brevipes*
  Wandering, *Tringa incana*
TEAL, Baikal, *Anas formosa*
  Blue-winged, *Anas discors*
  Cinnamon, *Anas cyanoptera*
  Green-winged, *Anas crecca*
TERN, Aleutian, *Onychoprion aleuticus*
  Arctic, *Sterna paradisaea*
  Black, *Chlidonias niger*
  Black-naped, *Sterna sumatrana*
  Bridled, *Onychoprion anaethetus*
  Caspian, *Hydroprogne caspia*
  Common, *Sterna hirundo*
  Elegant, *Thalasseus elegans*
  Forster's, *Sterna forsteri*
  Gray-backed, *Onychoprion lunatus*
  Great Crested, *Thalasseus bergii*
  Gull-billed, *Gelochelidon nilotica*
  Large-billed, *Phaetusa simplex*
  Least, *Sternula antillarum*
  Little, *Sternula albifrons*
  Roseate, *Sterna dougallii*
  Royal, *Thalasseus maximus*
  Sandwich, *Thalasseus sandvicensis*
  Sooty, *Onychoprion fuscatus*
  Whiskered, *Chlidonias hybrida*
  White, *Gygis alba*
  White-winged, *Chlidonias leucopterus*
THRASHER, Bendire's, *Toxostoma bendirei*
  Brown, *Toxostoma rufum*
  California, *Toxostoma redivivum*
  Crissal, *Toxostoma crissale*
  Curve-billed, *Toxostoma curvirostre*
  Le Conte's, *Toxostoma lecontei*
  Long-billed, *Toxostoma longirostre*
  Pearly-eyed, *Margarops fuscatus*
  Sage, *Oreoscoptes montanus*
THRUSH, Aztec, *Ridgwayia pinicola*
  Bicknell's, *Catharus bicknelli*
  Clay-colored, *Turdus grayi*
  Dusky, *Turdus naumanni*
  Eyebrowed, *Turdus obscurus*
  Gray-cheeked, *Catharus minimus*
  Hermit, *Catharus guttatus*
  Red-legged, *Turdus plumbeus*
  Swainson's, *Catharus ustulatus*
  Varied, *Ixoreus naevius*
  White-throated, *Turdus assimilis*
  Wood, *Hylocichla mustelina*
TITMOUSE, Black-crested, *Baeolophus atricristatus*
  Bridled, *Baeolophus wollweberi*
  Juniper, *Baeolophus ridgwayi*
  Oak, *Baeolophus inornatus*
  Tufted, *Baeolophus bicolor*
TITYRA, Masked, *Tityra semifasciata*
TOWHEE, Abert's, *Melozone aberti*
  California, *Melozone crissalis*
  Canyon, *Melozone fusca*
  Eastern, *Pipilo erythrophthalmus*
  Green-tailed, *Pipilo chlorurus*
  Spotted, *Pipilo maculatus*
TROGON, Elegant, *Trogon elegans*
TROPICBIRD, Red-billed, *Phaethon aethereus*
  Red-tailed, *Phaethon rubricauda*
  White-tailed, *Phaethon lepturus*
TURNSTONE, Black, *Arenaria melanocephala*
  Ruddy, *Arenaria interpres*
TURTLE-DOVE, Oriental, *Streptopelia orientalis*
VEERY, *Catharus fuscescens*
VERDIN, *Auriparus flaviceps*
VIOLETEAR, Green, *Colibri thalassinus*
VIREO, Bell's, *Vireo bellii*
  Black-capped, *Vireo atricapilla*
  Black-whiskered, *Vireo altiloquus*
  Blue-headed, *Vireo solitarius*
  Cassin's, *Vireo cassinii*
  Gray, *Vireo vicinior*
  Hutton's, *Vireo huttoni*
  Philadelphia, *Vireo philadelphicus*
  Plumbeous, *Vireo plumbeus*
  Puerto Rican, *Vireo latimeri*
  Red-eyed, *Vireo olivaceus*
  Thick-billed, *Vireo crassirostris*
  Warbling, *Vireo gilvus*
  White-eyed, *Vireo griseus*
  Yellow-green, *Vireo flavoviridis*
  Yellow-throated, *Vireo flavifrons*
  Yucatan, *Vireo magister*
VULTURE, Black, *Coragyps atratus*
  Turkey, *Cathartes aura*
WAGTAIL, Citrine, *Motacilla citreola*
  Eastern Yellow, *Motacilla tschutschensis*
  Gray, *Motacilla cinerea*
  White, *Motacilla alba*
WARBLER, Adelaide's, *Dendroica adelaidae*
  Arctic, *Phylloscopus borealis*
  Bachman's, *Vermivora bachmanii*
  Bay-breasted, *Dendroica castanea*
  Black-and-white, *Mniotilta varia*
  Black-throated Blue, *Dendroica caerulescens*
  Black-throated Gray, *Dendroica nigrescens*
  Black-throated Green, *Dendroica virens*
  Blackburnian, *Dendroica fusca*
  Blackpoll, *Dendroica striata*
  Blue-winged, *Vermivora cyanoptera*
  Canada, *Wilsonia canadensis*
  Cape May, *Dendroica tigrina*
  Cerulean, *Dendroica cerulea*
  Chestnut-sided, *Dendroica pensylvanica*
  Colima, *Oreothlypis crissalis*
  Connecticut, *Oporornis agilis*
  Crescent-chested, *Oreothlypis superciliosa*
  Dusky, *Phylloscopus fuscatus*
  Elfin-woods, *Dendroica angelae*
  Fan-tailed, *Euthlypis lachrymosa*
  Golden-cheeked, *Dendroica chrysoparia*
  Golden-crowned, *Basileuterus culicivorus*
  Golden-winged, *Vermivora chrysoptera*

Grace's, *Dendroica graciae*
Hermit, *Dendroica occidentalis*
Hooded, *Wilsonia citrina*
Kentucky, *Oporornis formosus*
Kirtland's, *Dendroica kirtlandii*
Lanceolated, *Locustella lanceolata*
Lucy's, *Oreothlypis luciae*
MacGillivray's, *Oporornis tolmiei*
Magnolia, *Dendroica magnolia*
Mourning, *Oporornis philadelphia*
Nashville, *Oreothlypis ruficapilla*
Olive, *Peucedramus taeniatus*
Orange-crowned, *Oreothlypis celata*
Palm, *Dendroica palmarum*
Pine, *Dendroica pinus*
Prairie, *Dendroica discolor*
Prothonotary, *Protonotaria citrea*
Red-faced, *Cardellina rubrifrons*
Rufous-capped, *Basileuterus rufifrons*
Sedge, *Acrocephalus schoenobaenus*
Swainson's, *Limnothlypis swainsonii*
Tennessee, *Oreothlypis peregrina*
Townsend's, *Dendroica townsendi*
Virginia's, *Oreothlypis virginiae*
Willow, *Phylloscopus trochilus*
Wilson's, *Wilsonia pusilla*
Wood, *Phylloscopus sibilatrix*
Worm-eating, *Helmitheros vermivorum*
Yellow, *Dendroica petechia*
Yellow-browed, *Phylloscopus inornatus*
Yellow-rumped, *Dendroica coronata*
Yellow-throated, *Dendroica dominica*
WATERTHRUSH, Louisiana, *Parkesia motacilla*
Northern, *Parkesia noveboracensis*
WAXWING, Bohemian, *Bombycilla garrulus*
Cedar, *Bombycilla cedrorum*
WHEATEAR, Northern, *Oenanthe oenanthe*
WHIMBREL, *Numenius phaeopus*
WHIP-POOR-WILL, Eastern, *Caprimulgus vociferus*
Mexican, *Caprimulgus arizonae*
WHISTLING-DUCK, Black-bellied, *Dendrocygna autumnalis*
Fulvous, *Dendrocygna bicolor*
West Indian, *Dendrocygna arborea*
WHITETHROAT, Lesser, *Sylvia curruca*
WIGEON, American, *Anas americana*
Eurasian, *Anas penelope*
WILLET, *Tringa semipalmata*
WOOD-PEWEE, Eastern, *Contopus virens*
Western, *Contopus sordidulus*
WOODCOCK, American, *Scolopax minor*
Eurasian, *Scolopax rusticola*
WOODPECKER, Acorn, *Melanerpes formicivorus*
American Three-toed, *Picoides dorsalis*
Arizona, *Picoides arizonae*
Black-backed, *Picoides arcticus*
Downy, *Picoides pubescens*
Gila, *Melanerpes uropygialis*
Golden-fronted, *Melanerpes aurifrons*

Great Spotted, *Dendrocopos major*
Hairy, *Picoides villosus*
Ivory-billed, *Campephilus principalis*
Ladder-backed, *Picoides scalaris*
Lewis's, *Melanerpes lewis*
Nuttall's, *Picoides nuttallii*
Pileated, *Dryocopus pileatus*
Puerto Rican, *Melanerpes portoricensis*
Red-bellied, *Melanerpes carolinus*
Red-cockaded, *Picoides borealis*
Red-headed, *Melanerpes erythrocephalus*
White-headed, *Picoides albolarvatus*
WOODSTAR, Bahama, *Calliphlox evelynae*
WREN, Bewick's *Thryomanes bewickii*
Cactus, *Campylorhynchus brunneicapillus*
Canyon, *Catherpes mexicanus*
Carolina, *Thryothorus ludovicianus*
House, *Troglodytes aedon*
Marsh, *Cistothorus palustris*
Pacific, *Troglodytes pacificus*
Rock, *Salpinctes obsoletus*
Sedge, *Cistothorus platensis*
Sinaloa, *Thryothorus sinaloa*
Winter, *Troglodytes hiemalis*
WRENTIT, *Chamaea fasciata*
WRYNECK, Eurasian, *Jynx torquilla*
YELLOWLEGS, Greater, *Tringa melanoleuca*
Lesser, *Tringa flavipes*
YELLOWTHROAT, Common, *Geothlypis trichas*
Gray-crowned, *Geothlypis poliocephala*

(2) *Taxonomic listing.* Species are listed in phylogenetic sequence by scientific name, with the common (English) name following the scientific name. To help clarify species relationships, we also list the higher-level taxonomic categories of Order, Family, and Subfamily.

Order ANSERIFORMES
Family ANATIDAE
Subfamily DENDROCYGNINAE
*Dendrocygna autumnalis,* Black-bellied Whistling-Duck
*Dendrocygna arborea,* West Indian Whistling-Duck
*Dendrocygna bicolor,* Fulvous Whistling-Duck
Subfamily ANSERINAE
*Anser fabalis,* Taiga Bean-Goose
*Anser serrirostris,* Tundra Bean-Goose
*Anser albifrons,* Greater White-fronted Goose
*Anser erythropus,* Lesser White-fronted Goose
*Chen canagica,* Emperor Goose
*Chen caerulescens,* Snow Goose
*Chen rossii,* Ross's Goose
*Branta bernicla,* Brant
*Branta leucopsis,* Barnacle Goose
*Branta canadensis,* Canada Goose (including *Branta hutchinsii,* Cackling Goose)

*Branta sandvicensis,* Hawaiian Goose
*Cygnus buccinator,* Trumpeter Swan
*Cygnus columbianus,* Tundra Swan
*Cygnus cygnus,* Whooper Swan
Subfamily ANATINAE
*Cairina moschata,* Muscovy Duck
*Aix sponsa,* Wood Duck
*Anas strepera,* Gadwall
*Anas falcata,* Falcated Duck
*Anas penelope,* Eurasian Wigeon
*Anas americana,* American Wigeon
*Anas rubripes,* American Black Duck
*Anas platyrhynchos,* Mallard
*Anas fulvigula,* Mottled Duck
*Anas wyvilliana,* Hawaiian Duck
*Anas laysanensis,* Laysan Duck
*Anas zonorhyncha,* Eastern Spot-billed Duck
*Anas superciliosa,* Pacific Black Duck
*Anas discors,* Blue-winged Teal
*Anas cyanoptera,* Cinnamon Teal
*Anas clypeata,* Northern Shoveler
*Anas bahamensis,* White-cheeked Pintail
*Anas acuta,* Northern Pintail
*Anas querquedula,* Garganey
*Anas formosa,* Baikal Teal
*Anas crecca,* Green-winged Teal
*Aythya valisineria,* Canvasback
*Aythya americana,* Redhead
*Aythya ferina,* Common Pochard
*Aythya baeri,* Baer's Pochard
*Aythya collaris,* Ring-necked Duck
*Aythya fuligula,* Tufted Duck
*Aythya marila,* Greater Scaup
*Aythya affinis,* Lesser Scaup
*Polysticta stelleri,* Steller's Eider
*Somateria fischeri,* Spectacled Eider
*Somateria spectabilis,* King Eider
*Somateria mollissima,* Common Eider
*Histrionicus histrionicus,* Harlequin Duck
*Melanitta perspicillata,* Surf Scoter
*Melanitta fusca,* White-winged Scoter
*Melanitta americana,* Black Scoter
*Clangula hyemalis,* Long-tailed Duck
*Bucephala albeola,* Bufflehead
*Bucephala clangula,* Common Goldeneye
*Bucephala islandica,* Barrow's Goldeneye
*Mergellus albellus,* Smew
*Lophodytes cucullatus,* Hooded Merganser
*Mergus merganser,* Common Merganser
*Mergus serrator,* Red-breasted Merganser
*Nomonyx dominicus,* Masked Duck
*Oxyura jamaicensis,* Ruddy Duck
Order GAVIIFORMES
Family GAVIIDAE
*Gavia stellata,* Red-throated Loon
*Gavia arctica,* Arctic Loon
*Gavia pacifica,* Pacific Loon
*Gavia immer,* Common Loon
*Gavia adamsii,* Yellow-billed Loon
Order PODICIPEDIFORMES
Family PODICIPEDIDAE

*Tachybaptus dominicus*, Least Grebe
*Podilymbus podiceps*, Pied-billed Grebe
*Podiceps auritus*, Horned Grebe
*Podiceps grisegena*, Red-necked Grebe
*Podiceps nigricollis*, Eared Grebe
*Aechmophorus occidentalis*, Western Grebe
*Aechmophorus clarkii*, Clark's Grebe
Order PHOENICOPTERIFORMES
Family PHOENICOPTERIDAE
*Phoenicopterus ruber*, American Flamingo
Order PROCELLARIIFORMES
Family DIOMEDEIDAE
*Thalassarche chlororhynchos*, Yellow-nosed Albatross
*Thalassarche cauta*, Shy Albatross
*Thalassarche melanophris*, Black-browed Albatross
*Phoebetria palpebrata*, Light-mantled Albatross
*Diomedea exulans*, Wandering Albatross
*Phoebastria immutabilis*, Laysan Albatross
*Phoebastria nigripes*, Black-footed Albatross
*Phoebastria albatrus*, Short-tailed Albatross
Family PROCELLARIIDAE
*Fulmarus glacialis*, Northern Fulmar
*Pterodroma macroptera*, Great-winged Petrel
*Pterodroma neglecta*, Kermadec Petrel
*Pterodroma arminjoniana*, Herald Petrel
*Pterodroma ultima*, Murphy's Petrel
*Pterodroma inexpectata*, Mottled Petrel
*Pterodroma cahow*, Bermuda Petrel
*Pterodroma hasitata*, Black-capped Petrel
*Pterodroma externa*, Juan Fernandez Petrel
*Pterodroma sandwichensis*, Hawaiian Petrel
*Pterodroma cervicalis*, White-necked Petrel
*Pterodroma hypoleuca*, Bonin Petrel
*Pterodroma nigripennis*, Black-winged Petrel
*Pterodroma cookii*, Cook's Petrel
*Pterodroma longirostris*, Stejneger's Petrel
*Pterodroma alba*, Phoenix Petrel
*Pterodroma leucoptera*, Gould's Petrel
*Pterodroma rostrata*, Tahiti Petrel
*Bulweria bulwerii*, Bulwer's Petrel
*Bulweria fallax*, Jouanin's Petrel
*Procellaria parkinsoni*, Parkinson's Petrel
*Calonectris leucomelas*, Streaked Shearwater
*Calonectris diomedea*, Cory's Shearwater
*Calonectris edwardsii*, Cape Verde Shearwater
*Puffinus creatopus*, Pink-footed Shearwater
*Puffinus carneipes*, Flesh-footed Shearwater
*Puffinus gravis*, Great Shearwater
*Puffinus pacificus*, Wedge-tailed Shearwater
*Puffinus bulleri*, Buller's Shearwater
*Puffinus griseus*, Sooty Shearwater
*Puffinus tenuirostris*, Short-tailed Shearwater
*Puffinus nativitatis*, Christmas Shearwater
*Puffinus puffinus*, Manx Shearwater
*Puffinus auricularis*, Townsend's Shearwater
*Puffinus opisthomelas*, Black-vented Shearwater
*Puffinus lherminieri*, Audubon's Shearwater
*Puffinus assimilis*, Little Shearwater
Family HYDROBATIDAE
*Oceanites oceanicus*, Wilson's Storm-Petrel
*Pelagodroma marina*, White-faced Storm-Petrel
*Fregetta tropica*, Black-bellied Storm-Petrel
*Fregetta grallaria*, White-bellied Storm-Petrel
*Nesofregetta fuliginosa*, Polynesian Storm-Petrel
*Oceanodroma furcata*, Fork-tailed Storm-Petrel
*Oceanodroma hornbyi*, Ringed Storm-Petrel
*Oceanodroma monorhis*, Swinhoe's Storm-Petrel
*Oceanodroma leucorhoa*, Leach's Storm-Petrel
*Oceanodroma homochroa*, Ashy Storm-Petrel
*Oceanodroma castro*, Band-rumped Storm-Petrel
*Oceanodroma tethys*, Wedge-rumped Storm-Petrel
*Oceanodroma matsudairae*, Matsudaira's Storm-Petrel
*Oceanodroma melania*, Black Storm-Petrel
*Oceanodroma tristrami*, Tristram's Storm-Petrel
*Oceanodroma microsoma*, Least Storm-Petrel
Order PHAETHONTIFORMES
Family PHAETHONTIDAE
*Phaethon lepturus*, White-tailed Tropicbird
*Phaethon aethereus*, Red-billed Tropicbird
*Phaethon rubricauda*, Red-tailed Tropicbird
Order CICONIIFORMES
Family CICONIIDAE
*Jabiru mycteria*, Jabiru
*Mycteria americana*, Wood Stork
Order SULIFORMES
Family FREGATIDAE
*Fregata magnificens*, Magnificent Frigatebird
*Fregata minor*, Great Frigatebird
*Fregata ariel*, Lesser Frigatebird
Family SULIDAE
*Sula dactylatra*, Masked Booby
*Sula nebouxii*, Blue-footed Booby
*Sula leucogaster*, Brown Booby
*Sula sula*, Red-footed Booby
*Morus bassanus*, Northern Gannet
Family PHALACROCORACIDAE
*Phalacrocorax penicillatus*, Brandt's Cormorant
*Phalacrocorax brasilianus*, Neotropic Cormorant
*Phalacrocorax auritus*, Double-crested Cormorant
*Phalacrocorax carbo*, Great Cormorant
*Phalacrocorax urile*, Red-faced Cormorant
*Phalacrocorax pelagicus*, Pelagic Cormorant
*Phalacrocorax melanoleucos*, Little Pied Cormorant
Family ANHINGIDAE
*Anhinga anhinga*, Anhinga
Order PELECANIFORMES
Family PELECANIDAE
*Pelecanus erythrorhynchos*, American White Pelican
*Pelecanus occidentalis*, Brown Pelican
Family ARDEIDAE
*Botaurus lentiginosus*, American Bittern
*Ixobrychus sinensis*, Yellow Bittern
*Ixobrychus exilis*, Least Bittern
*Ixobrychus eurhythmus*, Schrenck's Bittern
*Ixobrychus flavicollis*, Black Bittern
*Ardea herodias*, Great Blue Heron
*Ardea cinerea*, Gray Heron
*Ardea alba*, Great Egret
*Mesophoyx intermedia*, Intermediate Egret
*Egretta eulophotes*, Chinese Egret
*Egretta garzetta*, Little Egret
*Egretta sacra*, Pacific Reef-Egret
*Egretta gularis*, Western Reef-Heron
*Egretta thula*, Snowy Egret
*Egretta caerulea*, Little Blue Heron
*Egretta tricolor*, Tricolored Heron
*Egretta rufescens*, Reddish Egret
*Bubulcus ibis*, Cattle Egret
*Ardeola bacchus*, Chinese Pond-Heron
*Butorides virescens*, Green Heron
*Nycticorax nycticorax*, Black-crowned Night-Heron
*Nyctanassa violacea*, Yellow-crowned Night-Heron
*Gorsachius goisagi*, Japanese Night-Heron
*Gorsachius melanolophus*, Malayan Night-Heron
Family THRESKIORNITHIDAE
Subfamily THRESKIORNITHINAE
*Eudocimus albus*, White Ibis
*Eudocimus ruber*, Scarlet Ibis
*Plegadis falcinellus*, Glossy Ibis
*Plegadis chihi*, White-faced Ibis

Subfamily PLATALEINAE
  *Platalea ajaja*, Roseate Spoonbill
Order ACCIPITRIFORMES
Family CATHARTIDAE
  *Coragyps atratus*, Black Vulture
  *Cathartes aura*, Turkey Vulture
  *Gymnogyps californianus*, California
    Condor
Family PANDIONIDAE
  *Pandion haliaetus*, Osprey
Family ACCIPITRIDAE
  *Chondrohierax uncinatus*, Hook-
    billed Kite
  *Elanoides forficatus*, Swallow-tailed
    Kite
  *Elanus leucurus*, White-tailed Kite
  *Rostrhamus sociabilis*, Snail Kite
  *Ictinia mississippiensis*, Mississippi
    Kite
  *Milvus migrans*, Black Kite
  *Haliaeetus leucocephalus*, Bald Eagle
  *Haliaeetus albicilla*, White-tailed
    Eagle
  *Haliaeetus pelagicus*, Steller's Sea-
    Eagle
  *Circus cyaneus*, Northern Harrier
  *Accipiter soloensis*, Gray Frog-Hawk
  *Accipiter gularis*, Japanese
    Sparrowhawk
  *Accipiter striatus*, Sharp-shinned
    Hawk
  *Accipiter cooperii*, Cooper's Hawk
  *Accipiter gentilis*, Northern Goshawk
  *Geranospiza caerulescens*, Crane
    Hawk
  *Buteogallus anthracinus*, Common
    Black-Hawk
  *Parabuteo unicinctus*, Harris's Hawk
  *Buteo magnirostris*, Roadside Hawk
  *Buteo lineatus*, Red-shouldered Hawk
  *Buteo platypterus*, Broad-winged
    Hawk
  *Buteo nitidus*, Gray Hawk
  *Buteo brachyurus*, Short-tailed Hawk
  *Buteo swainsoni*, Swainson's Hawk
  *Buteo albicaudatus*, White-tailed
    Hawk
  *Buteo albonotatus*, Zone-tailed Hawk
  *Buteo solitarius*, Hawaiian Hawk
  *Buteo jamaicensis*, Red-tailed Hawk
  *Buteo regalis*, Ferruginous Hawk
  *Buteo lagopus*, Rough-legged Hawk
  *Aquila chrysaetos*, Golden Eagle
Order FALCONIFORMES
Family FALCONIDAE
Subfamily MICRASTURINAE
  *Micrastur semitorquatus*, Collared
    Forest-Falcon
Subfamily CARACARINAE
  *Caracara cheriway*, Crested Caracara
Subfamily FALCONINAE
  *Falco tinnunculus*, Eurasian Kestrel
  *Falco sparverius*, American Kestrel
  *Falco vespertinus*, Red-footed Falcon
  *Falco columbarius*, Merlin
  *Falco subbuteo*, Eurasian Hobby
  *Falco femoralis*, Aplomado Falcon
  *Falco rusticolus*, Gyrfalcon
  *Falco peregrinus*, Peregrine Falcon

  *Falco mexicanus*, Prairie Falcon
Order GRUIFORMES
Family RALLIDAE
  *Coturnicops noveboracensis*, Yellow
    Rail
  *Laterallus jamaicensis*, Black Rail
  *Gallirallus philippensis*, Buff-banded
    Rail
  *Gallirallus owstoni*, Guam Rail
  *Crex crex*, Corn Crake
  *Rallus longirostris*, Clapper Rail
  *Rallus elegans*, King Rail
  *Rallus limicola*, Virginia Rail
  *Porzana carolina*, Sora
  *Porzana tabuensis*, Spotless Crake
  *Porzana flaviventer*, Yellow-breasted
    Crake
  *Neocrex erythrops*, Paint-billed Crake
  *Pardirallus maculatus*, Spotted Rail
  *Porphyrio porphyrio*, Purple
    Swamphen
  *Porphyrio martinica*, Purple Gallinule
  *Porphyrio flavirostris*, Azure Gallinule
  *Gallinula chloropus*, Common
    Moorhen
  *Fulica atra*, Eurasian Coot
  *Fulica alai*, Hawaiian Coot
  *Fulica americana*, American Coot
  *Fulica caribaea*, Caribbean Coot
Family ARAMIDAE
  *Aramus guarauna*, Limpkin
Family GRUIDAE
  *Grus canadensis*, Sandhill Crane
  *Grus grus*, Common Crane
  *Grus americana*, Whooping Crane
Order CHARADRIIFORMES
Family CHARADRIIDAE
Subfamily VANELLINAE
  *Vanellus vanellus*, Northern Lapwing
Subfamily CHARADRIINAE
  *Pluvialis squatarola*, Black-bellied
    Plover
  *Pluvialis apricaria*, European Golden-
    Plover
  *Pluvialis dominica*, American Golden-
    Plover
  *Pluvialis fulva*, Pacific Golden-Plover
  *Charadrius mongolus*, Lesser Sand-
    Plover
  *Charadrius leschenaultii*, Greater
    Sand-Plover
  *Charadrius collaris*, Collared Plover
  *Charadrius alexandrinus*, Snowy
    Plover
  *Charadrius wilsonia*, Wilson's Plover
  *Charadrius hiaticula*, Common
    Ringed Plover
  *Charadrius semipalmatus*,
    Semipalmated Plover
  *Charadrius melodus*, Piping Plover
  *Charadrius dubius*, Little Ringed
    Plover
  *Charadrius vociferus*, Killdeer
  *Charadrius montanus*, Mountain
    Plover
  *Charadrius morinellus*, Eurasian
    Dotterel
Family HAEMATOPODIDAE
  *Haematopus ostralegus*, Eurasian

    Oystercatcher
  *Haematopus palliatus*, American
    Oystercatcher
  *Haematopus bachmani*, Black
    Oystercatcher
Family RECURVIROSTRIDAE
  *Himantopus himantopus*, Black-
    winged Stilt
  *Himantopus mexicanus*, Black-
    necked Stilt
  *Recurvirostra americana*, American
    Avocet
Family JACANIDAE
  *Jacana spinosa*, Northern Jacana
Family SCOLOPACIDAE
Subfamily SCOLOPACINAE
  *Xenus cinereus*, Terek Sandpiper
  *Actitis hypoleucos*, Common
    Sandpiper
  *Actitis macularius*, Spotted Sandpiper
  *Tringa ochropus*, Green Sandpiper
  *Tringa solitaria*, Solitary Sandpiper
  *Tringa brevipes*, Gray-tailed Tattler
  *Tringa incana*, Wandering Tattler
  *Tringa erythropus*, Spotted Redshank
  *Tringa melanoleuca*, Greater
    Yellowlegs
  *Tringa nebularia*, Common
    Greenshank
  *Tringa guttifer*, Nordmann's
    Greenshank
  *Tringa semipalmata*, Willet
  *Tringa flavipes*, Lesser Yellowlegs
  *Tringa stagnatilis*, Marsh Sandpiper
  *Tringa glareola*, Wood Sandpiper
  *Bartramia longicauda*, Upland
    Sandpiper
  *Numenius minutus*, Little Curlew
  *Numenius borealis*, Eskimo Curlew
  *Numenius phaeopus*, Whimbrel
  *Numenius tahitiensis*, Bristle-thighed
    Curlew
  *Numenius madagascariensis*, Far
    Eastern Curlew
  *Numenius arquata*, Eurasian Curlew
  *Numenius americanus*, Long-billed
    Curlew
  *Limosa limosa*, Black-tailed Godwit
  *Limosa haemastica*, Hudsonian
    Godwit
  *Limosa lapponica*, Bar-tailed Godwit
  *Limosa fedoa*, Marbled Godwit
  *Arenaria interpres*, Ruddy Turnstone
  *Arenaria melanocephala*, Black
    Turnstone
  *Aphriza virgata*, Surfbird
  *Calidris tenuirostris*, Great Knot
  *Calidris canutus*, Red Knot
  *Calidris alba*, Sanderling
  *Calidris pusilla*, Semipalmated
    Sandpiper
  *Calidris mauri*, Western Sandpiper
  *Calidris ruficollis*, Red-necked Stint
  *Calidris minuta*, Little Stint
  *Calidris temminckii*, Temminck's
    Stint
  *Calidris subminuta*, Long-toed Stint
  *Calidris minutilla*, Least Sandpiper
  *Calidris fuscicollis*, White-rumped

Sandpiper
*Calidris bairdii*, Baird's Sandpiper
*Calidris melanotos*, Pectoral Sandpiper
*Calidris acuminata*, Sharp-tailed Sandpiper
*Calidris maritima*, Purple Sandpiper
*Calidris ptilocnemis*, Rock Sandpiper
*Calidris alpina*, Dunlin
*Calidris ferruginea*, Curlew Sandpiper
*Calidris himantopus*, Stilt Sandpiper
*Eurynorhynchus pygmeus*, Spoon-billed Sandpiper
*Limicola falcinellus*, Broad-billed Sandpiper
*Tryngites subruficollis*, Buff-breasted Sandpiper
*Philomachus pugnax*, Ruff
*Limnodromus griseus*, Short-billed Dowitcher
*Limnodromus scolopaceus*, Long-billed Dowitcher
*Lymnocryptes minimus*, Jack Snipe
*Gallinago delicata*, Wilson's Snipe
*Gallinago gallinago*, Common Snipe
*Gallinago stenura*, Pin-tailed Snipe
*Gallinago megala*, Swinhoe's Snipe
*Scolopax rusticola*, Eurasian Woodcock
*Scolopax minor*, American Woodcock
Subfamily PHALAROPODINAE
*Phalaropus tricolor*, Wilson's Phalarope
*Phalaropus lobatus*, Red-necked Phalarope
*Phalaropus fulicarius*, Red Phalarope
Family LARIDAE
Subfamily LARINAE
*Creagrus furcatus*, Swallow-tailed Gull
*Rissa tridactyla*, Black-legged Kittiwake
*Rissa brevirostris*, Red-legged Kittiwake
*Pagophila eburnea*, Ivory Gull
*Xema sabini*, Sabine's Gull
*Chroicocephalus philadelphia*, Bonaparte's Gull
*Chroicocephalus cirrocephalus*, Gray-hooded Gull
*Chroicocephalus ridibundus*, Black-headed Gull
*Hydrocoloeus minutus*, Little Gull
*Rhodostethia rosea*, Ross's Gull
*Leucophaeus atricilla*, Laughing Gull
*Leucophaeus pipixcan*, Franklin's Gull
*Larus belcheri*, Belcher's Gull
*Larus crassirostris*, Black-tailed Gull
*Larus heermanni*, Heermann's Gull
*Larus canus*, Mew Gull
*Larus delawarensis*, Ring-billed Gull
*Larus occidentalis*, Western Gull
*Larus livens*, Yellow-footed Gull
*Larus californicus*, California Gull
*Larus argentatus*, Herring Gull
*Larus michahellis*, Yellow-legged Gull
*Larus thayeri*, Thayer's Gull
*Larus glaucoides*, Iceland Gull

*Larus fuscus*, Lesser Black-backed Gull
*Larus schistisagus*, Slaty-backed Gull
*Larus glaucescens*, Glaucous-winged Gull
*Larus hyperboreus*, Glaucous Gull
*Larus marinus*, Great Black-backed Gull
*Larus dominicanus*, Kelp Gull
Subfamily STERNINAE
*Anous stolidus*, Brown Noddy
*Anous minutus*, Black Noddy
*Procelsterna cerulea*, Blue-gray Noddy
*Gygis alba*, White Tern
*Onychoprion fuscatus*, Sooty Tern
*Onychoprion lunatus*, Gray-backed Tern
*Onychoprion anaethetus*, Bridled Tern
*Onychoprion aleuticus*, Aleutian Tern
*Sternula albifrons*, Little Tern
*Sternula antillarum*, Least Tern
*Phaetusa simplex*, Large-billed Tern
*Gelochelidon nilotica*, Gull-billed Tern
*Hydroprogne caspia*, Caspian Tern
*Chlidonias niger*, Black Tern
*Chlidonias leucopterus*, White-winged Tern
*Chlidonias hybridus*, Whiskered Tern
*Sterna dougallii*, Roseate Tern
*Sterna sumatrana*, Black-naped Tern
*Sterna hirundo*, Common Tern
*Sterna paradisaea*, Arctic Tern
*Sterna forsteri*, Forster's Tern
*Thalasseus maximus*, Royal Tern
*Thalasseus bergii*, Great Crested Tern
*Thalasseus sandvicensis*, Sandwich Tern
*Thalasseus elegans*, Elegant Tern
Subfamily RYNCHOPINAE
*Rynchops niger*, Black Skimmer
Family STERCORARIIDAE
*Stercorarius skua*, Great Skua
*Stercorarius maccormicki*, South Polar Skua
*Stercorarius pomarinus*, Pomarine Jaeger
*Stercorarius parasiticus*, Parasitic Jaeger
*Stercorarius longicaudus*, Long-tailed Jaeger
Family ALCIDAE
*Alle alle*, Dovekie
*Uria aalge*, Common Murre
*Uria lomvia*, Thick-billed Murre
*Alca torda*, Razorbill
*Cepphus grylle*, Black Guillemot
*Cepphus columba*, Pigeon Guillemot
*Brachyramphus perdix*, Long-billed Murrelet
*Brachyramphus marmoratus*, Marbled Murrelet
*Brachyramphus brevirostris*, Kittlitz's Murrelet
*Synthliboramphus hypoleucus*, Xantus's Murrelet
*Synthliboramphus craveri*, Craveri's

Murrelet
*Synthliboramphus antiquus*, Ancient Murrelet
*Ptychoramphus aleuticus*, Cassin's Auklet
*Aethia psittacula*, Parakeet Auklet
*Aethia pusilla*, Least Auklet
*Aethia pygmaea*, Whiskered Auklet
*Aethia cristatella*, Crested Auklet
*Cerorhinca monocerata*, Rhinoceros Auklet
*Fratercula arctica*, Atlantic Puffin
*Fratercula corniculata*, Horned Puffin
*Fratercula cirrhata*, Tufted Puffin
Order COLUMBIFORMES
Family COLUMBIDAE
*Patagioenas squamosa*, Scaly-naped Pigeon
*Patagioenas leucocephala*, White-crowned Pigeon
*Patagioenas flavirostris*, Red-billed Pigeon
*Patagioenas inornata*, Plain Pigeon
*Patagioenas fasciata*, Band-tailed Pigeon
*Streptopelia orientalis*, Oriental Turtle-Dove
*Zenaida asiatica*, White-winged Dove
*Zenaida aurita*, Zenaida Dove
*Zenaida macroura*, Mourning Dove
*Columbina inca*, Inca Dove
*Columbina passerina*, Common Ground-Dove
*Columbina talpacoti*, Ruddy Ground-Dove
*Leptotila verreauxi*, White-tipped Dove
*Geotrygon chrysia*, Key West Quail-Dove
*Geotrygon mystacea*, Bridled Quail-Dove
*Geotrygon montana*, Ruddy Quail-Dove
*Gallicolumba xanthonura*, White-throated Ground-Dove
*Gallicolumba stairi*, Friendly Ground-Dove
*Ptilinopus perousii*, Many-colored Fruit-Dove
*Ptilinopus porphyraceus*, Crimson-crowned Fruit-Dove
*Ptilinopus roseicapilla*, Mariana Fruit-Dove
*Ducula pacifica*, Pacific Imperial-Pigeon
Order CUCULIFORMES
Family CUCULIDAE
Subfamily CUCULINAE
*Cuculus fugax*, Hodgson's Hawk-Cuckoo
*Cuculus canorus*, Common Cuckoo
*Cuculus optatus*, Oriental Cuckoo
*Coccyzus americanus*, Yellow-billed Cuckoo
*Coccyzus minor*, Mangrove Cuckoo
*Coccyzus erythropthalmus*, Black-billed Cuckoo
*Coccyzus vieilloti*, Puerto Rican Lizard-Cuckoo

Subfamily NEOMORPHINAE
*Geococcyx californianus*, Greater
Roadrunner
Subfamily CROTOPHAGINAE
*Crotophaga ani*, Smooth-billed Ani
*Crotophaga sulcirostris*, Groove-billed
Ani
Order STRIGIFORMES
Family TYTONIDAE
*Tyto alba*, Barn Owl
Family STRIGIDAE
*Otus flammeolus*, Flammulated Owl
*Otus sunia*, Oriental Scops-Owl
*Megascops kennicottii*, Western
Screech-Owl
*Megascops asio*, Eastern Screech-Owl
*Megascops trichopsis*, Whiskered
Screech-Owl
*Megascops nudipes*, Puerto Rican
Screech-Owl
*Bubo virginianus*, Great Horned Owl
*Bubo scandiacus*, Snowy Owl
*Surnia ulula*, Northern Hawk Owl
*Glaucidium gnoma*, Northern Pygmy-
Owl
*Glaucidium brasilianum*, Ferruginous
Pygmy-Owl
*Micrathene whitneyi*, Elf Owl
*Athene cunicularia*, Burrowing Owl
*Ciccaba virgata*, Mottled Owl
*Strix occidentalis*, Spotted Owl
*Strix varia*, Barred Owl
*Strix nebulosa*, Great Gray Owl
*Asio otus*, Long-eared Owl
*Asio stygius*, Stygian Owl
*Asio flammeus*, Short-eared Owl
*Aegolius funereus*, Boreal Owl
*Aegolius acadicus*, Northern Saw-
whet Owl
*Ninox scutulata*, Brown Hawk-Owl
Order CAPRIMULGIFORMES
Family CAPRIMULGIDAE
Subfamily CHORDEILINAE
*Chordeiles acutipennis*, Lesser
Nighthawk
*Chordeiles minor*, Common
Nighthawk
*Chordeiles gundlachii*, Antillean
Nighthawk
Subfamily CAPRIMULGINAE
*Nyctidromus albicollis*, Common
Pauraque
*Phalaenoptilus nuttallii*, Common
Poorwill
*Caprimulgus carolinensis*, Chuck-
will's-widow
*Caprimulgus ridgwayi*, Buff-collared
Nightjar
*Caprimulgus vociferus*, Eastern Whip-
poor-will
*Caprimulgus arizonae*, Mexican
Whip-poor-will
*Caprimulgus noctitherus*, Puerto
Rican Nightjar
*Caprimulgus indicus*, Gray Nightjar
Order APODIFORMES
Family APODIDAE
Subfamily CYPSELOIDINAE
*Cypseloides niger*, Black Swift

*Streptoprocne zonaris*, White-collared
Swift
Subfamily CHAETURINAE
*Chaetura pelagica*, Chimney Swift
*Chaetura vauxi*, Vaux's Swift
*Chaetura brachyura*, Short-tailed
Swift
*Hirundapus caudacutus*, White-
throated Needletail
*Aerodramus spodiopygius*, White-
rumped Swiftlet
*Aerodramus bartschi*, Mariana
Swiftlet
Subfamily APODINAE
*Apus apus*, Common Swift
*Apus pacificus*, Fork-tailed Swift
*Apus melba*, Alpine Swift
*Aeronautes saxatalis*, White-throated
Swift
*Tachornis phoenicobia*, Antillean
Palm-Swift
Family TROCHILIDAE
Subfamily TROCHILINAE
*Colibri thalassinus*, Green Violetear
*Anthracothorax prevostii*, Green-
breasted Mango
*Anthracothorax dominicus*, Antillean
Mango
*Anthracothorax viridis*, Green Mango
*Eulampis jugularis*, Purple-throated
Carib
*Eulampis holosericeus*, Green-
throated Carib
*Orthorhyncus cristatus*, Antillean
Crested Hummingbird
*Chlorostilbon maugaeus*, Puerto Rican
Emerald
*Cynanthus latirostris*, Broad-billed
Hummingbird
*Hylocharis leucotis*, White-eared
Hummingbird
*Hylocharis xantusii*, Xantus's
Hummingbird
*Amazilia beryllina*, Berylline
Hummingbird
*Amazilia yucatanensis*, Buff-bellied
Hummingbird
*Amazilia rutila*, Cinnamon
Hummingbird
*Amazilia violiceps*, Violet-crowned
Hummingbird
*Lampornis clemenciae*, Blue-throated
Hummingbird
*Eugenes fulgens*, Magnificent
Hummingbird
*Heliomaster constantii*, Plain-capped
Starthroat
*Calliphlox evelynae*, Bahama
Woodstar
*Calothorax lucifer*, Lucifer
Hummingbird
*Archilochus colubris*, Ruby-throated
Hummingbird
*Archilochus alexandri*, Black-chinned
Hummingbird
*Calypte anna*, Anna's Hummingbird
*Calypte costae*, Costa's Hummingbird
*Stellula calliope*, Calliope
Hummingbird

*Atthis heloisa*, Bumblebee
Hummingbird
*Selasphorus platycercus*, Broad-tailed
Hummingbird
*Selasphorus rufus*, Rufous
Hummingbird
*Selasphorus sasin*, Allen's
Hummingbird
Order TROGONIFORMES
Family TROGONIDAE
Subfamily TROGONINAE
*Trogon elegans*, Elegant Trogon
*Euptilotis neoxenus*, Eared Quetzel
Order UPUPIFORMES
Family UPUPIDAE
*Upupa epops*, Eurasian Hoopoe
Order CORACIIFORMES
Family ALCEDINIDAE
Subfamily HALCYONINAE
*Todiramphus cinnamominus*,
Micronesian Kingfisher
*Todiramphus chloris*, Collared
Kingfisher
Subfamily CERYLINAE
*Megaceryle torquata*, Ringed
Kingfisher
*Megaceryle alcyon*, Belted Kingfisher
*Chloroceryle americana*, Green
Kingfisher
Order PICIFORMES
Family PICIDAE
Subfamily JYNGINAE
*Jynx torquilla*, Eurasian Wryneck
Subfamily PICINAE
*Melanerpes lewis*, Lewis's
Woodpecker
*Melanerpes portoricensis*, Puerto
Rican Woodpecker
*Melanerpes erythrocephalus*, Red-
headed Woodpecker
*Melanerpes formicivorus*, Acorn
Woodpecker
*Melanerpes uropygialis*, Gila
Woodpecker
*Melanerpes aurifrons*, Golden-fronted
Woodpecker
*Melanerpes carolinus*, Red-bellied
Woodpecker
*Sphyrapicus thyroideus*, Williamson's
Sapsucker
*Sphyrapicus varius*, Yellow-bellied
Sapsucker
*Sphyrapicus nuchalis*, Red-naped
Sapsucker
*Sphyrapicus ruber*, Red-breasted
Sapsucker
*Dendrocopos major*, Great Spotted
Woodpecker
*Picoides scalaris*, Ladder-backed
Woodpecker
*Picoides nuttallii*, Nuttall's
Woodpecker
*Picoides pubescens*, Downy
Woodpecker
*Picoides villosus*, Hairy Woodpecker
*Picoides arizonae*, Arizona
Woodpecker
*Picoides borealis*, Red-cockaded
Woodpecker

*Picoides albolarvatus*, White-headed Woodpecker
*Picoides dorsalis*, American Three-toed Woodpecker
*Picoides arcticus*, Black-backed Woodpecker
*Colaptes auratus*, Northern Flicker
*Colaptes chrysoides*, Gilded Flicker
*Dryocopus pileatus*, Pileated Woodpecker
*Campephilus principalis*, Ivory-billed Woodpecker
Order PASSERIFORMES
Family TYRANNIDAE
Subfamily ELAENIINAE
*Camptostoma imberbe*, Northern Beardless-Tyrannulet
*Myiopagis viridicata*, Greenish Elaenia
*Elaenia martinica*, Caribbean Elaenia
*Elaenia albiceps*, White-crested Eleania
Subfamily FLUVICOLINAE
*Mitrephanes phaeocercus*, Tufted Flycatcher
*Contopus cooperi*, Olive-sided Flycatcher
*Contopus pertinax*, Greater Pewee
*Contopus sordidulus*, Western Wood-Pewee
*Contopus virens*, Eastern Wood-Pewee
*Contopus caribaeus*, Cuban Pewee
*Contopus hispaniolensis*, Hispaniolan Pewee
*Contopus latirostris*, Lesser Antillean Pewee
*Empidonax flaviventris*, Yellow-bellied Flycatcher
*Empidonax virescens*, Acadian Flycatcher
*Empidonax alnorum*, Alder Flycatcher
*Empidonax traillii*, Willow Flycatcher
*Empidonax minimus*, Least Flycatcher
*Empidonax hammondii*, Hammond's Flycatcher
*Empidonax wrightii*, Gray Flycatcher
*Empidonax oberholseri*, Dusky Flycatcher
*Empidonax difficilis*, Pacific-slope Flycatcher
*Empidonax occidentalis*, Cordilleran Flycatcher
*Empidonax fulvifrons*, Buff-breasted Flycatcher
*Sayornis nigricans*, Black Phoebe
*Sayornis phoebe*, Eastern Phoebe
*Sayornis saya*, Say's Phoebe
*Pyrocephalus rubinus*, Vermilion Flycatcher
Subfamily TYRANNINAE
*Myiarchus tuberculifer*, Dusky-capped Flycatcher
*Myiarchus cinerascens*, Ash-throated Flycatcher
*Myiarchus nuttingi*, Nutting's Flycatcher
*Myiarchus crinitus*, Great Crested Flycatcher
*Myiarchus tyrannulus*, Brown-crested Flycatcher
*Myiarchus sagrae*, La Sagra's Flycatcher
*Myiarchus antillarum*, Puerto Rican Flycatcher
*Pitangus sulphuratus*, Great Kiskadee
*Myiozetetes similis*, Social Flycatcher
*Myiodynastes luteiventris*, Sulphur-bellied Flycatcher
*Legatus leucophalus*, Piratic Flycatcher
*Empidonomus varius*, Variegated Flycatcher
*Empidonomus aurantioatrocristatus*, Crowned Slaty Flycatcher
*Tyrannus melancholicus*, Tropical Kingbird
*Tyrannus couchii*, Couch's Kingbird
*Tyrannus vociferans*, Cassin's Kingbird
*Tyrannus crassirostris*, Thick-billed Kingbird
*Tyrannus verticalis*, Western Kingbird
*Tyrannus tyrannus*, Eastern Kingbird
*Tyrannus dominicensis*, Gray Kingbird
*Tyrannus caudifasciatus*, Loggerhead Kingbird
*Tyrannus forficatus*, Scissor-tailed Flycatcher
*Tyrannus savana*, Fork-tailed Flycatcher
*Pachyramphus aglaiae*, Rose-throated Becard
*Tityra semifasciata*, Masked Tityra
Family LANIIDAE
*Lanius cristatus*, Brown Shrike
*Lanius ludovicianus*, Loggerhead Shrike
*Lanius excubitor*, Northern Shrike
Family VIREONIDAE
*Vireo griseus*, White-eyed Vireo
*Vireo crassirostris*, Thick-billed Vireo
*Vireo latimeri*, Puerto Rican Vireo
*Vireo bellii*, Bell's Vireo
*Vireo atricapilla*, Black-capped Vireo
*Vireo vicinior*, Gray Vireo
*Vireo flavifrons*, Yellow-throated Vireo
*Vireo plumbeus*, Plumbeous Vireo
*Vireo cassinii*, Cassin's Vireo
*Vireo solitarius*, Blue-headed Vireo
*Vireo huttoni*, Hutton's Vireo
*Vireo gilvus*, Warbling Vireo
*Vireo philadelphicus*, Philadelphia Vireo
*Vireo olivaceus*, Red-eyed Vireo
*Vireo flavoviridis*, Yellow-green Vireo
*Vireo altiloquus*, Black-whiskered Vireo
*Vireo magister*, Yucatan Vireo
Family CORVIDAE
*Perisoreus canadensis*, Gray Jay
*Psilorhinus morio*, Brown Jay
*Cyanocorax yncas*, Green Jay
*Gymnorhinus cyanocephalus*, Pinyon Jay
*Cyanocitta stelleri*, Steller's Jay
*Cyanocitta cristata*, Blue Jay
*Aphelocoma coerulescens*, Florida Scrub-Jay
*Aphelocoma insularis*, Island Scrub-Jay
*Aphelocoma californica*, Western Scrub-Jay
*Aphelocoma ultramarina*, Mexican Jay
*Nucifraga columbiana*, Clark's Nutcracker
*Pica hudsonia*, Black-billed Magpie
*Pica nuttalli*, Yellow-billed Magpie
*Corvus kubaryi*, Mariana Crow
*Corvus brachyrhynchos*, American Crow
*Corvus caurinus*, Northwestern Crow
*Corvus leucognaphalus*, White-necked Crow
*Corvus imparatus*, Tamaulipas Crow
*Corvus ossifragus*, Fish Crow
*Corvus hawaiiensis*, Hawaiian Crow
*Corvus cryptoleucus*, Chihuahuan Raven
*Corvus corax*, Common Raven
Family ALAUDIDAE
*Alauda arvensis*, Sky Lark
*Eremophila alpestris*, Horned Lark
Family HIRUNDINIDAE
Subfamily HIRUNDININAE
*Progne subis*, Purple Martin
*Progne cryptoleuca*, Cuban Martin
*Progne dominicensis*, Caribbean Martin
*Progne chalybea*, Gray-breasted Martin
*Progne elegans*, Southern Martin
*Progne tapera*, Brown-chested Martin
*Tachycineta bicolor*, Tree Swallow
*Tachycineta albilinea*, Mangrove Swallow
*Tachycineta thalassina*, Violet-green Swallow
*Tachycineta cyaneoviridis*, Bahama Swallow
*Stelgidopteryx serripennis*, Northern Rough-winged Swallow
*Riparia riparia*, Bank Swallow
*Petrochelidon pyrrhonota*, Cliff Swallow
*Petrochelidon fulva*, Cave Swallow
*Hirundo rustica*, Barn Swallow
*Delichon urbicum*, Common House-Martin
Family PARIDAE
*Poecile carolinensis*, Carolina Chickadee
*Poecile atricapillus*, Black-capped Chickadee
*Poecile gambeli*, Mountain Chickadee
*Poecile sclateri*, Mexican Chickadee
*Poecile rufescens*, Chestnut-backed Chickadee
*Poecile hudsonicus*, Boreal Chickadee
*Poecile cinctus*, Gray-headed Chickadee
*Baeolophus wollweberi*, Bridled Titmouse

*Baeolophus inornatus*, Oak Titmouse
*Baeolophus ridgwayi*, Juniper
Titmouse
*Baeolophus bicolor*, Tufted Titmouse
*Baeolophus atricristatus*, Black-
crested Titmouse
Family REMIZIDAE
*Auriparus flaviceps*, Verdin
Family AEGITHALIDAE
*Psaltriparus minimus*, Bushtit
Family SITTIDAE
Subfamily SITTINAE
*Sitta canadensis*, Red-breasted
Nuthatch
*Sitta carolinensis*, White-breasted
Nuthatch
*Sitta pygmaea*, Pygmy Nuthatch
*Sitta pusilla*, Brown-headed Nuthatch
Family CERTHIIDAE
Subfamily CERTHIINAE
*Certhia americana*, Brown Creeper
Family TROGLODYTIDAE
*Campylorhynchus brunneicapillus*,
Cactus Wren
*Salpinctes obsoletus*, Rock Wren
*Catherpes mexicanus*, Canyon Wren
*Thryothorus sinaloa*, Sinaloa Wren
*Thryothorus ludovicianus*, Carolina
Wren
*Thryomanes bewickii*, Bewick's Wren
*Troglodytes aedon*, House Wren
*Troglodytes pacificus*, Pacific Wren
*Troglodytes hiemalis*, Winter Wren
*Cistothorus platensis*, Sedge Wren
*Cistothorus palustris*, Marsh Wren
Family POLIOPTILIDAE
*Polioptila caerulea*, Blue-gray
Gnatcatcher
*Polioptila californica*, California
Gnatcatcher
*Polioptila melanura*, Black-tailed
Gnatcatcher
*Polioptila nigriceps*, Black-capped
Gnatcatcher
Family CINCLIDAE
*Cinclus mexicanus*, American Dipper
Family REGULIDAE
*Regulus satrapa*, Golden-crowned
Kinglet
*Regulus calendula*, Ruby-crowned
Kinglet
Family PHYLLOSCOPIDAE
*Phylloscopus trochilus*, Willow
Warbler
*Phylloscopus sibilatrix*, Wood
Warbler
*Phylloscopus fuscatus*, Dusky Warbler
*Phylloscopus proregulus*, Pallas's
Leaf-Warbler
*Phylloscopus inornatus*, Yellow-
browed Warbler
*Phylloscopus borealis*, Arctic Warbler
Family SYLVIIDAE
*Sylvia curruca*, Lesser Whitethroat
*Chamaea fasciata*, Wrentit
Family ACROCEPHALIDAE
*Acrocephalus luscinia*, Nightingale
Reed-Warbler
*Acrocephalus familiaris*, Millerbird

*Acrocephalus schoenobaenus*, Sedge
Warbler
Family MEGALURIDAE
*Locustella ochotensis*, Middendorff's
Grasshopper-Warbler
*Locustella lanceolata*, Lanceolated
Warbler
Family MUSCICAPIDAE
*Ficedula narcissina*, Narcissus
Flycatcher
*Ficedula mugimaki*, Mugimaki
Flycatcher
*Ficedula albicilla*, Taiga Flycatcher
*Muscicapa sibirica*, Dark-sided
Flycatcher
*Muscicapa griseisticta*, Gray-streaked
Flycatcher
*Muscicapa dauurica*, Asian Brown
Flycatcher
*Muscicapa striata*, Spotted Flycatcher
Family TURDIDAE
*Monticola solitarius*, Blue Rock-
Thrush
*Luscinia sibilans*, Rufous-tailed Robin
*Luscinia calliope*, Siberian Rubythroat
*Luscinia svecica*, Bluethroat
*Luscinia cyane*, Siberian Blue Robin
*Tarsiger cyanurus*, Red-flanked
Bluetail
*Oenanthe oenanthe*, Northern
Wheatear
*Saxicola torquatus*, Stonechat
*Sialia sialis*, Eastern Bluebird
*Sialia mexicana*, Western Bluebird
*Sialia currucoides*, Mountain
Bluebird
*Myadestes townsendi*, Townsend's
Solitaire
*Myadestes myadestinus*, Kamao
*Myadestes lanaiensis*, Olomao
*Myadestes obscurus*, Omao
*Myadestes palmeri*, Puaiohi
*Catharus aurantiirostris*, Orange-
billed Nightingale-Thrush
*Catharus mexicanus*, Black-headed
Nightingale-Thrush
*Catharus fuscescens*, Veery
*Catharus minimus*, Gray-cheeked
Thrush
*Catharus bicknelli*, Bicknell's Thrush
*Catharus ustulatus*, Swainson's
Thrush
*Catharus guttatus*, Hermit Thrush
*Hylocichla mustelina*, Wood Thrush
*Turdus obscurus*, Eyebrowed Thrush
*Turdus naumanni*, Dusky Thrush
*Turdus pilaris*, Fieldfare
*Turdus grayi*, Clay-colored Thrush
*Turdus assimilis*, White-throated
Thrush
*Turdus rufopalliatus*, Rufous-backed
Robin
*Turdus migratorius*, American Robin
*Turdus plumbeus*, Red-legged Thrush
*Ixoreus naevius*, Varied Thrush
*Ridgwayia pinicola*, Aztec Thrush
Family MIMIDAE
*Dumetella carolinensis*, Gray Catbird
*Melanoptila glabrirostris*, Black

Catbird
*Mimus polyglottos*, Northern
Mockingbird
*Mimus gundlachii*, Bahama
Mockingbird
*Oreoscoptes montanus*, Sage Thrasher
*Toxostoma rufum*, Brown Thrasher
*Toxostoma longirostre*, Long-billed
Thrasher
*Toxostoma bendirei*, Bendire's
Thrasher
*Toxostoma curvirostre*, Curve-billed
Thrasher
*Toxostoma redivivum*, California
Thrasher
*Toxostoma crissale*, Crissal Thrasher
*Toxostoma lecontei*, Le Conte's
Thrasher
*Melanotis caerulescens*, Blue
Mockingbird
*Margarops fuscatus*, Pearly-eyed
Thrasher
Family STURNIDAE
*Sturnus philippensis*, Chestnut-
cheeked Starling
*Sturnus cineraceus*, White-cheeked
Starling
Family PRUNELLIDAE
*Prunella montanella*, Siberian
Accentor
Family MOTACILLIDAE
*Motacilla tschutschensis*, Eastern
Yellow Wagtail
*Motacilla citreola*, Citrine Wagtail
*Motacilla cinerea*, Gray Wagtail
*Motacilla alba*, White Wagtail
*Anthus trivialis*, Tree Pipit
*Anthus hodgsoni*, Olive-backed Pipit
*Anthus gustavi*, Pechora Pipit
*Anthus cervinus*, Red-throated Pipit
*Anthus rubescens*, American Pipit
*Anthus spragueii*, Sprague's Pipit
Family BOMBYCILLIDAE
*Bombycilla garrulus*, Bohemian
Waxwing
*Bombycilla cedrorum*, Cedar
Waxwing
Family PTILOGONATIDAE
*Ptilogonys cinereus*, Gray Silky-
flycatcher
*Phainopepla nitens*, Phainopepla
Family PEUCEDRAMIDAE
*Peucedramus taeniatus*, Olive
Warbler
Family CALCARIIDAE
*Calcarius lapponicus*, Lapland
Longspur
*Calcarius ornatus*, Chestnut-collared
Longspur
*Calcarius pictus*, Smith's Longspur
*Rhynchophanes mccownii*, McCown's
Longspur
*Plectrophenax nivalis*, Snow Bunting
*Plectrophenax hyperboreus*, McKay's
Bunting
Family PARULIDAE
*Vermivora bachmanii*, Bachman's
Warbler
*Vermivora cyanoptera*, Blue-winged

Warbler
*Vermivora chrysoptera*, Golden-winged Warbler
*Oreothlypis peregrina*, Tennessee Warbler
*Oreothlypis celata*, Orange-crowned Warbler
*Oreothlypis ruficapilla*, Nashville Warbler
*Oreothlypis virginiae*, Virginia's Warbler
*Oreothlypis crissalis*, Colima Warbler
*Oreothlypis luciae*, Lucy's Warbler
*Oreothlypis superciliosa*, Crescent-chested Warbler
*Parula americana*, Northern Parula
*Parula pitiayumi*, Tropical Parula
*Dendroica petechia*, Yellow Warbler
*Dendroica pensylvanica*, Chestnut-sided Warbler
*Dendroica magnolia*, Magnolia Warbler
*Dendroica tigrina*, Cape May Warbler
*Dendroica caerulescens*, Black-throated Blue Warbler
*Dendroica coronata*, Yellow-rumped Warbler
*Dendroica nigrescens*, Black-throated Gray Warbler
*Dendroica chrysoparia*, Golden-cheeked Warbler
*Dendroica virens*, Black-throated Green Warbler
*Dendroica townsendi*, Townsend's Warbler
*Dendroica occidentalis*, Hermit Warbler
*Dendroica fusca*, Blackburnian Warbler
*Dendroica dominica*, Yellow-throated Warbler
*Dendroica graciae*, Grace's Warbler
*Dendroica adelaidae*, Adelaide's Warbler
*Dendroica pinus*, Pine Warbler
*Dendroica kirtlandii*, Kirtland's Warbler
*Dendroica discolor*, Prairie Warbler
*Dendroica palmarum*, Palm Warbler
*Dendroica castanea*, Bay-breasted Warbler
*Dendroica striata*, Blackpoll Warbler
*Dendroica cerulea*, Cerulean Warbler
*Dendroica angelae*, Elfin-woods Warbler
*Mniotilta varia*, Black-and-white Warbler
*Setophaga ruticilla*, American Redstart
*Protonotaria citrea*, Prothonotary Warbler
*Helmitheros vermivorum*, Worm-eating Warbler
*Limnothlypis swainsonii*, Swainson's Warbler
*Seiurus aurocapilla*, Ovenbird
*Parkesia noveboracensis*, Northern Waterthrush
*Parkesia motacilla*, Louisiana

Waterthrush
*Oporornis formosus*, Kentucky Warbler
*Oporornis agilis*, Connecticut Warbler
*Oporornis philadelphia*, Mourning Warbler
*Oporornis tolmiei*, MacGillivray's Warbler
*Geothlypis trichas*, Common Yellowthroat
*Geothlypis poliocephala*, Gray-crowned Yellowthroat
*Wilsonia citrina*, Hooded Warbler
*Wilsonia pusilla*, Wilson's Warbler
*Wilsonia canadensis*, Canada Warbler
*Cardellina rubrifrons*, Red-faced Warbler
*Myioborus pictus*, Painted Redstart
*Myioborus miniatus*, Slate-throated Redstart
*Euthlypis lachrymosa*, Fan-tailed Warbler
*Basileuterus culicivorus*, Golden-crowned Warbler
*Basileuterus rufifrons*, Rufous-capped Warbler
*Icteria virens*, Yellow-breasted Chat
Family THRAUPIDAE
*Nesospingus speculiferus*, Puerto Rican Tanager
*Spindalis zena*, Western Spindalis
*Spindalis portoricensis*, Puerto Rican Spindalis
Family EMBERIZIDAE
*Sporophila torqueola*, White-collared Seedeater
*Tiaris olivaceus*, Yellow-faced Grassquit
*Tiaris bicolor*, Black-faced Grassquit
*Loxigilla portoricensis*, Puerto Rican Bullfinch
*Arremonops rufivirgatus*, Olive Sparrow
*Pipilo chlorurus*, Green-tailed Towhee
*Pipilo maculatus*, Spotted Towhee
*Pipilo erythrophthalmus*, Eastern Towhee
*Aimophila ruficeps*, Rufous-crowned Sparrow
*Melozone fusca*, Canyon Towhee
*Melozone crissalis*, California Towhee
*Melozone aberti*, Abert's Towhee
*Peucaea carpalis*, Rufous-winged Sparrow
*Peucaea botterii*, Botteri's Sparrow
*Peucaea cassinii*, Cassin's Sparrow
*Peucaea aestivalis*, Bachman's Sparrow
*Spizella arborea*, American Tree Sparrow
*Spizella passerina*, Chipping Sparrow
*Spizella pallida*, Clay-colored Sparrow
*Spizella breweri*, Brewer's Sparrow
*Spizella pusilla*, Field Sparrow
*Spizella wortheni*, Worthen's Sparrow
*Spizella atrogularis*, Black-chinned Sparrow
*Pooecetes gramineus*, Vesper Sparrow

*Chondestes grammacus*, Lark Sparrow
*Amphispiza quinquestriata*, Five-striped Sparrow
*Amphispiza bilineata*, Black-throated Sparrow
*Amphispiza belli*, Sage Sparrow
*Calamospiza melanocorys*, Lark Bunting
*Passerculus sandwichensis*, Savannah Sparrow
*Ammodramus savannarum*, Grasshopper Sparrow
*Ammodramus bairdii*, Baird's Sparrow
*Ammodramus henslowii*, Henslow's Sparrow
*Ammodramus leconteii*, Le Conte's Sparrow
*Ammodramus nelsoni*, Nelson's Sparrow
*Ammodramus caudacutus*, Saltmarsh Sparrow
*Ammodramus maritimus*, Seaside Sparrow
*Passerella iliaca*, Fox Sparrow
*Melospiza melodia*, Song Sparrow
*Melospiza lincolnii*, Lincoln's Sparrow
*Melospiza georgiana*, Swamp Sparrow
*Zonotrichia albicollis*, White-throated Sparrow
*Zonotrichia querula*, Harris's Sparrow
*Zonotrichia leucophrys*, White-crowned Sparrow
*Zonotrichia atricapilla*, Golden-crowned Sparrow
*Junco hyemalis*, Dark-eyed Junco
*Junco phaeonotus*, Yellow-eyed Junco
*Emberiza leucocephalos*, Pine Bunting
*Emberiza chrysophrys*, Yellow-browed Bunting
*Emberiza pusilla*, Little Bunting
*Emberiza rustica*, Rustic Bunting
*Emberiza elegans*, Yellow-throated Bunting
*Emberiza aureola*, Yellow-breasted Bunting
*Emberiza variabilis*, Gray Bunting
*Emberiza pallasi*, Pallas's Bunting
*Emberiza schoeniclus*, Reed Bunting
Family CARDINALIDAE
*Piranga flava*, Hepatic Tanager
*Piranga rubra*, Summer Tanager
*Piranga olivacea*, Scarlet Tanager
*Piranga ludoviciana*, Western Tanager
*Piranga bidentata*, Flame-colored Tanager
*Rhodothraupis celaeno*, Crimson-collared Grosbeak
*Cardinalis cardinalis*, Northern Cardinal
*Cardinalis sinuatus*, Pyrrhuloxia
*Pheucticus chrysopeplus*, Yellow Grosbeak
*Pheucticus ludovicianus*, Rose-breasted Grosbeak
*Pheucticus melanocephalus*, Black-headed Grosbeak

*Cyanocompsa parellina,* Blue Bunting
*Passerina caerulea,* Blue Grosbeak
*Passerina amoena,* Lazuli Bunting
*Passerina cyanea,* Indigo Bunting
*Passerina versicolor,* Varied Bunting
*Passerina ciris,* Painted Bunting
*Spiza americana,* Dickcissel
Family ICTERIDAE
*Dolichonyx oryzivorus,* Bobolink
*Agelaius phoeniceus,* Red-winged
   Blackbird
*Agelaius tricolor,* Tricolored
   Blackbird
*Agelaius humeralis,* Tawny-
   shouldered Blackbird
*Agelaius xanthomus,* Yellow-
   shouldered Blackbird
*Sturnella magna,* Eastern Meadowlark
*Sturnella neglecta,* Western
   Meadowlark
*Xanthocephalus xanthocephalus,*
   Yellow-headed Blackbird
*Euphagus carolinus,* Rusty Blackbird
*Euphagus cyanocephalus,* Brewer's
   Blackbird
*Quiscalus quiscula,* Common Grackle
*Quiscalus major,* Boat-tailed Grackle
*Quiscalus mexicanus,* Great-tailed
   Grackle
*Quiscalus niger,* Greater Antillean
   Grackle
*Molothrus bonariensis,* Shiny
   Cowbird
*Molothrus aeneus,* Bronzed Cowbird
*Molothrus ater,* Brown-headed
   Cowbird
*Icterus portoricensis,* Puerto Rican
   Oriole
*Icterus wagleri,* Black-vented Oriole
*Icterus spurius,* Orchard Oriole
*Icterus cucullatus,* Hooded Oriole
*Icterus pustulatus,* Streak-backed
   Oriole
*Icterus bullockii,* Bullock's Oriole
*Icterus gularis,* Altamira Oriole

*Icterus graduacauda,* Audubon's
   Oriole
*Icterus galbula,* Baltimore Oriole
*Icterus parisorum,* Scott's Oriole
Family FRINGILLIDAE
Subfamily FRINGILLINAE
*Fringilla coelebs,* Common Chaffinch
*Fringilla montifringilla,* Brambling
Subfamily EUPHONIINAE
*Euphonia musica,* Antillean Euphonia
Subfamily CARDUELINAE
*Leucosticte tephrocotis,* Gray-crowned
   Rosy-Finch
*Leucosticte atrata,* Black Rosy-Finch
*Leucosticte australis,* Brown-capped
   Rosy-Finch
*Pinicola enucleator,* Pine Grosbeak
*Carpodacus erythrinus,* Common
   Rosefinch
*Carpodacus purpureus,* Purple Finch
*Carpodacus cassinii,* Cassin's Finch
*Carpodacus mexicanus,* House Finch
*Loxia curvirostra,* Red Crossbill
*Loxia leucoptera,* White-winged
   Crossbill
*Acanthis flammea,* Common Redpoll
*Acanthis hornemanni,* Hoary Redpoll
*Spinus spinus,* Eurasian Siskin
*Spinus pinus,* Pine Siskin
*Spinus psaltria,* Lesser Goldfinch
*Spinus lawrencei,* Lawrence's
   Goldfinch
*Spinus tristis,* American Goldfinch
*Chloris sinica,* Oriental Greenfinch
*Pyrrhula pyrrhula,* Eurasian Bullfinch
*Coccothraustes vespertinus,* Evening
   Grosbeak
*Coccothraustes coccothraustes,*
   Hawfinch
Subfamily DREPANIDINAE
*Telespiza cantans,* Laysan Finch
*Telespiza ultima,* Nihoa Finch
*Psittirostra psittacea,* Ou
*Loxioides bailleui,* Palila
*Pseudonestor xanthophrys,* Maui

   Parrotbill
*Hemignathus virens,* Hawaii Amakihi
*Hemignathus flavus,* Oahu Amakihi
*Hemignathus kauaiensis,* Kauai
   Amakihi
*Hemignathus ellisianus,* Greater
   Akialoa
*Hemignathus lucidus,* Nukupuu
*Hemignathus munroi,* Akiapolaau
*Magumma parva,* Anianiau
*Oreomystis bairdi,* Akikiki
*Oreomystis mana,* Hawaii Creeper
*Paroreomyza maculata,* Oahu
   Alauahio
*Paroreomyza flammea,* Kakawahie
*Paroreomyza montana,* Maui
   Alauahio
*Loxops caeruleirostris,* Akekee
*Loxops coccineus,* Akepa
*Vestiaria coccinea,* Iiwi
*Palmeria dolei,* Akohekohe
*Himatione sanguinea,* Apapane
*Melamprosops phaeosoma,* Poo-uli

## PART 21—[AMENDED]

■ 3. Revise the authority citation for part 21 to read as follows:

**Authority:** Pub. L. 65–186, 40 Stat. 755 (1918) (16 U.S.C. 703–712), as amended.

### § 21.3 [Amended]

■ 4. In § 21.3, amend the definition of "Raptor" by adding the words "the Order Accipitriformes," immediately before the words "the Order Falconiformes" and adding a comma after "Falconiformes".

Dated: September 17, 2013.

**Michael J. Bean,**

*Acting Principal Deputy Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 2013–26061 Filed 10–31–13; 8:45 am]

**BILLING CODE 4310–55–P**